# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RONNIE BARRETT,**<br>6307 59th Avenue<br>Riverdale, MD 20737<br><br>        **Plaintiff,**<br><br>      **v.**<br><br>**ANDRE CHREKY,**<br>548 River Bend Road<br>Falls Church, VA 22066<br><br>**ANDRE CHREKY SALON/ANDRE CHREKY INC,**<br>1604 K Street, N.W.<br>Washington, D.C. 22006<br><br>     **SERVE:**<br>     CT Corporations System<br>     1015 15th Street, N.W.<br>     Suite 1000<br>     Washington, D.C. 20005<br><br>       **and**<br><br>**SPAC, LLC,**<br>1604 K Street, N.W.<br>Washington, D.C. 22006<br><br>     **SERVE:**<br>     CT Corporations System<br>     1015 15th Street, N.W.<br>     Suite 1000<br>     Washington, D.C. 20005<br><br>       **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  **Civil Action No. _____**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT FOR DECLARATORY
## AND MONETARY RELIEF AND JURY DEMAND

### Preliminary Statement

1.      This is a civil action against the Andre Chreky Salon/Andre Chreky Inc. ("the
Salon" or "ACI") for declaratory and equitable relief and monetary damages for injuries plaintiff
Ronnie Barrett has sustained as a result of defendant Andre Chreky's sexual harassment and
retaliation against her, in violation of the District of Columbia Human Rights Act, D.C. Code §
2-1401.01 et seq. ("DCHRA"), and for the Salon's negligent supervision of defendant Andre
Chreky.  This is also an action against defendant Andre Chreky ("Mr. Chreky"), in his individual
capacity, for aiding and abetting the sexual harassment and retaliation to which plaintiff was
subjected, in violation of the DCHRA, D.C. Code § 2-1401.62.  Mr. Chreky routinely subjected
Ms. Barrett and other female employees to unwelcome touching, sexual demands, vulgar and
sexually explicit remarks, threats, ridicule, intimidation and other abuse.  Mr. Chreky used his
position as the owner and operator of one of the nation's premier hair salons to attempt to coerce
and intimidate attractive, vulnerable immigrant female employees, like Ms. Barrett, to perform
sexual acts, including oral sex and group sex, and to otherwise engage in unwelcome physical
and sexual contact with him.  Mr. Chreky engaged in an egregious pattern of humiliating and
degrading behavior towards Ms. Barrett, and other female employees, promising that he would
provide them career advancement, trips to the White House, and contact with President George
W. Bush, First Lady Laura Bush, and other members of the Bush family if they acceded to his
sexual demands, and retaliating against them with a range of adverse actions and abusive
behavior when they rejected these sexual advances.

2.      This is also an action against defendant Salon and defendant Chreky for their
willful failure to pay plaintiff and other non-exempt employees overtime wages in violation of
the Fair Labor Standards Act, 29 U.S.C. § 207 et seq. ("FLSA") and the District of Columbia

Wage and Hour Act, D.C. Code § 32-1002 et seq.("DCWHA"); and for their unlawful

withholding of compensation, and their conversion of tips earned by plaintiff, in violation of the

District of Columbia Wage Payment and Collection Act, D.C. Code § 32-1301(1)

("DCWPCA"). Despite having been previously cited by the Department of Labor ("DOL") for

widespread overtime violations, and being ordered to pay back overtime to Salon employees,

including Ms. Barrett, defendant ACI engaged in widespread FLSA and DCWHA violations,

willfuly depriving Ms. Barrett and other Salon employees of overtime pay to which they are

legally entitled.

3.      This is also an action against SPAC, Inc., the owner of the property that houses

defendant Salon for negligence and for breach of its duty to protect business invitees, including

Ms. Barrett.

## Jurisdiction and Venue

4.      This Court has jurisdiction over plaintiff's claims pursuant to 28 U.S.C. §§ 1331

and 1343(a)(3) as this matter contains a federal question. This court has supplemental

jurisdiction over plaintiff's state law claims under 28 U.S.C. § 1367(a). This Court also has

jurisdiction over plaintiff's claims pursuant to 28 U.S.C. § 1332(a)(1), as there is complete

diversity of citizenship and the amount in controversy exceeds $75,000.

5.      Venue is proper in this district under 28 U.S.C. §§ 1391(a)(2) and (b)(1), as the

events or omissions giving rise to Ms. Barrett's claims occurred in the District of Columbia.

## Parties

6.      Ronnie Barrett is a citizen of Maryland who resides at 6307 59th Avenue,

Riverdale, MD 20737. At various times during the period of September 2003 to December

2005, Ms. Barrett was employed by Andre Chreky Inc., a corporation owned and operated by

Andre Chreky. Defendant Chreky was plaintiff's supervisor. At all times relevant to this Complaint, Ms. Barrett was an "employee" within the meaning of the DCHRA, D.C. Code § 2-1401.2(9), and was an "employee" engaged in "commerce" within the meaning of the FLSA, 29 U.S.C. §§ 203(b), 203(e). Ms. Barrett was not an exempt employee under the FLSA. At all times relevant to this Complaint, Ms. Barrett was an "employee" within the meaning of the DCWHA, D.C. Code § 32-1002(3).

7.      Defendant Andre Chreky is a citizen of Virginia who resides at 548 River Bend Road, Falls Church, VA 22066. Mr. Chreky is part owner of defendants Andre Chreky Inc. and SPAC, LLC. Mr. Chreky is an employer within the meaning of the DCHRA, D.C. Code § 2-1401.2(10), the FLSA, 29 U.S.C. § 203(d), the DCWHA, D.C. Code § 32-1002(3), and the DCWPCA, D.C. Code § 32-1302.

8.      Andre Chreky Inc. ("ACI" or "the Salon") is a District of Columbia corporation with its principal place of business at 1604 K Street N.W., Washington, D.C. 20006. ACI was formed for the purposes of owning and operating the Andre Chreky Salon and Spa. ACI is owned and operated by defendant Chreky and his wife, Serena Chreky. Andre Chreky is ACI's President and Treasurer. ACI is an employer within the meaning of the DCHRA, D.C. Code § 2-1401.2(10), the FLSA, 29 U.S.C. § 203(d), the DCWHA, D.C. Code § 32-1002(3), and the DCWPCA, D.C. Code § 32-1302.

9.      SPAC, LLC ("SPAC") is a District of Columbia corporation with its principal place of business at 1604 K Street N.W., Washington, D.C. 20006. SPAC owns the property that houses the Andre Chreky Salon and Spa. Upon information and belief, ACI rents the location 1604 K Street N.W., Washington, D.C. 20006, from SPAC. SPAC is owned and operated by defendant Chreky and his wife, Serena Chreky. Defendant Chreky is a "Member" of the

corporation.

## Factual Allegations

10.    Ms. Barrett was born in Brazil and immigrated to the United States in 1985. In 1992, Ms. Barrett earned her cosmetology license from Aspen Beauty Academy in Maryland and began her career as a hair stylist.

11.    In 1994, Ms. Barrett began working for defendant Andre Chreky at Piaf's, a salon owned by Mr. Chreky's sister, and then at Daniel's, a salon owned by Mr. Chreky's brother. In 1997, Mr. Chreky opened his own salon, the Andre Chreky Salon and Spa, and hired Ms. Barrett as his assistant. Over time, Ms. Barrett transitioned to the higher paying position of hair stylist. She remained in that position until May 1998, when she resigned.

12.    Ms. Barrett worked at the Roche Salon in Georgetown from 1998 to 2001, and then at the Toka Salon in Georgetown from 2002 to 2003.

## Sexual Harassment and Retaliation Allegations

13.    In or around late Summer 2003, Mr. Chreky became aware that Ms. Barrett was looking for a new job and offered her a position as a stylist with the Salon. Mr. Chreky asked Ms. Barrett what she was looking for in terms of salary. Ms. Barrett responded that she wanted to earn a bi-weekly salary of $2,500. Mr. Chreky responded that he did not want to start her at that salary. Instead he offered her a bi-weekly salary of $1,900 and told her that she would receive a review and an increase to $2,500 after three months. Ms. Barrett was hesitant to accept the offer given the manner in which defendant Chreky treated her during her first period of employment with the Salon. Ultimately, she accepted the position because the Salon had established itself as the premier salon in the District of Columbia serving the most elite clientele and paying its stylists top-end salaries.

14.    Upon the commencement of her employment with the Salon, defendants ACI and Mr. Chreky required Ms. Barrett to sign a non-compete agreement as a condition of her employment. Pursuant to this agreement, Ms. Barrett was obligated to refrain from competing with the business of the Salon for a period of six months, and within a radius of five miles, after termination of her employment.

15.    Almost immediately upon her return to the Salon, Mr. Chreky, who is more than 20 years plaintiff's senior, began sexually harassing Ms. Barrett. He showed an obsessive interest in Ms. Barrett and stalked her at the workplace, often isolating her in secluded areas of the Salon where he grabbed her and attempted to kiss and grope her. On each such occasion, Ms. Barrett rejected Mr. Chreky's unwelcome advances and touching. Mr. Chreky reacted with anger and disgust, but he remained undeterred.

16.    In February 2004, after Ms. Barrett returned from her honeymoon, Mr. Chreky's obsession with Ms. Barrett escalated, as did his unwelcome sexual attention and advances. He inundated Ms. Barrett with inappropriate comments about her husband, denigrating his sexual prowess. Mr. Chreky repeatedly propositioned Ms. Barrett and suggested that she have sex with him, because she undoubtedly "needed some extra sex." Ms. Barrett told Mr. Chreky that his remarks, often uttered in front of coworkers, made her very uncomfortable. Mr. Chreky laughed derisively in response to Ms. Barrett's complaints and requests that he cease his sexually harassing conduct.

17.    When Ms. Barrett rejected Mr. Chreky's advances, he retaliated against her by, inter alia, removing clients from her schedule, as he had also done with Jennifer Thong and other female employees who had rejected his advances, and directing Salon receptionists to make changes to Ms. Barrett's schedule moving clients from one stylist to another in a manner that

harmed Ms. Barrett. Mr. Chreky threatened Salon receptionists with termination if they revealed to the stylists that clients were being removed from their schedules at his direction. By secretly reassigning both new clients and Ms. Barrett's established clients to other stylists, Mr. Chreky deliberately depressed her earnings. He also deliberately damaged Ms. Barrett's future earnings by interfering with her ability to develop a loyal client base.

18.    In February 2004, Ms. Barrett asked Mr. Chreky for the raise he had promised she would be given after working at the Salon for three months. Mr. Chreky directed her to meet him at the end of the day in his office on the fifth floor to discuss her request, which she did. Ms. Barrett was aware that Mr. Chreky had previously isolated other female employees in his office and tried to force himself on them sexually. Accordingly, when she entered Mr. Chreky's office she made sure the door behind her remained open and sat down in the visitor's chair. Mr. Chreky began the meeting by stating that Sammy, his assistant, had just gone out to buy lemonade, "so we have a little time." As soon as Ms. Barrett heard this statement, she got up and tried to leave the office. Mr. Chreky jumped up and grabbed her below the neck and shoulder blades and forcefully shoved her back into the chair. He put one hand on his belt as if to open his pants and said, "Come on, just give me a blow job." Ms. Barrett pushed him away and ran out of the office.

19.    Mr. Chreky called Ms. Barrett at home that evening and apologized for his misconduct. He assured her that he would not repeat this conduct and would leave her alone in the future.

20.    Ms. Barrett was terrified of Mr. Chreky and humiliated as a result of his conduct and began active consideration of leaving the Salon. Because she had entered into a non-compete agreement with the Salon she was extremely concerned that if she left the Salon and

went to work elsewhere, Mr. Chreky would retaliate against her by filing a lawsuit to prevent her from working. Indeed, in staff meetings Mr. Chreky had made repeated threats to Salon stylists that if they left to work elsewhere, he would go after them in court and "take them to the cleaners."

21.    In the weeks following the incident referred to in paragraph 18, above, Ms Barrett actively avoided Mr. Chreky and he too stayed clear of Ms. Barrett. However, as time went on, he again began focusing unwelcome attention on her and made demeaning and taunting remarks to her. He regularly alluded to the incident in his office referred to in paragraph 18, above, and taunted her by asking her if she wanted to "go to the fifth floor" with him. Mr. Chreky made these comments in the presence of other stylists, who became aware that he was targeting Ms. Barrett for especially hostile and demeaning treatment.

22.    Ms. Barrett was terrified that defendant Chreky would try to force himself on her again. Ms. Barrett began looking for a new job, but was not able to find a comparable position.

23.    In April 2004, after learning that Ms. Barrett was pregnant, Mr. Chreky became increasingly obsessed with Ms. Barrett and her body. He made constant comments to Ms. Barrett about her breasts, often in front of other employees, saying things like, "Ronnie, your boobs are really swelling," "Come on, let me see them," and "Umm they look good." These and other comments continued throughout Ms. Barrett's pregnancy, and caused her great humiliation and embarrassment.

24.    As Ms. Barrett's pregnancy progressed, Mr. Chreky made repeated attempts to touch her breasts. He often brushed up against her while she was working, and deliberately touched her breasts. Mr. Chreky also routinely slapped or spanked Ms. Barrett on her buttocks, using enough force to leave red marks on Ms. Barrett's skin that remained for hours. On each

occasion, Ms. Barrett told him to stop this unwelcome behavior.

25.    Mr. Chreky retaliated against Ms. Barrett by subjecting her to punishing working conditions while she was pregnant.  He refused to let Ms. Barrett sit on a stool while cutting or styling a client's hair, even though this was a perfectly acceptable way to service a client.  He regularly came into the kitchen when Ms. Barrett was on her lunch break resting her legs, and insisted that she immediately return to the floor to assist him with clients, even though there were other stylists available who were not on their breaks.

26.    In late May 2004, Ms. Barrett began experiencing potentially serious, unexplained vaginal bleeding.  She asked Mr. Chreky if she could leave work early to see her obstetrician.  Mr. Chreky refused to let her leave.  Despite his refusal, Ms. Barrett went to the Emergency Room and was placed on bed rest.  The treating physician told her that she needed to spend less time standing up and needed to take breaks and rest during the work day.  When Ms. Barrett returned to work, she informed Mr. Chreky about her medical condition and her physician's direction to spend less time standing and to rest during the work day.  Mr. Chreky refused to accommodate Ms. Barrett's medical condition and told her that if he made allowances for her and her pregnancy, he would have to do so for everyone else.  On this and subsequent occasions he told her that if she did "not like the way things were done at the Salon, the front door is open."

27.    By July of 2004, Ms. Barrett began experiencing extreme swelling in her feet, ankles and legs.  Her physician advised her that the swelling was caused by her standing for long periods of time and advised her that it was medically necessary to sit while working and to take breaks during the work day.  Ms. Barrett informed Mr. Chreky about her physician's direction to her.  Once again, he refused to accommodate her medical condition and told her that she knew

where the front door was if she did not like the way he ran the Salon. Mr. Chreky continued his retaliatory demands that Ms. Barrett stand while cutting hair and interrupting her breaks with demands that she return to the floor to assist him even though there were other employees who were available to do so.

28.    In September 2004, Mr. Chreky put his hand down Ms. Barrett's shirt and tried to grab her breasts insisting that her "boobs looked sexy." Ms. Barrett pulled his hand away and demanded that he stop touching her. Mr. Chreky responded angrily to this rejection.

29.    Mr. Chreky routinely retaliated against Ms. Barrett whenever she rejected his physical advances. He did so by treating her in an angry and hostile manner, removing clients from her work schedule, reducing her client load, and altering her work schedule to make it less remunerative. Ms. Barrett became aware of these practices when a number of her loyal and longstanding clients contacted her and told her that when they arrived at the Salon, the receptionist said that "Ronnie was not available because of a mistake in the books," or that "Ronnie is booked." Mr. Chreky also directed Salon receptionists not to assign any new clients to her.

30.    By late September 2004, Ms. Barrett developed extreme swelling in her lower extremities as a result of Mr. Chreky's demand that she stand all day while working. At various times he taunted her and suggested that if she acted nicer to him, he would take good care of her. Ms. Barrett understood this to be a thinly veiled threat. As a result of the harassment and physical abuse, Ms. Barrett's swelling worsened and she was diagnosed with hypertension. Mr. Chreky refused to let her rest at the Salon or to put her legs up, as her doctor had directed.

31.    In December 2004, Ms. Barrett reminded Mr. Chreky of the promise he made at the time of hiring her to give her a raise after she had worked at the Salon for three months. He

excoriated her for making this request, accused her of being greedy and caring only about money, and once again told her that she knew where the front door was if she did not like how he was running the Salon.

32.    In January 2005, Ms. Barrett developed preeclampsia, a life threatening condition for both her and her unborn child. Ms. Barrett's baby was born almost a month prematurely and required a lengthy period of hospitalization. As a result of the complications of her delivery, and in order to care for her premature baby, Ms. Barrett was forced to remain away from work for five and a half months.

33.    Ms. Barrett returned to the Salon in May of 2005, deeply in debt from medical bills and lost income during her absence. As a result, she was especially vulnerable to Mr. Chreky's harassment and abuse, which resumed immediately upon her return to the Salon.

34.    Over Ms. Barrett's strong objections, Mr. Chreky pleaded with her to let him see her breasts and to taste her breast milk. He made frequent comments about her body, often in front of other stylists, and tried repeatedly to touch her breasts and spank her buttocks. Ms. Barrett attempted to ignore his offensive remarks and behavior because she desperately needed her job and the income it provided for her family. Ms. Barrett also enlisted the assistance of other Salon employees to ensure that she would not be left alone with Mr. Chreky.

35.    On or around November 15, 2005, Mr. Chreky became even more aggressive in making unwelcomed propositions and sexual advances towards Ms. Barrett. He demanded that she leave her husband and "start a relationship" with him. Mr. Chreky insisted that Ms. Barrett "needed a lover because American men are not good in bed." He told her that they could have "hot sex," that he would help her get an apartment, that they could be lovers, and that he wanted to be her "sugar daddy." Other stylists were present and overheard these comments, adding to

Ms. Barrett's humiliation.

36.     Ms. Barrett told him that she loved her husband and was not interested in having a relationship with him. In response, Mr. Chreky became physically aggressive, and deliberately brushed his body against hers and touched her in a sexual manner. He then ran his hand down the front of her shirt over her breast as other stylists looked on. Ms. Barrett was highly offended and humiliated by this conduct. Mr. Chreky appeared to take pleasure in her discomfort and continued to try to convince Ms. Barrett to show him her breasts and to allow him to touch them.

37.     After Ms. Barrett rejected these unwelcome advances, Mr. Chreky once again took actions to alter her work schedule, to deprive her of her best clients, to deny her new clients, and to diminish her client base and income. He also treated her with increased hostility and disdain, refused to talk to her, denigrated her abilities to Salon employees and clients, and assigned her to stock supplies in the stock room, which necessitated that she carry supplies from the ground floor to the fourth floor. This was hard physical labor.

38.     In late November 2005, Ms. Barrett went out to lunch with several other female stylists from the Salon. They each recounted the ways in which Mr. Chreky had propositioned and touched them, and confirmed that his behavior was getting more overt and aggressive. They also concurred with Ms.Barrett's observation that Mr. Chreky had once again targeted her for abuse, intimidation and ridicule.

39.     On December 6, 2005, which was a Saturday, Ms. Barrett clocked out at 6:00 p.m. after her work shift had ended. She remained at the Salon to attend a baby shower for a Salon employee that was to take place at the Salon at 7:00 p.m., after the Salon closed. Shortly after Ms. Barrett clocked out, Amal Darri, who served as Mr. Chreky's General Manager, directed her to stock products (e.g., shampoos and other hair care products that were sold at the

Salon). She stated "Andre said to tell you that if you are going to be downstairs, you have to do the retail." Ms. Barrett informed her that she had already clocked out for the day and had already stocked the color room. Ms. Darri then went upstairs to report this conversation to Mr. Chreky.

40.    A short time later Ms. Darri came back and informed Ms. Barrett that Mr. Chreky was very upset that she would not stock the supply room. She told Ms. Barrett, in the presence of several other employees, that Mr. Chreky did not want to see her face in the Salon and that he wanted Ms. Barrett out of the building immediately. She said that Mr. Chreky would call Ms. Barrett when he wanted her to come back. Ms. Barrett responded that she would clock back in and stock the supplies as Mr. Chreky had requested. Ms. Darri responded, "he wants you out of here and wants you to leave the building immediately." Ms. Barrett then told her co-workers that she would clock in and help them. Ms. Darri responded that "Andre is really mad at you and is going to fire you."

41.    At that point, Ms. Barrett became very frightened of Mr. Chreky and gathered all of her belongings from her locker. After the baby shower, Mr. Chreky approached Ms. Barrett in a threatening manner and began screaming at her. He said "didn't I fucking tell you to leave the building? When I tell you to do something, I expect you to do it." When Ms. Barrett tried to explain that she had not refused to stock the supplies and that she had simply told Ms. Darri that she had already clocked out, he became even more irrate and began cursing at Ms. Barrett and demanding that she leave at once. Ms. Barrett asked Mr. Chreky if he was firing her. Mr. Chreky taunted her to quit so that she would not be able to collect unemployment compensation. When Ms. Barrett refused to quit and asked him again if he was firing her he responded, "you can take it as you want. If you want to collect unemployment then you are fired."

42.     Ms. Barrett attempted to handle her departure in a professional and non-confrontational manner. Mr. Chreky flew into an uncontrollable rage and screamed and cursed at her in front of the Salon staff, leveling invectives and profanity at her. He demanded that she leave the building at once, physically menaced her, and forced her to back out of the Salon to avoid being struck by him.

43.     At various times throughout her employment at the Salon, Mr. Chreky boasted to Ms. Barrett and other Salon employees about his ability and willingness to assault individuals who angered him, including a homeless man who stood outside of the Salon. Through these boasts and erratic outbursts of anger, violence and assaults, Mr. Chreky terrified and manipulated Salon employees, including Ms. Barrett and other women whom he subjected to a sexually hostile and abusive environment.

44.     Throughout the period of her employment at the Salon, defendant Salon and Chreky created and maintained a sexually hostile work environment, by, inter alia, subjecting female employees, including Ms. Barrett and Jennifer Thong, to unwelcome sexual touching, sexual demands, vulgar and sexually explicit remarks, threats, ridicule, and intimidation. Mr. Chreky referred to women, including clients, in sexist and sexualized terms, and routinely called Salon patrons "bitches" among other sexist and demeaning terms. The harassment was so severe and pervasive that it altered the terms and conditions of plaintiff's employment. Mr. Chreky preyed on young, vulnerable immigrant women who were economically dependent on their jobs at the Salon and ill-equipped to assert their rights. On almost a daily basis Mr. Chreky made lewd comments about female employees' bodies and sex lives, and subjected them to unwelcome touching. On a number of occasions, Mr. Chreky cornered female employees, including Ms. Barrett, exposed himself, forced their heads towards his groin and demanded that

they give him a blow job. Ms. Barrett and other employees were forced to resort to elaborate protective plans to try to avoid being assaulted by him. Ms. Barrett was aware of Mr. Chreky's sexually abusive treatment of other employees, which further contributed to the sexually hostile work environment. Mr. Chreky did not treat male employees in this manner.

45.    Ms. Barrett and approximately twenty other different female employees complained to Maurice Clarke, then the Salon's Senior Manager, about Mr. Chreky's inappropriate sexual advances and sexual harassment of them. In response, Mr. Clark passed on the complaints to Mr. Chreky and told him that he was opening himself and the Salon up to unnecessary liability and that it was inappropriate for him to pursue these employees. Mr. Chreky responded, "I have an attorney." At no time did Mr. Chreky ever deny to Mr. Clark that he had engaged in these behaviors. Rather, he repeatedly responded, "This is my business, and I will run it the way I want."

46.    Mr. Chreky boasted to Ms. Barrett and others about having consensual sexual relationships with female Salon employees and was seen in various states of undress while in his office or in the Salon bathroom with different female employees. Mr. Chreky gave preferential treatment to the employees with whom he had a sexual relationship. Ms. Barrett and other female employees were aware of his sexual relationship with these employees and his preferential treatment of these employees, which further contributed to the sexually hostile work environment and underscored Mr. Chreky's threats that if Ms. Barrett wanted to advance in the workplace, she needed to submit to his unwelcome advances.

47.    Mr. Chreky also boasted to his employees that he was in fact the father in a high-profile and contested paternity suit brought by a former employee with whom he had had a long-term sexual relationship, and bragged that "no press was bad press." He made clear that he

would fight legally any claim, even meritorious ones, brought against him and would "bring down" anyone who took legal action against him.

48.    At various times throughout her employment, Mr. Chreky told Ms. Barrett that she needed to be nice to him and treat him well to get ahead.  He repeatedly stated that if she wanted to become the Salon's head colorist or to go to the White House with him to have contact with President Bush or his family, she needed to come to the Salon early in the morning, before others arrived.  Ms. Barrett understood this to be a crude sexual proposition, and a thinly veiled threat that if she wanted to advance in her career she needed to accede to his sexual demands. Ms. Barrett refused to accede to these demands, and Mr. Chreky then refused to take her to the White House or give her other high profile assignments.

49.    At various times throughout her employment, increasing in frequency towards the end of her employment, Ms. Barrett complained to Mr. Clarke about Mr. Chreky's sexual harassment and abuse of her.  Mr. Clark confirmed to Ms. Barrett that many other female employees had complained to him about Mr. Chreky's misconduct, but that his behavior only got worse over time.

50.    By letter dated September 15, 2006, Ms. Barrett put defendants on notice of her claims of sexual harassment in violation of the D.C. Human Rights Act.  On November 8, 2006, Ms. Barrett filed a charge under the DCHRA with the District of Columbia Office of Human Rights.  On September 22, 2006, Jennifer Thong filed a sexual harassment suit against defendants Chreky and the Salon.  On October 18, 2006, this suit was removed to the United States District Court for the District of Columbia, and is captioned Thong v. Andre Chreky Salon, et al., Civil Action No. 1:06-CV-01807-RCL.  While Ms. Barrett's charge and Ms. Thong's lawsuit was pending, defendants, through their agents at the Salon, threatened and

attempted to intimidate witnesses into changing their testimony, including witnesses who had

provided sworn statements corroborating the allegations contained herein that were submitted to

the District of Columbia Office of Human Rights.  On January 20, 2007, Ms. Barrett amended

her charge.  On January 30, 2007, Ms. Barrett requested that the DCOHR dismiss her charge.

Ms. Barrett has properly exhausted her administrative remedies.

### Wage and Hour Violations, Conversion and Breach of Contract

51.     In or around 2003, the Department of Labor ("DOL") investigated and cited the

Salon for overtime violations and required the Salon to pay its stylists, including Ms. Barrett,

back overtime pay.  Despite the findings by the DOL, Mr. Chreky stated "nobody gets

overtime."

52.     In breach of Mr. Chreky's agreement to pay Ms. Barrett at the rate of $1,900

every two weeks, the Salon paid Ms. Barrett at the rate of $21.00 per hour but only if she worked

a minimum of 45 hours per week.  Mrs. Chreky, who managed the Salon payroll, told Ms.

Barrett that her promised salary of $1,900 every two weeks was the same as $21.00 per hour so

long as Ms. Barrett worked 45 hours each week.  He further advised Ms. Barrett that if she

worked fewer than 45 hours in a given week, the Salon would dock her pay.

53.     Consistent with this direction, and in knowing and willful disregard of their legal

obligations under the FLSA, defendants notified all Salon stylists, including Ms. Barrett, that the

Salon had reclassified all of their positions to salaried positions.  This "reclassification"

notwithstanding, the Salon actually treated the stylists as though they were hourly employees.

Mr. Chreky continued to schedule stylists to work a minimum of 45 hours per week and required

them to clock in and out.  Mr. Chreky told the stylists that their "salaries" were calculated

according to an hourly rate and if they did not "meet their hours" their pay would be docked

accordingly. Mr. Chreky in fact docked their pay checks when they failed to work 45 hours and did not increase their checks to account for their overtime hours (all hours above 40 in a week), including the hours he required them to work above the Salon's 45-hour work requirement.

54. Mr. Chreky required Ms. Barrett and other Salon employees to turn over their tips to the Salon. On repeated occasions, Mr. Chreky refused to provide Ms. Barrett with her tips, either by directly refusing to give her some or all of the tip envelopes, or by falsely telling her that she had not received any tips.

**COUNT ONE -- DISCRIMINATION ON THE BASIS OF SEX IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT, D.C. CODE ANN. § 2-1401.01 ET SEQ. AGAINST DEFENDANTS ACI AND ANDRE CHREKY.**

55. Plaintiff hereby incorporates as though restated each of the factual allegations set forth in paragraphs 1 through 54 above.

56. The District of Columbia Human Rights Act ("DCHRA") prohibits discrimination on the basis of sex in the enjoyment of all benefits, privileges, terms, and conditions of employment.

57. At all times relevant to this Complaint ACI was an "employer" within the meaning of the DCHRA.

58. At all times relevant to this Complaint Plaintiff was an "employee" within the meaning of the DCHRA.

59. The Salon created and maintained a sexually hostile work environment in which discriminatory intimidation, ridicule, and insult were so severe and pervasive that it altered the conditions of Ms. Barrett's employment and created a sexually hostile work environment, in violation of the DCHRA. Mr. Chreky subjected Ms. Barrett to unwelcomed sexual advances, sexually explicit remarks, touching, and numerous attempts to coerce or force sexual contact.

This conduct was humiliating and physically threatening to Ms. Barrett.

60.    AIC is liable for Mr. Chreky actions because he was, at all time relevant to this Complaint, the owner and operator of the Salon and AIC

61.    On December 6, 2005, Mr. Chreky terminated Ms. Barrett's employment.

62.    In the alternative, through his official actions as owner and operator of the Salon, Mr. Chreky subjected Ms. Barrett to working conditions that were so intolerable that a reasonable person would have felt compelled to resign. Mr. Barrett endured repeated unwelcomed sexual advances, assaults, batteries, and retaliatory changes to her work schedule that greatly diminished her earning potential and caused a significant change in her benefits, leading to Ms. Barrett's constructive discharge on or around December 5, 2005.

63.    AIC is vicariously liable for Mr. Chreky's actions in terminating and/or constructively discharging Ms. Barrett.

64.    Defendant Andre Chreky aided, abetted, compelled and coerced the sexual harassment and termination complained of herein, in violation of the DCHRA.

65.    Defendants' actions have directly and proximately caused Ms. Barrett substantial economic loss and damage to her career and professional reputation, humiliation, and pain and suffering.

66.    Defendants' actions were wanton, reckless or in willful disregard of Ms. Barrett's legal rights.

**COUNT TWO --    RETALIATION IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT, D.C. CODE ANN. § 2-1401.01 ET SEQ. AGAINST DEFENDANTS ANDRE CHREKY AND ACI.**

67.    Plaintiff hereby incorporates as though restated each of the factual allegations set forth in paragraphs 1 through 66 above.

68.     The DCHRA prohibits retaliation against any employee for engaging in opposition to what she reasonably in good-faith believes constitutes unlawful discrimination under the DCHRA, including the rejection of sexual advances and other forms of sexual harassment.

69.     Ms. Barrett engaged in protected activity by opposing treatment she reasonably believed constituted unlawful discrimination, including repeatedly rejecting Mr. Chreky unwelcomed sexual advances, opposing this misconduct by complaining to Mr. Chreky about his harassing behavior, and asking him to stop, and reporting Mr. Chreky's behavior to Mr. Clarke, the Salon's then General Manager.

70.     Defendants ACI and Chreky took adverse action against Ms. Barrett, including, inter alia, taking away Ms. Barrett's clients, directing Salon employees to alter her schedule, denying her appropriate compensation and other benefits, subjecting her to retaliatory harassment after she opposed his unwelcomed sexual advances, and terminating and/or constructively discharging her. Mr. Chreky's retaliatory actions were so adverse that they would have dissuaded a reasonable Salon employee from making or supporting a charge of discrimination.

71.     Defendants' retaliatory actions were causally connected to Ms. Barrett's protected activity.

72.     At all times relevant to this Complaint, Mr. Chreky used his position as the owner and operator of the Salon and Ms. Barrett's supervisor to retaliate against her.

73.     Defendant Andre Chreky aided, abetted, compelled and coerced the retaliation complained of herein, in violation of the DCHRA.

74.     Defendants' actions have directly and proximately caused Ms. Barrett substantial

economic loss and damage to her career and professional reputation, humiliation and pain and suffering.

75.     Defendants' actions were wanton, reckless or in willful indifference to Ms. Barrett legal rights.

**COUNT THREE  --  VIOLATION OF THE FAIR LABOR STANDARDS ACT, 29 U.S.C. § 207 ET SEQ. AGAINST DEFENDANTS AIC AND CHREKY.**

76.     Ms. Barrett hereby incorporates as though restated each of the factual allegations set forth in paragraphs 1 through 75 above.

77.     The Fair Labor Standards Act ("FLSA") requires an employer to pay covered employees one and one half times the regular rate of pay for hours worked in excess of 40 hours per week.

78.     At all relevant times, defendants ACI and Chreky were "employers" engaged in interstate commerce within the meaning of the FLSA.

79.     At all times relevant, Ms. Barrett was a "covered employee" within the meaning of the FLSA, and was therefore entitled to the protections of the FLSA, including the right to be paid one and a half times her regular rate of pay for all hours worked in excess of 40 hours in any given work-week.

80.     From September 2003 until December of 2004, defendants required Ms. Barrett to work more than 40 hours per week without paying her one and one-half times her normal rate of pay.   During this same period, defendants took and retained plaintiff's tips, in violation of FLSA.

81.     Defendants were investigated and cited by the Department of Labor in 2003 for overtime violations and were on notice about the Salon's legal obligation to pay overtime wages

to Ms. Barrett and other Salon stylists. They failed to do so in knowing and willful disregard of their legal obligations under the FLSA.

82.    As a direct and proximate result of defendants' willful violation of FLSA, Ms. Barrett has suffered economic loss  and is entitled to an award of unpaid overtime, liquidated damages and other equitable relief.

**COUNT FOUR -    VIOLATION OF THE DISTRICT OF COLUMBIA WAGE AND HOUR ACT, D.C. CODE § 32-1002 ET SEQ. AGAINST DEFENDANTS ACI AND CHREKY.**

83.    Ms. Barrett hereby incorporates as though restated each of the factual allegations set forth in paragraphs 1 through 82 above.

84.    The District of Columbia Wage and Hour Act ("DCWHA") requires employers to pay covered employees one and one half times the regular rate of pay for hours worked in excess of 40 hours per week.

85.    At all relevant times, defendants ACI and Chreky were "employers" within the meaning of the DCWHA.

86.    At all relevant times Ms. Barrett was a "covered employee" within the meaning of the DCWHA, and was entitled to the protections of the DCWHA including the right to be paid one and a half time her regular rate of pay for all hours worked in excess of 40 hours in any given work-week.

87.    From September 2003 until December of 2004, defendants required Ms. Barrett to work more that 40 hours per week without overtime pay in violation of the DCWHA.  During this same period, defendants took and retained plaintiff's tips, in violation of the DCWHA..

88.    As a direct and proximate result of defendants' wilful violation of the DCWHA, Ms. Barrett has suffered economic loss, and is entitled to an award of unpaid overtime,

liquidated damages and other equitable relief.

**COUNT FIVE -**     **VIOLATION OF THE DISTRICT OF COLUMBIA WAGE PAYMENT AND COLLECTION ACT, D.C. CODE § 32-1301(1), AGAINST DEFENDANTS AIC AND CHREKY.**

89.    Ms. Barrett hereby incorporates as though restated each of the factual allegations set forth in paragraphs 1 through 88 above.

90.    At all times relevant to this Complaint, defendants ACI and Chreky were "employers" within the meaning of DCWPCA.

91.    At all times relevant to this Complaint, Ms. Barrett was an "employee" within the meaning of the DCWPCA.

92.    Under the DCWPA, defendants were obligated to pay plaintiff all wages due for work that she performed, including all earned tips that were held by the Salon on Ms. Barrett's behalf.

93.    In breach of their obligation, defendants routinely failed to pay or deliberately underpaid plaintiff for the tips she earned.

94.    As a direct and proximate result of defendants' willful violation of the DCWPCA, Ms. Barrett has suffered economic loss, and is entitled to an award of unpaid compensation in the form of withheld tips and other equitable relief.

**COUNT SIX --**     **CONVERSION AGAINST DEFENDANTS CHREKY AND ACI.**

95.    Plaintiff incorporates herein by reference all of the allegations contained in paragraphs one through 94.

96.    The taking and retention of the Plaintiff's tips constitutes the unlawful taking and exercise of ownership and control by the defendants over Ms. Barrett's personal property. Such a taking constituted a deprivation of plaintiff's rights to such property.

97.    Mr. Chreky routinely diverted some or all of Ms. Barrett's tips to ACI which he owned and operated.

98.    Defendants Andre Chreky and ACI are liable to plaintiff for all tips they unlawfully retained by Mr. Chreky and/or ACI, compensatory and punitive damages.

**COUNT SEVEN  --  NEGLIGENT SUPERVISION AGAINST
DEFENDANT AIC.**

99.    Plaintiff incorporates herein by reference all of the allegations contained in paragraphs one through 98.

100.    In the District of Columbia, employers have a duty to use reasonable care in supervision and retention of employees. ACI owed a duty to Ms. Barrett to protect her from unreasonable risk of foreseeable harm. Mr. Chreky's persistent sexual harassment and assaultive conduct toward Ms. Barrett and numerous other female employees was well known to ACI.

101.    ACI, a corporation owned and controlled by Andre and Serena Chreky, owed Ms. Barrett the duty to supervise its managers and to ensure that those who had authority over employees carried out their responsibilities with due care. ACI, through its owners and principal officers, Andre and Serena Chreky, had actual and constructive knowledge that Andre Chreky was likely to and did in fact harass, assault, and batter female employees, as well as carrying out his duties as a superior and manager in a dangerous manner. AIC had actual knowledge of Mr. Chreky's persistent harassing and assaultive conduct toward Ms. Barrett and other stylists through Andre Chreky, its President and Treasurer. ACI had a duty to adequately train, supervise and restrain its principal manager, Andre Chreky, in order to prevent the foreseeable harm to Ms. Barrett and the other stylists under his supervision.

102.    AIC breached its duty to protect its employees from unreasonable risk of harm, and this breach was the proximate cause of Ms. Barrett's injuries and the cause of the ensuing

damages to plaintiff.

### COUNT EIGHT  -  NEGLIGENCE AGAINST DEFENDANT SPAC, LLC.

103.    Plaintiff incorporates herein by reference all of the allegations contained in

paragraphs one through 102.

104.    In the District of Columbia, landlords have a duty to protect invitees from

foreseeable risk of harm caused by third parties on its property.

105.    SPAC, LLC, a corporation owned and controlled by Andre and Serena Chreky,

leased the premises at 1604 K Street, NW, Washington D.C. ("the premises"), to AIC and the

Salon where Ms. Barrett worked.

106.    Ms. Barrett's employment at the Salon made her an invitee of SPAC, LLC by

virtue of the fact that she worked at the premises.

107.    SPAC, LLC had actual and constructive knowledge that Andre Chreky was likely

to and did in fact harass, assault and batter female employees on the premises it leased to AIC.

108.    SPAC, LLC failed to warn or protect Ms. Barrett from the ongoing harassment

and assaults by Andre Chreky.

109.    SPAC, LLC's failure to warn or protect Ms. Barrett from Mr. Chreky's

harassment, assaults and batteries was the proximate cause of injuries to Ms. Barrett and caused

the ensuing damages to Ms. Barrett.

### COUNT NINE – BREACH OF CONTRACT AGAINST DEFENDANT ACI.

110.    Plaintiff hereby incorporates by reference as though restated each of the factual

allegations contained in paragraphs 1 through 109 above.

111.    Plaintiff and defendant Salon entered into a valid, binding, and enforceable

contract through which it promised to pay Ms. Barrett the equivalent of $1,900 every two weeks

for the first three months of her employment and to increase her salary after completion of the third month of employment.

112.    Defendant Salon breached this contract by failing to pay plaintiff the salary it was contractually obligated to pay her and by failing to give her a salary increase after her first three months of employment.

113.    Defendant Salon's actions described above directly and proximately have caused, and continue to cause, plaintiff to suffer economic damages.

114.    Defendant Salon has committed this breach of contract in bad faith and with actual malice.

## REQUESTED RELIEF

WHEREFORE, plaintiff prays this Court for the following relief:

1.     Enter a judgment in plaintiff's favor and against Andre Chreky and ACI for discrimination on the basis of sex in violation of the District of Columbia Human Rights Act, D.C. Code Ann. § 2-1401.01 et seq.;

2.     Enter a judgment in plaintiff's favor and against Andre Chreky and ACI for retaliation in violation of the District of Columbia Human Rights Act, D.C. Code Ann. § 2-1401.01 et seq.;

3.     Enter a judgment in plaintiff's favor and against ACI for violations of the Fair Labor Standards Act, 29 U.S.C. § 207 et seq.;

4.     Enter a judgment in plaintiff's favor and against ACI for violations of the District of Columbia Wage and Hour Act, D.C. Code § 32-1002 et seq.;

5.     Enter a judgment in plaintiff's favor and against ACI for violations of the District of Columbia Wage Payment and Collection Act, D.C. Code § 32-1301(1);

6.      Enter a judgment in plaintiff's favor and against Andre Chreky ACI for Conversion;

7.      Enter a judgment in plaintiff's favor and against ACI for Negligent Supervision;

8.      Enter a judgment in plaintiff's favor and against SPAC, LLC for Negligence;

9.      An award to plaintiff of compensatory damages in an amount to be proven at trial, but in any event not less than $1,000,000;

10.     An award to plaintiff of punitive damages in an amount to be proven at trial, but in any event not less than $3,000,000;

11.     An award of reasonable attorneys' fees and costs; and

12.     All other relief the court deems just.

Respectfully submitted,


Debra S. Katz (Bar No. 411861)
Katz, Marshall & Banks, LLP
1718 Connecticut Avenue, N.W.
6th Floor
Washington, D.C. 20009
(202) 299-1140
(202) 299-1148 (fax)


Ari M. Wilkenfeld (Bar. No. 461063)
Katz, Marshall & Banks, LLP
1718 Connecticut Avenue, N.W.
Sixth Floor
Washington, D.C. 20009
(202) 299-1140
(202) 299-1148 (fax)


Attorneys for Plaintiff Ronnie Barrett


Dated: February 1, 2007

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **RONNIE BARRETT,** ) | |
| 6307 59th Avenue ) | |
| Riverdale, MD 20737 ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **ANDRE CHREKY,** ) | |
| 548 River Bend Road ) | |
| Falls Church, VA 22066 ) | |
| ) | |
| **ANDRE CHREKY SALON/ANDRE CHREKY INC,** ) | |
| 1604 K Street, N.W. ) | |
| Washington, D.C. 22006 ) | |
| ) **Civil Action No. _____** | |
| **SERVE:** ) | |
| CT Corporations System ) | |
| 1015 15th Street, N.W. ) | |
| Suite 1000 ) | |
| Washington, D.C. 20005 ) | |
| ) | |
| **and** ) | |
| ) | |
| **SPAC, LLC,** ) | |
| 1604 K Street, N.W. ) | |
| Washington, D.C. 22006 ) | |
| ) | |
| **SERVE:** ) | |
| CT Corporations System ) | |
| 1015 15th Street, N.W. ) | |
| Suite 1000 ) | |
| Washington, D.C. 20005 ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

**JURY DEMAND**

Plaintiffs demand a jury trial on all claims so triable.

Plaintiffs demand a jury trial on all claims so triable.

Respectfully submitted,

_____
Debra S. Katz (Bar No. 411861)
Ari M. Wilkenfeld (Bar. No. 461063)
Katz, Marshall & Banks, LLP
1718 Connecticut Avenue, N.W.
Floor 6
Washington, D.C. 20009
(202) 299-1140
(202) 299-1148 (fax)

Attorneys for Plaintiff Ronnie Barrett

Dated: February 1, 2007

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

## I (a) PLAINTIFFS

RONNIE BARRETT
6307 59th Avenue
Riverdale, MD 20737

## DEFENDANTS

ANDRE CHREKY, 548 River Bend Road, Falls Church, VA 22066
ANDRE CHREKY SALON/ANDRE CHREKY INC, SPAC LLC,
1604 K Street, N.W., Washington, D.C. 22006S

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF**  Prince George's
**(EXCEPT IN U.S. PLAINTIFF CASES)**

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   Fairfax County
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Debra S. Katz, Esquire
Ari M. Wilkenfeld, Esquire
Katz, Marshall & Banks, LLP
1718 Connecticut Ave, NW
6th Floor
Washington, DC 20009
(202) 299-1140

ATTORNEYS (IF KNOWN)

John M. Bredehoft
Kaufman & Canoles
150 West Main Street
Post Office Box 3037
Norfolk, Virginia 23514-3037
(757) 624-3225

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ○ 2 U.S. Government Defendant
- ○ 3 Federal Question (U.S. Government Not a Party)
- ● 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ● 4 |
| Citizen of Another State | ● 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**○ A. Antitrust**

- ☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**

- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**

- ☐ 151 Medicare Act

Social Security:
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

Other Statutes
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**○ E. General Civil (Other)    OR    ○ F. Pro Se General Civil**

Real Property
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

Personal Property
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

Bankruptcy
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

Property Rights
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

Federal Tax Suits
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

Other Statutes
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** ▸ | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☒ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

District of Columbia Human Rights Act, D.C. Code Section 2-1401.01 et seq., for sexual harassment and retaliation.

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ 4,000,000<br>JURY DEMAND: | Check YES only if demanded in complaint<br>YES ☒  NO ☐ |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☒    NO ☐    If yes, please complete related case form.

DATE February 1, 2007    SIGNATURE OF ATTORNEY OF RECORD    *[signature]*

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I. COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI. CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.