**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
**RONNIE BARRETT,**                     )
                                        )
            **Plaintiff,**              )
                                        )
        **v.**                          )    **C.A. No. 07-CV-0250 (RCL)**
                                        )
**ANDRE CHREKY,**                       )
**ANDRE CHREKY SALON/ANDRE CHREKY INC.,** )
**SPAC, LLC**                           )
                                        )
            **Defendants.**             )
                                        )
_____)


**PLAINTIFF'S MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT**
**FOR DECLARATORY AND MONETARY RELIEF AND JURY DEMAND**

Plaintiff, Ronnie Barrett, through undersigned counsel and pursuant to Rule 15 of the

Federal Rules of Civil Procedure, respectfully submits this Motion for Leave to File an Amended

Complaint for Declaratory and Monetary Relief and Jury Demand ("the Motion").

Plaintiff seeks to file an Amended Complaint to further explain, amplify and provide

additional specificity regarding a critical allegation of her Complaint – that Defendants' unlawful

actions against her took place within an environment where laws, ordinances, and individual

rights were routinely ignored.

Paragraph 55 of the operative Complaint, attached hereto as Exhibit 1, states: "The

unlawful actions complained of in this matter occurred in a workplace where the owners,

operators and officers believed that the law did not apply to them.  In the same way that

Defendants violated Ms. Barrett's civil rights, stole tips from her, and denied her compensation

that she was lawfully entitled to, so too have the defendants disregarded a myriad of laws,

1

statutes, regulations and ordinances governing the operation of their business." The Amended

Complaint, attached hereto as Exhibit 2,[1] includes specific factual allegations pertaining to

Defendants' habitual and reckless disregard of laws, statutes, regulations and ordinances such as

I.R.S. regulations, D.C. cosmetology licensing ordinances, and Defendants' efforts to obstruct

justice.

**I.      NATURE OF NEW ALLEGATIONS**

In the Amended Complaint, Plaintiff provides information about Defendants' willful

violation of I.R.S. regulations regarding the reporting of tips. Mr. Chreky and ACI officers

instructed Salon employees to underreport the tips they received from clients in an effort to

lower the amount of FICA/Social Security taxes the Salon would be required to pay to the I.R.S.

Plaintiff provides information about Mr. Chreky's employment of unlicensed salon professionals

whom he unlawfully authorized to render services at the Andre Chreky Salon and Spa or on

behalf of Salon customers, including First Lady Laura Bush and the President's daughters

Barbara and Jenna Bush. Also, Plaintiff provides information about how Mr. Chreky and his

agents have engaged in obstruction of justice by threatening and intimidating third-party

witnesses in this lawsuit.

These additional factual allegations provide important factual support for a central

allegation of Plaintiff's Complaint, that Defendants' unlawful activity as to her was simply part

of a much larger corporate culture in which the owners and operators of the Salon belived that

the law did not apply to them.

**A.      Violations of I.R.S. Regulations Regarding the Reporting of Tips**

Mr. Chreky and other ACI officers specifically instructed Salon employees to under-

report the tips they received from clients in an effort to lower the amount of FICA/Social

---

[1] New text in the proposed Amended Complaint is underlined.

Security taxes the Salon would be required to pay to the Internal Revenue Service.  Mr. and Mrs. Chreky directed Salon employees to come up with a tip figure that was large enough not to raise suspicion by the IRS.  Amended Complaint ¶ 56.  Mr. Chreky's purpose in encouraging his employees to under-report their tips was to minimize the employer's share of federal income taxes withheld and paid out on all such tips.  Id. at ¶ 58.  Mr. Chreky specifically advised Plaintiff that she should not report all of the tips she received, including cash tips provided to her directly from a client.  With regard to the tips that clients left for her in envelopes at the front desk, Mr. and Mrs. Chreky told Ms. Barrett and other Salon employees to simply report a nominal amount.  Id. at ¶ 57.

Under 26 U.S.C. §§ 3121(a)(12)(B), 3401(a)(16)(B), cash tips of twenty dollars or more that are received in any calendar month while working for any one employer are subject to Social Security and income tax withholding and are considered employer-provided remuneration for FICA purposes.  Under 26 U.S.C. § 3121(q), employers are required to apply and collect both the employer's and the employee's portion of FICA taxes on an employee's reported tip income.  However, an employer is only responsible for the payment of FICA taxes for those tips which are actually reported by the employee.  If an employer is able to convince its employees to under-report their tips, the employer's obligations to pay FICA taxes are reduced to whatever extent the employee under-reports which is precisely what Defendants have done with regard to their employees.  Amended Complaint ¶ 64.

> Any person who willfully delivers or discloses to the Secretary any list, return, account, statement, or other document, known by him to be fraudulent or to be false as to any material matter, shall be fined not more than $10,000 ($50,000 in the case of a corporation), or imprisoned not more than 1 year, or both.  Any person required pursuant to section 6047(b), section 6104(d), or subsection (i) or (j) of section 527 to furnish any information to the Secretary or any other person who willfully furnishes to the Secretary or such other person any information known by him to be fraudulent or to be false as to any material matter shall be

fined not more than $10,000 ($50,000 in the case of a corporation), or imprisoned
not more than 1 year, or both.

26 U.S.C. § 7207.

Defendants were aware that the tips reported by its employees were false because Mr.
and Mrs. Chreky specifically instructed their employees to under-report the tips they had
received.  In addition, defendants received the monthly tip reports from the employees which
alerted them to the fact that, given the number of services provided by each employee and the
tips generally provided for clients for such services (e.g. typically 15%), the amounts reported
were a small fraction of the amounts actually received.  Most salon employees reported the exact
same amount of tips month after month (e.g. $300 to $400 per month) despite the fact that there
were obvious variations in the tips actually received by virtue of customer flow and number of
hours worked by employees during differing time periods, and despite the fact that given the
number of services provided each week, the actual tip amount would likely be in the range of
$4,000 to $6,000 per month.  Amended Complaint ¶ 66.

Defendants knew or reasonably should have known that the tip reports were false and
fraudulent but nevertheless submitted them to the IRS in violation of Section 7207.  Id. at ¶ 67.

**B.    Violations of D.C. Licensing Ordinances**

Chapter 37 D.C. Reg. § 3702 requires individuals employed in the District of Columbia
in the barber and cosmetology industry to maintain current licenses with the District of Columbia
before performing services on customers.  The regulations specifically list barbers,
cosmetologists, estheticians, manicurists, shampoo assistants, salon managers, salon owners, and
individuals who provide facials, massages, and scalp treatments as individuals who can not
operate without first obtaining a D.C. license and apply to all Salon employees who perform
such services for Salon customers.  Amended Complaint ¶ 68.

4

A sizable number of salon employees did not have valid District of Columbia licenses at the time they rendered services at the Andre Chreky Salon and Spa or on behalf of Salon customers, including First Lady Laura Bush, and the President's daughters Barbara and Jenna Bush. Such individuals include but are not limited to Elena Vantovskaya, Linda Mahboub, Edil Karkas, Xiomara Maradiaga, and Sami Tellawi. Id. at ¶ 69. Defendants were aware that all of their salon professionals were required to have valid D.C. licenses in order to perform services at the salon. Id. at ¶ 70.

Section 3727 provides that the City's Director of Consumer and Regulatory Affairs may conduct inspections to determine if a salon or spa maintains appropriate licenses for its professionals. Section 3727.2 specifically requires that salon owners take "appropriate action to ensure access to all parts of the premises for the purpose of facilitating inspection." Id. at ¶ 71.

Instead of complying with these requirements, Mr. Chreky developed an emergency drill whereby all unlicensed workers would flee out the back door of the Salon whenever District of Columbia licensing officials appeared to conduct inspections. Id. at ¶ 72. On such occasions, the front desk staff was trained to stall the inspectors at the front desk to provide the unlicensed staff, which was often as much as one third of the total staff, sufficient time to sneak out the back door where they would wait in the alley until the inspection had been completed. Id. at ¶ 73.

Section 3727.3 provides that the failure to facilitate inspections constitutes cause for withholding the issuance of a new license or revoking or suspending an existing license. Section 3727.5 further provides that any person who fails to comply with any provision of Chapter 37, shall, upon conviction, be punished by a fine not to exceed $5,000 or by imprisonment not to exceed 90 days for each failure to comply. Id. at ¶ 75.

This set of factual allegations provides an important backdrop for Paragraph 55 of the operative Complaint. If Defendants are so cavalier about violating rules and ordinances that could subject them to fine, imprisonment, and the possible loss of their license to operate a business, they certainly would have had a similar lack of regard for Plaintiff's civil rights.

### C.        Obstruction of Justice

Ms. Barrett filed a Charge of Discrimination with the District of Columbia's Office of Human Rights on November 8, 2007, which formed the basis for her original Complaint filed with this Court on February 1, 2007. Since that time, defendants and their agents have engaged in a series of prolonged and persistent efforts to obtain favorable testimony from third-party witnesses, and to prevent third-party witnesses from testifying in a manner unfavorable to defendants, through the use of threat, intimidation, and misrepresentation. By and through their actions, defendants and their agents have suborned perjury and otherwise obstructed justice violating Ms. Barrett's rights and the rights of countless other persons who are not parties to this lawsuit. Amended Complaint ¶ 76.

On December 7, 2006, counsel for Ms. Barrett provided counsel for defendants copies of several declarations from third-party witnesses all of whom had witnessed and confirmed some or all of the allegation in Ms. Barrett's Complaint. Counsel for Ms. Barrett also provided the names of additional persons whom they had interviewed and who they anticipated would also provide declarations in the near future. One such individual, Damon Taylor, was in the midst of reviewing and editing a declaration that he would eventually execute on February 2, 2007. Counsel for Ms. Barrett explained to counsel for defendants that Mr. Taylor had witnessed and had confirmed many of the allegations of sexual harassment, retaliation, and FLSA violations that Ms. Barrett had alleged. Id. at ¶ 77. Approximately four hours after counsel for defendants

had been apprised of Mr. Taylor's cooperation with counsel for Ms. Barrett, Mr. Taylor received

a threatening phone call from Sami Tellawi, a then current Salon employee. Mr. Telawi told Mr.

Taylor that Mr. Chreky demanded that he report to the Salon, where he was no longer an

employee, so that he could be interviewed. When Mr. Taylor responded that he was under no

obligation to report to the Salon or to cooperate with either party, Mr. Tellawi, at Mr. Chreky's

direction, threatened that Mr. Chreky would have Mr. Taylor arrested if he did not cooperate. Id.

at ¶ 78.

  Mr. Taylor immediately reported this incident to counsel for Ms. Barrett and explained

that he was concerned that he had placed himself in legal peril by cooperating with Ms. Barrett's

counsel, by refusing to report to the Salon as Mr. Chreky had demanded, and by agreeing to be

interviewed by Ms. Barrett's counsel. Id. at ¶ 79. Counsel for Ms. Barrett immediately

contacted counsel for defendants to advise them of Mr. Chreky's threatening conduct and to

demand that defendants cease all efforts to intimidate potential material witnesses. Nevertheless,

Mr. Chreky, and those acting on his behalf, have continued to threaten, intimidate, and

manipulate third party witnesses in this case. Id. at ¶ 80.

  In February of 2007, shortly after Ms. Barrett filed her Complaint, Mr. Chreky and/or his

agents ordered all current Salon employees to meet with David Sullivan, one of the attorneys for

defendants. All employees were scheduled for time slots, lasting ten to fifteen minutes each, in

which they were required to meet with Mr. Sullivan at a Starbucks situated next door to the

Salon where they worked. Upon information and belief, most, if not all such employees felt

pressured and compelled to meet with Mr. Sullivan. Upon information and belief, most, if not all

such employees believed that meeting with Mr. Sullivan was a job requirement and that they

could be terminated for failing to comply. Id. at ¶ 81.

On or about February 16, 2007, several employees were required to meet with Mr. Sullivan again, this time in the Salon.  These employees were presented with declarations drafted by Mr. Sullivan and were instructed to execute them.  Upon information and belief, most if not all of the employees felt pressured and compelled to sign the declarations.  Upon information and belief, most, if not all of the employees believed that signing the declarations presented to them was a job requirement and that they could be terminated for failing to comply.  Id. at ¶ 82.

Mr. Chreky, his agents, and his attorneys knew that in executing these declarations, the declarants provided unreliable, deceptive, and perjurous testimony under oath.  The declarations, most of which are carbon copies of each other, all provided that the declarant was aware of and did not believe the "allegations" contained in Ms. Barrett's Complaint.  However, as Mr. Chreky and Mr. Sullivan knew, none of the declarants had seen, read, or had otherwise been informed of most of allegations contained in Ms. Barrett's Complaint and could not competently provide any testimony on the allegations at the time they were required to sign the declarations under pain and penalty of perjury.  In addition, most of the declarants are immigrants for whom English is a second language.  Mr. Chreky and Mr. Sullivan knew that the declarants did not possess sufficient language skills to understand many of the words contained in the declarations they were required to sign.  Mr. Chreky and Mr. Sullivan were aware that due to their lack of sophistication with regard to legal matters, most, if not all of the declarants did not understand or appreciate the legal consequences of executing a sworn declaration that was less than fully accurate or truthful.  Id. at ¶ 83.

On October 1, 2 and 3, 2007, counsel for Ms. Barrett and Ms. Thong deposed nine of the individuals who provided virtually identical declarations in support of Mr. Chreky.  In the days leading up to their depositions, Mr. Chreky and/or his agents contacted each of the deponents

and ordered them to meet with counsel for defendants at a hotel.  Mr. Chreky and/or his agents

told the deponents that counsel for Ms. Barrett and Ms. Thong would attempt to "trick" or

"confuse" them during their depositions and that they needed to meet with counsel for

defendants so that they would know how to answer properly.  All nine deponents met with

counsel for defendants in advance of their depositions.  All nine deponents believed that

attending said meetings was a job requirement.  Most of the deponents believed that they could

be terminated if they failed to report for their assigned meetings with counsel for defendants in

advance of their depositions.  Id. at ¶ 84.

Upon information and belief, Mr. Chreky and/or his agents promised the deponents that

they would receive financial rewards if they provided favorable testimony during their

depositions.  Upon information and belief, at least one deponent Khadija Darif received a phone

call from Mr. Chreky immediately following her deposition.  Mr. Chreky had attended her

deposition just as he had for all of the other current employees deposed that week.  Mr. Chreky

admonished Ms. Darif for providing testimony that was favorable to Ms. Barrett and Ms. Thong.

Mr. Chreky later called the Ms. Darif's residence again, this time asking to speak to her husband,

Tony Khateeb.  Mr. Chreky told Mr. Khateeb that it was unfortunate that his wife had provided

testimony that was favorable to Ms. Barrett and Ms. Thong, but that she could expect to receive a

bonus and/or a raise if she would provide testimony favorable to him in the future.  Id. at ¶ 85.

With respect to witnesses who were no longer employed by the Salon, counsel for

defendants hired two separate investigation firms, Fortress Global Investigations and Security,

and Vital Investigations, to investigate several individuals including but not limited to those

individuals who provided declarations for Ms. Barrett.  The investigators approached most of the

witnesses at work posing as customers.  The investigators did not identify themselves as agents

for Mr. Chreky.  In fact, the investigators attempted to appear to be unassociated parties who were simply interested in hearing more about the lawsuit.  In many cases, where witnesses declined to comment on the lawsuit, the investigators would identify themselves and explain that the lawsuit was likely to settle.  The investigators knew that there was no possibility that the lawsuit would settle when speaking with the witnesses but rather were attempting to extract information from reluctant witnesses by lying about the posture of the lawsuit.  <u>Id.</u> at ¶ 86.

Several individuals who are potential witnesses for Barrett at trial have advised counsel for Barrett that they found the tactics employed by the private investigators to be threatening, that they were second guessing their decision to cooperate with counsel for Barrett, and that they were worried about their continued involvement in this lawsuit.  <u>Id.</u> at ¶ 87.

Like the laws prohibiting discrimination, sexual harassment, retaliation, misappropriation of tips, and denial of overtime compensation, federal laws regarding the reporting of tips to the IRS, obstruction of justice, and local laws pertaining to the licensing of barber and cosmetology professionals are clear constraints on the manner in which an employer may treat his employees and conduct business in general.  Defendants' actions demonstrate a reckless disregard for these laws and a proclivity to treat their employees in any manner that best suits the Andre Chreky Salon and its principals, including defendant Chreky.  <u>Id.</u> at ¶ 88.

## II.    LEAVE TO FILE AN AMENDED COMPLAINT SHOULD BE GRANTED UNDER RULE 15(c), FED. R. CIV. P. BECAUSE THE NEW ALLEGATIONS RELATE BACK TO ALLEGATION CONTAINED IN THE ORIGINAL COMPLAINT

Rule 15(c) establishes the standard that an amendment to a pleading "relates back" to the date of the original pleading.  Fed. R. Civ. P. 15(c).  Where no new cause action is alleged but new relevant facts are provided, as here, the courts liberally grant motions to amend where the

new allegations relate back to allegation contained in the original complaint. See Stevelman v. Alias Research, Inc., 174 F.3d 79, 87 (2nd Cir. 1999). If the amendment merely "explains, expands or amplifies what was alleged in support of the cause of action already asserted," it relates back under Rule 15. Wiren v. Paramount Pictures, Inc., 206 F.2d 465, 467-68 (D.C. Cir. 1953); see also F.D.I.C. v. Conner, 20 F.3d 1376, 1386 (5th Cir. 1994) (asserting that if plaintiff seeks to amplify the facts alleged in the prior complaint, then relation back is allowed); Gray v. Upchurch, 2006 WL 3694604, at *4 (S.D. Miss. Dec. 13, 2006) (granting motion for amended complaint and maintaining that when party further expounds upon facts previously alleged, the proffered amended complaint relates back); Oliner v. McBride's Industries, Inc., 106 F.R.D. 9, 12 (S.D.N.Y. 1985) (maintaining new allegations contained in an amended pleading will relate back if allegations amplify the facts alleged in original pleading or set forth those facts with greater specificity).

This Motion seeks to amend the Complaint to further explain, expand and amplify the allegation in paragraph 55, which states:

> The unlawful actions complained of in this matter occurred in a workplace where the owners, operators and officers believed that the law did not apply to them. In the same way that Defendants violated Ms. Barrett's civil rights, stole tips from her, and denied her compensation that she was lawfully entitled to, so too have the defendants disregarded a myriad of laws, statutes, regulations and ordinances governing the operation of their business.

The Amended Complaint contains additional facts that relate back to this allegation.

While these new allegations are not asserted to add a new cause of action, they are presented in order to illustrate and explain the Defendants' consistently flagrant disregard for the law. The new facts provide useful explanation of the context in which Mr. Chreky incessantly subjected Plaintiff and other female employees to unwelcome touching, sexual demands, vulgar and sexually explicit remarks, threats, ridicule, intimidation and abuse. These new allegations

explain the lawless and unregulated working environment that Plaintiff endured and demonstrate how Defendants "believed that the law did not apply to them."  As such, Plaintiff's Motion should be granted.

### III.    LEAVE TO FILE AN AMENDED COMPLAINT SHOULD BE "FREELY GIVEN" UNDER RULE 15(a), FED. R. CIV. P.

Rule 15(a) of the Federal Rules of Civil Procedure, provides that leave to file an amended pleading should be "freely given when justice so requires."  See Foman v.  Davis, 371 U.S. 178, 182 (1962); Firestone v. Firestone, 76 F.3d 1205, 1208 (D.C.Cir. 1996).  The rule evinces a preference for granting such leave so that cases can be considered on their merits.  See e.g., Elmore v. Corcoran, 913 F.2d 170, 172 (4th Cir. 1990) ("It is axiomatic that the Federal Rules of Civil Procedure allow liberal amendment of pleadings throughout the progress of a case.").  In fact, courts routinely permit parties to amend pleadings well after suit has been filed.  See e.g., Material Supply Int'l, Inc. v. Sunmatch Industrial Co., 146 F.3d 983 (D.C. Cir. 1998) (upholding trial court's decision to allow defendant to amend answer to include statute of limitations defense seventeen days before the start of trial).  A court should also consider the hardship to the moving party if the leave to amend were denied.  See 6 Wright, Miller & Kane, Federal Practice & Procedure: Civil 2d, § 1487 at 621-23 (2d ed. 1990).

The purpose of the liberal rule in favor of amendment is to provide the maximum opportunity for each claim to be decided on the merits rather than on procedural technicalities. "[I]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits."  Foman, 371 U.S. at 182.  Thus, unless the district court has a substantial reason to deny leave, its discretion is not broad enough to permit denial.  Although the grant or denial of leave to amend is committed to the district court's discretion, it is an abuse of discretion to deny leave to amend unless there is

sufficient reason, such as: 1) undue prejudice to the opposing party; 2) repeated failure to cure deficiencies by amendments previously allowed; 3) bad faith on the part of the moving party; 4) futility; or 5) undue delay.  Foman, 371 U.S. at 182; See also Firestone, 76 F.3d at 1208; Howard v. Gutierrez, 237 F.R.D. 310, 312 (D.D.C. 2006).  Here, there have been no failures to cure deficiencies by amendments previously allowed, and the motion is brought in good faith and is not futile since the additional facts simply provide specificity to allegations made in the operative complaint.

In a court's consideration of a motion for leave to amend a pleading, the crucial consideration is prejudice to the opposing party.  Stevens v. Stover, 702 F. Supp. 302, 305 (D.D.C. 1988).  To show prejudice sufficient to justify a denial of leave to amend, the opposing party must show that it was unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had the amendments been asserted earlier.  In re Vitamins Antitrust Litigation, 217 F.R.D. 30, 32 (D.D.C. 2003) (granting motion for leave to amend where defendants failed to establish prejudice despite plaintiffs' delay in amending complaint).   The opposing party must show unfairness in procedure or timing preventing them from properly responding.  Id.  See also Djourabchi v. Self, 240 F.R.D. 5, 13 (D.D.C. 2006) (granting motion for leave to add new claim and finding that opposing party failed to show that amendment was prejudicial because it substantially changed the theory of case or imposed added expense and burden).

Here, Defendants will suffer no prejudice because they have been on notice, since the filing of the operative complaint, of Plaintiff's allegation of their disregard of laws and regulations governing their business affairs.  See Howard, 237 F.R.D. at 312 (determining that defendant not prejudiced because of notice of claim since the filing of lawsuit).  In addition,

Plaintiff is simply amending the complaint to provide additional relevant facts, not to assert a new claim. Therefore, Defendants will not suffer the burden of having to defend against a new cause of action.

Moreover, Defendants will not be prejudiced by the amendment of the operative complaint because discovery is still open.  Plaintiff seeks to amend the complaint well in advance of the closing date for discovery in this lawsuit.  Defendants have ample opportunity to investigate these new allegations as they see fit and take whatever discovery, related to these new allegations, that they wish.  Not only does the amendment not restrain or hamper Defendants' ability to defend against Plaintiff's claim, it provides Defendants with more supporting facts that better explain and clarify the assertions in the operative complaint.

## IV.    <u>CONCLUSION</u>

For all the foregoing reasons, Plaintiff's Motion for Leave to File an Amended Complaint for Declaratory and Monetary Relief and Jury Demand should be granted and the Clerk directed to file the Amended Complaint.

Respectfully submitted,


_____/s/ Ari M. Wilkenfeld_____
Debra S. Katz (Bar No. 411861)
Ari M. Wilkenfeld (Bar. No. 461063)
Katz, Marshall & Banks, LLP
1718 Connecticut Avenue, N.W.
Sixth Floor
Washington, D.C. 20009
(202) 299-1140
(202) 299-1148 (fax)

Attorneys for Plaintiff Ronnie Barrett

Dated:  January 11 2008

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RONNIE BARRETT,**<br>6307 59th Avenue<br>Riverdale, MD 20737<br><br>**Plaintiff,**<br><br>**v.**<br><br>**ANDRE CHREKY,**<br>548 River Bend Road<br>Falls Church, VA 22066<br><br>**ANDRE CHREKY SALON/ANDRE CHREKY INC,**<br>1604 K Street, N.W.<br>Washington, D.C. 22006<br><br>    **SERVE:**<br>    CT Corporations System<br>    1015 15th Street, N.W.<br>    Suite 1000<br>    Washington, D.C. 20005<br><br>    **and**<br><br>**SPAC, LLC,**<br>1604 K Street, N.W.<br>Washington, D.C. 22006<br><br>    **SERVE:**<br>    CT Corporations System<br>    1015 15th Street, N.W.<br>    Suite 1000<br>    Washington, D.C. 20005<br><br>    **Defendants.** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) )   **Civil Action No.** _____<br>) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

## COMPLAINT FOR DECLARATORY
## AND MONETARY RELIEF AND JURY DEMAND

## Preliminary Statement

1.      This is a civil action against the Andre Chreky Salon/Andre Chreky Inc. ("the

Salon" or "ACI") for declaratory and equitable relief and monetary damages for injuries plaintiff

Ronnie Barrett has sustained as a result of defendant Andre Chreky's sexual harassment and

retaliation against her, in violation of the District of Columbia Human Rights Act, D.C. Code §

2-1401.01 et seq. ("DCHRA"), and for the Salon's negligent supervision of defendant Andre

Chreky.  This is also an action against defendant Andre Chreky ("Mr. Chreky"), in his individual

capacity, for aiding and abetting the sexual harassment and retaliation to which plaintiff was

subjected, in violation of the DCHRA, D.C. Code § 2-1401.62.  Mr. Chreky routinely subjected

Ms. Barrett and other female employees to unwelcome touching, sexual demands, vulgar and

sexually explicit remarks, threats, ridicule, intimidation and other abuse.  Mr. Chreky used his

position as the owner and operator of one of the nation's premier hair salons to attempt to coerce

and intimidate attractive, vulnerable immigrant female employees, like Ms. Barrett, to perform

sexual acts, including oral sex and group sex, and to otherwise engage in unwelcome physical

and sexual contact with him.  Mr. Chreky engaged in an egregious pattern of humiliating and

degrading behavior towards Ms. Barrett, and other female employees, promising that he would

provide them career advancement, trips to the White House, and contact with President George

W. Bush, First Lady Laura Bush, and other members of the Bush family if they acceded to his

sexual demands, and retaliating against them with a range of adverse actions and abusive

behavior when they rejected these sexual advances.

2.      This is also an action against defendant Salon and defendant Chreky for their

willful failure to pay plaintiff and other non-exempt employees overtime wages in violation of

the Fair Labor Standards Act, 29 U.S.C. § 207 et seq. ("FLSA") and the District of Columbia

Wage and Hour Act, D.C. Code § 32-1002 et seq.("DCWHA"); and for their unlawful

withholding of compensation, and their conversion of tips earned by plaintiff, in violation of the

District of Columbia Wage Payment and Collection Act, D.C. Code § 32-1301(1)

("DCWPCA"). Despite having been previously cited by the Department of Labor ("DOL") for

widespread overtime violations, and being ordered to pay back overtime to Salon employees,

including Ms. Barrett, defendant ACI engaged in widespread FLSA and DCWHA violations,

willfuly depriving Ms. Barrett and other Salon employees of overtime pay to which they are

legally entitled.

      3.      This is also an action against SPAC, Inc., the owner of the property that houses

defendant Salon for negligence and for breach of its duty to protect business invitees, including

Ms. Barrett.

### Jurisdiction and Venue

      4.      This Court has jurisdiction over plaintiff's claims pursuant to 28 U.S.C. §§ 1331

and 1343(a)(3) as this matter contains a federal question. This court has supplemental

jurisdiction over plaintiff's state law claims under 28 U.S.C. § 1367(a). This Court also has

jurisdiction over plaintiff's claims pursuant to 28 U.S.C. § 1332(a)(1), as there is complete

diversity of citizenship and the amount in controversy exceeds $75,000.

      5.      Venue is proper in this district under 28 U.S.C. §§ 1391(a)(2) and (b)(1), as the

events or omissions giving rise to Ms. Barrett's claims occurred in the District of Columbia.

### Parties

      6.      Ronnie Barrett is a citizen of Maryland who resides at 6307 59th Avenue,

Riverdale, MD 20737. At various times during the period of September 2003 to December

2005, Ms. Barrett was employed by Andre Chreky Inc., a corporation owned and operated by

Andre Chreky. Defendant Chreky was plaintiff's supervisor. At all times relevant to this Complaint, Ms. Barrett was an "employee" within the meaning of the DCHRA, D.C. Code § 2-1401.2(9), and was an "employee" engaged in "commerce" within the meaning of the FLSA, 29 U.S.C. §§ 203(b), 203(e). Ms. Barrett was not an exempt employee under the FLSA. At all times relevant to this Complaint, Ms. Barrett was an "employee" within the meaning of the DCWHA, D.C. Code § 32-1002(3).

7.    Defendant Andre Chreky is a citizen of Virginia who resides at 548 River Bend Road, Falls Church, VA 22066. Mr. Chreky is part owner of defendants Andre Chreky Inc. and SPAC, LLC. Mr. Chreky is an employer within the meaning of the DCHRA, D.C. Code § 2-1401.2(10), the FLSA, 29 U.S.C. § 203(d), the DCWHA, D.C. Code § 32-1002(3), and the DCWPCA, D.C. Code § 32-1302.

8.    Andre Chreky Inc. ("ACI" or "the Salon") is a District of Columbia corporation with its principal place of business at 1604 K Street N.W., Washington, D.C. 20006. ACI was formed for the purposes of owning and operating the Andre Chreky Salon and Spa. ACI is owned and operated by defendant Chreky and his wife, Serena Chreky. Andre Chreky is ACI's President and Treasurer. ACI is an employer within the meaning of the DCHRA, D.C. Code § 2-1401.2(10), the FLSA, 29 U.S.C. § 203(d), the DCWHA, D.C. Code § 32-1002(3), and the DCWPCA, D.C. Code § 32-1302.

9.    SPAC, LLC ("SPAC") is a District of Columbia corporation with its principal place of business at 1604 K Street N.W., Washington, D.C. 20006. SPAC owns the property that houses the Andre Chreky Salon and Spa. Upon information and belief, ACI rents the location 1604 K Street N.W., Washington, D.C. 20006, from SPAC. SPAC is owned and operated by defendant Chreky and his wife, Serena Chreky. Defendant Chreky is a "Member" of the

corporation.

## Factual Allegations

10.     Ms. Barrett was born in Brazil and immigrated to the United States in 1985.  In

1992, Ms. Barrett earned her cosmetology license from Aspen Beauty Academy in Maryland and

began her career as a hair stylist.

11.     In 1994, Ms. Barrett began working for defendant Andre Chreky at Piaf's, a

salon owned by Mr. Chreky's sister, and then at Daniel's, a salon owned by Mr. Chreky's

brother.  In 1997, Mr. Chreky opened his own salon, the Andre Chreky Salon and Spa, and hired

Ms. Barrett as his assistant.  Over time, Ms. Barrett transitioned to the higher paying position of

hair stylist.  She remained in that position until May 1998, when she resigned.

12.     Ms. Barrett worked at the Roche Salon in Georgetown from 1998 to 2001, and

then at the Toka Salon in Georgetown from 2002 to 2003.

## Sexual Harassment and Retaliation Allegations

13.     In or around late Summer 2003, Mr. Chreky became aware that Ms. Barrett was

looking for a new job and offered her a position as a stylist with the Salon.  Mr. Chreky asked

Ms. Barrett what she was looking for in terms of salary.  Ms. Barrett responded that she wanted

to earn a bi-weekly salary of $2,500.  Mr. Chreky responded that he did not want to start her at

that salary.  Instead he offered her a bi-weekly salary of $1,900 and told her that she would

receive a review and an increase to $2,500 after three months. Ms. Barrett was hesitant to accept

the offer given the manner in which defendant Chreky treated her during her first period of

employment with the Salon.  Ultimately, she accepted the position because the Salon had

established itself as the premier salon in the District of Columbia serving the most elite clientele

and paying its stylists top-end salaries.

14.     Upon the commencement of her employment with the Salon, defendants ACI and Mr. Chreky required Ms. Barrett to sign a non-compete agreement as a condition of her employment. Pursuant to this agreement, Ms. Barrett was obligated to refrain from competing with the business of the Salon for a period of six months, and within a radius of five miles, after termination of her employment.

15.     Almost immediately upon her return to the Salon, Mr. Chreky, who is more than 20 years plaintiff's senior, began sexually harassing Ms. Barrett. He showed an obsessive interest in Ms. Barrett and stalked her at the workplace, often isolating her in secluded areas of the Salon where he grabbed her and attempted to kiss and grope her. On each such occasion, Ms. Barrett rejected Mr. Chreky's unwelcome advances and touching. Mr. Chreky reacted with anger and disgust, but he remained undeterred.

16.     In February 2004, after Ms. Barrett returned from her honeymoon, Mr. Chreky's obsession with Ms. Barrett escalated, as did his unwelcome sexual attention and advances. He inundated Ms. Barrett with inappropriate comments about her husband, denigrating his sexual prowess. Mr. Chreky repeatedly propositioned Ms. Barrett and suggested that she have sex with him, because she undoubtedly "needed some extra sex." Ms. Barrett told Mr. Chreky that his remarks, often uttered in front of coworkers, made her very uncomfortable. Mr. Chreky laughed derisively in response to Ms. Barrett's complaints and requests that he cease his sexually harassing conduct.

17.     When Ms. Barrett rejected Mr. Chreky's advances, he retaliated against her by, inter alia, removing clients from her schedule, as he had also done with Jennifer Thong and other female employees who had rejected his advances, and directing Salon receptionists to make changes to Ms. Barrett's schedule moving clients from one stylist to another in a manner that

harmed Ms. Barrett. Mr. Chreky threatened Salon receptionists with termination if they revealed to the stylists that clients were being removed from their schedules at his direction. By secretly reassigning both new clients and Ms. Barrett's established clients to other stylists, Mr. Chreky deliberately depressed her earnings. He also deliberately damaged Ms. Barrett's future earnings by interfering with her ability to develop a loyal client base.

18.     In February 2004, Ms. Barrett asked Mr. Chreky for the raise he had promised she would be given after working at the Salon for three months. Mr. Chreky directed her to meet him at the end of the day in his office on the fifth floor to discuss her request, which she did. Ms. Barrett was aware that Mr. Chreky had previously isolated other female employees in his office and tried to force himself on them sexually. Accordingly, when she entered Mr. Chreky's office she made sure the door behind her remained open and sat down in the visitor's chair. Mr. Chreky began the meeting by stating that Sammy, his assistant, had just gone out to buy lemonade, "so we have a little time." As soon as Ms. Barrett heard this statement, she got up and tried to leave the office. Mr. Chreky jumped up and grabbed her below the neck and shoulder blades and forcefully shoved her back into the chair. He put one hand on his belt as if to open his pants and said, "Come on, just give me a blow job." Ms. Barrett pushed him away and ran out of the office.

19.     Mr. Chreky called Ms. Barrett at home that evening and apologized for his misconduct. He assured her that he would not repeat this conduct and would leave her alone in the future.

20.     Ms. Barrett was terrified of Mr. Chreky and humiliated as a result of his conduct and began active consideration of leaving the Salon. Because she had entered into a non-compete agreement with the Salon she was extremely concerned that if she left the Salon and

went to work elsewhere, Mr. Chreky would retaliate against her by filing a lawsuit to prevent her from working. Indeed, in staff meetings Mr. Chreky had made repeated threats to Salon stylists that if they left to work elsewhere, he would go after them in court and "take them to the cleaners."

21.    In the weeks following the incident referred to in paragraph 18, above, Ms Barrett actively avoided Mr. Chreky and he too stayed clear of Ms. Barrett. However, as time went on, he again began focusing unwelcome attention on her and made demeaning and taunting remarks to her. He regularly alluded to the incident in his office referred to in paragraph 18, above, and taunted her by asking her if she wanted to "go to the fifth floor" with him. Mr. Chreky made these comments in the presence of other stylists, who became aware that he was targeting Ms. Barrett for especially hostile and demeaning treatment.

22.    Ms. Barrett was terrified that defendant Chreky would try to force himself on her again. Ms. Barrett began looking for a new job, but was not able to find a comparable position.

23.    In April 2004, after learning that Ms. Barrett was pregnant, Mr. Chreky became increasingly obsessed with Ms. Barrett and her body. He made constant comments to Ms. Barrett about her breasts, often in front of other employees, saying things like, "Ronnie, your boobs are really swelling," "Come on, let me see them," and "Umm they look good." These and other comments continued throughout Ms. Barrett's pregnancy, and caused her great humiliation and embarrassment.

24.    As Ms. Barrett's pregnancy progressed, Mr. Chreky made repeated attempts to touch her breasts. He often brushed up against her while she was working, and deliberately touched her breasts. Mr. Chreky also routinely slapped or spanked Ms. Barrett on her buttocks, using enough force to leave red marks on Ms. Barrett's skin that remained for hours. On each

occasion, Ms. Barrett told him to stop this unwelcome behavior.

25.     Mr. Chreky retaliated against Ms. Barrett by subjecting her to punishing working conditions while she was pregnant.  He refused to let Ms. Barrett sit on a stool while cutting or styling a client's hair, even though this was a perfectly acceptable way to service a client.  He regularly came into the kitchen when Ms. Barrett was on her lunch break resting her legs, and insisted that she immediately return to the floor to assist him with clients, even though there were other stylists available who were not on their breaks.

26.     In late May 2004, Ms. Barrett began experiencing potentially serious, unexplained vaginal bleeding.  She asked Mr. Chreky if she could leave work early to see her obstetrician.  Mr. Chreky refused to let her leave.  Despite his refusal, Ms. Barrett went to the Emergency Room and was placed on bed rest.  The treating physician told her that she needed to spend less time standing up and needed to take breaks and rest during the work day.  When Ms. Barrett returned to work, she informed Mr. Chreky about her medical condition and her physician's direction to spend less time standing and to rest during the work day.  Mr. Chreky refused to accommodate Ms. Barrett's medical condition and told her that if he made allowances for her and her pregnancy, he would have to do so for everyone else.  On this and subsequent occasions he told her that if she did "not like the way things were done at the Salon, the front door is open."

27.     By July of 2004, Ms. Barrett began experiencing extreme swelling in her feet, ankles and legs.  Her physician advised her that the swelling was caused by her standing for long periods of time and advised her that it was medically necessary to sit while working and to take breaks during the work day.   Ms. Barrett informed Mr. Chreky about her physician's direction to her.  Once again, he refused to accommodate her medical condition and told her that she knew

where the front door was if she did not like the way he ran the Salon. Mr. Chreky continued his retaliatory demands that Ms. Barrett stand while cutting hair and interrupting her breaks with demands that she return to the floor to assist him even though there were other employees who were available to do so.

28.    In September 2004, Mr. Chreky put his hand down Ms. Barrett's shirt and tried to grab her breasts insisting that her "boobs looked sexy." Ms. Barrett pulled his hand away and demanded that he stop touching her. Mr. Chreky responded angrily to this rejection.

29.    Mr. Chreky routinely retaliated against Ms. Barrett whenever she rejected his physical advances. He did so by treating her in an angry and hostile manner, removing clients from her work schedule, reducing her client load, and altering her work schedule to make it less remunerative. Ms. Barrett became aware of these practices when a number of her loyal and longstanding clients contacted her and told her that when they arrived at the Salon, the receptionist said that "Ronnie was not available because of a mistake in the books," or that "Ronnie is booked." Mr. Chreky also directed Salon receptionists not to assign any new clients to her.

30.    By late September 2004, Ms. Barrett developed extreme swelling in her lower extremities as a result of Mr. Chreky's demand that she stand all day while working. At various times he taunted her and suggested that if she acted nicer to him, he would take good care of her. Ms. Barrett understood this to be a thinly veiled threat. As a result of the harassment and physical abuse, Ms. Barrett's swelling worsened and she was diagnosed with hypertension. Mr. Chreky refused to let her rest at the Salon or to put her legs up, as her doctor had directed.

31.    In December 2004, Ms. Barrett reminded Mr. Chreky of the promise he made at the time of hiring her to give her a raise after she had worked at the Salon for three months. He

excoriated her for making this request, accused her of being greedy and caring only about money, and once again told her that she knew where the front door was if she did not like how he was running the Salon.

32.    In January 2005, Ms. Barrett developed preeclampsia, a life threatening condition for both her and her unborn child. Ms. Barrett's baby was born almost a month prematurely and required a lengthy period of hospitalization. As a result of the complications of her delivery, and in order to care for her premature baby, Ms. Barrett was forced to remain away from work for five and a half months.

33.    Ms. Barrett returned to the Salon in May of 2005, deeply in debt from medical bills and lost income during her absence. As a result, she was especially vulnerable to Mr. Chreky's harassment and abuse, which resumed immediately upon her return to the Salon.

34.    Over Ms. Barrett's strong objections, Mr. Chreky pleaded with her to let him see her breasts and to taste her breast milk. He made frequent comments about her body, often in front of other stylists, and tried repeatedly to touch her breasts and spank her buttocks. Ms. Barrett attempted to ignore his offensive remarks and behavior because she desperately needed her job and the income it provided for her family. Ms. Barrett also enlisted the assistance of other Salon employees to ensure that she would not be left alone with Mr. Chreky.

35.    On or around November 15, 2005, Mr. Chreky became even more aggressive in making unwelcomed propositions and sexual advances towards Ms. Barrett. He demanded that she leave her husband and "start a relationship" with him. Mr. Chreky insisted that Ms. Barrett "needed a lover because American men are not good in bed." He told her that they could have "hot sex," that he would help her get an apartment, that they could be lovers, and that he wanted to be her "sugar daddy." Other stylists were present and overheard these comments, adding to

Ms. Barrett's humiliation.

36.     Ms. Barrett told him that she loved her husband and was not interested in having a relationship with him. In response, Mr. Chreky became physically aggressive, and deliberately brushed his body against hers and touched her in a sexual manner. He then ran his hand down the front of her shirt over her breast as other stylists looked on. Ms. Barrett was highly offended and humiliated by this conduct. Mr. Chreky appeared to take pleasure in her discomfort and continued to try to convince Ms. Barrett to show him her breasts and to allow him to touch them.

37.     After Ms. Barrett rejected these unwelcome advances, Mr. Chreky once again took actions to alter her work schedule, to deprive her of her best clients, to deny her new clients, and to diminish her client base and income. He also treated her with increased hostility and disdain, refused to talk to her, denigrated her abilities to Salon employees and clients, and assigned her to stock supplies in the stock room, which necessitated that she carry supplies from the ground floor to the fourth floor. This was hard physical labor.

38.     In late November 2005, Ms. Barrett went out to lunch with several other female stylists from the Salon. They each recounted the ways in which Mr. Chreky had propositioned and touched them, and confirmed that his behavior was getting more overt and aggressive. They also concurred with Ms.Barrett's observation that Mr. Chreky had once again targeted her for abuse, intimidation and ridicule.

39.     On December 6, 2005, which was a Saturday, Ms. Barrett clocked out at 6:00 p.m. after her work shift had ended. She remained at the Salon to attend a baby shower for a Salon employee that was to take place at the Salon at 7:00 p.m., after the Salon closed. Shortly after Ms. Barrett clocked out, Amal Darri, who served as Mr. Chreky's General Manager, directed her to stock products (e.g., shampoos and other hair care products that were sold at the

Salon). She stated "Andre said to tell you that if you are going to be downstairs, you have to do the retail." Ms. Barrett informed her that she had already clocked out for the day and had already stocked the color room. Ms. Darri then went upstairs to report this conversation to Mr. Chreky.

40.    A short time later Ms. Darri came back and informed Ms. Barrett that Mr. Chreky was very upset that she would not stock the supply room. She told Ms. Barrett, in the presence of several other employees, that Mr. Chreky did not want to see her face in the Salon and that he wanted Ms. Barrett out of the building immediately. She said that Mr. Chreky would call Ms. Barrett when he wanted her to come back. Ms. Barrett responded that she would clock back in and stock the supplies as Mr. Chreky had requested. Ms. Darri responded, "he wants you out of here and wants you to leave the building immediately." Ms. Barrett then told her co-workers that she would clock in and help them. Ms. Darri responded that "Andre is really mad at you and is going to fire you."

41.    At that point, Ms. Barrett became very frightened of Mr. Chreky and gathered all of her belongings from her locker. After the baby shower, Mr. Chreky approached Ms. Barrett in a threatening manner and began screaming at her. He said "didn't I fucking tell you to leave the building? When I tell you to do something, I expect you to do it." When Ms. Barrett tried to explain that she had not refused to stock the supplies and that she had simply told Ms. Darri that she had already clocked out, he became even more irrate and began cursing at Ms. Barrett and demanding that she leave at once. Ms. Barrett asked Mr. Chreky if he was firing her. Mr. Chreky taunted her to quit so that she would not be able to collect unemployment compensation. When Ms. Barrett refused to quit and asked him again if he was firing her he responded, "you can take it as you want. If you want to collect unemployment then you are fired."

42.    Ms. Barrett attempted to handle her departure in a professional and non-confrontational manner.  Mr. Chreky flew into an uncontrollable rage and screamed and cursed at her in front of the Salon staff, leveling invectives and profanity at her.  He demanded that she leave the building at once, physically menaced her, and forced her to back out of the Salon to avoid being struck by him.

43.    At various times throughout her employment at the Salon, Mr. Chreky boasted to Ms. Barrett and other Salon employees about his ability and willingness to assault individuals who angered him, including a homeless man who stood outside of the Salon.   Through these boasts and erratic outbursts of anger, violence and assaults, Mr. Chreky terrified and manipulated Salon employees, including Ms. Barrett and other women whom he subjected to a sexually hostile and abusive environment.

44.    Throughout the period of her employment at the Salon, defendant Salon and Chreky created and maintained a sexually hostile work environment, by, _inter alia_, subjecting female employees, including Ms. Barrett and Jennifer Thong, to unwelcome sexual touching, sexual demands, vulgar and sexually explicit remarks, threats, ridicule, and intimidation.  Mr. Chreky referred to women, including clients, in sexist and sexualized terms, and routinely called Salon patrons "bitches" among other sexist and demeaning terms.  The harassment was so severe and pervasive that it altered the terms and conditions of plaintiff's employment.  Mr. Chreky preyed on young, vulnerable immigrant women who were economically dependent on their jobs at the Salon and ill-equipped to assert their rights.  On almost a daily basis Mr. Chreky made lewd comments about female employees' bodies and sex lives, and subjected them to unwelcome touching.  On a number of occasions, Mr. Chreky cornered female employees, including Ms. Barrett, exposed himself, forced their heads towards his groin and demanded that

they give him a blow job. Ms. Barrett and other employees were forced to resort to elaborate protective plans to try to avoid being assaulted by him. Ms. Barrett was aware of Mr. Chreky's sexually abusive treatment of other employees, which further contributed to the sexually hostile work environment. Mr. Chreky did not treat male employees in this manner.

45.    Ms. Barrett and approximately twenty other different female employees complained to Maurice Clarke, then the Salon's Senior Manager, about Mr. Chreky's inappropriate sexual advances and sexual harassment of them. In response, Mr. Clark passed on the complaints to Mr. Chreky and told him that he was opening himself and the Salon up to unnecessary liability and that it was inappropriate for him to pursue these employees. Mr. Chreky responded, "I have an attorney." At no time did Mr. Chreky ever deny to Mr. Clark that he had engaged in these behaviors. Rather, he repeatedly responded, "This is my business, and I will run it the way I want."

46.    Mr. Chreky boasted to Ms. Barrett and others about having consensual sexual relationships with female Salon employees and was seen in various states of undress while in his office or in the Salon bathroom with different female employees. Mr. Chreky gave preferential treatment to the employees with whom he had a sexual relationship. Ms. Barrett and other female employees were aware of his sexual relationship with these employees and his preferential treatment of these employees, which further contributed to the sexually hostile work environment and underscored Mr. Chreky's threats that if Ms. Barrett wanted to advance in the workplace, she needed to submit to his unwelcome advances.

47.    Mr. Chreky also boasted to his employees that he was in fact the father in a high-profile and contested paternity suit brought by a former employee with whom he had had a long-term sexual relationship, and bragged that "no press was bad press." He made clear that he

would fight legally any claim, even meritorious ones, brought against him and would "bring

down" anyone who took legal action against him.

48.    At various times throughout her employment, Mr. Chreky told Ms. Barrett that

she needed to be nice to him and treat him well to get ahead.  He repeatedly stated that if she

wanted to become the Salon's head colorist or to go to the White House with him to have contact

with President Bush or his family, she needed to come to the Salon early in the morning, before

others arrived.  Ms. Barrett understood this to be a crude sexual proposition, and a thinly veiled

threat that if she wanted to advance in her career she needed to accede to his sexual demands.

Ms. Barrett refused to accede to these demands, and Mr. Chreky then refused to take her to the

White House or give her other high profile assignments.

49.    At various times throughout her employment, increasing in frequency towards the

end of her employment, Ms. Barrett complained to Mr. Clarke about Mr. Chreky's sexual

harassment and abuse of her.  Mr. Clark confirmed to Ms. Barrett that many other female

employees had complained to him about Mr. Chreky's misconduct, but that his behavior only

got worse over time.

50.    By letter dated September 15, 2006, Ms. Barrett put defendants on notice of her

claims of sexual harassment in violation of the D.C. Human Rights Act.  On November 8, 2006,

Ms. Barrett filed a charge under the DCHRA with the District of Columbia Office of Human

Rights.  On September 22, 2006, Jennifer Thong filed a sexual harassment suit against

defendants Chreky and the Salon.  On October 18, 2006, this suit was removed to the United

States District Court for the District of Columbia, and is captioned Thong v. Andre Chreky

Salon, et al., Civil Action No. 1:06-CV-01807-RCL.  While Ms. Barrett's charge and Ms.

Thong's lawsuit was pending, defendants, through their agents at the Salon, threatened and

attempted to intimidate witnesses into changing their testimony, including witnesses who had

provided sworn statements corroborating the allegations contained herein that were submitted to

the District of Columbia Office of Human Rights. On January 20, 2007, Ms. Barrett amended

her charge. On January 30, 2007, Ms. Barrett requested that the DCOHR dismiss her charge.

Ms. Barrett has properly exhausted her administrative remedies.

### Wage and Hour Violations, Conversion and Breach of Contract

51.     In or around 2003, the Department of Labor ("DOL") investigated and cited the

Salon for overtime violations and required the Salon to pay its stylists, including Ms. Barrett,

back overtime pay. Despite the findings by the DOL, Mr. Chreky stated "nobody gets

overtime."

52.     In breach of Mr. Chreky's agreement to pay Ms. Barrett at the rate of $1,900

every two weeks, the Salon paid Ms. Barrett at the rate of $21.00 per hour but only if she worked

a minimum of 45 hours per week. Mrs. Chreky, who managed the Salon payroll, told Ms.

Barrett that her promised salary of $1,900 every two weeks was the same as $21.00 per hour so

long as Ms. Barrett worked 45 hours each week. He further advised Ms. Barrett that if she

worked fewer than 45 hours in a given week, the Salon would dock her pay.

53.     Consistent with this direction, and in knowing and willful disregard of their legal

obligations under the FLSA, defendants notified all Salon stylists, including Ms. Barrett, that the

Salon had reclassified all of their positions to salaried positions. This "reclassification"

notwithstanding, the Salon actually treated the stylists as though they were hourly employees.

Mr. Chreky continued to schedule stylists to work a minimum of 45 hours per week and required

them to clock in and out. Mr. Chreky told the stylists that their "salaries" were calculated

according to an hourly rate and if they did not "meet their hours" their pay would be docked

accordingly.  Mr. Chreky in fact docked their pay checks when they failed to work 45 hours and

did not increase their checks to account for their overtime hours (all hours above 40 in a week),

including the hours he required them to work above the Salon's 45-hour work requirement.

    54.      Mr. Chreky required Ms. Barrett and other Salon employees to turn over their tips

to the Salon.  On repeated occasions, Mr. Chreky refused to provide Ms. Barrett with her tips,

either by directly refusing to give her some or all of the tip envelopes, or by falsely telling her

that she had not received any tips.

        **COUNT ONE --**       **DISCRIMINATION ON THE BASIS OF SEX IN
VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN
RIGHTS ACT, D.C. CODE ANN. § 2-1401.01 ET SEQ.
AGAINST DEFENDANTS ACI AND ANDRE CHREKY.**

    55.      Plaintiff hereby incorporates as though restated each of the factual allegations set

forth in paragraphs 1 through 54 above.

    56.      The District of Columbia Human Rights Act ("DCHRA") prohibits

discrimination on the basis of sex in the enjoyment of all benefits, privileges, terms, and

conditions of employment.

    57.      At all times relevant to this Complaint ACI was an "employer" within  the

meaning of the DCHRA.

    58.      At all times relevant to this Complaint Plaintiff was an "employee" within the

meaning of the DCHRA.

    59.      The Salon created and maintained a sexually hostile work environment in which

discriminatory intimidation, ridicule, and insult were so severe and pervasive that it altered the

conditions of Ms. Barrett's employment and created a sexually hostile work environment, in

violation of the DCHRA.  Mr. Chreky subjected Ms. Barrett to unwelcomed sexual advances,

sexually explicit remarks, touching, and numerous attempts to coerce or force sexual contact.

This conduct was humiliating and physically threatening to Ms. Barrett.

60.     AIC is liable for Mr. Chreky actions because he was, at all time relevant to this Complaint, the owner and operator of the Salon and AIC

61.     On December 6, 2005, Mr. Chreky terminated Ms. Barrett's employment.

62.     In the alternative, through his official actions as owner and operator of the Salon, Mr. Chreky subjected Ms. Barrett to working conditions that were so intolerable that a reasonable person would have felt compelled to resign. Mr. Barrett endured repeated unwelcomed sexual advances, assaults, batteries, and retaliatory changes to her work schedule that greatly diminished her earning potential and caused a significant change in her benefits, leading to Ms. Barrett's constructive discharge on or around December 5, 2005.

63.     AIC is vicariously liable for Mr. Chreky's actions in terminating and/or constructively discharging Ms. Barrett.

64.     Defendant Andre Chreky aided, abetted, compelled and coerced the sexual harassment and termination complained of herein, in violation of the DCHRA.

65.     Defendants' actions have directly and proximately caused Ms. Barrett substantial economic loss and damage to her career and professional reputation, humiliation, and pain and suffering.

66.     Defendants' actions were wanton, reckless or in willful disregard of Ms. Barrett's legal rights.

**COUNT TWO --     RETALIATION IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT, D.C. CODE ANN. § 2-1401.01 ET SEQ. AGAINST DEFENDANTS ANDRE CHREKY AND ACI.**

67.     Plaintiff hereby incorporates as though restated each of the factual allegations set forth in paragraphs 1 through 66 above.

68.    The DCHRA prohibits retaliation against any employee for engaging in opposition to what she reasonably in good-faith believes constitutes unlawful discrimination under the DCHRA, including the rejection of sexual advances and other forms of sexual harassment.

69.    Ms. Barrett engaged in protected activity by opposing treatment she reasonably believed constituted unlawful discrimination, including repeatedly rejecting Mr. Chreky unwelcomed sexual advances, opposing this misconduct by complaining to Mr. Chreky about his harassing behavior, and asking him to stop, and reporting Mr. Chreky's behavior to Mr. Clarke, the Salon's then General Manager.

70.    Defendants ACI and Chreky took adverse action against Ms. Barrett, including, inter alia, taking away Ms. Barrett's clients, directing Salon employees to alter her schedule, denying her appropriate compensation and other benefits, subjecting her to retaliatory harassment after she opposed his unwelcomed sexual advances, and terminating and/or constructively discharging her. Mr. Chreky's retaliatory actions were so adverse that they would have dissuaded a reasonable Salon employee from making or supporting a charge of discrimination.

71.    Defendants' retaliatory actions were causally connected to Ms. Barrett's protected activity.

72.    At all times relevant to this Complaint, Mr. Chreky used his position as the owner and operator of the Salon and Ms. Barrett's supervisor to retaliate against her.

73.    Defendant Andre Chreky aided, abetted, compelled and coerced the retaliation complained of herein, in violation of the DCHRA.

74.    Defendants' actions have directly and proximately caused Ms. Barrett substantial

economic loss and damage to her career and professional reputation, humiliation and pain and suffering.

75.    Defendants' actions were wanton, reckless or in willful indifference to Ms. Barrett legal rights.

**COUNT THREE -- VIOLATION OF THE FAIR LABOR STANDARDS ACT, 29 U.S.C. § 207 ET SEQ. AGAINST DEFENDANTS AIC AND CHREKY.**

76.    Ms. Barrett hereby incorporates as though restated each of the factual allegations set forth in paragraphs 1 through 75 above.

77.    The Fair Labor Standards Act ("FLSA") requires an employer to pay covered employees one and one half times the regular rate of pay for hours worked in excess of 40 hours per week.

78.    At all relevant times, defendants ACI and Chreky were "employers" engaged in interstate commerce within the meaning of the FLSA.

79.    At all times relevant, Ms. Barrett was a "covered employee" within the meaning of the FLSA, and was therefore entitled to the protections of the FLSA, including the right to be paid one and a half times her regular rate of pay for all hours worked in excess of 40 hours in any given work-week.

80.    From September 2003 until December of 2004, defendants required Ms. Barrett to work more than 40 hours per week without paying her one and one-half times her normal rate of pay.   During this same period, defendants took and retained plaintiff's tips, in violation of FLSA.

81.    Defendants were investigated and cited by the Department of Labor in 2003 for overtime violations and were on notice about the Salon's legal obligation to pay overtime wages

to Ms. Barrett and other Salon stylists. They failed to do so in knowing and willful disregard of their legal obligations under the FLSA.

82.    As a direct and proximate result of defendants' willful violation of FLSA, Ms. Barrett has suffered economic loss and is entitled to an award of unpaid overtime, liquidated damages and other equitable relief.

### COUNT FOUR -    VIOLATION OF THE DISTRICT OF COLUMBIA WAGE AND HOUR ACT, D.C. CODE § 32-1002 ET SEQ. AGAINST DEFENDANTS ACI AND CHREKY.

83.    Ms. Barrett hereby incorporates as though restated each of the factual allegations set forth in paragraphs 1 through 82 above.

84.    The District of Columbia Wage and Hour Act ("DCWHA") requires employers to pay covered employees one and one half times the regular rate of pay for hours worked in excess of 40 hours per week.

85.    At all relevant times, defendants ACI and Chreky were "employers" within the meaning of the DCWHA.

86.    At all relevant times Ms. Barrett was a "covered employee" within the meaning of the DCWHA, and was entitled to the protections of the DCWHA including the right to be paid one and a half time her regular rate of pay for all hours worked in excess of 40 hours in any given work-week.

87.    From September 2003 until December of 2004, defendants required Ms. Barrett to work more that 40 hours per week without overtime pay in violation of the DCWHA. During this same period, defendants took and retained plaintiff's tips, in violation of the DCWHA..

88.    As a direct and proximate result of defendants' wilful violation of the DCWHA, Ms. Barrett has suffered economic loss, and is entitled to an award of unpaid overtime,

liquidated damages and other equitable relief.

**COUNT FIVE -    VIOLATION OF THE DISTRICT OF COLUMBIA WAGE PAYMENT AND COLLECTION ACT, D.C. CODE § 32-1301(1),  AGAINST DEFENDANTS AIC AND CHREKY.**

89.    Ms. Barrett hereby incorporates as though restated each of the factual allegations set forth in paragraphs 1 through 88 above.

90.    At all times relevant to this Complaint, defendants ACI and Chreky were "employers" within the meaning of DCWPCA.

91.    At all times relevant to this Complaint, Ms. Barrett was an "employee" within the meaning of the DCWPCA.

92.    Under the DCWPA, defendants were obligated to pay plaintiff all wages due for work that she performed, including all earned tips that were held by the Salon on Ms. Barrett's behalf.

93.  In breach of their obligation, defendants routinely failed to pay or deliberately underpaid plaintiff for the tips she earned.

94.    As a direct and proximate result of defendants' willful violation of the DCWPCA, Ms. Barrett has suffered economic loss, and is entitled to an award of unpaid compensation in the form of withheld tips and other equitable relief.

**COUNT SIX --    CONVERSION AGAINST DEFENDANTS CHREKY AND ACI.**

95.    Plaintiff incorporates herein by reference all of the allegations contained in paragraphs one through 94.

96.    The taking and retention of the Plaintiff's tips constitutes the unlawful taking and exercise of ownership and control by the defendants over Ms. Barrett's personal property.  Such a taking constituted a deprivation of plaintiff's rights to such property.

97.     Mr. Chreky routinely diverted some or all of Ms. Barrett's tips to ACI which he owned and operated.

98.     Defendants Andre Chreky and ACI are liable to plaintiff for all tips they unlawfully retained by Mr. Chreky and/or ACI, compensatory and punitive damages.

## COUNT SEVEN  -- NEGLIGENT SUPERVISION AGAINST DEFENDANT AIC.

99.     Plaintiff incorporates herein by reference all of the allegations contained in paragraphs one through 98.

100.     In the District of Columbia, employers have a duty to use reasonable care in supervision and retention of employees.  ACI owed a duty to Ms. Barrett to protect her from unreasonable risk of foreseeable harm.  Mr. Chreky's persistent sexual harassment and assaultive conduct toward Ms. Barrett and numerous other female employees was well known to ACI.

101.     ACI, a corporation owned and controlled by Andre and Serena Chreky, owed Ms. Barrett the duty to supervise its managers and to ensure that those who had authority over employees carried out their responsibilities with due care.  ACI, through its owners and principal officers, Andre and Serena Chreky, had actual and constructive knowledge that Andre Chreky was likely to and did in fact harass, assault, and batter female employees, as well as carrying out his duties as a superior and manager in a dangerous manner.  AIC had actual knowledge of Mr. Chreky's persistent harassing and assaultive conduct toward Ms. Barrett and other stylists through Andre Chreky, its President and Treasurer.  ACI had a duty to adequately train, supervise and restrain its principal manager, Andre Chreky, in order to prevent the foreseeable harm to Ms. Barrett and the other stylists under his supervision.

102.     AIC breached its duty to protect its employees from unreasonable risk of harm, and this breach was the proximate cause of Ms. Barrett's injuries and the cause of the ensuing

damages to plaintiff.

## COUNT EIGHT - NEGLIGENCE AGAINST DEFENDANT SPAC, LLC.

103.    Plaintiff incorporates herein by reference all of the allegations contained in paragraphs one through 102.

104.    In the District of Columbia, landlords have a duty to protect invitees from foreseeable risk of harm caused by third parties on its property.

105.    SPAC, LLC, a corporation owned and controlled by Andre and Serena Chreky, leased the premises at 1604 K Street, NW, Washington D.C. ("the premises"), to AIC and the Salon where Ms. Barrett worked.

106.    Ms. Barrett's employment at the Salon made her an invitee of SPAC, LLC by virtue of the fact that she worked at the premises.

107.    SPAC, LLC had actual and constructive knowledge that Andre Chreky was likely to and did in fact harass, assault and batter female employees on the premises it leased to AIC.

108.    SPAC, LLC failed to warn or protect Ms. Barrett from the ongoing harassment and assaults by Andre Chreky.

109.    SPAC, LLC's failure to warn or protect Ms. Barrett from Mr. Chreky's harassment, assaults and batteries was the proximate cause of injuries to Ms. Barrett and caused the ensuing damages to Ms. Barrett.

## COUNT NINE – BREACH OF CONTRACT AGAINST DEFENDANT ACI.

110.    Plaintiff hereby incorporates by reference as though restated each of the factual allegations contained in paragraphs 1 through 109 above.

111.    Plaintiff and defendant Salon entered into a valid, binding, and enforceable contract through which it promised to pay Ms. Barrett the equivalent of $1,900 every two weeks

for the first three months of her employment and to increase her salary after completion of the third month of employment.

112.    Defendant Salon breached this contract by failing to pay plaintiff the salary it was contractually obligated to pay her and by failing to give her a salary increase after her first three months of employment.

113.    Defendant Salon's actions described above directly and proximately have caused, and continue to cause, plaintiff to suffer economic damages.

114.    Defendant Salon has committed this breach of contract in bad faith and with actual malice.

## REQUESTED RELIEF

WHEREFORE, plaintiff prays this Court for the following relief:

1.    Enter a judgment in plaintiff's favor and against Andre Chreky and ACI for discrimination on the basis of sex in violation of the District of Columbia Human Rights Act, D.C. Code Ann. § 2-1401.01 et seq.;

2.    Enter a judgment in plaintiff's favor and against Andre Chreky and ACI for retaliation in violation of the District of Columbia Human Rights Act, D.C. Code Ann. § 2-1401.01 et seq.;

3.    Enter a judgment in plaintiff's favor and against ACI for violations of the Fair Labor Standards Act, 29 U.S.C. § 207 et seq.;

4.    Enter a judgment in plaintiff's favor and against ACI for violations of the District of Columbia Wage and Hour Act, D.C. Code § 32-1002 et seq.;

5.    Enter a judgment in plaintiff's favor and against ACI for violations of the District of Columbia Wage Payment and Collection Act, D.C. Code § 32-1301(1);

6.      Enter a judgment in plaintiff's favor and against Andre Chreky ACI for Conversion;

7.      Enter a judgment in plaintiff's favor and against ACI for Negligent Supervision;

8.      Enter a judgment in plaintiff's favor and against SPAC, LLC for Negligence;

9.      An award to plaintiff of compensatory damages in an amount to be proven at trial, but in any event not less than $1,000,000;

10.     An award to plaintiff of punitive damages in an amount to be proven at trial, but in any event not less than $3,000,000;

11.     An award of reasonable attorneys' fees and costs; and

12.     All other relief the court deems just.

Respectfully submitted,

_____
Debra S. Katz (Bar No. 411861)
Katz, Marshall & Banks, LLP
1718 Connecticut Avenue, N.W.
6th Floor
Washington, D.C. 20009
(202) 299-1140
(202) 299-1148 (fax)

_____
Ari M. Wilkenfeld (Bar. No. 461063)
Katz, Marshall & Banks, LLP
1718 Connecticut Avenue, N.W.
Sixth Floor
Washington, D.C. 20009
(202) 299-1140
(202) 299-1148 (fax)


Attorneys for Plaintiff Ronnie Barrett

Dated: February 1, 2007

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RONNIE BARRETT,**<br>6307 59th Avenue<br>Riverdale, MD 20737<br><br>    **Plaintiff,**<br><br>  **v.**<br><br>**ANDRE CHREKY,**<br>548 River Bend Road<br>Falls Church, VA 22066<br><br>**ANDRE CHREKY SALON/ANDRE CHREKY INC,**<br>1604 K Street, N.W.<br>Washington, D.C. 22006<br><br>  **SERVE:**<br>  CT Corporations System<br>  1015 15th Street, N.W.<br>  Suite 1000<br>  Washington, D.C. 20005<br><br>   **and**<br><br>**SPAC, LLC,**<br>1604 K Street, N.W.<br>Washington, D.C. 22006<br><br>  **SERVE:**<br>  CT Corporations System<br>  1015 15th Street, N.W.<br>  Suite 1000<br>  Washington, D.C. 20005<br><br>   **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) **Civil Action No. _____**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## JURY DEMAND

Plaintiffs demand a jury trial on all claims so triable.

Plaintiffs demand a jury trial on all claims so triable.

Respectfully submitted,

Debra S. Katz (Bar No. 411861)
Ari M. Wilkenfeld (Bar. No. 461063)
Katz, Marshall & Banks, LLP
1718 Connecticut Avenue, N.W.
Floor 6
Washington, D.C. 20009
(202) 299-1140
(202) 299-1148 (fax)

Attorneys for Plaintiff Ronnie Barrett

Dated: February 1, 2007

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| **RONNIE BARRETT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **C.A. No. 07-CV-0250 (RCL)** |
| | ) | |
| **ANDRE CHREKY,** | ) | |
| **ANDRE CHREKY SALON/ANDRE CHREKY INC.,** | ) | |
| **SPAC, LLC** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

_____)

### FIRST AMENDED COMPLAINT FOR DECLARATORY
### AND MONETARY RELIEF AND JURY DEMAND

### Preliminary Statement

1.      This is a civil action against the Andre Chreky Salon/Andre Chreky Inc. ("the

Salon" or "ACI") for declaratory and equitable relief and monetary damages for injuries plaintiff

Ronnie Barrett has sustained as a result of defendant Andre Chreky's sexual harassment and

retaliation against her, in violation of the District of Columbia Human Rights Act, D.C. Code §

2-1401.01 et seq. ("DCHRA"), and for the Salon's negligent supervision of defendant Andre

Chreky.  This is also an action against defendant Andre Chreky ("Mr. Chreky"), in his individual

capacity, for aiding and abetting the sexual harassment and retaliation to which plaintiff was

subjected, in violation of the DCHRA, D.C. Code § 2-1401.62.  Mr. Chreky routinely subjected

Ms. Barrett and other female employees to unwelcome touching, sexual demands, vulgar and

sexually explicit remarks, threats, ridicule, intimidation and other abuse.  Mr. Chreky used his

position as the owner and operator of one of the nation's premier hair salons to attempt to coerce

and intimidate attractive, vulnerable immigrant female employees, like Ms. Barrett, to perform sexual acts, including oral sex and group sex, and to otherwise engage in unwelcome physical and sexual contact with him.  Mr. Chreky engaged in an egregious pattern of humiliating and degrading behavior towards Ms. Barrett, and other female employees, promising that he would provide them career advancement, trips to the White House, and contact with President George W. Bush, First Lady Laura Bush, and other members of the Bush family if they acceded to his sexual demands, and retaliating against them with a range of adverse actions and abusive behavior when they rejected these sexual advances.

2.     This is also an action against defendant Salon and defendant Chreky for their willful failure to pay plaintiff and other non-exempt employees overtime wages in violation of the Fair Labor Standards Act, 29 U.S.C. § 207 et seq. ("FLSA") and the District of Columbia Wage and Hour Act, D.C. Code § 32-1002 et seq.("DCWHA"); and for their unlawful withholding of compensation, and their conversion of tips earned by plaintiff, in violation of the District of Columbia Wage Payment and Collection Act, D.C. Code § 32-1301(1) ("DCWPCA"). Despite having been previously cited by the Department of Labor ("DOL") for widespread overtime violations, and being ordered to pay back overtime to Salon employees, including Ms. Barrett, defendant ACI engaged in widespread FLSA and DCWHA violations, willfully depriving Ms. Barrett and other Salon employees of overtime pay to which they are legally entitled.

3.     This is also an action against SPAC, Inc., the owner of the property that houses defendant Salon for negligence and for breach of its duty to protect business invitees, including Ms. Barrett.

**Jurisdiction and Venue**

4.     This Court has jurisdiction over plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) as this matter contains a federal question.  This court has supplemental jurisdiction over plaintiff's state law claims under 28 U.S.C. § 1367(a).  This Court also has jurisdiction over plaintiff's claims pursuant to 28 U.S.C. § 1332(a)(1), as there is complete diversity of citizenship and the amount in controversy exceeds $75,000.

5.     Venue is proper in this district under 28 U.S.C. §§ 1391(a)(2) and (b)(1), as the events or omissions giving rise to Ms. Barrett's claims occurred in the District of Columbia.

**Parties**

6.     Ronnie Barrett is a citizen of Maryland who resides at 6307 59th Avenue, Riverdale, MD 20737.  At various times during the period of September 2003 to December 2005, Ms. Barrett was employed by Andre Chreky Inc., a corporation owned and operated by Andre Chreky.  Defendant Chreky was plaintiff's supervisor.  At all times relevant to this Complaint, Ms. Barrett was an "employee" within the meaning of the DCHRA, D.C. Code § 2-1401.2(9), and was an "employee" engaged in "commerce" within the meaning of the FLSA, 29 U.S.C. §§ 203(b), 203(e).  Ms. Barrett was not an exempt employee under the FLSA.  At all times relevant to this Complaint, Ms. Barrett was an "employee" within the meaning of the DCWHA, D.C. Code § 32-1002(3).

7.     Defendant Andre Chreky is a citizen of Virginia who resides at 548 River Bend Road, Falls Church, VA 22066.  Mr. Chreky is part owner of defendants Andre Chreky Inc. and SPAC, LLC.   Mr. Chreky is an employer within the meaning of the DCHRA, D.C. Code § 2-1401.2(10), the FLSA, 29 U.S.C. § 203(d), the DCWHA, D.C. Code § 32-1002(3), and the DCWPCA, D.C. Code § 32-1302.

8.     Andre Chreky Inc. ("ACI" or "the Salon") is a District of Columbia corporation with its principal place of business at 1604 K Street N.W., Washington, D.C. 20006.   ACI was formed for the purposes of owning and operating the Andre Chreky Salon and Spa.  ACI is owned and operated by defendant Chreky and his wife, Serena Chreky.  Andre Chreky is ACI's President and Treasurer.  ACI is an employer within the meaning of the DCHRA, D.C. Code § 2-1401.2(10), the FLSA, 29 U.S.C. § 203(d), the DCWHA, D.C. Code § 32-1002(3), and the DCWPCA, D.C. Code § 32-1302.

9.     SPAC, LLC ("SPAC") is a District of Columbia corporation with its principal place of business at 1604 K Street N.W., Washington, D.C. 20006.  SPAC owns the property that houses the Andre Chreky Salon and Spa.  Upon information and belief, ACI rents the location 1604 K Street N.W., Washington, D.C. 20006, from SPAC.  SPAC is owned and operated by defendant Chreky and his wife, Serena Chreky.  Defendant Chreky is a "Member" of the corporation.

## Factual Allegations

10.     Ms. Barrett was born in Brazil and immigrated to the United States in 1985.  In 1992, Ms. Barrett earned her cosmetology license from Aspen Beauty Academy in Maryland and began her career as a hair stylist.

11.     In 1994, Ms. Barrett began working for defendant Andre Chreky at Piaf's, a salon owned by Mr. Chreky's sister, and then at Daniel's, a salon owned by Mr. Chreky's brother.  In 1997, Mr. Chreky opened his own salon, the Andre Chreky Salon and Spa, and hired Ms. Barrett as his assistant.  Over time, Ms. Barrett transitioned to the higher paying position of hair stylist. She remained in that position until May 1998, when she resigned.

12.      Ms. Barrett worked at the Roche Salon in Georgetown from 1998 to 2001, and then at the Toka Salon in Georgetown from 2002 to 2003.

## Sexual Harassment and Retaliation Allegations

13.      In or around late Summer 2003, Mr. Chreky became aware that Ms. Barrett was looking for a new job and offered her a position as a stylist with the Salon.  Mr. Chreky asked Ms. Barrett what she was looking for in terms of salary.  Ms. Barrett responded that she wanted to earn a bi-weekly salary of $2,500.  Mr. Chreky responded that he did not want to start her at that salary.  Instead he offered her a bi-weekly salary of $1,900 and told her that she would receive a review and an increase to $2,500 after three months.  Ms. Barrett was hesitant to accept the offer given the manner in which defendant Chreky treated her during her first period of employment with the Salon.  Ultimately, she accepted the position because the Salon had established itself as the premier salon in the District of Columbia serving the most elite clientele and paying its stylists top-end salaries.

14.      Upon the commencement of her employment with the Salon, defendants ACI and Mr. Chreky required Ms. Barrett to sign a non-compete agreement as a condition of her employment.  Pursuant to this agreement, Ms. Barrett was obligated to refrain from competing with the business of the Salon for a period of six months, and within a radius of five miles, after termination of her employment.

15.      Almost immediately upon her return to the Salon, Mr. Chreky, who is more than 20 years plaintiff's senior, began sexually harassing Ms. Barrett.  He showed an obsessive interest in Ms. Barrett and stalked her at the workplace, often isolating her in secluded areas of the Salon where he grabbed her and attempted to kiss and grope her.  On each such occasion,

Ms. Barrett rejected Mr. Chreky's unwelcome advances and touching. Mr. Chreky reacted with anger and disgust, but he remained undeterred.

16.    In February 2004, after Ms. Barrett returned from her honeymoon, Mr. Chreky's obsession with Ms. Barrett escalated, as did his unwelcome sexual attention and advances. He inundated Ms. Barrett with inappropriate comments about her husband, denigrating his sexual prowess. Mr. Chreky repeatedly propositioned Ms. Barrett and suggested that she have sex with him, because she undoubtedly "needed some extra sex." Ms. Barrett told Mr. Chreky that his remarks, often uttered in front of coworkers, made her very uncomfortable. Mr. Chreky laughed derisively in response to Ms. Barrett's complaints and requests that he cease his sexually harassing conduct.

17.    When Ms. Barrett rejected Mr. Chreky's advances, he retaliated against her by, inter alia, removing clients from her schedule, as he had also done with Jennifer Thong and other female employees who had rejected his advances, and directing Salon receptionists to make changes to Ms. Barrett's schedule moving clients from one stylist to another in a manner that harmed Ms. Barrett. Mr. Chreky threatened Salon receptionists with termination if they revealed to the stylists that clients were being removed from their schedules at his direction. By secretly reassigning both new clients and Ms. Barrett's established clients to other stylists, Mr. Chreky deliberately depressed her earnings. He also deliberately damaged Ms. Barrett's future earnings by interfering with her ability to develop a loyal client base.

18.    In February 2004, Ms. Barrett asked Mr. Chreky for the raise he had promised she would be given after working at the Salon for three months. Mr. Chreky directed her to meet him at the end of the day in his office on the fifth floor to discuss her request, which she did.

19.    Ms. Barrett was aware that Mr. Chreky had previously isolated other female employees in his office and tried to force himself on them sexually.  Accordingly, when she entered Mr. Chreky's office she made sure the door behind her remained open and sat down in the visitor's chair.  Mr. Chreky began the meeting by stating that Sammy, his assistant, had just gone out to buy lemonade, "so we have a little time."  As soon as Ms. Barrett heard this statement, she got up and tried to leave the office.  Mr. Chreky jumped up and grabbed her below the neck and shoulder blades and forcefully shoved her back into the chair.  He put one hand on his belt as if to open his pants and said, "Come on, just give me a blow job."  Ms. Barrett pushed him away and ran out of the office.

20.    Mr. Chreky called Ms. Barrett at home that evening and apologized for his misconduct.  He assured her that he would not repeat this conduct and would leave her alone in the future.

21.    Ms. Barrett was terrified of Mr. Chreky and humiliated as a result of his conduct and began active consideration of leaving the Salon.  Because she had entered into a non-compete agreement with the Salon she was extremely concerned that if she left the Salon and went to work elsewhere, Mr. Chreky would retaliate against her by filing a lawsuit to prevent her from working.  Indeed, in staff meetings Mr. Chreky had made repeated threats to Salon stylists that if they left to work elsewhere, he would go after them in court and "take them to the cleaners."

22.    In the weeks following the incident referred to in paragraph 18, above, Ms Barrett actively avoided Mr. Chreky and he too stayed clear of Ms. Barrett.  However, as time went on, he again began focusing unwelcome attention on her and made demeaning and taunting remarks to her.  He regularly alluded to the incident in his office referred to in paragraph 18, above, and

taunted her by asking her if she wanted to "go to the fifth floor" with him. Mr. Chreky made these comments in the presence of other stylists, who became aware that he was targeting Ms. Barrett for especially hostile and demeaning treatment.

23.     Ms. Barrett was terrified that defendant Chreky would try to force himself on her again. Ms. Barrett began looking for a new job, but was not able to find a comparable position.

24.      In April 2004, after learning that Ms. Barrett was pregnant, Mr. Chreky became increasingly obsessed with Ms. Barrett and her body. He made constant comments to Ms. Barrett about her breasts, often in front of other employees, saying things like, "Ronnie, your boobs are really swelling," "Come on, let me see them," and "Umm they look good." These and other comments continued throughout Ms. Barrett's pregnancy, and caused her great humiliation and embarrassment.

25.     As Ms. Barrett's pregnancy progressed, Mr. Chreky made repeated attempts to touch her breasts. He often brushed up against her while she was working, and deliberately touched her breasts. Mr. Chreky also routinely slapped or spanked Ms. Barrett on her buttocks, using enough force to leave red marks on Ms. Barrett's skin that remained for hours. On each occasion, Ms. Barrett told him to stop this unwelcome behavior.

26.     Mr. Chreky retaliated against Ms. Barrett by subjecting her to punishing working conditions while she was pregnant. He refused to let Ms. Barrett sit on a stool while cutting or styling a client's hair, even though this was a perfectly acceptable way to service a client. He regularly came into the kitchen when Ms. Barrett was on her lunch break resting her legs, and insisted that she immediately return to the floor to assist him with clients, even though there were other stylists available who were not on their breaks.

27.     In late May 2004, Ms. Barrett began experiencing potentially serious, unexplained vaginal bleeding.  She asked Mr. Chreky if she could leave work early to see her obstetrician. Mr. Chreky refused to let her leave.  Despite his refusal, Ms. Barrett went to the Emergency Room and was placed on bed rest.  The treating physician told her that she needed to spend less time standing up and needed to take breaks and rest during the work day.  When Ms. Barrett returned to work, she informed Mr. Chreky about her medical condition and her physician's direction to spend less time standing and to rest during the work day.  Mr. Chreky refused to accommodate Ms. Barrett's medical condition and told her that if he made allowances for her and her pregnancy, he would have to do so for everyone else.  On this and subsequent occasions he told her that if she did "not like the way things were done at the Salon, the front door is open."

28.     By July of 2004, Ms. Barrett began experiencing extreme swelling in her feet, ankles and legs.  Her physician advised her that the swelling was caused by her standing for long periods of time and advised her that it was medically necessary to sit while working and to take breaks during the work day.   Ms. Barrett informed Mr. Chreky about her physician's direction to her.  Once again, he refused to accommodate her medical condition and told her that she knew where the front door was if she did not like the way he ran the Salon.  Mr. Chreky continued his retaliatory demands that Ms. Barrett stand while cutting hair and interrupting her breaks with demands that she return to the floor to assist him even though there were other employees who were available to do so.

29.     In September 2004, Mr. Chreky put his hand down Ms. Barrett's shirt and tried to grab her breasts insisting that her "boobs looked sexy."  Ms. Barrett pulled his hand away and demanded that he stop touching her.  Mr. Chreky responded angrily to this rejection.

Mr. Chreky routinely retaliated against Ms. Barrett whenever she rejected his physical advances. He did so by treating her in an angry and hostile manner, removing clients from her work schedule, reducing her client load, and altering her work schedule to make it less remunerative. Ms. Barrett became aware of these practices when a number of her loyal and longstanding clients contacted her and told her that when they arrived at the Salon, the receptionist said that "Ronnie was not available because of a mistake in the books," or that "Ronnie is booked."  Mr. Chreky also directed Salon receptionists not to assign any new clients to her.

30.     By late September 2004, Ms. Barrett developed extreme swelling in her lower extremities as a result of Mr. Chreky's demand that she stand all day while working.  At various times he taunted her and suggested that if she acted nicer to him, he would take good care of her. Ms. Barrett understood this to be a thinly veiled threat.  As a result of the harassment and physical abuse, Ms. Barrett's swelling worsened and she was diagnosed with hypertension.  Mr. Chreky refused to let her rest at the Salon or to put her legs up, as her doctor had directed.

31.     In December 2004, Ms. Barrett reminded Mr. Chreky of the promise he made at the time of hiring her to give her a raise after she had worked at the Salon for three months.  He excoriated her for making this request, accused her of being greedy and caring only about money, and once again told her that she knew where the front door was if she did not like how he was running the Salon.

32.     In January 2005, Ms. Barrett developed preeclampsia, a life threatening condition for both her and her unborn child.  Ms. Barrett's baby was born almost a month prematurely and required a lengthy period of hospitalization.  As a result of the complications of her delivery, and in order to care for her premature baby, Ms. Barrett was forced to remain away from work for five and a half months.

33.    Ms. Barrett returned to the Salon in May of 2005, deeply in debt from medical bills and lost income during her absence. As a result, she was especially vulnerable to Mr. Chreky's harassment and abuse, which resumed immediately upon her return to the Salon.

34.    Over Ms. Barrett's strong objections, Mr. Chreky pleaded with her to let him see her breasts and to taste her breast milk. He made frequent comments about her body, often in front of other stylists, and tried repeatedly to touch her breasts and spank her buttocks. Ms. Barrett attempted to ignore his offensive remarks and behavior because she desperately needed her job and the income it provided for her family. Ms. Barrett also enlisted the assistance of other Salon employees to ensure that she would not be left alone with Mr. Chreky.

35.    On or around November 15, 2005, Mr. Chreky became even more aggressive in making unwelcomed propositions and sexual advances towards Ms. Barrett. He demanded that she leave her husband and "start a relationship" with him. Mr. Chreky insisted that Ms. Barrett "needed a lover because American men are not good in bed." He told her that they could have "hot sex," that he would help her get an apartment, that they could be lovers, and that he wanted to be her "sugar daddy." Other stylists were present and overheard these comments, adding to Ms. Barrett's humiliation.

36.    Ms. Barrett told him that she loved her husband and was not interested in having a relationship with him. In response, Mr. Chreky became physically aggressive, and deliberately brushed his body against hers and touched her in a sexual manner. He then ran his hand down the front of her shirt over her breast as other stylists looked on. Ms. Barrett was highly offended and humiliated by this conduct. Mr. Chreky appeared to take pleasure in her discomfort and continued to try to convince Ms. Barrett to show him her breasts and to allow him to touch them

37.     After Ms. Barrett rejected these unwelcome advances, Mr. Chreky once again took actions to alter her work schedule, to deprive her of her best clients, to deny her new clients, and to diminish her client base and income.  He also treated her with increased hostility and disdain, refused to talk to her, denigrated her abilities to Salon employees and clients, and assigned her to stock supplies in the stock room, which necessitated that she carry supplies from the ground floor to the fourth floor.  This was hard physical labor.

38.     In late November 2005, Ms. Barrett went out to lunch with several other female stylists from the Salon.  They each recounted the ways in which Mr. Chreky had propositioned and touched them, and confirmed that his behavior was getting more overt and aggressive.  They also concurred with Ms. Barrett's observation that Mr. Chreky had once again targeted her for abuse, intimidation and ridicule.

39.     On December 6, 2005, which was a Saturday, Ms. Barrett clocked out at 6:00 p.m. after her work shift had ended.  She remained at the Salon to attend a baby shower for a Salon employee that was to take place at the Salon at 7:00 p.m., after the Salon closed.  Shortly after Ms. Barrett clocked out, Amal Darri, who served as Mr. Chreky's General Manager, directed her to stock products (e.g., shampoos and other hair care products that were sold at the Salon).  She stated "Andre said to tell you that if you are going to be downstairs, you have to do the retail."  Ms. Barrett informed her that she had already clocked out for the day and had already stocked the color room.  Ms. Darri then went upstairs to report this conversation to Mr. Chreky.

40.     A short time later Ms. Darri came back and informed Ms. Barrett that Mr. Chreky was very upset that she would not stock the supply room.  She told Ms. Barrett, in the presence of several other employees, that Mr. Chreky did not want to see her face in the Salon and that he wanted Ms. Barrett out of the building immediately.  She said that Mr. Chreky would call Ms.

Barrett when he wanted her to come back.  Ms. Barrett responded that she would clock back in

and stock the supplies as Mr. Chreky had requested.  Ms. Darri responded, "he wants you out of

here and wants you to leave the building immediately."  Ms. Barrett  then told her co-workers

that she would clock in and help them.  Ms. Darri responded that "Andre is really mad at you and

is going to fire you."

41.     At that point, Ms. Barrett became very frightened of Mr. Chreky and gathered all

of her belongings from her locker.  After the baby shower, Mr. Chreky approached Ms. Barrett in

a threatening manner and began screaming at her.  He said "didn't I fucking tell you to leave the

building?  When I tell you to do something, I expect you to do it."  When Ms. Barrett tried to

explain that she had not refused to stock the supplies and that she had simply told Ms. Darri that

she had already clocked out, he became even more irrate and began cursing at Ms. Barrett and

demanding that she leave at once.  Ms. Barrett asked Mr. Chreky if he was firing her.  Mr.

Chreky taunted her to quit so that she would not be able to collect unemployment compensation.

When Ms. Barrett refused to quit and asked him again if he was firing her he responded, "you

can take it as you want.  If you want to collect unemployment then you are fired."

42.     Ms. Barrett attempted to handle her departure in a professional and non-

confrontational manner.  Mr. Chreky flew into an uncontrollable rage and screamed and cursed

at her in front of the Salon staff, leveling invectives and profanity at her.  He demanded that she

leave the building at once, physically menaced her, and forced her to back out of the Salon to

avoid being struck by him.

43.     At various times throughout her employment at the Salon, Mr. Chreky boasted to

Ms. Barrett and other Salon employees about his ability and willingness to assault individuals

who angered him, including a homeless man who stood outside of the Salon.   Through these

boasts and erratic outbursts of anger, violence and assaults, Mr. Chreky terrified and manipulated

Salon employees, including Ms. Barrett and other women whom he subjected to a sexually

hostile and abusive environment.

44.    Throughout the period of her employment at the Salon, defendant Salon and

Chreky created and maintained a sexually hostile work environment, by, inter alia, subjecting

female employees, including Ms. Barrett and Jennifer Thong, to unwelcome sexual touching,

sexual demands, vulgar and sexually explicit remarks, threats, ridicule, and intimidation.  Mr.

Chreky referred to women, including clients, in sexist and sexualized terms, and routinely called

Salon patrons "bitches" among other sexist and demeaning terms.  The harassment was so severe

and pervasive that it altered the terms and conditions of plaintiff's employment.  Mr. Chreky

preyed on young, vulnerable immigrant women who were economically dependent on their jobs

at the Salon and ill-equipped to assert their rights.  On almost a daily basis Mr. Chreky made

lewd comments about female employees' bodies and sex lives, and subjected them to unwelcome

touching.  On a number of occasions, Mr. Chreky cornered female employees, including Ms.

Barrett, exposed himself, forced their heads towards his groin and demanded that they give him a

blow job.  Ms. Barrett and other employees were forced to resort to elaborate protective plans to

try to avoid being assaulted by him.  Ms. Barrett was aware of Mr. Chreky's sexually abusive

treatment of other employees, which further contributed to the sexually hostile work

environment.  Mr. Chreky did not treat male employees in this manner.

45.    Ms. Barrett and approximately twenty other different female employees

complained to Maurice Clarke, then the Salon's Senior Manager, about Mr. Chreky's

inappropriate sexual advances and sexual harassment of them.  In response, Mr. Clark passed on

the complaints to Mr. Chreky and told him that he was opening himself and the Salon up to

unnecessary liability and that it was inappropriate for him to pursue these employees.  Mr.

Chreky responded, "I have an attorney."  At no time did Mr. Chreky ever deny to Mr. Clark that

he had engaged in these behaviors.  Rather, he repeatedly responded, "This is my business, and I

will run it the way I want."

46.    Mr. Chreky boasted to Ms. Barrett and others about having consensual sexual

relationships with female Salon employees and was seen in various states of undress while in his

office or in the Salon bathroom with different female employees.  Mr. Chreky gave preferential

treatment to the employees with whom he had a sexual relationship.  Ms. Barrett and other

female employees were aware of his sexual relationship with these employees and his

preferential treatment of these employees, which further contributed to the sexually hostile work

environment and underscored Mr. Chreky's threats that if Ms. Barrett wanted to advance in the

workplace, she needed to submit to his unwelcome advances.

47.    Mr. Chreky also boasted to his employees that he was in fact the father in a high-

profile and contested paternity suit brought by a former employee with whom he had had a long-

term sexual relationship, and bragged that "no press was bad press."  He made clear that he

would fight legally any claim, even meritorious ones, brought against him and would "bring

down" anyone who took legal action against him.

48.    At various times throughout her employment, Mr. Chreky told Ms. Barrett that

she needed to be nice to him and treat him well to get ahead.   He repeatedly stated that if she

wanted to become the Salon's head colorist or to go to the White House with him to have contact

with President Bush or his family, she needed to come to the Salon early in the morning, before

others arrived.  Ms. Barrett understood this to be a crude sexual proposition, and a thinly veiled

threat that if she wanted to advance in her career she needed to accede to his sexual demands.

Ms. Barrett refused to accede to these demands, and Mr. Chreky then refused to take her to the White House or give her other high profile assignments.

49.     At various times throughout her employment, increasing in frequency towards the end of her employment, Ms. Barrett complained to Mr. Clarke about Mr. Chreky's sexual harassment and abuse of her.  Mr. Clark confirmed to Ms. Barrett that many other female employees had complained to him about Mr. Chreky's misconduct, but that his behavior only got worse over time.

50.     By letter dated September 15, 2006, Ms. Barrett put defendants on notice of her claims of sexual harassment in violation of the D.C. Human Rights Act.  On November 8, 2006, Ms. Barrett filed a charge under the DCHRA with the District of Columbia Office of Human Rights.  On September 22, 2006, Jennifer Thong filed a sexual harassment suit against defendants Chreky and the Salon.  On October 18, 2006, this suit was removed to the United States District Court for the District of Columbia, and is captioned <u>Thong v. Andre Chreky Salon, et a</u>l., Civil Action No. 1:06-CV-01807-RCL.  While Ms. Barrett's charge and Ms. Thong's lawsuit was pending, defendants, through their agents at the Salon, threatened and attempted to intimidate witnesses into changing their testimony, including witnesses who had provided sworn statements corroborating the allegations contained herein that were submitted to the District of Columbia Office of Human Rights.  On January 20, 2007, Ms. Barrett amended her charge.  On January 30, 2007, Ms. Barrett requested that the DCOHR dismiss her charge.  Ms. Barrett has properly exhausted her administrative remedies.

## <u>Wage and Hour Violations, Conversion and Breach of Contract</u>

51.     In or around 2003, the Department of Labor ("DOL") investigated and cited the Salon for overtime violations and required the Salon to pay its stylists, including Ms. Barrett,

back overtime pay. Despite the findings by the DOL, Mr. Chreky stated "nobody gets overtime."

52.     In breach of Mr. Chreky's agreement to pay Ms. Barrett at the rate of $1,900 every two weeks, the Salon paid Ms. Barrett at the rate of $21.00 per hour but only if she worked a minimum of 45 hours per week. Mrs. Chreky, who managed the Salon payroll, told Ms. Barrett that her promised salary of $1,900 every two weeks was the same as $21.00 per hour so long as Ms. Barrett worked 45 hours each week. He further advised Ms. Barrett that if she worked fewer than 45 hours in a given week, the Salon would dock her pay.

53.     Consistent with this direction, and in knowing and willful disregard of their legal obligations under the FLSA, defendants notified all Salon stylists, including Ms. Barrett, that the Salon had reclassified all of their positions to salaried positions. This "reclassification" notwithstanding, the Salon actually treated the stylists as though they were hourly employees. Mr. Chreky continued to schedule stylists to work a minimum of 45 hours per week and required them to clock in and out. Mr. Chreky told the stylists that their "salaries" were calculated according to an hourly rate and if they did not "meet their hours" their pay would be docked accordingly. Mr. Chreky in fact docked their pay checks when they failed to work 45 hours and did not increase their checks to account for their overtime hours (all hours above 40 in a week), including the hours he required them to work above the Salon's 45-hour work requirement.

54.     Mr. Chreky required Ms. Barrett and other Salon employees to turn over their tips to the Salon. On repeated occasions, Mr. Chreky refused to provide Ms. Barrett with her tips, either by directly refusing to give her some or all of the tip envelopes, or by falsely telling her that she had not received any tips.

55.    The unlawful actions complained of in this matter occurred in a workplace where the owners, operators and officers believed that the law did not apply to them.  In the same way that Defendants violated Ms. Barrett's civil rights, stole tips from her, and denied her compensation that she was lawfully entitled to, so too have the defendants disregarded a myriad of laws, statutes, regulations and ordinances governing the operation of their business.

### Violations of I.R.S. Regulations Regarding the Reporting of Tips

56.    Mr. Chreky and other ACI officers, including Serena Chreky, specifically instructed Salon employees to under-report the tips they received from clients in an effort to lower the amount of FICA/social security taxes the Salon would be required to pay to the Internal Revenue Service.  Mr. and Mrs. Chreky directed Salon employees to come up with a tip figure that was large enough not to raise suspicion by the IRS.

57.    Mr. Chreky specifically advised Ms. Barrett that she should not report all of the tips she received, including cash tips provided to her directly from a client.  With regard to the tips that clients left for her in envelopes at the front desk, Mr. and Mrs. Chreky told Ms. Barrett and other Salon to simply report a nominal amount.

58.    Mr. Chreky's purpose in encouraging his employees to under-report their tips was to minimize the employer's share of federal income taxes withheld and paid out on all such tips.

59.    Under 26 U.S.C. §§ 3121(a)(12)(B), 3401(a)(16)(B), cash tips of twenty dollars or more that are received in any calendar month while working for any one employer are subject to Social Security and income tax withholding.  These tips must be reported to the employer by the tenth day of the month following the month in which they were received.

60.    At all times relevant to this case, defendants were aware of this legal requirement.

61.     Tips received by an employee in the course of his or her employment are considered employer-provided remuneration for FICA purposes.  26 U.S.C. § 3121(q), therefore requires employers to apply and collect both the employer's and the employee's portion of FICA taxes on an employee's reported tip income up to the taxable wage base for the given year.  Withholding for income tax and Medicare tax purposes is not capped.

62.     At all times relevant to this case, defendants were aware of this legal requirement.

63.     Under 26 U.S.C. § 3121(g), employers must pay FICA taxes on the total amount of cash tips received by an employee up to an including the contribution and the benefit wage base determined under 26 U.S.C.§ 3121(a)(1).

64.     However, by law, an employer is only responsible for the payment of FICA for those tips which are actually reported by the employee.  If an employer is able to convince its employees to under report their tips, the employer's obligations to pay FICA taxes are reduced to whatever extent the employee under reports.

65.     26 U.S.C. 7207 provides: "Any person who willfully delivers or discloses to the Secretary any list, return, account, statement, or other document, known by him to be fraudulent or to be false as to any material matter, shall be fined not more than $10,000 ($50,000 in the case of a corporation), or imprisoned not more than 1 year, or both.  Any person required pursuant to section 6047(b), section 6104(d), or subsection (i) or (j) of section 527 to furnish any information to the Secretary or any other person who willfully furnishes to the Secretary or such other person any information known by him to be fraudulent or to be false as to any material matter shall be fined not more than $10,000 ($50,000 in the case of a corporation), or imprisoned not more than 1 year, or both."

66. Defendants were aware that the tips reported by its employees were false, because Mr. and Mrs. Chreky had specifically instructed his employees to under-report the tips they had received. In addition, defendants received the monthly tip reports from the employees which alerted them to the fact that given the number of services provided by each employee and the tips generally provided for clients for such services (e.g. typically 15%) the amounts reported were a small fraction of the amounts actually received. Most salon employees reported the exact same amount of tips month after month (e.g. $300 to $400 per months) despite the fact that there were obvious variations in the tips actually received by virtue of customer flow and number of hours worked by employees during differing time periods, and despite the fact that given the number of services provided each week, the actual tip amount would likely be in the range of $4,000 to $6,000 per month

67. Defendants knew or reasonably should have known that the tip reports were false and fraudulent but nevertheless submitted them to the IRS in violation of Section 7207. They did so in an effort to minimize the amount the Salon paid in taxes and in order to maximize the Salon's profits.

**Violations of D.C. Licensing Ordinances**

68. Chapter 37 D.C. Reg. § 3702 requires individuals employed in the District of Columbia in the barber and cosmetology industry to maintain current licenses with the District of Columbia before performing services on customers. The regulations specifically list barbers, cosmetologists, esthticians, manicurists, shampoo assistants, salon managers, salon owners, and individuals who provide facials, massages, and scalp treatments as individuals who can not operate without first obtaining a D.C. license and apply to all Salon employees who perform such services for Salon customers.

69.     A sizable number of salon employees did not have valid District of Columbia licenses at the time they rendered services at the Andre Chreky Salon and Spa or on behalf of Salon customers, including First Lady Laura Bush, and the President's daughters Barbara and Jenna Bush.  Such individuals include but are not limited to Elena Vantovskaya, Linda Mahboub, Edil Karkas, Xiomara Maradiaga, and Sami Tellawi.

70.     Defendants were aware that all of their salon professionals were required to have valid D.C. licenses in order to perform services at the salon.

71.     Section 3727 provides that the City's Director of Consumer and Regulatory Affairs may conduct inspections to determine if a salon or spa maintains appropriate licenses for its professionals.  Section 3727.2 specifically requires that salon owners take "appropriate action to ensure access to all parts of the premises for the purpose of facilitating inspection."

72.     Instead of complying with these requirements, Mr. Chreky developed an emergency drill whereby all unlicensed workers would flee out the back door of the Salon whenever District of Columbia licensing officials appeared to conduct licensing inspections.

73.     On such occasions, the front desk staff was trained to stall the inspectors at the front desk to provide the unlicensed staff, which was often as much as one third of the total staff, sufficient time to sneak out the back door where they would wait in the alley until the inspection had been completed.

74.     Upon information and belief, defendants terminated several employees who did not have current District of Columbia licenses as a result of discovery sought by Barrett relating to defendants' compliance with District of Columbia licensing regulations

75.     Section 3727.3 provides that the failure to facilitate inspections constitutes cause for withholding the issuance of a new license or revoking or suspending an existing license.

Section 3727.5 further provides that any person who fails to comply with any provision of Chapter 37, shall, upon conviction, be punished by a fine not to exceed $5,000 or by imprisonment not to exceed 90 days for each failure to comply.

## Obstruction of Justice

76.     Ms. Barrett filed a Charge of Discrimination with the District of Columbia's Office on Human Rights on November 8, 2007 which formed the basis for her original Complaint filed with this Court on February 1, 2007.  Since that time, defendants and their agents have engaged in a series of prolonged and persistent efforts to obtain favorable testimony from third-party witnesses, and to prevent third-party witnesses from testifying in a manner unfavorable to defendants, through the use of threat, intimidation, and misrepresentation.  By and through their actions, defendants and their agents have suporned perjury and otherwise obstructed justice violating Ms. Barrett's rights and the rights of countless other persons who are not parties to this lawsuit

77.     On December 7, 2006, counsel for Ms. Barrett provided counsel for defendants copies of several declarations from third-party witnesses all of whom had witnessed and confirmed some or all of the allegation in Ms. Barrett's Complaint.  Counsel for Ms. Barrett also provided the names of additional persons who they had interviewed and who they anticipated would also provide declarations in the near future.  One such individual, Damon Taylor, was in the midst of reviewing and editing a declaration that he would eventually execute on February 2, 2007.  Counsel for Ms. Barrett explained to counsel for defendants that Mr. Taylor had witnessed and had confirmed many of the allegations of sexual harassment, retaliation, and FLSA violations that Ms. Barrett had alleged.

78.     Approximately four hours after counsel for defendants had been apprised of Mr. Taylor's cooperation with counsel for Ms. Barrett, Mr. Taylor received a threatening phone call from Sami Telawi, a then current Salon employee.  Mr. Telawi told Mr. Taylor that Mr. Chreky demanded that he report to the Salon, where he was no longer an employee, so that he could be interviewed.  When Mr. Taylor responded that he was under no obligation to report to the Salon or to cooperate with either party, Mr. Telawi, at Mr. Chreky's direction, threatened that Mr. Chreky would have Mr. Taylor arrested if he did not cooperate.

79.     Mr. Taylor immediately reported this incident to counsel for Ms. Barrett and explained that he was concerned that he had placed himself in legal peril by cooperating with Ms. Barrett's counsel and by refusing to report to the Salon as Mr. Chreky had demanded and by agreeing to be interviewed by Ms. Barrett's counsel.

80.     Counsel for Ms. Barrett immediately contacted counsel for defendants to advise them of Mr. Chreky's threatening conduct and to demand that defendants cease all efforts to intimidate potential material witnesses.  Nevertheless, Mr. Chreky, and those acting on his behalf, have continued to threaten, intimidate, and manipulate third party witnesses in this case.

81.     In February of 2007, shortly after Ms. Barrett filed her Complaint, Mr. Chreky and/or his agents ordered all current Salon employees to meet with David Sullivan, one of the attorneys for defendants.  All employees were scheduled for time slots, lasting ten to fifteen minutes each, in which they were required to meet with Mr. Sullivan at a Starbucks situated next door to the Salon where they worked.  Upon information and belief, most, if not all such employees felt pressured and compelled to meet with Mr. Sullivan.  Upon information and belief, most, if not all such employees believed that meeting with Mr. Sullivan was a job requirement and that they could be terminated for failing to comply.

82.    On February 16, 2007, several employees were required to meet with Mr. Sullivan again, this time in the Salon.  These employees were presented with declarations drafted by Mr. Sullivan and were instructed to execute them.  Upon information and belief, most if not all of the employees felt pressured and compelled to sign the declarations.  Upon information and belief, most, if not all of the employees believed that signing the declarations presented to them was a job requirement and that they could be terminated for failing to comply.

83.    Mr. Chreky, his agents, and his attorneys knew that in executing these declarations, the declarants provided unreliable, deceptive, and perjuos testimony under oath.  The declarations, most of which are carbon copies of each other, all provided that the declarant was aware of and did not believe the "allegations" contained in Ms. Barrett's Complaint.  However, as Mr. Chreky and Mr. Sullivan knew, none of the declarants had seen, read, or had otherwise been informed of most of allegations contained in Ms. Barrett's Complaint and could not competently provide any testimony on the allegations at the time they were required to sign the declarations under pain and penalty of perjury.  In addition, most of the declarants are immigrants for whom English is a second language.  Mr. Chreky and Mr. Sullivan knew that the declarants did not possess sufficient language skills to understand many of the words contained in the declarations they were required to sign.  Mr. Chreky and Mr. Sullivan were aware that due to their lack of sophistication with regard to legal matters, most, if not all of the declarants did not understand or appreciate the legal consequences of executing a sworn declaration that was less than fully accurate or truthful.

84.    On October 1, 2 and 3, 2007, counsel for Ms. Barrett and Ms. Thong deposed nine of the individuals who provided virtually identical declarations in support of Mr. Chreky.  In the days leading up to their depositions, Mr. Chreky and/or his agents contacted each of the

deponents and ordered them to meet with counsel for defendants at a hotel.  Mr. Chreky or his agents told the deponents that counsel for Ms. Barrett and Ms. Thong would attempt to "trick" or "confuse" them during their depositions and that they needed to meet with counsel for defendants so that they would know how to answer properly.  All nine deponents met with counsel for defendants in advance of their depositions.  All nine deponents believed that attending said meetings was a job requirement.  Most of the deponents believed that they could be terminated if they failed to report for their assigned meetings with counsel for defendants in advance of their depositions.

85.    Upon information and belief, Mr. Chreky and/or his agents promised the deponents that they would receive financial rewards if they provided favorable testimony during their depositions.  Upon information and belief, at least one deponent Khadija Darif received a phone call from Mr. Chreky immediately following her deposition.  Mr. Chreky had attended her deposition just as he had for all of the other current employees deposed that week.  Mr. Chreky admonished Ms. Darif for providing testimony that was favorable to Ms. Barrett and Ms. Thong.  Mr. Chreky later called the Darif residence again, this time asking to speak to her husband.  Mr. Chreky told Mr. Darif that it was unfortunate that his wife had provided testimony that was favorable to Ms. Barrett and Ms. Thong, but that she could expect to receive a bonus and/or a raise if she would provide testimony favorable to him in the future.

86.    With respect to witnesses who where no longer employed by the Salon, counsel for defendants hired two separate investigation firms, Fortress Global Investigations and Security, and Vital Investigations, to investigate several individuals including but not limited to those individuals who provided declarations for Ms. Barrett.  The investigators approached most of the witnesses at work posing as customers.  The investigators did not identify themselves as

agents for Mr. Chreky.  In fact, the investigators attempted to appear to be unassociated parties who were simply interested in hearing of more about the lawsuit.  In many cases, where witnesses declined to comment on the lawsuit, the investigators would identify themselves and explain that the lawsuit was likely to settle.  The investigators knew that there was no possibility that the lawsuit would settle when speaking with the witnesses but were rather attempting to extract information from reluctant witnesses by lying about the posture of the lawsuit.

87.    Several individuals who are potential witnesses for Barrett at trial have advised counsel for Barrett that they found the tactics employed by the private investigators to be threatening, that they were second guessing their decision to cooperate with counsel for Barrett, and that they were worried about their continued involvement in this lawsuit.

88.    Like the laws prohibiting discrimination, sexual harassment, retaliation, misappropriation of tips, and overtime compensation, federal laws regarding the reporting of tips to the IRS, and local laws pertaining to the licensing of barber and cosmetology professionals and obstruction of justice are clear constraints on the manner in which an employer may treat his employees and conduct business in general.  Defendants' actions demonstrate a reckless disregard for these laws and a proclivity to treat their employees in any manner that best suits the Andre Chreky Salon and its principals, including defendants Chreky and Mrs. Chreky.

**COUNT ONE -- DISCRIMINATION ON THE BASIS OF SEX IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT, D.C. CODE ANN. § 2-1401.01 ET SEQ. AGAINST DEFENDANTS ACI AND ANDRE CHREKY.**

89.    Plaintiff hereby incorporates as though restated each of the factual allegations set forth in paragraphs 1 through 88 above.

90.     The District of Columbia Human Rights Act ("DCHRA") prohibits discrimination on the basis of sex in the enjoyment of all benefits, privileges, terms, and conditions of employment.

91.     At all times relevant to this Complaint ACI was an "employer" within the meaning of the DCHRA.

92.     At all times relevant to this Complaint Plaintiff was an "employee" within the meaning of the DCHRA.

93.     The Salon created and maintained a sexually hostile work environment in which discriminatory intimidation, ridicule, and insult were so severe and pervasive that it altered the conditions of Ms. Barrett's employment and created a sexually hostile work environment, in violation of the DCHRA.  Mr. Chreky subjected Ms. Barrett to unwelcomed sexual advances, sexually explicit remarks, touching, and numerous attempts to coerce or force sexual contact. This conduct was humiliating and physically threatening to Ms. Barrett.

94.     AIC is liable for Mr. Chreky actions because he was, at all time relevant to this Complaint, the owner and operator of the Salon and AIC

95.     On December 6, 2005, Mr. Chreky terminated Ms. Barrett's employment.

96.     In the alternative, through his official actions as owner and operator of the Salon, Mr. Chreky subjected Ms. Barrett to working conditions that were so intolerable that a reasonable person would have felt compelled to resign.  Mr. Barrett endured repeated unwelcomed sexual advances, assaults, batteries, and retaliatory changes to her work schedule that greatly diminished her earning potential and caused a significant change in her benefits, leading to Ms. Barrett's constructive discharge on or around December 5, 2005.

97.     AIC is vicariously liable for Mr. Chreky's actions in terminating and/or constructively discharging Ms. Barrett.

98.     Defendant Andre Chreky aided, abetted, compelled and coerced the sexual harassment and termination complained of herein, in violation of the DCHRA.

99.     Defendants' actions have directly and proximately caused Ms. Barrett substantial economic loss and damage to her career and professional reputation, humiliation, and pain and suffering.

100.     Defendants' actions were wanton, reckless or in willful disregard of Ms. Barrett's legal rights.

**COUNT TWO -- RETALIATION IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT, D.C. CODE ANN. § 2-1401.01 ET SEQ. AGAINST DEFENDANTS ANDRE CHREKY AND ACI.**

101.     Plaintiff hereby incorporates as though restated each of the factual allegations set forth in paragraphs 1 through 100 above.

102.     The DCHRA prohibits retaliation against any employee for engaging in opposition to what she reasonably in good-faith believes constitutes unlawful discrimination under the DCHRA, including the rejection of sexual advances and other forms of sexual harassment.

103.     Ms. Barrett engaged in protected activity by opposing treatment she reasonably believed constituted unlawful discrimination, including repeatedly rejecting Mr. Chreky unwelcomed sexual advances, opposing this misconduct by complaining to Mr. Chreky about his harassing behavior, and asking him to stop, and reporting Mr. Chreky's behavior to Mr. Clarke, the Salon's then General Manager.

104.     Defendants ACI and Chreky took adverse action against Ms. Barrett, including,

inter alia, taking away Ms. Barrett's clients, directing Salon employees to alter her schedule,

denying her appropriate compensation and other benefits, subjecting her to retaliatory

harassment after she opposed his unwelcomed sexual advances, and terminating and/or

constructively discharging her.  Mr. Chreky's retaliatory actions were so adverse that they would

have dissuaded a reasonable Salon employee from making or supporting a charge of

discrimination.

105.     Defendants' retaliatory actions were causally connected to Ms. Barrett's protected

activity.

106.     At all times relevant to this Complaint, Mr. Chreky used his position as the owner

and operator of the Salon and Ms. Barrett's supervisor to retaliate against her.

107.     Defendant Andre Chreky aided, abetted, compelled and coerced the retaliation

complained of herein, in violation of the DCHRA.

108.     Defendants' actions have directly and proximately caused Ms. Barrett substantial

economic loss and damage to her career and professional reputation, humiliation and pain and

suffering.

109.     Defendants' actions were wanton, reckless or in willful indifference to Ms.

Barrett legal rights.

**COUNT THREE --  VIOLATION OF THE FAIR LABOR STANDARDS
ACT, 29 U.S.C. § 207 ET SEQ. AGAINST DEFENDANTS AIC AND CHREKY.**

110.     Ms. Barrett hereby incorporates as though restated each of the factual allegations

set forth in paragraphs 1 through 109 above.

111.    The Fair Labor Standards Act ("FLSA") requires an employer to pay covered employees one and one half times the regular rate of pay for hours worked in excess of 40 hours per week.

112.    At all relevant times, defendants ACI and Chreky were "employers" engaged in interstate commerce within the meaning of the FLSA.

113.    At all times relevant, Ms. Barrett was a "covered employee" within the meaning of the FLSA, and was therefore entitled to the protections of the FLSA, including the right to be paid one and a half times her regular rate of pay for all hours worked in excess of 40 hours in any given work-week.

114.    From September 2003 until December of 2004, defendants required Ms. Barrett to work more than 40 hours per week without paying her one and one-half times her normal rate of pay.   During this same period, defendants took and retained plaintiff's tips, in violation of FLSA.

115.    Defendants were investigated and cited by the Department of Labor in 2003 for overtime violations and were on notice about the Salon's legal obligation to pay overtime wages to Ms. Barrett and other Salon stylists.  They failed to do so in knowing and willful disregard of their legal obligations under the FLSA.

116.    As a direct and proximate result of defendants' willful violation of FLSA, Ms. Barrett has suffered economic loss and is entitled to an award of unpaid overtime, liquidated damages and other equitable relief.

**COUNT FOUR -- VIOLATION OF THE DISTRICT OF COLUMBIA WAGE AND HOUR ACT, D.C. CODE § 32-1002 ET SEQ. AGAINST DEFENDANTS ACI AND CHREKY.**

117.    Ms. Barrett hereby incorporates as though restated each of the factual allegations set forth in paragraphs 1 through 116 above.

118.    The District of Columbia Wage and Hour Act ("DCWHA") requires employers to pay covered employees one and one half times the regular rate of pay for hours worked in excess of 40 hours per week.

119.    At all relevant times, defendants ACI and Chreky were "employers" within the meaning of the DCWHA.

120.    At all relevant times Ms. Barrett was a "covered employee" within the meaning of the DCWHA, and was entitled to the protections of the DCWHA including the right to be paid one and a half time her regular rate of pay for all hours worked in excess of 40 hours in any given work-week.

121.    From September 2003 until December of 2004, defendants required Ms. Barrett to work more that 40 hours per week without overtime pay in violation of the DCWHA. During this same period, defendants took and retained plaintiff's tips, in violation of the DCWHA..

122.    As a direct and proximate result of defendants' wilful violation of the DCWHA,

123.    Ms. Barrett has suffered economic loss, and is entitled to an award of unpaid overtime, liquidated damages and other equitable relief.

**COUNT FIVE -- VIOLATION OF THE DISTRICT OF COLUMBIA WAGE PAYMENT AND COLLECTION ACT, D.C. CODE § 32-1301(1), AGAINST DEFENDANTS AIC AND CHREKY.**

124.    Ms. Barrett hereby incorporates as though restated each of the factual allegations set forth in paragraphs 1 through 123 above.

125.    At all times relevant to this Complaint, defendants ACI and Chreky were "employers" within the meaning of DCWPCA.

126.    At all times relevant to this Complaint, Ms. Barrett was an "employee" within the meaning of the DCWPCA.

127.    Under the DCWPA, defendants were obligated to pay plaintiff all wages due for work that she performed, including all earned tips that were held by the Salon on Ms. Barrett's behalf.

128.    In breach of their obligation, defendants routinely failed to pay or deliberately underpaid plaintiff for the tips she earned.

129.    As a direct and proximate result of defendants' willful violation of the DCWPCA, Ms. Barrett has suffered economic loss, and is entitled to an award of unpaid compensation in the form of withheld tips and other equitable relief.

## COUNT SIX -- <u>CONVERSION AGAINST DEFENDANTS CHREKY AND ACI.</u>

130.    Plaintiff incorporates herein by reference all of the allegations contained in paragraphs one through 129.

131.    The taking and retention of the Plaintiff's tips constitutes the unlawful taking and exercise of ownership and control by the defendants over Ms. Barrett's personal property. Such a taking constituted a deprivation of plaintiff's rights to such property.

132.    Mr. Chreky routinely diverted some or all of Ms. Barrett's tips to ACI which he owned and operated.

133.    Defendants Andre Chreky and ACI are liable to plaintiff for all tips they unlawfully retained by Mr. Chreky and/or ACI, compensatory and punitive damages.

**COUNT SEVEN  --  <u>NEGLIGENT SUPERVISION AGAINST DEFENDANT AIC.</u>**

134.    Plaintiff incorporates herein by reference all of the allegations contained in paragraphs one through 133.

135.    In the District of Columbia, employers have a duty to use reasonable care in supervision and retention of employees.  ACI owed a duty to Ms. Barrett to protect her from unreasonable risk of foreseeable harm.  Mr. Chreky's persistent sexual harassment and assaultive conduct toward Ms. Barrett and numerous other female employees was well known to ACI.

136.    ACI, a corporation owned and controlled by Andre and Serena Chreky, owed Ms. Barrett the duty to supervise its managers and to ensure that those who had authority over employees carried out their responsibilities with due care.  ACI, through its owners and principal officers, Andre and Serena Chreky, had actual and constructive knowledge that Andre Chreky was likely to and did in fact harass, assault, and batter female employees, as well as carrying out his duties as a superior and manager in a dangerous manner.  AIC had actual knowledge of Mr. Chreky's persistent harassing and assaultive conduct toward Ms. Barrett and other stylists through Andre Chreky, its President and Treasurer.  ACI had a duty to adequately train, supervise and restrain its principal manager, Andre Chreky, in order to prevent the foreseeable harm to Ms. Barrett and the other stylists under his supervision.

137.    AIC breached its duty to protect its employees from unreasonable risk of harm, and this breach was the proximate cause of Ms. Barrett's injuries and the cause of the ensuing damages to plaintiff.

**COUNT EIGHT - <u>NEGLIGENCE AGAINST DEFENDANT SPAC, LLC.</u>**

138.    Plaintiff incorporates herein by reference all of the allegations contained in paragraphs one through 137.

139.    In the District of Columbia, landlords have a duty to protect invitees from foreseeable risk of harm caused by third parties on its property.

140.    Ms. Barrett's employment at the Salon made her an invitee of SPAC, LLC by virtue of the fact that she worked at the premises.

141.    SPAC, LLC had actual and constructive knowledge that Andre Chreky was likely to and did in fact harass, assault and batter female employees on the premises it leased to AIC.

142.    SPAC, LLC failed to warn or protect Ms. Barrett from the ongoing harassment and assaults by Andre Chreky.

143.    SPAC, LLC's failure to warn or protect Ms. Barrett from Mr. Chreky's harassment, assaults and batteries was the proximate cause of injuries to Ms. Barrett and caused the ensuing damages to Ms. Barrett.

### COUNT NINE – <u>BREACH OF CONTRACT AGAINST DEFENDANT ACI.</u>

144.    Plaintiff hereby incorporates by reference as though restated each of the factual allegations contained in paragraphs 1 through 143 above.

145.    Plaintiff and defendant Salon entered into a valid, binding, and enforceable contract through which it promised to pay Ms. Barrett the equivalent of $1,900 every two weeks for the first three months of her employment and to increase her salary after completion of the third month of employment.

146.    Defendant Salon breached this contract by failing to pay plaintiff the salary it was contractually obligated to pay her and by failing to give her a salary increase after her first three months of employment.

147.    Defendant Salon's actions described above directly and proximately have caused, and continue to cause, plaintiff to suffer economic damages.

148.    Defendant Salon has committed this breach of contract in bad faith and with actual malice.

## REQUESTED RELIEF

WHEREFORE, plaintiff prays this Court for the following relief:

1.      Enter a judgment in plaintiff's favor and against Andre Chreky and ACI for discrimination on the basis of sex in violation of the District of Columbia Human Rights Act, D.C. Code Ann. § 2-1401.01 et seq.;

2.      Enter a judgment in plaintiff's favor and against Andre Chreky and ACI for retaliation in violation of the District of Columbia Human Rights Act, D.C. Code Ann. § 2-1401.01 et seq.;

3.      Enter a judgment in plaintiff's favor and against ACI for violations of the Fair Labor Standards Act, 29 U.S.C. § 207 et seq.;

4.      Enter a judgment in plaintiff's favor and against ACI for violations of the District of Columbia Wage and Hour Act, D.C. Code § 32-1002 et seq.;

5.      Enter a judgment in plaintiff's favor and against ACI for violations of the District of Columbia Wage Payment and Collection Act, D.C. Code § 32-1301(1);

6.      Enter a judgment in plaintiff's favor and against Andre Chreky ACI for Conversion;

7.      Enter a judgment in plaintiff's favor and against ACI for Negligent Supervision;

8.      Enter a judgment in plaintiff's favor and against SPAC, LLC for Negligence;

9.      An award to plaintiff of compensatory damages in an amount to be proven at trial, but in any event not less than $1,000,000;

10.    An award to plaintiff of punitive damages in an amount to be proven at trial, but

in any event not less than $3,000,000;

11.    An award of reasonable attorneys' fees and costs; and

12.    All other relief the court deems just.


Respectfully submitted,


_____
Debra S. Katz (Bar No. 411861)
Katz, Marshall & Banks, LLP
1718 Connecticut Avenue, N.W.
6th Floor
Washington, D.C. 20009
(202) 299-1140
(202) 299-1148 (fax)


_____
Ari M. Wilkenfeld (Bar. No. 461063)
Katz, Marshall & Banks, LLP
1718 Connecticut Avenue, N.W.
Sixth Floor
Washington, D.C. 20009
(202) 299-1140
(202) 299-1148 (fax)


Attorneys for Plaintiff Ronnie Barrett


Dated: _____ 2008

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                )
**RONNIE BARRETT,**                              )
                                                )
                     **Plaintiff,**              )
                                                )
          **v.**                                 )     **C.A. No. 07-CV-0250 (RCL)**
                                                )
**ANDRE CHREKY,**                                )
**ANDRE CHREKY SALON/ANDRE CHREKY INC.,**        )
**SPAC, LLC**                                    )
                                                )
                     **Defendants.**             )
                                                )
_____)


### ORDER

Upon consideration of Plaintiff's Motion for Leave to File an Amended Complaint, any

Opposition and Reply thereto, and the entire record of this case, it is this __day of _____,

2008,

**ORDERED**, that the motion be and same is hereby **GRANTED**; and it is

**FURTHER ORDERED**, that Plaintiff shall be permitted to file the proposed First

Amended Complaint attached as Exhibit 2 to Plaintiff's Motion.


                                        _____
                                        Hon. Royce C. Lamberth
                                        UNITED STATES DISTRICT JUDGE

1