IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RONNIE BARRETT,                        )
                                       )
            Plaintiff,                 )
                                       )
v.                                     )        C.A. No. 07-CV-0250
                                       )
ANDRE CHREKY SALON, ET AL.             )
                                       )
            Defendants.                )

## DEFENDANTS' OPPOSITION TO PLAINTIFF
## RONNIE BARRETT'S MOTION FOR LEAVE TO AMEND HER COMPLAINT

Defendants Andre Chreky, Inc., SPAC, LLC, and Andre Chreky (collectively "Defendants") oppose Plaintiff Ronnie Barrett's ("Barrett") Motion for Leave to Amend her Complaint in this matter because she seeks to add no new claims to her original Complaint and because none of the additional factual material she proposes adding to her Complaint supports any of her existing claims.

Barrett's proposed amendment is part of a transparent effort to embarrass Defendants by accusing them of various criminal acts (proposed additional Paragraphs 56-67 and, along with accusations jointly directed at Defendants' counsel, 76-88) and regulatory violations (Paragraphs 68-75) that bear no connection to the causes of action actually asserted by Barrett against Defendants. The IRS and regulatory accusations found at Paragraphs 56-67 and 68-75 are not topically appropriate for inclusion in Barrett's civil action, and, to the extent Plaintiff might argue that these facts are relevant to claims she may assert in future, absolutely no authority exists to provide a civil action connected to these "facts." Further, if Plaintiff believes that Defendants and their counsel have been involved in an elaborate and concerted effort to obstruct

justice, as she accuses in Paragraphs 76-88, levying such allegations in factual paragraphs of a Complaint, again, is a procedurally inappropriate approach. Moreover, Plaintiff may not consciously subvert the strictures of the Federal Rules of Evidence by attempting to insert information that is not relevant to her claims – and that would not be admissible at trial of this matter – in the factual paragraphs of her Complaint.

In short, Plaintiff's Motion to Amend her Complaint is calculated not to provide the Court with contextual information to demonstrate "a much larger corporate culture in which the owners and operators of the Salon belived (sic) that the law did not apply to them," as she alleges, but rather is an extensive and unnecessary revision to her original Complaint that is calculated to embarrass Defendants, their counsel, and even the First Family, as she gratuitously mentions on pages 2 and 5 of her Motion and in Paragraph 69 of her proposed Amended Complaint. (Plaintiff's Motion to Amend at page 2.) Under these circumstances, Plaintiff's attempt to amend her Complaint is not consistent with any appropriate goal provided by the Federal Rules of Civil Procedure and amendment should not be allowed.

## I.    PLAINTIFF'S MOTION FOR LEAVE SHOULD BE DENIED PURSUANT TO RULE 15.

Amendments to complaints generally will be allowed freely. *Foman v. Davis*, 371 U.S. 178, 182 (1962). However, amendments may be denied where (a) undue prejudice to the opposing party will arise; (b) the moving party has repeatedly failed to cure deficiencies through previous amendments; (c) the moving party engages in bad faith; (d) undue delay will arise; or (e) the amendments are futile. *Id.* In this case, while Plaintiff asserts that her amendments relate back to her original claims, they in fact have no relation to her ability to prove the elements of *any* of those claims. They are, therefore, futile. Further, these additional "facts" attempt to saddle Defendants with precisely the type of prejudicial characteristics that would *not* be

2

admissible at trial, such as allegations of unrelated "bad acts." And, these additional "facts" fly in the face of the testimony Plaintiff's own counsel solicited in depositions of multiple employees of Defendants. Those depositions consisted almost entirely of questioning by Plaintiff's counsel on the themes in her "Obstruction of Justice" section, and despite the fact that Plaintiff's counsel *did not* elicit testimony in support of an obstruction argument, Plaintiff's counsel asserts such an argument here. The parties are late in discovery (indeed, this Court has extended the discovery cut-off in this case). Given this posture, it is disingenuous at best for Plaintiff's counsel to persist in an obstruction argument that was not supported by *any* deposition already taken in this case. Under these circumstances, Plaintiff's proposed amendments are also in bad faith.

Plaintiff should not be allowed to amend her Complaint where her amendment is made in bad faith and is futile. *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996), *citing Foman v. Davis*, 371 U.S. 178, 182 (1962). An amendment may be denied as futile where it does not "provide any factual allegations in support of (plaintiff's) claims or …alleged injuries." *Radcliffe v. United States*, __ F. Supp. 2d __, 2007 WL 3254737, No. 07cv586 at *2 (D.D.C. Nov. 6, 2007) (attached as Exhibit A); *Willoughby v. Potomac Elec. Power Co.*, 100 F.3d 999, 1003 (D.C. Cir. 1996) (Plaintiff's attempt to amend complaint to add discrimination claim was futile where his facts could not establish a prima facie case of discrimination). Plaintiff in this case proposes to amend her Complaint to add facts which do not support the legal claims currently before this Court under the terms of her Complaint or indeed any cause of action whatsoever, and which evidence bad faith.

A.    **Alleged I.R.S. Violations**.

Plaintiff provides the Court with additional "facts" regarding Defendants' alleged violation of the Internal Revenue Code, Sections 3121 and 3401. None of Plaintiff's existing claims allege tax code violations; indeed, none of them can, as the Code does not create a private right of action for employees with respect to their employer's alleged violations of the Code. *Van Keppel v. Fly Ash Mgmt.*, 1998 WL 596726, No. Civ. A. 97-2681-KHV at *2-3 (D. Kan. Aug. 3, 1998) ("Plaintiff has not cited (and the Court has not uncovered) any cases which afford him a private right of action for defendants' violation of the Internal Revenue Code") (attached as Exhibit B). Where Plaintiff's additional facts do not support her existing claims and cannot support any new claims, the proposed amendment is futile and should not be granted.

B.    **Alleged D.C. Licensing Violations.**

Plaintiff provides the Court with additional "facts" regarding Defendants' alleged violations of the District of Columbia Code. None of Plaintiff's claims alleges private actions based on these violations, as again, none can. The District of Columbia Code sections cited by Plaintiff do not provide for private claims. Where Plaintiff's additional facts do not support her existing claims and cannot support any new claims, the proposed amendment is futile and should not be granted.

C.    **Allegations of Obstruction of Justice.**

Plaintiff's "facts" regarding Defendants' alleged obstruction of justice do not support her existing claims or state a different private cause of action. Indeed, they are serious factual allegations made despite discovery responses which contradict the allegations. Where these "facts" do not support an existing claim, they are futile; where they are not supported by

4

the well-developed discovery in this matter, they are in bad faith. Under these circumstances,

Plaintiff's proposed amendment is futile and in bad faith, and should not be granted.

II.     **AS EVIDENCE OF PLAINTIFF'S BAD FAITH, MANY OF THE
        PROPOSED ALLEGATIONS ARE CONTRADICTED BY DEPOSITION
        TESTIMONY ELICITED BY PLAINTIFF'S ATTORNEYS.**

Certain of Plaintiff's allegations in her Motion's Section C, "Obstruction of Justice," are

entirely unable to support any amendment to the Complaint, and also particularly disturbing to

Defense Counsel, because Plaintiff has taken over nine depositions which contradict the

assertions of this Section. Specifically, Plaintiff's allegations that various of Defendants'

employees were "ordered" to provide counsel with declarations and felt "pressured and

compelled to execute" them are entirely without foundation after depositions of these same

declarants.

As Plaintiff acknowledges in her Motion, nine of the declarants she alleges were forced

to provide declarations were deposed on October 1, 2, and 3, 2007. Despite deposition testimony

to the contrary, Plaintiff states that these deponents (a) were "ordered" by Mr. Chreky to meet

with defense counsel prior to their depositions; (b) were told "that counsel for

Ms. Barrett…would attempt to 'trick' or 'confuse' them during their depositions and that they

needed to meet with counsel for defendants so that they would know how to answer properly";

(c) were "immigrants for whom English is a second language" and who "did not possess

sufficient language skills to understand many of the words contained in the declarations they

were required to sign"; and (d) "due to their lack of sophistication with regard to legal matters,"

"did not understand or appreciate the legal consequences of executing a sworn declaration that

was less than fully accurate or truthful." Plaintiff's Motion to Amend at page 8-9. These, as

well as Plaintiff's allegations that "Mr. Chreky, his agents, and his attorneys knew that in

executing these declarations, the declarants provided unreliable, deceptive, and perjurous testimony under oath," are not supported or are flatly contradicted by the declarants' own deposition testimony, as below outlined deposition-by-deposition. Plaintiff's Motion to Amend at pages 7-8.

In fact, counsel for Ms. Barrett and Ms. Thong used compound questions and terms of art that clearly disoriented and confused the deponents – precisely the effect that Ms. Barrett accuses defense counsel of having on these deponents. In short, Barrett's attempt to discredit these individuals demeans their intelligence by suggesting that limited English skills are tantamount to unsophisticated thinking. All Plaintiff asserts, at its core, is that Mr. Chreky is barred from using in his defense his own employees – those who know most about his Salon and what takes place in it – purely because many of them are immigrants. At most, these are evidentiary arguments, and Plaintiff should not be allowed to insert them into her Complaint as a litigation strategy, which apparently is driven by non-substantive motives.

### Mila Petrosyan

Ms. Petrosyan testified in her deposition she understood that Mr. Chreky's counsel did not represent her interests. Petrosyan Deposition at 11, attached as Exhibit C, hereinafter "Petrosyan Dep. at __." She stated that she met with Mr. Sullivan for ten or fifteen minutes on the day of the deposition and that he advised her to tell the truth and "just the truth." Petrosyan Dep. at 14-15. Ms. Petrosyan specifically testified, in response to Mr. Wilkenfeld's deliberate questions, that Mr. Sullivan had *not* advised her that counsel would be trying to trick and confuse her during the deposition. Petrosyan Dep. at 15 (Q: (Mr. Sullivan)… told you that we might be asking questions designed to trick you? A: No. Not about kind of trick questions. No. Q: But

he warned you that we might be trying to confuse you and get answers out of you that way?  A: Not confuse.  He told me if you don't understand some questions, you just ask again.")

### Xiamara Maradiaga

Xiamara Maradiaga, deposed on October 2, 2007, testified that Mr. Sullivan advised her only to "say the truth and relax, take (her) time" during the deposition.  She further testified that she understood that Mr. Sullivan was not *her* lawyer during his meetings with her.  Maradiaga Deposition at 9, attached as Exhibit D, hereinafter "Maradiaga Dep. at __."  To the extent Barrett is concerned about Ms. Maradiaga's English skills and sophistication, Ms. Maradiaga conferred with another employee who translated her draft declaration into Spanish.  Maradiaga Dep. at 90-91.

As for Ms. Maradiaga's declaration being "forced," she specifically described her declaration as "voluntary."  Maradiaga Dep. at 118-19.  When aggressively questioned by the attorney for Jennifer Thong, Jonathan Rose (counsel for Defendants, Ms. Barrett, and Ms. Thong have agreed to jointly conduct discovery in these two separate cases), about what "voluntary" meant, Ms. Maradiaga stated that nobody told her what to say in her declaration.  Maradiaga Dep. at 118-19.  And, as to Ms. Maradiaga's grasp of the legal consequences of lying under oath, she specifically stated that Mr. Sullivan had warned her what "penalty of perjury" meant.  He told her specifically that it could mean she would go to jail if she were not truthful.  She reaffirmed for Mr. Rose several times that what she stated in her declaration was the truth.  Maradiaga Dep. at 120-22.

### Aouatif Mahboub

Ms. Mahboub testified that she understood that she was under oath during her deposition and that Mr. Bredehoft and Mr. Sullivan were not her attorneys.  Mahboub Deposition at 13-15,

attached as Exhibit E, hereinafter "Mahboub Dep. at __." She met with Mr. Sullivan twice to discuss and sign her declaration. Mahboub Dep. at at 15, 24. On the second occasion that she met with him, he reiterated what he had heard her say during the first meeting and asked her to confirm that the content of the declaration accurately reflected what she previously had said. Mahboub Dep. at 24. Ms. Mahboub understood that she was signing the declaration under penalty of perjury, and she understood what perjury meant. Mahboub Dep. at 25. Before Ms. Mahboub signed the declaration, Mr. Sullivan advised her to "take (her) time to read it." She testified that she followed this advice and took more than ten minutes to read the declaration before signing it. Mahboub Dep. at 25-26.

Despite the multiple aggressive questions of Barrett's counsel, Debra Katz, regarding Ms. Mahboub's loyalty to and desire to support Mr. and Mrs. Chreky, Ms. Mahboub made clear that she was telling the truth in her deposition. Mahboub Dep. at 18. Further, Ms. Mahboub stated that the words in her previous declaration were *her own words* (immediately following this statement, Ms. Katz responded by saying "These are not your words. Am I right about that?") Mahboub Dep. at 27.

Ms. Mahboub stated that it was *not* a requirement that employees give declarations in support of Mr. Chreky during the pending litigation. None of her co-workers expressed fear to her that he or she would be fired for failing to give a declaration; none told her he or she was "not comfortable going to give" a declaration. Mahboub Dep. at 42.

### Edil Karkas

Mr. Karkas met Mr. Bredehoft for the first time on the day of his deposition. Karkas Deposition at 31, attached as Exhibit F, hereinafter "Karkas Dep. at __." He met with Mr. Sullivan twice prior to his deposition, once to discuss his declaration and once to review and sign

it. Karkas Dep. at 31-32, 44, and 56. Mr. Karkas stated that he was truthful in his descriptions to Mr. Sullivan. Karkas Dep. at 48. Before he signed his declaration, Mr. Karkas took his time reading it. Karkas Dep. at 59.

Mr. Karkas stated that Mr. Sullivan had explained the importance of being under oath to him before he signed his declaration. Karkas Dep. at 77-78. He understood that Mr. Bredehoft and Mr. Sullivan were not his lawyers. Karkas Dep. at 36-37. He testified that Mr. Chreky did not give him any advice about how he should answer deposition questions, other than to tell the truth. Karkas Dep. at 43, 52.

### *Anisa Ghafoorzai*

Ms. Ghafoorzai understood that Mr. Bredehoft and Mr. Sullivan were not her attorneys. Ghafoorzai Deposition at 18, attached as Exhibit G, hereinafter "Ghafoorzai Dep. at __." She met Mr. Bredehoft the day before her deposition. Ghafoorzai Dep. at 17-18. She met with Mr. Sullivan on two occasions prior to her deposition – once to discuss her declaration with him and once to sign it. Ghafoorzai Dep. at 19, 43-46. She confirmed in her deposition that she gave her declaration voluntarily. Ghafoorzai Dep. at 79-80. No one told her she would be fired or lose tips if she did not give a declaration, and she was promised no benefit for giving the declaration. Ghafoorzai Dep. at 56, 80. Mr. Sullivan explained to her that giving her declaration under penalty of perjury meant that she would have to tell the truth throughout the declaration, and Ms. Ghafoorzai confirmed that there was no doubt in her mind as to the truth of the entire declaration. Ghafoorzai Dep. at 81-82.

Mr. Sullivan advised Ms. Ghafoorzai the day before her deposition that she should not be nervous, and she should tell the truth. Ms. Ghafoorzai testified explicitly and specifically that

Mr. Sullivan did *not* advise her that Mr. Wilkenfeld might try to confuse her during her deposition. Ghafoorzai Dep. at 19-20, 22.

### Khadija Darif

Ms. Darif met Mr. Bredehoft the day of her deposition. She understood that Mr. Bredehoft and Mr. Sullivan were attorneys for Mr. Chreky, not her. Darif Deposition at 10-12, attached as Exhibit H, hereinafter "Darif Dep. at __." Mr. Sullivan met with Ms. Darif prior to her deposition and advised her not to be nervous and to tell the truth. Darif Dep. at 13. Mr. Sullivan also met with Ms. Darif to discuss her declaration. Darif Dep. at 26. He explained that the law required that her declaration be truthful. Darif Dep. at 88. Ms. Darif was *not* told that she would be fired if she did not provide a declaration in this case. Darif Dep. at 112.

### Elena Vantsovskaya

Ms. Vantsovskaya was the front desk manager at Chreky Salon. Vantsovskaya Deposition at 9-10, attached as Exhibit I, hereinafter "Vantsovskaya Dep. at __." Ms. Vantsovskaya testified that she understood that Mr. Bredehoft and Mr. Sullivan were not her attorneys. Vantsovskaya Dep. at 13. She clarified that she was *not* required to meet with Mr. Sullivan and Mr. Bredehoft on the day of deposition. Vantsovskaya Dep. at 14-15. In her voluntary meeting with Mr. Bredehoft and Mr. Sullivan prior to her deposition, the only direction they gave her was to tell the truth. Vantsovskaya Dep. at 35.

Ms. Vantsovskaya had met with David Sullivan on two other occasions to discuss and sign her declaration. Vantsovskaya Dep. at 35-38. She clarified twice in her deposition that Mr. Chreky had *not* told her that the plaintiffs' lawyers would try to "trip her up" in the depositions. Vantsovskaya Dep. at 18-19. Rather, Mr. Chreky said that "some questions will be confusing and to listen to the questions carefully." Vantsovskaya Dep. at 19. Despite Ms. Katz's repeated

leading questions to that effect, Ms. Vantsovskaya confirmed that Mr. Chreky had *not* coached her about how to answer her deposition questions. Vantsovskaya Dep. at 19.

### *Faviola Veizaga*

Ms. Veizaga testified that Mr. Sullivan told her to tell the truth in her deposition and listen carefully to the questions. Veizaga Deposition at 18, attached as Exhibit J, hereinafter "Veizaga Dep. at __." Mr. Sullivan did not advise Ms. Veizaga that the attorney taking the deposition would try to confuse her, but rather to ask for a repeat of any question she did not understand. Veizaga Dep. at 20.

Ms. Veizaga met with Mr. Sullivan twice to complete her declaration in this case. While Ms. Veizaga did not remember whether Mr. Sullivan advised her of what "28 U.S.C. Section 1746" is, she stated that "[h]e probably did explain to me, but I…don't remember." Veizaga Dep. at 95. At the second meeting, she read through her draft declaration twice before signing it. Veizaga Dep. at 46. Ms. Veizaga confirmed in her deposition that Mr. Sullivan and Mr. Bredehoft were Mr. Chreky's attorneys, not her own. Veizaga Dep. at 15. She stated that she was "just saying what I think," and that she was not concerned that anything she said would damage the salon. Veizaga Dep. at 38-39.

### *Rodney Pinion*

Mr. Pinion, who was raised in Mississippi, has worked at the Chreky Salon since it opened in 1997. Pinion Deposition at 7, 11-12, attached as Exhibit K, hereinafter "Pinion Dep. at __." Mr. Pinion understood that Mr. Bredehoft and Mr. Sullivan were not his attorneys, but rather represented the Salon. Pinion Dep. at 15-16. In his meeting with Mr. Pinion the day before his deposition, Mr. Sullivan advised Mr. Pinion "[n]ot to be nervous," to "[j]ust answer the questions that are asked," and "[j]ust give honest answers." Pinion Dep. at 19.

11

Mr. Pinion was asked to meet with Mr. Sullivan before the deposition by the front desk manager at the Salon, Elena Vontsovskaya.  Pinion Dep. at 21.  He felt that he could say "no" to the meeting if he did not want to attend, and, when asked specifically, confirmed that he did not think he was "putting (himself) in jeopardy with Mr. or Mrs. Chreky if (he) refused to meet with their attorneys."  Pinion Dep. at 22-23.

Prior to his deposition, Mr. Pinion met once with Mr. Bredehoft and three times with Mr. Sullivan.  Two of the meetings with Mr. Sullivan were to discuss his observations in the Salon and create his declaration.  Pinion Dep. at 17-18, 23.  Mr. Pinion stated that Mr. Sullivan put his answers to Mr. Sullivan's questions in his declaration, and when Mr. Pinion read the draft, Mr. Sullivan asked him if he wanted to make any changes to it.  Pinion Dep. at 49, 52.  Mr. Pinion stated that he could refuse to sign the draft declaration if he chose, and he did not think there would be any ramifications from Mr. or Mrs. Chreky.  Pinion Dep. at 52-53.

Mr. Pinion testified that his declaration was voluntary and that he was not promised money nor worried about any reprisal when he gave his declaration.  Pinion Dep. at 93.  Mr. Pinion does not remember whether Mr. Sullivan explained to him what 28 U.S.C. Section 1746 is, but he thinks Mr. Sullivan "probably did."  Pinion Dep. at 95.

In sum, Barrett's proposed amended allegations are not supported or are flatly contradicted by the deposition testimony elicited in this case.

### III.    CONCLUSION

For these reasons, Defendants request that this Court deny Plaintiff's Motion for Leave to File an Amended Complaint and award Defendants the fees and costs, including attorneys' fees, associated with their Opposition to this premature and unsupported Motion.[1]

---

[1] Local Rule 7(m) requires that, before filing a non-dispositive motion, a party engage in and certify a good faith effort to confer with opposing counsel to narrow the scope of any differences.  Plaintiff's

January 22, 2008

Respectfully submitted,

_____/s/_____

John M. Bredehoft
D.C. Bar No. 375606
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, Virginia 23510
757-624-3225 (direct voice line)
757-624-3169 (facsimile)
jmbredehoft@kaufcan.com

Counsel for Defendants

::ODMA\PCDOCS\DOCSNFK\1321965\3

---

counsel in this case presented Defendants' counsel with a copy of the proposed amended complaint on December 18, 2007, and demanded a response by the close of business on December 21, 2007. Defendant's counsel supplied that response, in writing. *See* Sullivan Letter to Wilkenfeld and Katz, attached as Exhibit L.  No attorney for Plaintiff responded to this letter from Mr. Sullivan.  Further, Plaintiff's counsel has not attached to this Motion to Amend any certification of conferral over the motion.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RONNIE BARRETT,                              )
                                             )
            Plaintiff,                       )
                                             )
v.                                           )        C.A. No. 07-CV-0250
                                             )
ANDRE CHREKY, ET AL.                         )
                                             )
            Defendants.                      )
                                             )

## ORDER DENYING PLAINTIFF'S MOTION TO AMEND COMPLAINT

THIS MATTER came to be heard on the Motion of Plaintiff, Ronnie Barrett, seeking to amend her complaint in this matter.

It appears to the Court that the additional facts proposed by Plaintiff for her complaint do not support any claim Plaintiff has asserted. Further, facts respecting the Internal Revenue Code and the District of Columbia's ordinances cannot support any claim for relief. Facts regarding alleged obstruction of justice by Defendants are not supported by Plaintiff's own extensive discovery in this matter. Under these circumstances, Plaintiff's proposed amendments are futile and proposed in bad faith.

The Motion to Amend, therefore, is DENIED, and Plaintiff shall be required to pay for Defendants' reasonable fees and costs, including attorney's fees, associated with responding to Plaintiff's motion.

**DATE:**                                    **ENTER:**

_____                      _____

                                             **UNITED STATES JUDGE**

14

EXHIBIT

tabbies △ A

519 F.Supp.2d 84, 2007 WL 3254737 (D.D.C.), 100 A.F.T.R.2d 2007-6543

Motions, Pleadings and Filings

United States District Court,
District of Columbia.
Charles RADCLIFFE, Plaintiff,
v.
UNITED STATES, Defendant.
No. 07cv586 (RJL).
Nov. 6, 2007.

**Background:** Taxpayer brought pro se action against United States under Taxpayers Bill of Rights, alleging numerous violations of the Internal Revenue Code. United States moved to dismiss, and taxpayer moved to amend.

**Holdings:** The District Court, Richard J. Leon, J., held that:
(1) taxpayer failed to state a claim, and
(2) amendment would be futile.

Ordered accordingly.

West Headnotes

[1] KeyCite Notes 

☞ 220 Internal Revenue
  ☞ 220XXVII Remedies for Wrongful Enforcement
    ☞ 220XXVII(D) Proceedings
      ☞ 220k4938 k. Pleading. Most Cited Cases

Taxpayer's complaint against United States alleging 97 different counts of misconduct by the Internal Revenue Service (IRS) in connection with a collection action the IRS had been pursuing against him for more than ten years failed to state claim under Taxpayers Bill of Rights; complaint provided nothing more than a series of bald assertions that agents of the IRS had violated various sections of the Internal Revenue Code, and did not explain how the IRS violated the Internal Revenue Code, when these violations allegedly occurred, nor how these violations caused taxpayer injury. 26 U.S.C.A. § 7433.

[2] KeyCite Notes

☞ 170A Federal Civil Procedure
  ☞ 170AVII Pleadings and Motions
    ☞ 170AVII(E) Amendments
      ☞ 170Ak824 k. Time for Amendment in General. Most Cited Cases

☞ 170A Federal Civil Procedure KeyCite Notes
  ☞ 170AVII Pleadings and Motions
    ☞ 170AVII(E) Amendments
      ☞ 170Ak834 k. Injustice or Prejudice. Most Cited Cases

☞170A Federal Civil Procedure KeyCite Notes 
  ☞170AVII Pleadings and Motions
    ☞170AVII(E) Amendments
      ☞170Ak851 k. Form and Sufficiency of Amendment. Most Cited Cases

A court may deny a motion to amend if the Court finds , inter alia, bad faith, dilatory motive, undue prejudice to the opposing party, or futility. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

[3] KeyCite Notes 

☞170A Federal Civil Procedure
  ☞170AVII Pleadings and Motions
    ☞170AVII(E) Amendments
      ☞170Ak851 k. Form and Sufficiency of Amendment. Most Cited Cases

Taxpayer's amended complaint pursuant to Taxpayers Bill of Rights would likely fail on a motion to dismiss and, therefore, taxpayer's motion to amend would be futile, warranting denial of motion; as with prior complaint which court dismissed for failure to state a claim, amended complaint, which simply merged the number of claims from 97 to 12, failed to provide any factual allegations in support of taxpayer's claims or his alleged injuries. 26 U.S.C.A. § 7433; Fed.Rules Civ.Proc.Rules 12(b)(6), 15 (a), 28 U.S.C.A.

***85** Charles Radcliffe, Denver, CO, pro se.

Beatriz T. Saiz, U.S. Department of Justice, Washington, DC, for Defendant.

## MEMORANDUM OPINION

(November *2,* 2007) [# 8, 10]

RICHARD J. LEON, District Judge.
  ****1** Charles Radcliffe, *pro se,* has sued the United States pursuant to 26 U.S.C. § 7433 alleging numerous violations of the Internal Revenue Code. Currently before the Court is defendant's motion to dismiss and plaintiff's motion to file a second amended complaint. For the reasons set forth below, defendant's motions is GRANTED and plaintiff's motion is DENIED.

## I. ANALYSIS

### A. DEFENDANT'S MOTION TO DISMISS
  Mr. Radcliffe has sued the United States pursuant to the Taxpayers Bill of Rights, 26 U.S.C. § 7433 FN1, alleging 97 different counts of misconduct by the Internal Revenue Service ("IRS") in connection with a collection action the IRS has been pursuing against him since 1993.FN2 The defendant has moved to dismiss the complaint pursuant to Federal Rule 12(b)(6) arguing, *inter alia,* that plaintiff has failed allege sufficient facts to support his claim for damages. Upon review of the record, the Court agrees.

FN1. Title 26, U.S.C. § 7433 creates a private right of action against the United States if: "in connection with any collection of Federal tax ... any officer or employee of the Internal

Revenue Service recklessly or intentionally, or by reason of negligence disregards any provision of [Title 26], or any regulation promulgated under [that] title." 26 U.S.C. § 7433(a) (2006).

FN2. The Court notes that plaintiff's current action is only the most recent challenge of this collection action. *See Radcliffe v. U.S.,* 2007 WL 1141580, slip op., (D.D.C.2007); *Radcliffe v. U.S.,* 453 F.Supp.2d 101 (D.D.C.2006).

Under Rule 12(b)(6) a court may dismiss a complaint for failure to state a claim upon which relief may be granted if it appears, assuming the alleged facts to be true and drawing all inferences in plaintiff's favor, that plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Harris v. Ladner,* 127 F.3d 1121, 1123 (D.C.Cir.1997); *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C.Cir.1994). In ruling on a motion to dismiss, the Court will liberally construe the plaintiff's complaint, but will not "accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint." *Kowal,* 16 F.3d at 1276.

[1]     In the case at hand, plaintiff's complaint, although lengthy, provides nothing more than a series of bald assertions that agents of the IRS have violated various sections of the Internal Revenue Code. Plaintiff has not explained how the IRS violated the Internal Revenue Code, when these violations allegedly occurred, nor how these violations caused him injury. Although Federal Rule of Civil Procedure 8(a) provides that a complaint need only contain "a short and plain statement of the **\*86** claim showing that the pleader is entitled to relief," something more than an unsupported assertion of a violation is needed. Accordingly, the Court will GRANT defendant's motion to dismiss.

## B. PLAINTIFF'S MOTION TO AMEND

In response to the defendant's motion to dismiss, plaintiff has moved for leave to file a second amended complaint. Upon review of the proposed Second Amended Complaint, however, the Court finds that amending the Amended Complaint would be futile.

[2]     Under Rule 15(a), "a party may amend the party's pleadings only by leave of the court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Federal Rule of Civil Procedure 15(a). A court may deny a motion to amend, however, if the Court finds, *inter alia,* bad faith, dilatory motive, undue prejudice to the opposing party, or futility. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Firestone v. Firestone,* 76 F.3d 1205, 1208 (D.C.Cir.1996).

**\*\*2** [3]     In the case at hand, plaintiff's proposed Second Amended Complaint simply pares the number of claims in the Amended Complaint from 97 to 12. Like the Amended Complaint, the Second Amended Complaint offers nothing more than a simple laundry list of alleged violations of the Internal Revenue Code. As before, plaintiff has failed to provide any factual allegations in support of his claims or his alleged injuries. As a result, the Court finds that the Second Amended Complaint would likely fail on a motion to dismiss and, therefore, the motion to amend would be futile. Accordingly, plaintiff's motion to amend the Amended Complaint will be DENIED.

## II. CONCLUSION

Therefore, for the reasons noted above, defendant's motion to dismiss will be GRANTED and plaintiff's motion to amend the Amended Complaint will be DENIED.

D.D.C.,2007.
Radcliffe v. U.S.

519 F.Supp.2d 84, 2007 WL 3254737 (D.D.C.), 100 A.F.T.R.2d 2007-6543

Motions, Pleadings and Filings (Back to top)

• 2007 WL 4460799 (Trial Motion, Memorandum and Affidavit) Response to United States' Reply and Request for Leave to Amend Complaint (Jul. 12, 2007)
• 2007 WL 4460798 (Trial Motion, Memorandum and Affidavit) United States' Motion to Dismiss Amended Complaint (Jul. 5, 2007)
• 2007 WL 4460797 (Trial Pleading) Amended Verified Complaint, Petition, and Claim for Damages Pursuant to 26 U.S.C. | 7433 (Jun. 4, 2007)
• 1:07cv00586 (Docket) (Mar. 26, 2007)
END OF DOCUMENT

(C) 2008 Thomson/West. No Claim to Orig. US Gov. Works.

EXHIBIT

B

Not Reported in F.Supp.2d, 1998 WL 596726 (D.Kan.)

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, D. Kansas.
Dierk W. VAN KEPPEL, Plaintiff,
v.
FLY ASH MANAGEMENT, L.L.C., et. al., Defendant.
No. Civ.A. 97-2681-KHV.
Aug. 3, 1998.

Derron D. Gunderman, Wallace, Saunders, Austin, Brown & Enochs, Chartered, Overland Park, KS, Douglas D. Silvius, Ronald C. Spradley, Spradley & Riesmeyer, P.C., Kansas City, MO, for Dierk W Van Keppel, plaintiff.

Jeffrey A. Chanay, Gail D. Edson, Entz & Chanay, P.A., Topeka, KS, for Fly Ash Management, L.L.C., a Kansas Limited Liability Company, defendant.

Jeffrey A. Chanay, Gail D. Edson, (See above), for Flint Hills Fly Ash, Inc., defendant.

Jeffrey A. Chanay, Gail D. Edson, (See above), for Don Hock, defendant.

Jeffrey A. Chanay, Gail D. Edson, (See above), for William K Pryor, defendant.

Jeffrey A. Chanay, Gail D. Edson, (See above), for Brady E Pryor, defendant.

### MEMORANDUM AND ORDER

VRATIL, J.

*1 This matter comes before the Court on defendants' *Motion To Dismiss* (Doc. # 21) filed March 13, 1998. In that motion, defendants ask the Court to strike plaintiff's demand for a jury trial on his claims under the Employee Retirement Income Security Act [ERISA], 29 U.S.C. § 1001 *et seq.* ; to dismiss plaintiff's claim for punitive damages under the Kansas Wage Payment Act, K.S.A. § 44-313 *et seq.;* and to dismiss plaintiff's claim for reimbursement of alleged business expenses.

### I. *Legal Standards*

In ruling on a motion to dismiss, the Court must assume the truth of all well-pleaded facts in plaintiff's complaint and view them in a light most favorable to plaintiff. *Zinermon v. Burch,* 494 U.S. 113, 118, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990); *see also Swanson v. Bixler,* 750 F.2d 810, 810 (10th Cir.1984) ("[a]ll well-pleaded facts, as distinguished from conclusory allegations, must be taken as true"). The Court must make all reasonable inferences in favor of plaintiff, and the pleadings must be construed liberally. *Id.; see also* Fed.R.Civ.P. 8(a); *Lafoy v. HMO Colorado,* 988 F.2d 97, 98 (10th Cir.1993). The issue in reviewing the sufficiency of plaintiff's complaint is not whether he will prevail, but whether he is entitled to offer evidence to support his claims. *See Schuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Therefore the Court may not dismiss a cause of action for failure to state a claim unless it appears beyond a doubt that plaintiff can prove no set of facts in support of his theory of recovery that would entitle him to relief. *Conely v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence,* 927 F.2d 1111, 1115 (10th Cir.1991). Although plaintiff need not precisely state each element of his claims, he must plead minimal factual allegations on those material elements that must be proved.

*Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir.1991).

## II. *Factual Background*

In evaluating those claims, the Court deems the following facts to be undisputed or if disputed, construed in the light most favorable to plaintiff. Plaintiff Dierk W. Van Keppel claims that Fly Ash Management, Flint Hills Fly Ash, Inc., Don Hock, William K. Pryor, and Brady Pryor wrongfully withheld certain sums from his compensation, failed to furnish plan descriptions and annual reports of ERISA plans in which he participated, and wrongfully terminated his employment in violation of ERISA. Plaintiff also claims that defendants violated the Kansas Wage Payment Act by failing to pay final wages and reimburse certain expenses.

From November 1, 1994 to July 10, 1997, plaintiff worked as a sales representative for Fly Ash Management and Flint Hills Fly Ash. During his employment, plaintiff participated in two retirement plans, the Flint Hills Fly Ash Money Purchase Pension and Trust Retirement Plan and the Fly Ash Management SEP Plan. Neither plan allows voluntary employee contributions. During 1995, 1996 and 1997, however, defendants withheld amounts from plaintiff's compensation for the stated reason that such withholdings were voluntary contributions to plaintiff's retirement plans. In March 1997, defendants issued plaintiff a check for $4,369.44, stating that this amount, net of taxes, had been withheld from his compensation through 1996. Defendants did not furnish an accounting of any investments or earnings on the money that was withheld in 1996. Since May 6, 1997, plaintiff has requested an accounting and payment of commissions due from Fly Ash Management.

*2 On July 10, 1997, Fly Ash Management terminated plaintiff's employment after William Pryor advised him that his commissions would be reduced. Plaintiff's requests for account information and his statements that he would enforce his rights regarding his pension benefits were a substantial factor in his termination.

Plaintiff has yet to receive the money that defendants withheld from his commissions. They have also failed to pay salary earned between June 27 and July 10, 1997, or to reimburse expenses for June and July of 1997, as required under his expense reimbursement arrangement.

## III. *Analysis*

### A. Right to Jury Trial on ERISA Claim

Defendant moves to dismiss plaintiff's demand for a jury trial. While the motion is made under Fed.R.Civ.P. 12(b)(6), the Court will address the issue as if it were properly styled as a motion to strike under Fed.R.Civ.P. 12(f). *See Sanchez v. La Rosa Del Monte Express, Inc.,* 1994 WL 603901 (N.D.Ill.1994); *See also BBCA, Inc. v. United States,* 954 F.2d 1429, 1432 (8th Cir.), *cert. denied,* 506 U.S. 866, 113 S.Ct. 192, 121 L.Ed.2d 136 (1992) (substance rather than form of motion is controlling).

In Count I, plaintiff claims that defendants violated 29 U.S.C. §§ 1021, 1022, 1023, and 1024(b) by failing to furnish summary plan descriptions of plaintiff's benefit plans. Plaintiff also claims that defendants violated U.S.C. §§ 1140, 1141 by interfering with his rights under the plans and by terminating him after he exercised his rights. Plaintiff demands a jury trial on his claims.

In determining whether plaintiff has a right to a jury trial, the Court must make a two-part analysis. First, it must determine whether ERISA provides the right to a jury trial. Next, it must consider whether a jury trial is required by the Seventh Amendment of the Constitution.

Section 510 of ERISA, 29 U.S.C. § 1140, which prohibits interference with the rights of a benefit participant, is silent on the issue of trial by jury. Section 502, 29 U.S.C. § 1132, the enforcement vehicle for violations of Section 510, is likewise silent on this issue. Lacking clear statutory guidance,

the Court must turn to the second prong of the test and determine whether the Seventh Amendment requires a jury trial.

The Seventh Amendment preserves a party's right to a jury trial. "If a jury would have been impaneled in a particular kind of case in 1791, then the Seventh Amendment requires a jury trial today, if either party so desires." *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 345, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). The Supreme Court has consistently held that whether the right exists must be judged by historical standards examining both the nature of the action and the remedy. *See e.g., Curtis v. Loether,* 415 U.S. 189, 193, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974); *Ross v. Bernhard,* 396 U.S. 531, 533, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970).

To determine the nature of the issues involved, the Court must first compare the present action to those brought in the courts of England prior to the merger of the courts of law and equity. *See e .g., Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 477, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962). Next, it must determine whether the remedy sought is legal or equitable in nature. *See e.g., Ross v. Bernhard,* 396 U.S. 531, 542, 90 S.Ct. 733, 24 L.Ed.2d 729.

**\*3** In analyzing the nature of the action and remedy, the Court is informed by the cases cited by the parties and recent cases decided within this District. Defendant's motion to strike cites decisions of this District which repeatedly hold that ERISA claims do not give rise to either a legal remedy or a trial by jury. *See, e.g., Growney v. H.J. Heinz Co.,* 1997 WL 534463 (D.Kan.); *Clevinger v. Trans World Airlines, Inc.,* 1997 WL 540795 (D.Kan.); *Johnson v. Centennial Life Ins. Co.,* 885 F.Supp. 227 (D.Kan.1995); *Zimmerman v. Sloss Equipment, Inc.,* 835 F.Supp. 1283 (D.Kan.) *aff'd* 72 F.3d 822 (10th Cir.1995); *Babich v. Unisys Corp.,* No.1994 WL 167984 (D.Kan.).

Plaintiff argues that the Tenth Circuit decision in *Zimmerman,* 72 F.3d 822 (10th Cir.1995), and the Supreme Court decision in *Firestone Tire & Rubber Company v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), shed doubt on these holdings. Any such doubt has been conclusively dispelled, however, by *Adams v. Cyprus Amax Minerals Co.,* 149 F.3d 1156, 1998 WL 396565 (10th Cir.). There, the Tenth Circuit rejected the proposition that *Firestone* invites courts to reexamine whether certain ERISA claims require jury trials. Specifically, it held that an action under Section 1132 (a)(1)(B) is analogous to a trust action and is therefore equitable in nature. *Id.* at \*4. Moreover, it determined that recovery of benefits is an equitable action seeking restitution rather than a legal action seeking compensatory relief. *Id.* at \*5. Concluding that both the nature of the action and remedy were equitable, it held that Section 1132(a)(1)(B) of ERISA provides no right to a jury trial. The Tenth Circuit thus became the fifth circuit, since *Firestone,* to hold that parties do not have a right to a jury trial in cases arising under ERISA. *See; DeFelice v. American International Life Assurance Company of New York,* 112 F.3d 61, 64 (2nd Cir.1997); *Borst v. Chevron Corp.,* 36 F.3d 1308 (5th Cir.1994); *Spinellii v. Gaughan,* 12 F.3d 853 (9th Cir.1993); *Harsch v. Eisenburg,* 956 F.2d 651, 661 (7th Cir.1992), *cert. denied,* 506 U.S. 818, 113 S.Ct. 61, 121 L.Ed.2d 29 (1992).

Plaintiff's final argument is that he seeks relief not only under ERISA but also under the Internal Revenue Code, 26 U.S.C. § 6051. Plaintiff alleges that Fly Ash Management violated Section 6051 when it withheld sums from his commissions without noting the changes on his "Form W-2 Wage and Tax Statement" for 1996. Plaintiff contends that this violation subjects defendants to penalties under 26 U.S.C. §§ 6674 and 6682 and grants him the right to a jury trial.

Sections 6674 and 6682 of Article 26 allow civil penalties, assessed by the Secretary of the Internal Revenue Service, for violations of the Internal Revenue Code. Plaintiff has not cited (and the Court has not uncovered) any cases which afford him a private right of action for defendants' violation of the Internal Revenue Code. Absent such authority, plaintiff's argument must fail. Plaintiff cannot use the alleged violation of the Internal Revenue Code as a means of obtaining a trial by jury.

### B. Motion to Dismiss Claim for Punitive Damages

**\*4** Defendants ask the Court to dismiss plaintiff's claim for punitive damages under the Kansas Wage Payment Act, K.S.A. § 44-315, for two reasons. First, defendants argue that the Act does not

allow punitive damages. Second, they contend that plaintiff is not allowed punitive damages because his claim sounds in contract and not in tort. Plaintiff does not dispute the first point and defendant's motion is therefore sustained as to any claim under the Kansas Wage Payment Act.

Plaintiff argues, however, that he is entitled to punitive damages under the malicious prosecution theory articulated in Count II of his complaint. The Kansas Supreme Court has held that "[a] cause of action for malicious prosecution of a civil action may be alleged in general language in a petition, so long as the essential elements are set forth." *Nelson v. Miller,* 227 Kan. 271, 277, 607 P.2d 438, 443 (1980). Under Kansas law, a claim for malicious prosecution requires a factual showing that (1) defendant initiated, continued, or procured the proceeding of which complaint is made; (2) defendant in doing so acted without probable cause; (3) defendant acted with malice; (4) the proceedings terminated in favor of plaintiff; and (5) plaintiff sustained damages. *See Lindenman v.. Umscheid,* 255 Kan. 610, 624, 875 P.2d 964, 974 (1994); *Tappen v.. Ager,* 599 F.2d 376, 378 (10th Cir.1979); *Thompson v. General Fin. Co.,* 205 Kan. 76, 91, 468 P.2d 269, 282 (1970);; *Nelson,* 227 Kan. at 276, 607 P.2d 438.

From the allegations of Count II, it appears that plaintiff cannot maintain an actionable claim for punitive damages based on a malicious prosecution theory of relief. Count II alleges that defendants continued the proceeding of which the complaint is made by filing a Petition for Review in the District Court of Shawnee County, Kansas; that defendants acted without probable cause, that defendants acted with malice, and that plaintiff sustained damages in the form legal fees. Plaintiff, however, does not allege that the proceedings have terminated in his favor. Indeed, plaintiff alleges that defendants have filed a petition for review. In Kansas, the right to maintain an action for malicious prosecution does not accrue until the time for appeal has passed on the original action. *See Hutchinson Travel Agency, Inc. v. McGregor,* 10 Kan.App.2d 461, 463, 701 P.2d 977, 979 (Kan.Court.App.1985). Plaintiff's complaint does not claim that the prior action has terminated and it therefore omits an essential element of a malicious prosecution claim. Plaintiff must therefore show cause why the Court should not dismiss his claim for malicious prosecution.

### C. Motion to Dismiss Claim for Expenses

Defendant also asks the Court to dismiss plaintiff's claim for reimbursement of expenses under the Kansas Wage Payment Act, K.S.A. § 44-313, *et seq.,* because expenses are not defined as compensation under the Act. Plaintiff responds that he seeks reimbursement under his expense reimbursement agreement and not under the Act. This aspect of defendant's motion is therefore moot.

*\*5* **IT IS THEREFORE ORDERED** that defendant's *Motion To Dismiss* (Doc. # 21) filed March 13, 1997, be and hereby is sustained to the extent that plaintiff's demand for a jury trial on his ERISA claims is stricken and plaintiff's claim for punitive damages under the Kansas Wage Payment Act, K.S.A. § 44-315 is hereby dismissed.

**IT IS FURTHER ORDERED** that plaintiff show cause in writing on or before August 14, 1998 why his claim for malicious prosecution should not be dismissed for failure to state a claim upon which relief can be granted.

D.Kan.,1998.
Van Keppel v. Fly Ash Management, L.L.C.
Not Reported in F.Supp.2d, 1998 WL 596726 (D.Kan.)

Motions, Pleadings and Filings (Back to top)

• 2:97cv02681 (Docket) (Dec. 31, 1997)
END OF DOCUMENT

(C) 2008 Thomson/West. No Claim to Orig. US Gov. Works.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
                                :
RONNIE BARRETT,                 :
                                :
            Plaintiff,          :
                                :
        vs.                     :     C.A. No.
                                :     07-CV-0250(RCL)
ANDRE CHREKY,                   :
ANDRE CHREKY SALON/ANDRE        :
CHREKY INC., SPAC, LLC,         :
                                :
            Defendants.         :
- - - - - - - - - - - - - - - x
                                :
JENNIFER THONG,                 :
                                :
            Plaintiff,          :
                                :     Civil No.
        vs.                     :     1:06-1807(RCL)
                                :
ANDRE CHREKY SALON, et al.,     :
                                :
            Defendants.         :
                                :
- - - - - - - - - - - - - - - x

                    Washington, D.C.
                    Monday, October 1, 2007


        The deposition of MILA PETROSYAN, called for

examination by counsel for Plaintiffs in the

above-entitled matter, pursuant to Notice, in the

offices of Katz, Marshall & Banks, 1718 Connecticut



1          Right next to you is John Bredehoft.

2          Have you met Mr. Bredehoft before?

3     A.   No.

4     Q.   Have you spoken with him today?

5     A.   Today?  No.

6     Q.   Have you ever spoken with him?

7     A.   No.

8     Q.   Next to him is your employer Mr. Chreky.

9          You understand that Mr. Bredehoft is

10   representing Mr. Chreky, the salon and the company

11   that owns the building?

12    A.   Yes.

13    Q.   And you understand that he is here to

14   represent Mr. Chreky's interests?

15    A.   Yes.

16    Q.   And you understand that he is not here to

17   represent your interests?

18    A.   Yes.

19    Q.   And he is not your lawyer, Mr. Bredehoft is

20   not your lawyer; is that correct?

21    A.   No.

22    Q.   Have you met with Mr. Bredehoft's associate,

14

```
1    to meet with Mr. Sullivan today, correct?

2        A.    What do you mean job?

3        Q.    As an employee of Mr. Chreky, it was your

4    job today, one of your duties as his employee today,

5    to go meet with Mr. Sullivan?

6        A.    Yes.

7        Q.    What did Mr. Sullivan tell you?

8        A.    He told me just tell the truth of what you

9    know and just the truth.  We never discussed about

10   other things.

11       Q.    How long did this meeting go on for?

12       A.    Maybe 10 or 15 minutes.  We came here after.

13       Q.    So, in those 10 to 15 minutes he told you

14   make sure you tell the truth?

15       A.    Yes.

16       Q.    What else did he tell you?

17       A.    Nothing.

18       Q.    Well, you were together for at least ten

19   minutes.

20       A.    He told me to just tell the truth.  If you

21   are asked something, tell the truth to what you know.

22       Q.    For ten minutes he just told you over and
```

15

1  over again tell the truth?

2      A.    No.   We talked about other things.   Not

3  about this case.   We just talk about different

4  things.

5      Q.    Did he talk to you about any of the

6  questions you might be asked today?

7      A.    No.

8      Q.    Did he tell you to be careful not to be

9  confused by the questions we ask you?

10     A.    I think so.   Yes.

11     Q.    So, he indicated to you that we might be

12 trying to ask questions that would be confusing to

13 you?

14     A.    Yes.

15     Q.    And he also told you that we might be asking

16 questions designed to trick you?

17     A.    No.   Not about kind of trick questions.   No.

18     Q.    But he warned you that we might be trying to

19 confuse you and get answers out of you that way?

20     A.    Not confuse.   He told me if you don't

21 understand some questions, you just ask again.

22          MR. WILKENFELD:   Let's mark this as

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
                              :
RONNIE BARRETT,               :
                              :
          Plaintiff,          :
                              :
      vs.                     :      C.A. No.
                              :   07-CV-0250(RCL)
ANDRE CHREKY,                 :
ANDRE CHREKY SALON/ANDRE      :
CHREKY INC., SPAC, LLC,       :
                              :
          Defendants.         :
                              :
- - - - - - - - - - - - - - - x
                              :
JENNIFER THONG,               :
                              :
          Plaintiff,          :
                              :
                              :      Civil No.
      vs.                     :   1:06-1807(RCL)
                              :
ANDRE CHREKY SALON, et al.,   :
                              :
          Defendants.         :
                              :
- - - - - - - - - - - - - - - x

                    Washington, D.C.
                    Tuesday, October 2, 2007

        The deposition of XIOMARA MARADIAGA, called

for examination by counsel for Plaintiffs in the

above-entitled matter, pursuant to Notice, in the

offices of Katz, Marshall & Banks, 1718 Connecticut

Avenue, N.W., Sixth Floor, Washington, D.C., convened

JARDIM REPORTING ASSOCIATES
(703) 867-0396



1    Q.    So, is that three times that you have met

2    with Mr. Sullivan?

3    A.    Yes.

4    Q.    Including yesterday?

5    A.    Yes.  Including yesterday.

6    Q.    What was the purpose of your meeting

7    yesterday with Mr. Sullivan?

8    A.    Only to tell me to say the truth, say the

9    truth and relax, take your time.  That is it.

10    Q.    Were you finished?

11    A.    I don't remember how many times.

12         I tell him because I don't speak very good

13    English and I need time.  Because I do not speak very

14    good English I don't understand the questions and I

15    ask the questions for him.  He said I don't know the

16    lawyer's questions.  He just said say the truth and

17    relax and take your time.

18    Q.    Good advice.

19    A.    Yes.

20    Q.    You understood he wasn't your lawyer when he

21    was giving that advice, correct?

22    A.    Yes.

90

1    occasion?

2        A.    The same time.

3        Q.    Ten minutes?

4        A.    About ten or seven.

5        Q.    Seven or ten minutes?

6        A.    Yes.

7        Q.    Mr. Sullivan presented this document for you

8    to review?

9        A.    Yes.

10       Q.    And you reviewed it there in the Starbucks?

11       A.    Yes.

12       Q.    And you signed it?

13       A.    Yes.

14       Q.    Did you make any changes to the document

15   before you signed it?

16       A.    No.

17       Q.    Did Mr. Sullivan offer to translate this

18   document into Spanish for you?

19       A.    Somebody translated it for me.

20       Q.    Who?

21       A.    Carla.

22       Q.    Carla?

1      A.    Yes.

2      Q.    The colorist?

3      A.    Yes.

4      Q.    So, she came over to your meeting with

5  Mr. Sullivan?

6      A.    No.  She translated later.  Because the

7  simple I understand something and I say not this,

8  da-da-da-da-da.

9      Q.    My question is was Carla sitting at the

10  table with Mr. Sullivan when you walked in and he

11  handed this to you?

12      A.    Yes.

13      Q.    She was sitting at the table?

14      A.    Yes.

15      Q.    Did he offer to give you this document in

16  Spanish?

17      A.    No.

18      Q.    Would it have been easier for you to read if

19  this document had been presented to you in Spanish?

20      A.    Yes.  But Carla translated --

21      Q.    Okay.  You answered my question.  Thank you.

22          Directing your attention to paragraph two.

```
 1        A.    Yes.

 2        Q.    That is a true statement, right?

 3        A.    Yes.

 4        Q.    I am going to direct your attention to

 5   paragraph seven.  Paragraph seven says:  I have made

 6   this declaration voluntarily.

 7              What did you mean by that when you said

 8   that?

 9              You said these word to Mr. Sullivan?

10        A.    Yes.  Because I never have people tell me go

11   and you say this, this and this.  Yes.  Voluntary.

12              MR. ROSE:  Can you read back her answer

13   please?

14              (The reporter read the requested portion of

15   the record.)

16   BY MR. ROSE:

17        Q.    So, your understanding of voluntary is that

18   even though you were directed by someone at your

19   place of work to go and talk with Mr. Chreky's

20   attorney, unless they told you exactly what to say it

21   was a voluntary statement?

22              Is that a true statement?
```

1              (Discussion between the Interpreter and the
2       witness.)
3              THE INTERPRETER:  Nobody told me anything.
4       They only said that he wanted to interview me.
5       BY MR. ROSE:
6          Q.   Were these words yours?  Did you say this at
7       the table when you were meeting with Mr. Sullivan, I
8       have made this declaration voluntarily?
9              MR. BREDEHOFT:  Can you translate that?
10             THE INTERPRETER:  Could you read back the
11      question please?
12             (The reporter read the requested portion of
13      the record.)
14             THE INTERPRETER:  Yes.  It is true.
15      BY MR. ROSE:
16         Q.   Those were your words?
17         A.   Yes.
18         Q.   Your exact words?
19         A.   Yes.
20         Q.   It goes on to say in paragraph seven, the
21      second sentence:  I have been promised no benefit,
22      nor threatened with any reprisal in connection with

1    this Declaration.

2              Those were your words to Mr. Sullivan?

3        A.    Yes.

4        Q.    You said those words to him?

5        A.    Yes.

6        Q.    Directing your attention to paragraph eight,

7    it says:  Pursuant to 28 U.S.C. Section 1746, I

8    declare under penalty of perjury under the laws of

9    the United States of America that the foregoing is

10   true and correct.

11             Do you see that?

12       A.    Yes.

13       Q.    Did you say those words to Mr. Sullivan?

14       A.    (Nodding.)

15       Q.    You are nodding your head, but you need to

16   answer.

17       A.    Yes.

18       Q.    What is 28 U.S.C. Section 1746?

19       A.    He told me, but I don't remember that.

20       Q.    He did?  He told you what it was, but you

21   told him these words?

22       A.    Because Carla translated for me.  But I

```
 1   don't remember now.  I don't remember.

 2       Q.    This is your declaration and you signed it,

 3   right?

 4       A.    Yes.

 5       Q.    What did you mean when you said I declare

 6   under penalty of perjury under the laws of the United

 7   States that the foregoing is true and correct?

 8       A.    Because I said the truth.

 9       Q.    Did you understand what the penalty of

10   perjury is?

11       A.    Yes.  He explained to me.  Carla translated

12   for me.  I don't remember right now.

13       Q.    As best you can recall, what did

14   Mr. Sullivan tell you under penalty of perjury meant?

15       A.    I told you I don't remember.

16       Q.    Did he tell you that you could go to jail if

17   you lied under oath?

18       A.    Yes.

19       Q.    He did say that?

20       A.    Yes.

21       Q.    Did he say you could be criminally

22   prosecuted?
```

```
 1        A.    Me?

 2        Q.    Yes.

 3        A.    Criminally?

 4        Q.    Did Mr. Sullivan advise you that if you lied

 5   under oath, that criminal prosecution was part of the

 6   penalty of perjury?

 7        A.    Yes.

 8             MR. ROSE:  Let's take a few minutes.

 9             (Recess.)

10   BY MR. ROSE:

11        Q.    I just want to make absolutely certain that

12   once we brought Mr. Kumin into the room you

13   understood that if you had any questions, just as you

14   did before, I instructed you if you had any questions

15   with respect to my question, to let me know and

16   throughout the deposition you did let me know when

17   you didn't understand, correct?

18        A.    Not exactly understand very well.

19        Q.    But once he came in, you would look to

20   Mr. Kumin and he was able to assist your

21   understanding the question that was posed, correct?

22        A.    Yes.
```

COPY

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
                              :
RONNIE BARRETT,               :
                              :
            Plaintiff,        :
                              :
      vs.                     :      C.A. No.
                              :      07-CV-0250(RCL)
ANDRE CHREKY,                 :
ANDRE CHREKY SALON/ANDRE      :
CHREKY INC., SPAC, LLC,       :
                              :
            Defendants.       :
                              :
- - - - - - - - - - - - - - - x
                              :
JENNIFER THONG,               :
                              :
            Plaintiff,        :
                              :      Civil No.
      vs.                     :      1:06-1807(RCL)
                              :
ANDRE CHREKY SALON, et al.,   :
                              :
            Defendants.       :
                              :
- - - - - - - - - - - - - - - x

                  Washington, D.C.
                  Monday, October 1, 2007

      The deposition of AOUATIF MAHBOUB, called

for examination by counsel for Plaintiffs in the

above-entitled matter, pursuant to Notice, in the

offices of Katz, Marshall & Banks, 1718 Connecticut

Avenue, N.W., Sixth Floor, Washington, D.C., convened

EXHIBIT

�114 E

1       A.    Sure.

2       Q.    Because the Court Reporter can only write

3   down what one of us are saying at a time.

4       A.    Sure.

5       Q.    You have to answer all the questions that I

6   put to you.

7             Do you understand that?

8       A.    I do understand.

9       Q.    Whether you like the questions or you don't

10  like the questions, you are duty bound today to

11  answer the questions I put to you.

12      A.    Sure.

13      Q.    Do you understand that?

14      A.    I do understand that.

15      Q.    You understand that you are under oath?

16      A.    Yes.

17      Q.    And there are penalties for not telling the

18  truth under oath.

19            You understand that?

20      A.    Yes.  I do understand that.

21      Q.    What is your current position at the salon?

22      A.    Colorist.  Hair colorist.  Hair assistant.

14

```
 1        Q.    And you are an assistant to Mr. Chreky?

 2        A.    To Mr. Chreky.

 3        Q.    Do you only work on his clients or do you

 4   perform color services for other clients?

 5        A.    Mostly only his clients.

 6        Q.    Has that position changed over time?

 7              I understand your hours are now down to four

 8   days a week, but has your position itself changed

 9   over time?

10        A.    No.

11        Q.    Have you always reported to Mr. Chreky?

12        A.    I can't understand that.

13        Q.    Who is your supervisor?

14        A.    Mr. Chreky and Serena.

15        Q.    And those two have always been your

16   supervisors; is that right?

17        A.    Correct.

18        Q.    Now, you are not represented by counsel

19   today; is that right?

20              You understand these are lawyers for

21   Mr. Chreky and the salon?

22        A.    Yes.  Correct.
```

1      Q.    They are not your lawyers?

2      A.    Yes.

3      Q.    You understand that?

4      A.    I do understand that.

5      Q.    Now, can you identify for me how many

6   occasions you have met with these lawyers?

7            By these lawyers I mean Mr. Bredehoft and

8   Mr. Sullivan.

9      A.    I met with David two times.

10      Q.    Have you ever met with Mr. Bredehoft?

11      A.    Today.

12      Q.    Where did you meet with them?

13      A.    With David?

14      Q.    Yes.

15      A.    In the salon.

16      Q.    You met with Mr. Bredehoft and David

17   Sullivan.  You met with Mr. Bredehoft today in the

18   salon?

19      A.    No.  Today in the hotel.

20      Q.    In the hotel.

21            Which hotel?

22      A.    Capitol --

1    Mr. Chreky or his wife; is that right?

2       A.    That is right.

3       Q.    And you wouldn't want to say or do anything

4    that could have legal liability for Mr. Chreky; is

5    that right?

6       A.    Yes.

7       Q.    And I take it that you are here today to do

8    your best to help Mr. Chreky; is that right?

9       A.    And to say the truth.

10      Q.    Okay.  But to help Mr. Chreky; is that

11   right?

12      A.    Yes.

13      Q.    And in giving the declaration that you gave

14   in the case it was your intention to try to help

15   Mr. Chreky; is that right?

16      A.    Correct.

17      Q.    Now, you mentioned that you met with David

18   Sullivan on two occasions.

19         MS. KATZ:  Let's have this marked as

20   Exhibit 1, which is the subpoena that was served.

21               (Mahboub Exhibit No. 1 was marked

22                   for identification.)

24

```
 1        Q.    And this was in Starbucks and there were

 2   other people around, correct?

 3        A.    Correct.

 4        Q.    And I take it that Mr. Sullivan, the second

 5   time you met with him, gave you a declaration to

 6   sign, correct?

 7        A.    Correct.

 8        Q.    And you knew that the second time that you

 9   were meeting with him was for the purpose of signing

10   that declaration, correct?

11        A.    But he was retelling me the things that I

12   said, if I am okay with everything that I said.

13        Q.    Let's turn to the last two physical pages of

14   this document.  Let's look at the date, first of all.

15              Flip to the second page of this document

16   please.

17              Do you see that date, 2/16/07?

18        A.    Yes.

19        Q.    That was the date you signed this document,

20   correct?

21        A.    Correct.

22        Q.    And you understood that you were signing
```

25

1    this document under penalty of perjury.

2              Do you see you signed that?

3        A.    Yes.

4        Q.    Was that explained to you what the penalties

5    of perjury are?  Do you know what those penalties

6    are?

7        A.    Yes.

8        Q.    And that was explained to you by

9    Mr. Sullivan?

10       A.    Yes.

11       Q.    And you signed this document?

12       A.    Yes.  I did.

13       Q.    Now, the first time you met with

14   Mr. Sullivan, was that earlier in the same day or was

15   it a different day?

16       A.    A different day.

17       Q.    Between the time that you met with

18   Mr. Sullivan and you signed this document, had you

19   spoken with him or communicated with him in any

20   manner?

21       A.    No.

22       Q.    Were you given any other drafts of this

26

1  declaration?

2      A.    No.

3      Q.    So, Mr. Sullivan gave you this declaration

4  and you signed it?

5      A.    And I read it.

6      Q.    So, you read it before you signed it?

7      A.    Yes.

8      Q.    Always a good policy.

9            And when you met with him that day to sign

10  this, that was even a shorter meeting than the first

11  one; is that right?

12      A.    Longer.

13      Q.    The second time?

14      A.    Yes.   Because he said take your time to read

15  and read.

16      Q.    Now, you would agree with me, would you not,

17  that the words in this declaration were drafted by

18  Mr. Sullivan?

19            Is that right?

20      A.    Right.

21      Q.    You did not draft any of these words?

22      A.    No.

27

1      Q.    And these are the words that he put to what

2    you told him; is that right?

3      A.    Correct.

4      Q.    These are not your words?

5      A.    It is my words.

6      Q.    He drafted this, right?

7      A.    Yes.

8      Q.    These are not your words.  Am I right about

9    that?

10          These are not your words.  These are the

11   words that Mr. Sullivan gave to you, correct?

12     A.    Right.

13     Q.    What is sexual harassment?

14     A.    When someone pushes you to do things that

15   you don't want to do.

16     Q.    Things of a sexual nature?

17     A.    Yes.

18     Q.    Is there anything else that is sexual

19   harassment to your knowledge?

20     A.    No.

21     Q.    So, you understand sexual harassment to be

22   if someone pushes you to have sex with them and you

JARDIM REPORTING ASSOCIATES
(703) 867-0396

42

1      Q.    To your knowledge, you understood that

2    everyone else also believed that it was a requirement

3    to go sign this declaration, correct?

4            MR. BREDEHOFT:   Foundation.

5            THE WITNESS:   It wasn't a requirement.

6            BY MS. KATZ:

7      Q.    Did anyone say no?

8      A.    Nobody said no.

9      Q.    Did you discuss the declarations with

10   anyone?

11     A.    My family.

12     Q.    With respect to the Chreky Salon employees,

13   did anyone suggest to you that they were not

14   comfortable going to give these declarations?

15     A.    No.

16     Q.    Did anyone tell you that they feared that

17   they would be terminated if they didn't sign a

18   declaration?

19     A.    No.

20     Q.    But I take it when you were sent to go meet

21   with Mr. Sullivan you knew that the purpose was to

22   sign a declaration to help Mr. Chreky in this

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
                :
RONNIE BARRETT,          :
                :
      Plaintiff,   :
                :
   vs.          :    C.A. No.
                :  07-CV-0250(RCL)
ANDRE CHREKY,         :
ANDRE CHREKY SALON/ANDRE  :
CHREKY INC., SPAC, LLC,   :
                :
      Defendants.  :
                :
- - - - - - - - - - - - - - - x
                :
JENNIFER THONG,      :
                :
      Plaintiff,   :
                :    Civil No.
   vs.          :  1:06-1807(RCL)
                :
ANDRE CHREKY SALON, et al.,  :
                :
      Defendants.  :
                :
- - - - - - - - - - - - - - - x

Washington, D.C.
Monday, October 1, 2007

The deposition of EDIL KARKAS, called for

examination by counsel for Plaintiffs in the

above-entitled matter, pursuant to Notice, in the

offices of Katz, Marshall & Banks, 1718 Connecticut

Avenue, N.W., Sixth Floor, Washington, D.C., convened

JARDIM REPORTING ASSOCIATES
(703) 867-0396


EXHIBIT
F

31

```
1    Mr. Bredehoft.

2            Are you familiar with Mr. Bredehoft?  Have

3    you met him before?

4        A.    To tell you the truth, this is the first

5    time I met him.

6        Q.    Today?

7        A.    Today is the first time.

8        Q.    Have you ever spoken with an associate who

9    works for Mr. Bredehoft?

10       A.    Yes.

11       Q.    And his name is what?

12       A.    David.

13       Q.    Sullivan?

14       A.    Sullivan.  Twice before.

15       Q.    Were you surprised that Mr. Chreky decided

16   to come here today?

17       A.    No.  Not really.

18       Q.    Did he say anything to you as to why he was

19   coming here today?

20       A.    No.  He is here.  We came together and we

21   are all here together.

22       Q.    You came over here to the deposition with
```

```
 1    Mr. Chreky?

 2        A.    Pretty much.

 3        Q.    And Mr. Bredehoft?

 4        A.    Same thing.

 5        Q.    And you met with them before coming over

 6    here?

 7        A.    Yes.  This morning.

 8        Q.    Where did you meet?

 9        A.    Where?  In the hotel.  The Washington

10    Hilton.

11        Q.    Nearby on Connecticut Avenue?

12        A.    We sat for like 10 or 15 minutes.

13        Q.    Only 10 or 15 minutes.

14              What was discussed during this 10 or

15    15 minutes?

16        A.    Talking about things.

17        Q.    What kind of things?

18        A.    Like what we are doing today, what we are

19    going through, what we are facing.

20        Q.    What did Mr. Bredehoft say to you?

21        A.    He talked to me.  He tells me we are coming

22    today, just get ready and everything is going to be
```

1    Mr. Bredehoft?

2           "ANSWER:  He is our lawyer.  It is good to

3    meet him.

4           "QUESTION:  You just said he is our lawyer.

5           "Why is it you said he is our lawyer?"

6           THE WITNESS:  Just a lawyer for the case.

7           BY MR. ROSE:

8    Q.    What does that mean to you?

9    A.    He is the lawyer.

10   Q.    Is he your lawyer?

11   A.    No, sir.

12   Q.    So, why did you say he is our lawyer?  That

13   would include you.

14   A.    Excuse the English sometimes.

15   Q.    You said he was the lawyer for the case.

16          The fact that he is the lawyer for the case,

17   for Mr. Chreky and the salon, why would you believe

18   that he somehow had some role as lawyer for you?

19   A.    He is not for me.  He is Andre's lawyer.

20   Q.    So, he is not here representing you in any

21   way, shape or form today; is that correct?

22   A.    Correct, sir.

37

1     Q.    And that has always been the case, he has

2    never represented you; is that correct?

3     A.    Yes, sir.

4     Q.    When I say Mr. Bredehoft, I am also

5    including his associate Mr. Sullivan.

6          Do you understand that?

7     A.    Yes.

8     Q.    And that is true?

9          They have never represented you, correct?

10    A.    Correct, sir.

11    Q.    So, when Mr. Chreky asked you to show up at

12   the Capitol Hilton this morning to meet with his

13   attorneys before coming over for this deposition, did

14   you feel you could say no?

15    A.    As far as what no?  Why would I say no?

16          MR. ROSE:  Please re-read my question.

17          BY MR. ROSE:

18    Q.    If there is something about my question that

19   you don't understand, just let me know.  Otherwise

20   please just respond.

21          (The reporter read the requested portion of

22   the record.)

43

1      A.    Not in the salon.  I have it at home.

2      Q.    Did Mr. Chreky contact you yesterday?  Did

3  you speak with Mr. Chreky about your testimony here

4  today yesterday?

5      A.    Yesterday he came to the salon.  He was busy

6  and I was busy.  I was working.  So, we don't talk

7  about it much until we met this morning.

8      Q.    You said not much.  Did you talk about it at

9  all yesterday?

10     A.    Yesterday?  Not really.  This morning we

11  did.

12     Q.    What does not really mean?  Is it no or is

13  it not really?

14     A.    No.  This morning, yes.

15     Q.    So, Saturday night and this morning you

16  spoke with Mr. Chreky and yesterday he didn't say a

17  word to you about this deposition; is that correct?

18     A.    Yes.

19     Q.    Did he give you any specific advice as to

20  how you should respond to questions today?

21     A.    No.

22     Q.    Did he give you any advice at all?

1      A.    No.

2      Q.    How many times did you meet with

3  Mr. Sullivan?

4      A.    Two times.

5      Q.    Do you recall when they were?

6      A.    I'm sorry?

7      Q.    Do you recall when you met with him?

8      A.    Yes.

9      Q.    When did you meet with him?

10      A.    I met with him back in February and the

11  second time April.

12      Q.    So, you met with him the first time in

13  February?

14      A.    First time in February.

15      Q.    Second time in April you believe?

16      A.    April.  Yes.

17      Q.    Do you remember the occasion for your second

18  meeting with him?

19      A.    Just questions.

20      Q.    The first time you met with him in February,

21  it was February of this year; is that correct?

22      A.    Yes.

48

1 speaking with him was to assist him with the lawsuit?

2     A.    Yes.

3     Q.    So, when you met with Mr. Sullivan what did

4 you tell him?

5     A.    When I met with Mr. David I told him what I

6 know, what I see.  The years I have been there, four

7 and a half years, just what I have seen.

8     Q.    That is it?

9     A.    The truth.  It is all about the truth.  So,

10 nothing else.

11     Q.    Where do you work?  What floor do you work

12 on?

13     A.    Second floor.

14     Q.    How many people work on the second floor?

15     A.    With the assistants, with the stylists, and

16 we have colorists in the back, altogether probably

17 15 people upstairs on the second floor.

18     Q.    Where the colorists are in the back is there

19 any partition or is it just wide open and they can

20 see everything that is going on?

21     A.    Wide open.

22     Q.    And you can see everything that is going on

52

1    coming and testifying here, did he give you any

2    instructions at all with respect to your testimony

3    here today?

4        A.    No.

5        Q.    Did he tell you that you should tell the

6    truth?

7        A.    Yes.

8        Q.    That is an instruction.

9        A.    That is an instruction.

10       Q.    That would mean that your prior answer was

11   not true.

12       A.    I understand that.  I'm sorry.  Yes.

13       Q.    And what did he say in that regard?

14       A.    He said to tell the truth, say what you have

15   seen and just tell the truth.

16       Q.    How many years have you known the Chrekys?

17       A.    Since 1997.

18       Q.    Were your parents friends with Mr. Chreky?

19       A.    No.

20       Q.    They are not friends?

21       A.    No.

22       Q.    No one else in your family was familiar with

1     Q.   So, you met with him and Mr. Sullivan gave
2  you this document?
3     A.   Yes.
4     Q.   And you signed it?
5     A.   Yes.
6     Q.   What, if any, changes did you make to this
7  document before you signed it?
8          Did you make any changes?
9     A.   No.
10    Q.   He handed you the declaration and you --
11    A.   I read it.  Before you sign you have to
12  read.
13    Q.   That is a good practice.
14    A.   It took me a while.  You have to read it.
15 Anything in life you have to read before you sign
16 anything.
17    Q.   That is a very good practice.
18         So, you read it and you were happy with the
19 statement, you were satisfied that the statement
20 accurately reflected the information you had
21 communicated to Mr. Sullivan; is that correct?
22    A.   Yes.

1     A.    Yes.

2     Q.    And what did Mr. Sullivan say, as best as

3  you can recall, when he handed you the declaration?

4     A.    He said make sure you read it, look at it,

5  take your time, there was no rush, take your time and

6  go over it.

7     Q.    Did he tell you that you could take it home

8  and read it?

9     A.    No.  But I read it at the salon.  I sat on

10  the couch and I read it.

11     Q.    The couch in Mrs. Chreky's office?

12     A.    Yes.

13     Q.    You just said a few minutes ago that it is

14  your practice to read things all the time before you

15  sign something.

16          Is that an accurate characterization of your

17  prior testimony?

18     A.    I didn't understand the last one.

19     Q.    Do you read things before you sign them?

20     A.    Yes.

21     Q.    At the time that you were hired in May of

22  2003, were you given a handbook or the office

1    correct?

2       A.    Yes.

3       Q.    And you signed them without making any

4    changes, correct?

5       A.    Yes.

6       Q.    Directing your attention to the very last

7    paragraph on the last page right before you signed,

8    it says:   Pursuant to 28 U.S.C. Section 1746, I

9    declare under penalty of perjury under the laws of

10   the United States of America that the foregoing is

11   true and correct.

12          Do you see that?

13      A.    Yes.

14      Q.    Did anyone explain to you before you signed

15   it what 28 U.S.C. Section 1746 meant and what it

16   meant to declare something under penalty of perjury?

17      A.    Mr. David did.

18      Q.    What did he say?

19      A.    I don't understand the 28, but I understand

20   under oath the laws of the United States it is all

21   true and correct.   That I understand.   But the 28 I

22   didn't understand.   And the 1746.   I didn't

1    understand that.

2        Q.    Do you understand that there are serious

3    penalties for giving sworn testimony that is false?

4        A.    Yes.

5        Q.    And that was explained to you?

6        A.    Yes.

7        Q.    How did you receive tips?  Did they give

8    them directly to you?

9        A.    No.

10       Q.    How were tips processed at the salon?

11       A.    We have them.  The client, they don't come

12   upstairs and give it.  Some hand it to you.  Some

13   leave them downstairs at -- what do you call that?

14   We have a little thing we put the tips all together.

15   The receptionist does that.  We leave them all there

16   Mondays thru until Saturdays.

17           What we do is all the employees at the

18   salon, about four, three, two, people, get all the

19   tips together and divide them.  They go by names,

20   different names, and hand it to us by Saturday night

21   right after work.

22       Q.    When do they get distributed on Saturday

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x

RONNIE BARRETT,                    :

        Plaintiff,                :

                       :

     vs.                          :      C.A. No.
                       :    07-CV-0250(RCL)
ANDRE CHREKY,                      :
ANDRE CHREKY SALON/ANDRE           :
CHREKY INC., SPAC, LLC,            :

        Defendants.               :

- - - - - - - - - - - - - - - - x
                       :

JENNIFER THONG,                    :

        Plaintiff,                :

                       :      Civil No.
     vs.                          :    1:06-1807(RCL)

ANDRE CHREKY SALON, et al.,        :

        Defendants.               :

- - - - - - - - - - - - - - - - x

                Washington, D.C.
                Tuesday, October 2, 2007

      The deposition of ANISA GHAFOORZAI, called

for examination by counsel for Plaintiffs in the

above-entitled matter, pursuant to Notice, in the

offices of Katz, Marshall & Banks, 1718 Connecticut

Avenue, N.W., Sixth Floor, Washington, D.C., convened

EXHIBIT

G

1            Sitting to your left is John Bredehoft.

2            Have you met him before?

3       A.   Yes.  I met him yesterday in the hallway.

4       Q.   So, you met him yesterday in the hallway?

5       A.   No.  Not here.

6            I came and saw David about today.  He just

7  came down and we just shaked hands.

8       Q.   So, the first time you met Mr. Bredehoft was

9  today?

10      A.   Yes.

11      Q.   In this room?

12      A.   Yes.

13           MR. BREDEHOFT:  I can't help you out on

14  answers.

15           THE WITNESS:  Yesterday.

16  BY MR. WILKENFELD:

17      Q.   You saw him yesterday?

18      A.   Yes.  Just to say hi and introduce.

19      Q.   To his left is Mr. Chreky, your employer?

20      A.   Yes.

21      Q.   And to his left is David Sullivan?

22      A.   Yes.

18

1     Q.   You understand that Mr. Sullivan and

2  Mr. Bredehoft are here to represent Mr. Chreky and

3  his businesses, correct?

4     A.   Yes.

5     Q.   And they are here to represent his

6  interests, correct?

7     A.   Yes.

8     Q.   And you know that they don't represent you?

9     A.   I don't understand.

10     Q.   You understand that Mr. Sullivan and

11  Mr. Bredehoft are not your attorneys?

12     A.   Yes.

13     Q.   They are not here to protect your interests?

14     A.   Yes.

15     Q.   Other than meeting with Mr. Bredehoft in

16  this room just now, when was the last time that you

17  met with either Mr. Bredehoft or Mr. Sullivan?

18         Was it yesterday?

19     A.   Yesterday.

20     Q.   And was that at the Hilton?

21     A.   Yes.

22     Q.   What time was that?

```
 1      A.    Maybe 6:00 o'clock.

 2            I was nervous and I wanted to ask David

 3    about it because I had never been.  He said just tell

 4    the truth and you don't have to be nervous, see you

 5    tomorrow there, just tell the truth.  That is it.

 6      Q.    Is it going okay so far?

 7      A.    Yes.

 8      Q.    Good.

 9            Who else was at this meeting at the Hilton

10    yesterday?

11      A.    Yesterday it wasn't a meeting.  It was me,

12    Rodney, Faviola and Xiomara.  Just a few minutes I

13    saw David.  And when we were leaving I saw Andre and

14    we just shaked hands and we went home.

15      Q.    During that meeting you were told to think

16    about what sexual harassment means to you, right?

17      A.    Yes.

18      Q.    And Mr. Sullivan said that, right?

19      A.    No.

20            The case I know.  He said you know tomorrow

21    we are going to be there about this situation.

22      Q.    Right.
```

1          And he said this is a case that involves

2    sexual harassment, right?

3        A.    Yes.

4        Q.    Mr. Sullivan said that?

5        A.    Yes.

6        Q.    He said that you should think about what the

7    word sexual harassment means because of the language

8    barrier?

9        A.    Yes.

10       Q.    So, he told you to think about what the word

11   sexual harassment means to you and figure out a way

12   to explain?

13       A.    He said we have to read the documents he

14   gave us.

15       Q.    Just so I am clear, Mr. Sullivan told you

16   that you should think about how you would be able to

17   explain what sexual harassment is because you might

18   have a problem with the language barrier?

19       A.    I don't know.

20       Q.    Do you remember anyone telling you that you

21   should think about how to best explain sexual

22   harassment in English?

```
 1   you?

 2       A.    No.

 3       Q.    Did he tell you that you should be careful

 4   not to be confused about my questions?

 5       A.    No.  But he said when you ask a question

 6   just think and be sure and answer the question.

 7       Q.    By the way, the instruction Mr. Sullivan

 8   gave you that you should tell the truth, that is what

 9   we all want.  That is the universal instruction.

10       A.    He just said tell the truth.

11             MR. WILKENFELD:  If I could have this marked

12   as Exhibit 1.

13             (Ghafoorzai Exhibit No. 1 was marked for

14   identification.)

15   BY MR. WILKENFELD:

16       Q.    I just had the Court Reporter hand you a

17   document which we have marked as Exhibit 1.

18             You were served with a subpoena in this

19   case; is that right?

20       A.    I don't understand.

21       Q.    A person served you with an envelope last

22   week, correct?
```

1    to be making this kind of money at a new job, would

2    you?

3              MR. BREDEHOFT:  Foundation.

4              THE WITNESS:  I don't know about that.  I

5    never think about that.

6    BY MR. WILKENFELD:

7        Q.    So, you think you can make this kind of

8    money anywhere?

9        A.    Maybe not.

10             Because I am happy in the place I work I

11   never looked for another job, I never ask another

12   place.  I don't know how much the other salons pay.

13       Q.    Now, earlier this year you met with

14   Mr. Sullivan twice, correct?

15       A.    Yes.

16       Q.    And the first time you met with him is at a

17   Starbucks?

18       A.    Yes.

19       Q.    And there were employees who met with

20   Mr. Sullivan before you?

21       A.    I think so.

22       Q.    And there were employees who met with

```
 1   Mr. Sullivan after you?

 2        A.   I think so.

 3        Q.   How did you know what time you were supposed

 4   to go to meet with Mr. Sullivan?

 5        A.   I don't know.  Just they told me.

 6        Q.   Who are they?  Who told you?

 7        A.   I don't remember.  I don't remember.

 8        Q.   But it was somebody at the salon?

 9        A.   I think so.  I don't remember.

10        Q.   Well, did a customer tell you to go see

11   Mr. Sullivan?

12        A.   No.  Not a customer.

13        Q.   Did a person on the street tell you to see

14   Mr. Sullivan?

15        A.   No.  Somebody from the salon.

16        Q.   So, it was somebody from the salon?

17        A.   Yes.

18        Q.   Did you clock out when you went and saw

19   Mr. Sullivan?

20        A.   No.

21        Q.   And you didn't clock out because when you

22   went to see Mr. Sullivan you were doing your job,
```

45

```
 1    right?

 2         A.    Yes.  But I don't clock out.

 3         Q.    And that is because when you went to see

 4    Mr. Sullivan you were doing your job?

 5         A.    Yes.

 6         Q.    And you met with Mr. Sullivan for about ten

 7    minutes?

 8         A.    Yes.

 9         Q.    Was it a little bit less than ten minutes?

10         A.    I don't remember exactly.

11         Q.    And he asked you a few questions, right?

12         A.    Yes.

13         Q.    And then a few weeks later he came back to

14    the salon, correct?  Mr. Sullivan that is.

15         A.    Yes.

16         Q.    And when he came back he had a declaration

17    for you to sign?

18         A.    I think so.

19         Q.    Well, you signed a declaration, correct?

20         A.    Yes.  I did sign.

21         Q.    Did you write the declaration yourself?

22         A.    No.  He asked me some questions.
```

46

```
 1        Q.    I am talking now about this piece of paper,
 2    the declaration in the back here.
 3              This is your declaration, correct?
 4        A.    Yes.
 5        Q.    Did you type this?
 6        A.    No.
 7        Q.    Who typed this?
 8        A.    I don't know who typed this.
 9        Q.    Did Mr. Sullivan give you this piece of
10    paper?
11        A.    I think.
12        Q.    How did your signature get on this piece of
13    paper?
14        A.    I did sign the paper, but I don't remember
15    if I have it with me.
16        Q.    I know.
17              What I am asking is who gave you this piece
18    of paper so that you could sign it?
19        A.    David.
20        Q.    David Sullivan?
21        A.    Yes.
22        Q.    And you will agree with me that these are
```

1      A.    Yes.

2            I don't do anything and somebody give me

3      something to pay for it or something to do this

4      thing.   That is what I think.

5      Q.    Do you work hard during the day?

6      A.    A job is a job.   Sometimes you are busy

7      back-to-back.   Sometimes you have time.

8      Q.    Are you usually busy?

9      A.    It just depends on the day, the week.

10     Q.    How many clients do you usually see a day?

11     A.    Sometimes we do more facial and less wax.

12     Sometimes more wax than facial.   It is hard to say.

13     Q.    But how many people do you see during the

14     day?

15     A.    I don't count.

16     Q.    When was the last day you worked?

17     A.    Saturday.

18     Q.    How many people did you see that day?

19     A.    I don't know.   Ten.

20     Q.    Ten.

21           Is that a regular amount?

22     A.    I told you it depends.   If I do just

1    always see Jennifer.  I thought maybe Jennifer stayed

2    there to learn from Andre the way that Andre cut

3    hair.  I always see Jennifer when she is not busy

4    close to Andre and watching.

5        Q.    She certainly didn't appear to be suffering

6    from any type of harassment or discrimination.

7             Do you understand what that means?

8        A.    Yes.

9        Q.    What does that mean?

10            Right there.  She certainly didn't appear to

11   be suffering from any type of harassment or

12   discrimination.

13       A.    She never said nothing.  She never

14   complained.

15       Q.    She never complained?

16       A.    No.

17       Q.    She never said anything?

18       A.    No.  And I used to see her every day

19   usually.  She never did.

20       Q.    Seven.  I have made this declaration

21   voluntarily.

22            Did you make this declaration voluntarily?

1      A.    Yes.

2      Q.    Did anyone tell you that you would be fired

3   if you didn't?

4      A.    No.

5      Q.    Did anyone tell you that you would have your

6   tips taken away if you didn't sign?

7      A.    No.

8      Q.    Did anyone tell you that anything bad at all

9   would happen to you if you didn't sign it?

10     A.    No.

11     Q.    Did Mr. Sullivan say you can sign or not

12  sign, it is your choice?

13     A.    Yes.  He never asked me that.

14          He asked me this question and he gave me the

15  paper and then I signed.  Because everything was true

16  and everything was from my heart.

17     Q.    I have been promised no benefit.

18          Do you see that?

19     A.    Yes.

20     Q.    Did anyone promise you a benefit if you

21  signed?

22     A.    No.

81

1     Q.    Have you gotten any benefits out of signing

2  this?

3     A.    No.

4     Q.    Or threatened with any reprisal.

5          Were you threatened with anything?

6     A.    No.

7     Q.    You weren't threatened with anything?

8     A.    No.

9     Q.    Now, you have no idea, right, what 28 U.S.C.

10  1746 is.

11          You don't know what that is, do you?

12     A.    No.

13     Q.    Do you know what saying that this is true

14  and correct means?

15     A.    No.  I don't understand.

16     Q.    Do you see that?

17     A.    Yes.

18          Everything that is there is correct that I

19  say.

20     Q.    Do you have any doubt in your mind that any

21  of that is untrue?

22     A.    No.

82

1  Q. When you met with Mr. Sullivan did he

2 explain to you that this was a sworn statement and

3 that you had to have it true?

4  A. Yes.

5  Q. He explained that to you?

6  A. Yes. Everything you say you have to tell

7 the truth.

8  Q. And that it was terribly important that this

9 be true.

10   Did he say that to you?

11  A. Yes. He did.

12  Q. And that this was under penalty of perjury,

13 as it says there, right?

14  A. Yes.

15  Q. And he explained that to you, right?

16  A. Yes.

17  Q. What is your native language?

18  A. Farsi.

19   MR. BREDEHOFT: Nothing further.

20   MR. WILKENFELD: Of course I have to

21 follow-up.

22   EXAMINATION BY COUNSEL FOR PLAINTIFF

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
                              :
RONNIE BARRETT,               :
                              :
            Plaintiff,        :
                              :
      vs.                     :        C.A. No.
                              :        07-CV-0250(RCL)
ANDRE CHREKY,                 :
ANDRE CHREKY SALON/ANDRE      :
CHREKY INC., SPAC, LLC,       :
                              :
            Defendants.       :
                              :
- - - - - - - - - - - - - - - x
                              :
JENNIFER THONG,               :
                              :
            Plaintiff,        :
                              :
                              :        Civil No.
      vs.                     :        1:06-1807(RCL)
                              :
ANDRE CHREKY SALON, et al.,   :
                              :
            Defendants.       :
                              :
- - - - - - - - - - - - - - - x

                  Washington, D.C.
                  Monday, October 1, 2007

      The deposition of KHADIJA DARIF, called for

examination by counsel for Plaintiffs in the

above-entitled matter, pursuant to Notice, in the

offices of Katz, Marshall & Banks, 1718 Connecticut

Avenue, N.W., Sixth Floor, Washington, D.C., convened

JARDIM REPORTING ASSOCIATES
(703) 867-0396



1    Q.    I am going to be asking you questions and

2    the Court Reporter here is going to be taking down

3    every word that is said in this room while we are on

4    the record.

5         If, for whatever reason, you don't

6    understand a question I have asked, just please let

7    me know and I will rephrase it or have it re-read

8    until you understand.  If you don't say anything, we

9    are going to presume that you understood the

10   question.

11        You are sitting here and next to you is a

12   gentleman by the name of Mr. Bredehoft.

13        Do you know Mr. Bredehoft?

14   A.    I just met him today.

15   Q.    Mr. Bredehoft is Mr. Chreky's attorney,

16   correct?

17   A.    Correct.

18   Q.    And Mr. Chreky is sitting next to

19   Mr. Bredehoft on the other side; is that correct?

20   A.    Yes.

21   Q.    Mr. Chreky owns the salon and is your boss?

22   A.    Yes.  Correct.

1       Q.    And on the other side of Mr. Chreky is a

2    gentleman by the name of Mr. Sullivan.

3             Do you recognize Mr. Sullivan?

4       A.    I do.

5       Q.    Have you met with him before?

6       A.    We met.

7       Q.    How many times have you met Mr. Sullivan?

8       A.    Twice.

9       Q.    How did you get over here today for this

10   deposition?

11      A.    My husband dropped me off.

12      Q.    Did you have an opportunity to meet with

13   Mr. Bredehoft or Mr. Sullivan before coming over here

14   today?

15      A.    Exactly.  Yes.

16      Q.    When did that occur?

17      A.    1:00 o'clock.

18      Q.    1:00 o'clock.

19            Where did you meet?

20      A.    At the Hilton on Connecticut.

21      Q.    You met Mr. Sullivan?

22      A.    Yes.

1    Q.    I know that because Mr. Bredehoft was here.

2         MR. BREDEHOFT:  Mr. Bredehoft is lazy.

3         MR. ROSE:  Just a good delegation.

4         BY MR. ROSE:

5    Q.    How is it that you came to meet Mr. Sullivan

6    over at the Hilton?  Was it just an idea you had?

7    A.    Yes.  I was nervous.  I didn't know.  I had

8    never been to this before.  So, I just called and

9    wanted to get information of how it is going to go,

10   how it is supposed to be.  I never been to this

11   before.

12   Q.    Sure.  I understand.

13   A.    So, I called and I saw him at 1:00 o'clock.

14   Q.    It can be nerve racking even for people that

15   have done it a number of times.  So, it is

16   understandable.

17        I guess I just want to make absolutely

18   certain.  These gentlemen, Mr. Bredehoft and

19   Mr. Sullivan, represent Mr. Chreky and the salon.

20        Do you understand that?

21        They are not your attorney, correct?

22   A.    Exactly.

1    Q.   And one of the other instructions I needed

2  to tell you is that you do need to give an audible

3  response.  She will say nodding, but for the record

4  you need to say yes.

5         What did Mr. Sullivan say to you when you

6  met with him?

7    A.   He told me don't be nervous and all that you

8  need to say is just the truth.  Whatever you know,

9  just say the truth.  That is all.

10   Q.   How is it that you got the idea to contact

11 Mr. Sullivan?

12        Was it your idea?

13   A.   It was my husband's idea.  He wanted me to

14 not be nervous.  So, I just called and checked.

15   Q.   Did Mr. Chreky ask you to meet with his

16 attorneys before you testified here today?

17   A.   I heard on Saturday, but not from Andre.

18   Q.   Who did you hear it from?

19   A.   From my friend Linda.

20   Q.   Linda contacted you?

21   A.   No.  She works with me.  She works with me

22 at the salon.

1    Q.   How long did you meet with Mr. Sullivan?

2    A.   Six to seven minutes.

3    Q.   Six to seven minutes?

4    A.   Yes.

5    Q.   What did you discuss with Mr. Sullivan

6  during the six to seven minutes?

7    A.   He asked me if I had seen anything at the

8  salon going on, any stuff.  I said no.  If Jennifer

9  got hurt, she never complained to me or something.

10    Q.   He asked you specific questions along those

11  lines?

12    A.   He was asking me how long I have been

13  working over there, how Andre treated everyone.  That

14  is it.

15    Q.   You met with Mr. Sullivan you said a second

16  time.  When was that?

17    A.   I don't remember the dates.

18    Q.   Well, how long after do you think it was?

19    A.   Maybe two weeks after that.

20    Q.   What was the purpose of your second meeting?

21    A.   He showed me the paper that everything that

22  I had said was on the paper.  I read it and I signed

1   the laws of the United States meant?

2     A.   Yes.

3     Q.   He did?

4     A.   Yes.

5     Q.   What did he explain to you?

6     A.   He was asking the truth.  He said just say

7   the truth and you have nothing to worry about.

8     Q.   Did he explain what would happen if you

9   didn't tell the truth in the declaration?

10     A.   No.

11     Q.   He didn't?

12     A.   No.

13     MR. ROSE:  Let's break for a couple of

14   minutes or longer if you would like.

15     (Recess.)

16     (Whereupon, the husband of the witness,

17   Tony Khateeb, is present for the following

18   proceedings.)

19     MR. ROSE:  We are back on.

20     Let's mark this.

21        (Darif Exhibit No. 2 was marked for

22          identification.)

1    the way through this deposition your husband came

2    into the room and it seemed like you were having an

3    easier time answering the questions.

4           Did you feel more comfortable answering the

5    questions with your husband in the room?

6       A.    Yes.

7       Q.    And that was because of his presence and his

8    ability to help you understand certain words?

9       A.    Yes.

10          MR. ROSE:  I have no further questions.

11          Thank you very much.

12          I really appreciate you coming in today for

13   your testimony.

14          MR. BREDEHOFT:  I'm sorry.  I am going to

15   keep you for five more minutes.

16          EXAMINATION BY COUNSEL FOR DEFENDANTS

17          BY MR. BREDEHOFT:

18      Q.    Did Andre tell you that you would be fired

19   if you didn't sign the declaration?

20      A.    No.

21      Q.    Did anybody tell you that?

22      A.    No.

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
                                :
RONNIE BARRETT,                 :
                                :
          Plaintiff,            :
                                :
     vs.                        :     C.A. No.
                                :     07-CV-0250(RCL)
ANDRE CHREKY,                   :
ANDRE CHREKY SALON/ANDRE        :
CHREKY INC., SPAC, LLC,         :
                                :
          Defendants.           :
                                :
- - - - - - - - - - - - - - - x
                                :
JENNIFER THONG,                 :
                                :
          Plaintiff,            :
                                :
                                :     Civil No.
     vs.                        :     1:06-1807(RCL)
                                :
ANDRE CHREKY SALON, et al.,     :
                                :
          Defendants.           :
                                :
- - - - - - - - - - - - - - - x

          Washington, D.C.
          Monday, October 1, 2007

     The deposition of ELENA VANTSOVSKAYA, called

for examination by counsel for Plaintiffs in the

above-entitled matter, pursuant to Notice, in the

offices of Katz, Marshall & Banks, 1718 Connecticut

Avenue, N.W., Sixth Floor, Washington, D.C., convened

JARDIM REPORTING ASSOCIATES
(703) 867-0396



9

1   is my regular days.

2       Q.    What are your hours on Saturday and Sunday?

3       A.    Saturday 8:00 a.m. to 8:00 p.m. and Sunday

4   9:00 to 5:00.

5       Q.    And Monday if you have to?

6       A.    Yes.   Normally from 9:00 to 6:00.

7       Q.    So, I take it that your position with the

8   salon has changed over time?

9       A.    That is correct.

10      Q.    You used to be a full time employee; is that

11  correct?

12      A.    That is correct.

13      Q.    When did it change?

14      A.    It changed about five months ago when I

15  started working at the Renaissance Hotel.

16      Q.    Why did it change?

17      A.    Because I needed to work at the Renaissance

18  Hotel.   I wanted to get some experience in the hotel

19  industry.

20      Q.    And when you said you needed to work at the

21  Renaissance Hotel, was that a requirement of your

22  training?

1       A.    No.   This is my personal will.

2       Q.    Did Mr. Chreky play a role in helping you

3   obtain that position?

4       A.    No.

5       Q.    Did he give you a reference for that

6   position?

7       A.    No.   I didn't require any.

8       Q.    So, up until about five months ago you had a

9   full time position with the salon; is that correct?

10      A.    That is correct.

11      Q.    What is your current title?

12      A.    Front desk manager.

13      Q.    Who do you manage?

14      A.    I manage the front desk.

15      Q.    Do you manage people at the front desk?

16      A.    That is correct.

17      Q.    And who do you supervise?

18      A.    I supervise the front desk agents.

19      Q.    Who are the front desk agents?

20      A.    It is a staff of about 12 people at this

21  moment.

22      Q.    When did you take the title of front desk

1    Q.   And you are here and sitting to your direct

2   left is John Bredehoft, who is counsel for

3   Mr. Chreky; is that correct?

4    A.   That is correct.

5    Q.   And Mr. Chreky is also at this deposition.

6       MS. KATZ:  Just for the record, I would like

7   to note that Andre Chreky is sitting here, as is

8   David Sullivan with Mr. Bredehoft.

9       BY MS. KATZ:

10    Q.   You do not have a retainer agreement with

11  Mr. Bredehoft or his firm; is that right?

12    A.   That is correct.

13    Q.   And you understand he is Mr. Chreky's

14  lawyer, not your lawyer; is that correct?

15    A.   Absolutely.

16    Q.   You have not sought out their advice for

17  purposes of getting legal advice for yourself; is

18  that correct?

19    A.   No.

20    Q.   They are not your lawyers?

21    A.   They are not my lawyers.

22    Q.   And they have never been your lawyers; is

14

```
1    that correct?

2        A.    That is correct.

3        Q.    And you are not represented by these people

4    today; is that right?

5        A.    That is correct.

6        Q.    Now, you met with them in preparation for

7    your deposition, did you not?

8        A.    I did.

9        Q.    You met with them this morning, correct?

10       A.    I did.

11       Q.    And you met with them this morning at

12   Mr. Chreky's request, did you not?

13       A.    No.

14       Q.    At whose request did you meet with them?

15       A.    Well, since I received the subpoena last

16   night I checked that there were some people actually

17   who received subpoenas as well and we agreed to come

18   this morning to meet the lawyers.

19       Q.    Did someone request that you meet with the

20   lawyers?

21       A.    Probably you can tell that it was a request,

22   but it wasn't a requirement.
```

1    Q.    I understand that, but listen to the

2  question that I ask you and this will go much

3  quicker.

4         Did someone request that you meet with the

5  lawyers?  Yes or no?

6    A.    Yes.

7    Q.    Who made that request?

8    A.    Andre.

9    Q.    Did he make that request to you directly?

10   A.    Yes.

11   Q.    In what form did he make that request to

12  you?  Was that in person or in some other way?

13   A.    It was in person.

14   Q.    What did he say to you?

15   A.    He said that tomorrow we will have to meet

16  with the lawyers.  And it was when I already got the

17  subpoena.  So, I realized that I would probably have

18  to do that.

19   Q.    And when he told you that you will have to

20  meet with the lawyers, did he tell you where you

21  would meet with the lawyers?

22   A.    Yes.

1    A.    It was just for my confidence in telling the

2    truth and being able not to be stressed in the

3    position since it was the first time when I had to do

4    that.  It was more comforting than anything else.

5    Q.    Mr. Chreky told you, did he not, that the

6    lawyers for Ms. Barrett and Ms. Thong would try to

7    trip you up in their questions, did he not?

8    A.    No.

9    Q.    Did he tell you that this could be very

10   confusing?

11   A.    He did mention that.

12   Q.    And he told you that the lawyers would

13   deliberately create some confusion for you, right?

14   A.    Yes.

15   Q.    And he told you that we would be here trying

16   to trick you, so it would be important to talk to his

17   lawyers first to find out how not to be tricked; is

18   that right?

19   A.    No.

20   Q.    Words to that effect?

21   A.    I'm sorry?

22   Q.    He said words to that effect?

1    A.    He just mentioned that some questions will

2 be confusing and to listen to the questions

3 carefully.

4    Q.    So, Mr. Chreky was coaching you about how to

5 answer the questions in the deposition?

6    A.    He was not.

7    Q.    Mr. Chreky told you how to answer questions,

8 did he not?

9    A.    He did not.

10    Q.    Well, he told you to listen to the words,

11 right?

12    A.    That is correct.

13    Q.    I would consider that a direction.  So, for

14 purposes of my question assume that is a direction.

15         Are we on the same page?

16    A.    Yes.

17    Q.    Mr. Chreky gave you directions about how to

18 sit and answer questions in this deposition, did he

19 not?

20    A.    I wouldn't consider that directions, but as

21 I said, it was more comforting and making me realize

22 that this is just a regular conversation.

1    meeting?

2        A.    No.

3        Q.    Were you given any directions during this

4    meeting other than I presume they told you to testify

5    truthfully?

6        A.    No.   There were no other directions given.

7        Q.    Was today your first meeting with

8    Mr. Bredehoft?

9        A.    Yes.

10       Q.    But you had met with Mr. Sullivan two other

11   times; is that right?

12       A.    No.   Just one time.

13       Q.    Just one time?

14       A.    Yes.

15       Q.    And that was the day that you were asked to

16   sign your declaration?

17       A.    That was the date when we talked and I

18   signed it afterwards.

19       Q.    If you take a look at Exhibit C to

20   Exhibit 1.

21            Let's just orient ourselves here.   It is the

22   last physical page of Exhibit 1 please.

1              What is the date of this?

2        A.    It is March 8, '07.

3        Q.    This reflects the date that you met with

4    Mr. Sullivan; is that right?

5        A.    That is correct.

6        Q.    Where did you meet with Mr. Sullivan?

7        A.    It was in the Starbucks.

8        Q.    And I take it that other patrons were

9    present; is that right?

10       A.    Not from our salon, but there were other

11   people in the Starbucks.

12       Q.    Yes.   The Starbucks on K Street is a busy

13   restaurant; is that right?

14       A.    That is right.   Yes.

15       Q.    And I take it that you took no special

16   precautions to have a confidential conversation at

17   Starbucks with Mr. Sullivan; is that right?

18       A.    That is correct.

19       Q.    How long was your meeting with Mr. Sullivan?

20       A.    About 10 or 15 minutes.

21       Q.    And I take it that he gave you a declaration

22   to sign?

1      A.    First I told everything and then I signed

2    it.  Yes.

3      Q.    He didn't have a computer sitting there, did

4    he?

5      A.    He did not.

6      Q.    So, I just want to understand this.

7            You are at Starbucks with Mr. Sullivan.

8      A.    Yes.

9      Q.    Before leaving Starbucks you signed this

10   declaration?

11     A.    No.  I did not.

12     Q.    When did you sign this declaration?

13     A.    I believe it was the next day.

14     Q.    Did he send you the declaration?

15     A.    No.  He just gave me one in person.

16     Q.    I am not understanding this.

17           You met with him?

18     A.    Yes.

19     Q.    Did he give you the declaration at the time

20   you met with him?

21     A.    Yes.

22     Q.    So, you had never spoken to Mr. Sullivan --

1     A.   I'm sorry.  I didn't understand that.

2         You meant that did he bring an already

3 printed copy for me to sign that one time we met?

4     Q.   Yes.

5     A.   No.

6     Q.   So, when you met with him did he give you

7 anything to read?

8     A.   No.

9     Q.   When did you get this physical copy of this

10 declaration?

11     A.   As I said, it was probably the next day.

12     Q.   Did you see him in person to get this

13 declaration?

14     A.   I believe so.  Yes.

15     Q.   Where did you see him?

16     A.   In the salon.

17     Q.   So, Mr. Sullivan obtained your signature at

18 the salon?

19     A.   No.

20     Q.   Help me here.  I am not understanding this.

21     A.   I just don't remember the exact way that

22 happened.

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
                :
RONNIE BARRETT,        :
                :
      Plaintiff,  :
                :
                :
     vs.         :     C.A. No.
                :    07-CV-0250(RCL)
ANDRE CHREKY,        :
ANDRE CHREKY SALON/ANDRE  :
CHREKY INC., SPAC, LLC,  :
                :
      Defendants. :
                :
- - - - - - - - - - - - - - - - x
                :
JENNIFER THONG,     :
                :
      Plaintiff,  :
                :     Civil No.
     vs.         :    1:06-1807(RCL)
                :
ANDRE CHREKY SALON, et al.,  :
                :
      Defendants. :
                :
- - - - - - - - - - - - - - - - x

Washington, D.C.
Tuesday, October 2, 2007

The deposition of FAVIOLA VEIZAGA, called

for examination by counsel for Plaintiffs in the

above-entitled matter, pursuant to Notice, in the

offices of Katz, Marshall & Banks, 1718 Connecticut

Avenue, N.W., Sixth Floor, Washington, D.C., convened

JARDIM REPORTING ASSOCIATES
(703) 867-0396



```
 1          Sitting to your left is Mr. Bredehoft,
 2   correct?
 3      A.   Okay.
 4      Q.   Have you met Mr. Bredehoft?
 5      A.   Yes.  John.  I am not good with last names.
 6      Q.   And sitting next to him is Mr. Chreky?
 7      A.   Yes.
 8      Q.   And he is your employer?
 9      A.   Yes.
10      Q.   And sitting next to him is Mr. Sullivan and
11   he is also Mr. Chreky's lawyer.
12          Do you understand that?
13      A.   Yes.
14      Q.   You understand that they are here today
15   representing Mr. Chreky, the salon and the company
16   which owns the building which the salon is in?
17          Do you understand that?
18      A.   Yes.
19      Q.   And you understand that they are here to
20   represent his interests today?
21      A.   Yes.
22      Q.   They are not here to represent you?
```

18

```
1        Q.    Who was at that meeting?

2        A.    Who was at that meeting?

3              My co-workers.  Rodney, who was here earlier

4    this morning, Xiomara, Anisa and myself.

5        Q.    And during that meeting you discussed in

6    general terms, not you personally, but the group

7    discussed in general terms, what the deposition might

8    be like, correct?

9        A.    Yes.

10       Q.    And you were told that you should tell the

11   truth?

12       A.    Yes.

13       Q.    And you were told listen carefully so you

14   are not confused by the questions?

15       A.    Yes.

16       Q.    And in addition to that, there was a

17   discussion about what sexual harassment means; is

18   that right?

19       A.    Yes.

20       Q.    Who explained what sexual harassment means?

21       A.    Nobody.

22       Q.    You said there was a discussion about sexual
```

1    truth, whatever she thinks.

2        Q.    So, how did you come up with the idea of

3    advising Xiomara to think about what sexual

4    harassment means to her?

5        A.    Because I was reading the package that you

6    guys sent us.

7        Q.    And that word stuck out as something that

8    everyone should be prepared to know what it means?

9        A.    Because she asked me earlier.  Yes.

10       Q.    What did Mr. Sullivan tell you guys to do?

11       A.    Just to be on time.  Tell the truth.  It was

12   our first time, so he said just be calm, don't get

13   nervous, and take your time answering questions.

14       Q.    Did he warn you that we might try and ask

15   questions that are confusing?

16       A.    Not confusing, but you might speak too fast

17   or words that we don't understand, and to just ask

18   again if we don't understand the question.

19       Q.    All right.  And, again, he is absolutely

20   right.  If I am speaking too fast or if I am saying

21   any words you don't understand, please feel free to

22   tell me.

38

```
 1      A.    Yes.

 2      Q.    And you are loyal to Mr. Chreky?

 3      A.    Yes.

 4      Q.    You enjoy the job that you have?

 5      A.    Yes.

 6      Q.    And you are not interested in working

 7   anyplace else?

 8      A.    Not at the moment.

 9      Q.    And you wouldn't want to lose your job?

10      A.    No.

11      Q.    You wouldn't want to do anything today that

12   would endanger the financial position of the salon,

13   correct?

14      A.    What do you mean?

15      Q.    You don't want anything you say today to be

16   damaging to the salon's financial situation, correct?

17      A.    I am just saying what I think.  Yes.

18      Q.    But are you concerned that something you

19   might say might be damaging to the salon?

20      A.    No.

21      Q.    You certainly wouldn't want to do anything

22   that would damage the reputation of the salon,
```

```
1   correct?

2        A.    No.

3              Why would I?

4        Q.    I'm sorry?

5        A.    Why would I?

6        Q.    Right.

7              And you certainly wouldn't want to do

8   anything that would damage the salon's legal

9   interests?

10       A.    No.

11       Q.    And if you can, you would like to be helpful

12  to Mr. Chreky in defending this lawsuit; is that

13  correct?

14       A.    Yes.  Of course.

15       Q.    Now, yesterday was not the first time you

16  met with David Sullivan, correct?

17       A.    Yes.

18       Q.    You met with him two times before that?

19       A.    Yes.

20       Q.    Do you remember the first time you met with

21  him was in the Starbucks?

22       A.    Yes.
```

1     A.   Yes.

2     Q.   When you gave your answers once again you

3  were trying to be helpful to the salon and its

4  efforts to defend the lawsuit, correct?

5     A.   Yes.

6     Q.   Now, a couple of weeks later Mr. Sullivan

7  came back to the salon, correct?

8     A.   Yes.

9     Q.   And he gave you a declaration to sign?

10    A.   To read first and then agree.

11    Q.   So, he gave you a declaration and you read

12  it?

13    A.   Yes.

14    Q.   And then you signed it?

15    A.   Yes.

16    Q.   Did you make any changes to the declaration?

17    A.   No.  I read it twice though.

18    Q.   Now, these are Mr. Sullivan's words, not

19  your words, correct?

20    A.   Yes.

21    Q.   He drafted this, correct, not you?

22    A.   Yes.

95

```
 1    America that the foregoing is true and correct.

 2            Do you see that?

 3      A.    Yes.

 4      Q.    And you read that before you signed this,

 5    correct?

 6      A.    Yes.

 7      Q.    Do you know what 28 U.S.C. Section 1746 is?

 8      A.    No.

 9      Q.    Did anyone explain to you what that was

10    before you signed it?

11      A.    No.

12      Q.    And you know Mr. Sullivan is an attorney,

13    right?

14      A.    He probably did explain to me, but I was

15    running back and forth.  I don't remember.  No.

16      Q.    So, you think Mr. Sullivan might have tried

17    to explain it to you, but that you were really busy

18    and didn't have time to listen to it very well?

19      A.    Yes.

20      Q.    So, when you signed this document you were

21    pretty busy?

22      A.    I remember it being cold.  I had someone.  I
```

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
                  :

RONNIE BARRETT,         :

      Plaintiff,      :

                  :

   vs.           :     C.A. No.

                  :  07-CV-0250(RCL)

ANDRE CHREKY,         :
ANDRE CHREKY SALON/ANDRE  :
CHREKY INC., SPAC, LLC,   :

                  :

      Defendants.     :

- - - - - - - - - - - - - - - - x
                  :

JENNIFER THONG,      :

      Plaintiff,      :

                  :     Civil No.

   vs.           :  1:06-1807(RCL)

                  :

ANDRE CHREKY SALON, et al.,  :

                  :

      Defendants.     :

                  :

- - - - - - - - - - - - - - - - x

Washington, D.C.
Tuesday, October 2, 2007

The deposition of RODNEY PINION, called for

examination by counsel for Plaintiffs in the

above-entitled matter, pursuant to Notice, in the

offices of Katz, Marshall & Banks, 1718 Connecticut

Avenue, N.W., Sixth Floor, Washington, D.C., convened



EXHIBIT

tabbies

△ K

     1       Q.    I don't expect this to be too long.

     2       A.    Okay.

     3       Q.    Could you please briefly describe your

     4    educational background?

     5       A.    As far back as high school?

     6       Q.    Where did you go to high school?

     7       A.    High school was Lafayette High School.

     8       Q.    Where is that?

     9       A.    In Oxford, Mississippi.

    10       Q.    After high school what did you do?

    11       A.    Two semesters at Ole Miss, University of

    12    Mississippi, in journalism.

    13       Q.    And from Ole Miss?

    14       A.    Jeffie Liles Academy of Hair.

    15       Q.    Where is that?

    16       A.    That is in Oxford.

    17             Then to Sebastian International.

    18       Q.    How long were you at the Jeffie Liles

    19    Academy of Hair?

    20       A.    Ten months.

    21       Q.    What period of time was that?

    22       A.    1981.

11

```
 1      A.    I came back to D.C.

 2      Q.    And where did you work?

 3      A.    I started at Andre's.

 4      Q.    At the Andre Chreky Salon.  And that was in

 5  1994?

 6      A.    No.  '97.

 7      Q.    1997.

 8      A.    So, I must have been at Today's Look a

 9  little longer.

10      Q.    So, maybe six years.

11            When did the Andre Chreky Salon open?

12      A.    '97.

13      Q.    I have been driving by the street and I have

14  seen the sign about ten years.

15      A.    '97.  In May.

16      Q.    So, you were at Today's Look for six years?

17      A.    Yes.

18      Q.    Were you one of the original employees at

19  the Andre Chreky Salon?

20      A.    Yes.

21      Q.    How is it that you came to be employed at

22  the Andre Chreky Salon?
```

| | | |
|---|---|---|
| 1 | A. | I knew someone who told me that he was |
| 2 | opening a salon -- | |
| 3 | Q. | Who was that? |
| 4 | A. | -- and I should check it out. |
| 5 | | Her first name is Carmen. |
| 6 | Q. | And her last name? |
| 7 | A. | I have forgotten her last name. |
| 8 | Q. | So, you were a friend of Carmen's? |
| 9 | A. | Yes. |
| 10 | Q. | So, Carmen was involved with the salon |
| 11 | before it opened? | |
| 12 | | I mean, were you there on its first day? |
| 13 | A. | Yes. |
| 14 | Q. | And you helped get the salon ready for |
| 15 | business? | |
| 16 | A. | Yes. |
| 17 | Q. | So, Carmen was involved in helping set up |
| 18 | the salon and help get the staff together? | |
| 19 | A. | Yes. |
| 20 | Q. | What was her position? |
| 21 | A. | Front desk manager. |
| 22 | Q. | Did Carmen work with Mr. Chreky prior to the |

15

1    you have met with before and you don't recall when?

2         A.    Not exactly.

3         Q.    But you definitely met with Mr. Bredehoft,

4    the gentleman on your immediate left?

5         A.    Yes.

6         Q.    How long ago do you think it was?

7         A.    Six months.

8         Q.    Do you remember the occasion of your

9    meeting?

10             What did you discuss with him?

11        A.    The subject was brought up.

12        Q.    What subject?

13        A.    Of Jennifer and Ronnie.

14        Q.    It was brought up or was that the reason for

15   your discussion?

16        A.    That was the reason.

17        Q.    I mean, you weren't asking him for legal

18   advice, right?

19        A.    No.

20        Q.    And he doesn't represent you here today,

21   correct?

22        A.    Correct.

16

1  Q. He is representing the salon and Mr. Chreky

2 and Mr. Chreky's interest, correct?

3  A. Right.

4  Q. Just to complete the record, Mr. Chreky is

5 sitting to the immediate left of Mr. Bredehoft; is

6 that correct?

7  A. Correct.

8  Q. And he is your boss, correct?

9  A. Yes.

10  Q. On his immediate left is a gentleman by the

11 name of David Sullivan, who is an associate of

12 Mr. Bredehoft's.

13   Have you met Mr. Sullivan before?

14  A. Yes.

15  Q. On what occasion did you meet with

16 Mr. Sullivan?

17  A. When?

18  Q. We can start with when. Approximately when

19 did you meet with Mr. Sullivan?

20  A. I am horrible with dates.

21  Q. That is okay.

22   Was it within the past year?

1       A.    It was within the past year.

2       Q.    How many times have you met with

3  Mr. Sullivan?

4       A.    Twice.

5       Q.    Was Mr. Sullivan present at the meeting

6  where you met Mr. Bredehoft that you just testified

7  about or was that an individual meeting you had with

8  Mr. Bredehoft?

9       A.    No.   He wasn't present.

10      Q.    Mr. Sullivan was not present at your meeting

11  with Mr. Bredehoft?

12      A.    Correct.

13      Q.    So I am clear, you had three separate

14  meetings with Mr. Chreky's attorneys before today?

15      A.    Yes.

16      Q.    You haven't met with them in the past day or

17  two to help you prepare for this deposition in any

18  way?

19            MR. BREDEHOFT:   Form.

20            THE WITNESS:   Yes.

21  BY MR. ROSE:

22      Q.    You have?

18

```
 1      A.    Yes.

 2      Q.    So, there was an additional time that you

 3  met with them.

 4            Who did you meet with?

 5      A.    With David.

 6      Q.    With Mr. Sullivan?

 7      A.    Yes.

 8      Q.    When did you meet with Mr. Sullivan?

 9      A.    Yesterday.

10      Q.    Was that one of the two times you were just

11  referring to or is that three times that you met with

12  Mr. Sullivan?

13      A.    That was three.

14      Q.    Where did you meet Mr. Sullivan?

15      A.    At the lobby of the Washington Hilton.

16      Q.    Just up here on Connecticut?

17      A.    Yes.

18      Q.    When did you meet with him?

19      A.    Yesterday.

20      Q.    I'm sorry.  What time of day?

21      A.    5:30.

22      Q.    How long did you meet with Mr. Sullivan
```

19

1    yesterday at the Hilton?

2        A.    30 minutes.

3        Q.    What did you discuss with Mr. Sullivan for

4    30 minutes?

5        A.    Not to be nervous.  Just answer the

6    questions that are asked.

7        Q.    Anything else?

8        A.    We are not on trial.  Just give honest

9    answers.

10       Q.    Anything else?

11       A.    No.

12       Q.    You just testified that you met with

13   Mr. Sullivan yesterday at approximately 5:30 p.m. for

14   about a half-hour and your response when I asked you

15   about what you discussed took you less than a minute.

16       A.    Right.

17       Q.    Could you please elaborate on what your

18   discussions with Mr. Sullivan were about?

19       A.    How we were.

20       Q.    What do you mean?

21       A.    How was everybody feeling?  Is everybody

22   busy?

1    Q.   Anything else that you discussed in this

2  half-hour meeting with Mr. Sullivan yesterday

3  afternoon?

4    A.   No.

5    Q.   Who asked you to go to that meeting?

6    A.   Our receptionist Elena.

7    Q.   Elena asked you to go?

8    A.   She told me.

9    Q.   Do you report to Elena?

10    A.   Yes. She manages the front desk.

11    Q.   But does she manage you as a stylist?

12    A.   No.

13    Q.   So, why is it that you showed up at a hotel

14  for a meeting at 5:30 when someone who is a manager

15  of a different department tells you to do something?

16    A.   I don't understand.

17    Q.   Did you understand that when Elena was

18  telling you that you should go and meet with

19  Mr. Sullivan that in fact that instruction was from

20  Mr. Chreky?

21    A.   No.

22    Q.   No?

1          Does Elena often tell you to go and meet
2  people outside of the salon at a specific time?
3      A.    If someone calls and asks.
4      Q.    How often has Elena directed you to an
5  appointment outside of the salon for non-hair
6  purposes?
7      A.    Not often.
8      Q.    Not often or never?
9      A.    Not often.
10      Q.    Can you give me an example of when she has
11  previously?
12      A.    If someone called and wanted to know if I
13  would meet them for lunch, a friend.
14      Q.    A friend.
15          What about instructions to go meet with
16  someone who is an attorney for your boss?  How many
17  times have you been directed by Elena to go and meet
18  with an attorney for your boss a day before you are
19  appearing pursuant to a subpoena?
20      A.    Just once.
21      Q.    Did you feel that you could say no?
22      A.    Yes.

23

1    Q.    You didn't feel that you might somehow be

2    putting yourself in jeopardy with Mr. or Mrs. Chreky

3    if you refused to meet with their attorneys?

4    A.    No.

5    Q.    So, when you met with Mr. Bredehoft

6    approximately six months ago, and I know it is six

7    months ago, but could you please as best you can

8    recall tell me what it is you discussed with

9    Mr. Bredehoft?

10         What did he ask you?

11    A.    Was I aware of Jennifer and Ronnie's

12    accusations?

13    Q.    Did he ask you anything else?

14    A.    If I had seen anything, anything

15    inappropriate.

16    Q.    Anything else?

17    A.    No.

18    Q.    When you met with Mr. Bredehoft had you met

19    with Mr. Sullivan already?

20    A.    No.

21    Q.    So, you met with Mr. Bredehoft first before

22    you met with Mr. Sullivan for the first time?

1       A.    I don't remember.

2       Q.    Do you recall what the purpose of the

3   meeting, the next meeting that you had with

4   Mr. Sullivan, was about?

5       A.    Yes.

6       Q.    What was it?  What was the purpose of your

7   next meeting with Mr. Sullivan?

8       A.    He had printed out the questions that he

9   asked me and my answers.

10      Q.    It was in a question and answer format?

11      A.    Yes.  He wanted to know if they were

12  correct.

13      Q.    He had written on a piece of paper the

14  questions he asked and then the answer said Rodney's

15  response?  Is that what you saw?

16      A.    No.  They weren't his questions.  They were

17  my responses.

18      Q.    Just your responses?

19      A.    Yes.

20      Q.    He was showing you a copy of the declaration

21  that he had prepared for you?

22      A.    Right.

1  Q. You signed it.

2   Did you read it?

3  A. Yes.

4  Q. Did you make any changes to it?

5  A. No.

6  Q. Did you ask him whether or not you could

7 make any changes to it?

8  A. He asked me.

9  Q. He asked you if you wanted to make any

10 changes to it?

11  A. Yes.

12  Q. And you said?

13  A. No.

14  Q. Were you happy with the declaration he

15 presented for your signature?

16  A. Yes.

17  Q. Did you feel that you could refuse to sign

18 the declaration?

19  A. Yes.

20  Q. Why is it that you felt that?

21   You didn't think there would be any

22 ramifications from Mr. and Mrs. Chreky if you refused

53

1    to sign it?

2        A.    No.

3        Q.    Are you aware of whether there were any

4    other employees at the salon at the time that you

5    were being asked to go meet with Mr. Sullivan and to

6    sign your declaration, are you aware of any other

7    employees who were asked to provide a declaration who

8    refused to do so?

9        A.    No.

10       Q.    You are not aware of anyone?

11       A.    No.

12       Q.    To the best of your knowledge, every single

13   employee who was asked to go and meet or told to go

14   and meet with Mr. Sullivan and was presented with a

15   declaration signed it?

16            Is that your testimony?

17       A.    I don't know.

18            MR. ROSE:  Can you read back my question?

19            (The reporter read the requested portion of

20   the record.)

21            THE WITNESS:  No.

22   BY MR. ROSE:

1        A.    No.

2        Q.    So, he understood you were there

3    voluntarily?

4        A.    Yes.

5        Q.    Why would you need to say it?

6        A.    Just to let him know.

7        Q.    And you said I have been promised no benefit

8    nor threatened with any reprisal in connection with

9    this Declaration as you sat there in Starbucks that

10   day?

11       A.    Yes.

12       Q.    You did say that?

13       A.    Right.

14       Q.    Those exact words?

15       A.    I might have said money instead of benefit.

16       Q.    And you said nor threatened with any

17   reprisal?

18       A.    Or threatened in any way.

19       Q.    Do you know what reprisal means?

20             What does reprisal mean to you?

21       A.    Like any action taken against me.

22       Q.    And you said that to Mr. Sullivan that day,

1      Q.    Mr. Sullivan put those in there?

2      A.    Yes.

3      Q.    Did he explain to you what penalty of

4   perjury meant under the laws of the United States?

5      A.    He probably did.

6      Q.    But you are not sure?

7      A.    Not right now.

8      Q.    Did he explain to you what 28 U.S.C.

9   Section 1746 was?

10     A.    He might have.

11     Q.    But you don't recall?

12     A.    Not right now.

13     Q.    Did he show you a Code section?

14     A.    I don't believe so.

15     Q.    If he did, do you think you would remember

16   that?

17     A.    Maybe.

18     Q.    It says you signed this declaration on the

19   16th of February.  Is that about right?

20     A.    Yes.

21     Q.    And you met with Mr. Bredehoft approximately

22   how long before you executed this declaration?

# KAUFMAN & CANOLES

———— I A Professional Corporation I————
**Attorneys and Counselors at Law**

David J. Sullivan
757 / 624-3249
djsullivan@kaufcan.com

757 / 624-3000
*fax:* 757 / 624-3169

*Mailing Address:*
P.O. Box 3037
Norfolk, VA 23514

150 West Main Street
Suite 2100
Norfolk, VA 23510

December 21, 2007

<u>VIA E-MAIL AND U. S. MAIL</u>

Ari M. Wilkenfeld, Esquire
Debra S. Katz, Esq.
KATZ, MARSHALL & BANKS, LLP
1718 Connecticut Avenue, N.W.
Sixth Floor
Washington, DC 20009

Re:     **Ronnie Barrett v. Andre Chreky Salon & Spa**
        **Case No.:  1:07 CV 00250 (RCL)**

Dear Mr. Wilkenfeld and Ms. Katz:

I have reviewed your letter dated December 18, 2007, and your draft Amended Complaint. I strongly disagree with many of the proposed allegations you've included in the draft Amended Complaint. However, if you will provide citations for the authority on which you base your amended claims, I will consider your request that we consent to your filing of the draft Amended Complaint.

I look forward to hearing from you.

Regards,

David J. Sullivan

DJS/jwb

1202131\1

**EXHIBIT**

△ L