## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| **RONNIE BARRETT,** | ) |
|  | ) |
| **Plaintiff,** | ) |
|  | ) |
| **v.** | ) **C.A. No. 07-CV-0250 (RCL)** |
|  | ) |
| **ANDRE CHREKY,** | ) |
| **ANDRE CHREKY SALON/ANDRE CHREKY INC.,** | ) |
| **SPAC, LLC** | ) |
|  | ) |
| **Defendants.** | ) |
|  | ) |

_____)

### PLAINTIFF'S REPLY TO DEFEDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT

Plaintiff, Ronnie Barrett, through undersigned counsel, respectfully submits this Reply to Defendants' Opposition to Plaintiff's Motion for Leave to File an Amended Complaint ("Opposition").

Tellingly, Defendants have not alleged, nor could they, that Defendants would be prejudiced by the proposed amendment. Nor have they countered Plaintiff's argument that she would be prejudiced if the Court denied her Motion to Amend. Rather, Defendants oppose Plaintiff's Motion for Leave to File an Amended Complaint ("Pl. Motion") arguing that the amendments are in bad faith, do not add new claims or support existing claims, and are futile. These arguments can be easily dispensed with.

Plaintiff's Motion is not in bad faith. On the contrary, Ms. Barrett's factual assertions are amply supported by the evidence obtained in the course of discovery. Furthermore, in amending her complaint, Plaintiff seeks only to add factual allegations which relate back to Paragraph 55 of

1

the operative Complaint regarding the corporate culture at the Andre Chreky Salon and Spa ("the

Salon"), in which Defendants acted in reckless disregard of federal and local laws to the

detriment of salon employees including Plaintiff.  The additional factual allegations, therefore,

serve to support Ms. Barrett's legal claims that Defendants acted in reckless disregard of her

legal rights.  Finally, Plaintiff's Motion is not futile.  It does not seek to add new legal claims that

would not survive a 12(b)(6) motion.  Instead, Pl. Motion seeks to add factual allegations that

relate back to allegations in the original Complaint which provide the factual support for

Plaintiff's causes of action.

I.     **PLAINTIFF'S AMENDMENTS WILL NOT PREJUDICE DEFENDANTS**

Prejudice to the defendant is the crucial consideration when a court addresses a motion

for leave to amend a pleading.  Stevens v. Stover, 702 F. Supp. 302, 305 (D.D.C. 1988).  To

show prejudice sufficient to justify a denial of leave to amend, the opposing party must show that

it was unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it

would have offered had the amendments been asserted earlier.  In re Vitamins Antitrust

Litigation, 217 F.R.D. 30, 32 (D.D.C. 2003) (granting motion for leave to amend where

defendants failed to establish prejudice despite plaintiffs' delay in amending complaint).   The

opposing party must show unfairness in procedure or timing preventing them from properly

responding.  Id.  See also Djourabchi v. Self, 240 F.R.D. 5, 13 (D.D.C. 2006) (granting motion

for leave to add new claim and finding that opposing party failed to show that amendment was

prejudicial because it substantially changed the theory of case or imposed added expense and

burden).

Defendants have, in effect, conceded that there is no prejudice in adding these factual

allegations.  They make no mention of unfairness in the opportunity to present facts or evidence

or any unfairness of procedure or timing.  Rather, Defendants claim that the factual allegations are "precisely the type of prejudicial characteristics that would not be admissible at trial, such as allegations of unrelated 'bad acts.'"  Opposition at 2-3.  This is not the type of prejudice contemplated by the court in ruling on a motion to amend.  Such a determination on evidence of "prior bad acts" is not made on the face of the complaint, or any amendments to it, but is rather an evidentiary issue regarding the probative value of evidence a party seeks to introduce at trial.

Furthermore, these factual allegations would not be inadmissible, as Defendants assert. Plaintiff does not submit such factual allegations as evidence of "prior bad acts" in order to prove action in conformity therewith.  Instead, Plaintiff seeks to add factual allegations corroborated by evidence which is relevant to show Defendants' modus operandi, plan, absence of mistake or accident.  The allegations are also relevant to show Defendants' harmful business practices, willful disregard for laws and regulations, and other such behavior which led to Plaintiff's injuries.[1]

Finally, the Court should weigh the fact that the Defendants would not be prejudiced by amending the Complaint against the prejudice that the Plaintiff will suffer should she not be allowed to amend her Complaint.  The factual allegations at issue all support and enhance Ms. Barrett's allegations that she worked in an environment in which disregard of the law was the norm.  Such facts are essential to Ms. Barrett's claims as they speak to the atmosphere of flagrant disregard for the law which pervaded the Andre Chreky Salon and allowed for the substantial injuries that Ms. Barrett has suffered.

---

[1] Rule 404(b) of the Federal Rules of Evidence states: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . ."  Fed. R. Evid. 404(b).

II.    **PLAINTIFF'S AMENDMENTS ARE NOT MADE IN BAD FAITH**

Defendants argue that Plaintiff's proposed amendments are made in bad faith because they are not supported by the evidence in this case. Opposition at 3. This argument, and the deposition testimony Defendants cite as support, suggest that Defendants are either in a state of denial about the deposition testimony that has been adduced, or have cherry picked testimony to produce a wholly inaccurate and misleading spin on the evidence. However, as demonstrated below, every factual allegation Plaintiff seeks to add in her Amended Complaint is supported by ample, and in many cases overwhelming evidence obtained in the course of discovery.

A.    **Obstruction of Justice**

Defendants' Opposition devotes almost 10 of the 14 pages in an effort to prove that no evidence exists supporting Plaintiff's allegations that Defendants and their counsel have attempted to obstruct justice. In fact, all such allegations are well supported by credible evidence, including the deposition testimony of Defendants' current and former employees.

Paragraphs 77 and 78 of the Amended Complaint detail Mr. Chreky's efforts to intimidate Damon Taylor, a witness for Plaintiff, who provided a sworn declaration attesting to the fact that Mr. Chreky subjected female employees, including Ms. Barrett and Ms. Thong, to unwelcomed touching and inappropriate sexual comments. The Amended Complaint alleges that on December 7, 2006, counsel for Ms. Barrett provided counsel for Defendants with the names of persons whom they had interviewed and who they anticipated would provide declarations in the near future in support of Ms. Barrett's case. Amended Complaint at ¶ 77. One such individual, Damon Taylor, was in the midst of reviewing and editing a declaration that he would eventually execute on February 2, 2007. Id. Approximately four hours later, Mr. Taylor received a threatening phone call from Sami Tellawi, then a current Salon employee who served

as Mr. Chreky's assistant.  Id. at ¶ 78.  As Mr. Taylor confirmed in his signed declaration, and later at his deposition, the purpose and effect of this telephone call was to intimidate him.

> In December, 2006, I was contacted by phone by Sammy [sic] a former colleague from the Salon, who was working for Mr. Chreky.  Sammy [sic] told me "Damon, you need to go over to Andre's office and meet with him immediately.  Andre is a very powerful man he can have you thrown in jail if you don't."  It is my belief that Mr. Chreky instructed Sammy [sic] to call and make that threat.  I was particularly scared from the threatening phone call, because I had seen that Mr. Chreky had a propensity for physical violence, having heard that Mr. Chreky had attacked a homeless man outside the Salon.  I have been genuinely scared for my safety since this call.

Declaration of Damon Taylor, February 2, 2007, attached and incorporated herein as Exhibit 1, at ¶ 15.  See also Deposition of Damon Taylor, October 30, 2007, attached and incorporated herein as Exhibit 2, at 94-95 ("Q: Date you have a reason to fear that threat that Sami was delivering to you from Mr. Chreky?  A:  I was afraid.  Yes.").[2]

The Amended Complaint also details the intimidating effect Defendants' private investigators have had on potential witnesses for Plaintiff.  Amended Complaint at ¶¶ 86-87.[3]  These allegations are well supported by deposition testimony.  Nora Critzos, a former Salon employee and potential witness for Plaintiff, testified that a private investigator working for Mr. Chreky showed up at her place of business posing as a potential customer and tried to question her.  See Deposition of Nora Dunleavy Critzos, November 14, 2007 (hereafter "Critzos Deposition"), attached and incorporated herein as Exhibit 3, at 84-85.  When Ms. Critzos demanded that the private investigator identify herself, she responded that she was an investigator and "sub-lawyer" for David Sullivan, counsel for Defendants.  Id. at 86.  Ms. Critzos testified that she was intimidated by the private investigator's insistence on continuing to ask her

---

[2] On December 12, 2006, after repeated attempts to reach counsel for Defendants by telephone, counsel for Plaintiff notified counsel for Defendants of this clear effort to intimidate a material witness.  See Letter from D. Katz to J. Bredehoft (December 12, 2006), attached and incorporated herein as Exhibit 17.

[3] Counsel for Plaintiff notified counsel for Defendant of this further effort to intimidate material witnesses by letter dated September 18, 2007, attached and incorporated herein as Exhibit 18.

questions after she refused to speak with her.  Id. at 86-88.  At one point, the private investigator

went so far as to suggest that Ms. Critzos was being paid for her willingness to testify in a

manner favorable to Plaintiff.  Id. at 87.  Ms. Critzos testified that she found the private

investigator's actions intimidating, explaining: "She was really up there in my face.  I mean just

right there in my face.  And I was, you know, I don't know who you are.  But it was accusatory

questions."  Id. at 87-88.  "I felt nervous because I didn't know who this lady was and she was

extremely confrontational.  As I said, this is my personal space.  She was well within that.  And

she was a very large woman."  Id. at 92.  Ms. Critzos further testified that she became nervous

about the fact that she had provided a statement in this case favorable to Plaintiff after her

experience with this private investigator.  Id. at 88.

Cynthia Torrico, another former Chreky employee who had provided a declaration

supporting Plaintiff's case, had a similar experience with a private investigator hired by

Defendants.  She testified that the private investigator was "pushy," she felt intimidated, and that

her encounter with the private investigator made her nervous about her continued involvement in

the case.  See Deposition of Cynthia Torrico, November 14, 2007 (hereafter "Torrico

Deposition"), attached and incorporated herein as Exhibit 4, at 44, 62 and 64.

The Amended Complaint also details Defendants' heavy-handed tactics in attempting to

secure favorable testimony from current Salon employees, despite the fact that they lacked the

requisite language skills or legal sophistication to appreciate the legal peril in which they were

being placed in executing declarations for their employer.   Amended Complaint at ¶¶ 81-83.

Specifically, the Amended Complaint alleges that Defendants exerted pressure as

employers to compel the "witnesses" to meet with Mr. Sullivan at a Starbucks situated next door

to the Salon where they worked.  Id. at ¶ 81.  Several of these witnesses, who ultimately went on

to sign declaration for Defendants, confirmed during their depositions that they believed it was part of their job, as employees of the Salon, to meet with Mr. Sullivan, that they felt pressured to meet with Mr. Sullivan, and that they believed they were required to attend the meeting and sign the declarations provided to them by Defendants' counsel.

Several witnesses testified that they believed it was part of their job to meet with Mr. Sullivan at Starbucks.  See Deposition of Mila Petrosyan, October 1, 2007 (hereafter "Petrosyan Deposition"), attached and incorporated herein as Exhibit 5, at 32; Deposition of Xiomara Maradiaga, October 2, 2007 (hereafter "Maradiaga Deposition"), attached and incorporated herein as Exhibit 6, at 37; Deposition of Anisa Ghafoorzai, October 2, 2007 (hereafter "Ghafoorzai Deposition"), attached and incorporated herein as Exhibit 7, at 44.

Aouatif Mahboub testified that Mrs. Chreky specifically directed her to meet with Mr. Sullivan, and that "everybody" knew that they were required to meet with Mr. Sullivan and to provide a declaration on behalf of Mr. Chreky.  Deposition of Aouatif Mahboub, October 1, 2007 (hereafter "Mahboub Deposition"), attached and incorporated herein as Exhibit 8, at 23, 39-40 ("Q: Okay.  But is it fair to say that everyone knew that giving a declaration was a job requirement, right?  A: Right.").  Faviola Veizaga testified that she believed meeting with Mr. Sullivan at Starbucks was part of her job, Deposition of Faviola Veizaga, October 2, 2007 (hereafter "Veizaga Deposition"), attached and incorporated herein as Exhibit 9, at 40-41, and that it was every employee's job to do so.  "Q: Every single employee in the salon met with Mr. Sullivan?  A: That is what I understood.  Yes.  Q: And that makes sense because it was their job to meet with Mr. Sullivan, correct?  A: I guess.  Yes."  Id. at 72.

7

Despite the fact that Mr. Chreky was sitting in the room when all of these witness testified, some of them confirmed that they felt pressured to execute the declarations.  Khadija Darif testified:

> QUESTION: When you were being asked to sign a declaration did you fear in any way that if you didn't sign it that your employment at the salon might be in jeopardy?
> THE WITNESS: What does in jeopardy mean?
> Q:  I'm sorry.  That you might be terminated.
> A:  Yes.
> Q:  You did understand that?
> A:  Yes.
> Q:  If you didn't sign it that, you might be terminated?
> A: Yes.

Deposition of Khadija Darif, October 1, 2007 (hereafter "Darif Deposition"), attached and incorporated herein as Exhibit 10, at 96.  See also Deposition of Elena Vantovskaya, October 1, 2007 (hereafter "Vantovskaya Deposition"), attached and incorporated herein as Exhibit 11, at 48 (witness felt obligated to provide a declaration).

Defendants extracted these declarations from current Salon employees even though it was plainly obvious to Defendants and/or their counsel that many of these witnesses did not have sufficient language skills to comprehend what they were actually declaring under oath. Amended Complaint ¶ 83.  During the depositions on October 1-3, 2007, counsel for Plaintiff tried to question many of these witnesses about the contents of their declarations which they had signed under the pain and penalty of perjury, only to find out that the witnesses literally did not understand what they had signed.  Counsel for plaintiff did not conduct such questioning to belittle the witnesses as Defendants have suggested in their opposition.  Opposition at 5.  Quite the contrary, counsel for Plaintiff was shocked to learn that Defendants and their counsel placed these witnesses in legal jeopardy by pressuring them to sign declarations under oath when it was clear they did not understand the words contained in the declarations.

When counsel began to question Xiomara Maradiaga about the contents of the declaration Defendants and their counsel caused her to sign under oath, Ms. Maradiaga was initially unable to provide a meaningful answer because she did not know what the word "declaration" meant.  Maradiaga Deposition at 33.[4]  Despite the fact that her declaration contained a firm denial that she had witnessed "sexual harassment" at the Salon, Ms. Maradiaga did not actually know what the term "sexual harassment" meant and tried to look it up the night before her deposition.  Id. at 79.  During her deposition, when questioned about her critical denial of the existence of sexual harassment in the Salon, she demanded that an interpreter explain what "sexually harassed" meant before proceeding.  Id. at 100.  Ms. Maradiaga's declaration also stated that Mr. Chreky had not behaved in a sexually inappropriate manner.  When questioned about this, Ms. Maradiaga testified that she did not know what the term "sexually inappropriate" meant.  Id. at 81.

Anisa Ghafoorzai's declaration stated that she was aware of Plaintiff's "allegations" and knew the "allegations" to be false.  When questioned on this point, she asked counsel for Plaintiff to define the word "allegation" before answering questions about her sworn statement that the "allegations" were false.  Ghafoorzai Deposition at 52.  In an effort to add credibility to the declarations, counsel for Defendants included a clause whereby the witnesses swore that they did not fear any "reprisal" if they chose not to sign the declaration.  When questioned about this statement, and what she understood she was declaring by stating that she feared no "reprisal," Ms. Ghafoorzai testified that "reprisal" meant that no one had offered her a "prize" in exchange for her willingness to sign a declaration.  Id. at 55-56, 104.

Edil Karkas' declaration, like everyone else's, contained a sentence in which he declared that he never heard Mr. Chreky "make comments of a sexual nature."  This is obviously an

---

[4] She similarly did not know what the words "loyal" and "hurt" meant.  Id. at 66, 70.

important statement in this case where Plaintiff alleges that she was subjected to a sexually

hostile work environment that included constant unwelcomed comments of a sexual nature.

When questioned about what he meant when he declared that Mr. Chreky did not make

"comments of a sexual nature," Mr. Karkas testified: "I mean by like never grabbed in front.  I

didn't see it.  Grab a butt or grab her boobs or force her or force somebody to do stuff."

Deposition of Edil Karkas, October 1, 2007 (hereafter "Karkas Deposition"), attached and

incorporated herein as Exhibit 12, at 75.

        All of the declarations in question contained a statement in which the declarant denied

having witnessed "sexual harassment" in the Salon.  Again, these statements take on enormous

importance in a case where Plaintiff claims that she was subjected to severe and pervasive acts of

sexual harassment throughout her employment.  On October 1, 2007, counsel for Plaintiff

deposed several of Defendants' declarants and asked them what they understood the term "sexual

harassment" to mean when they signed their respective declarations.  Ms. Petrosyan testified that

sexual harassment is "when men are not nice to women."  Petrosyan Deposition at 39.  Ms.

Maradiaga did not know what the term "sexual harassment" meant and asked to be provided with

a translation of that term before she would explain what she meant in her declaration where she

stated, under oath, that she had not observed "sexual harassment" at the Salon.  Maradiaga

Deposition at 100.  Ms. Mahboub initially testified that "sexual harassment" is when someone

forces you to do something you don't want to do.  Mahboub Deposition at 27-28.  She later

clarified that sexual comments, and hugging and kissing in the workplace are, by definition, not

sexual harassment because that term is reserved for forced acts of sexual intercourse.  Id. at 28.

Mr. Karkas defined "sexual harassment" as instances where a man beats a woman or forces her

to have sex with him.  Karkas Deposition at 71-72.

Having secured the highly suspect declarations discussed above, Mr. Chreky tried to lock in the declarants' testimony by ordering them to meet with his attorneys before their depositions. Amended Complaint Paragraph 84 alleges:

> Mr. Chreky and/or his agents contacted each of the deponents and ordered them to meet with counsel for defendants at a hotel. Mr. Chreky or his agents told the deponents that counsel for Ms. Barrett and Ms. Thong would attempt to "trick" or "confuse" them during their depositions and that they needed to meet with counsel for defendants so that they would know how to answer properly. All nine deponents met with counsel for defendants in advance of their depositions. All nine deponents believed that attending said meetings was a job requirement. Most of the deponents believed that they could be terminated if they failed to report for their assigned meetings with counsel for defendants in advance of their depositions.

These allegations were confirmed during the depositions in question during which most of the witnesses testified that they met with counsel for Defendants the day before their depositions, and that they believed they were required to meet with Defendants' attorneys.

Ms. Mahboub testified that Mr. Chreky called her at home (which was unusual) and told her to meet with his attorneys. Mahboub Deposition at 35-36. Mr. Chreky told her that she needed the assistance of his attorneys so that counsel for Plaintiff would not be able to "trip" or "trick" her. Id. at 16-17. Mr. Karkas testified that Mr. Chreky asked him to meet with his attorneys before his deposition and that he did not feel he could say no. Karkas Deposition at 37-38. Ms. Vantovskaya testified that Mr. Chreky asked her to meet with his attorneys and advised her that Plaintiffs' attorneys would deliberately try to confuse her. Vantovskaya Deposition at 15, 18. Ms. Veizaga testified that Mr. Chreky told her to meet with his attorneys and that she understood that doing so was part of her job. Veizaga Deposition at 22-23. Ms. Petrosyan testified that she believed that it was part of her job to meet with Mr. Chreky's attorneys before her deposition. Petrosyan Deposition at 14. She further testified that at this meeting, Mr. Sullivan cautioned her that counsel for Plaintiff would be trying to confuse her. Id.

11

On October 1, 2007, counsel for Plaintiff deposed 5 of the individuals who signed declarations for Defendants. As discussed above, these witnesses were unable to define, much less understand, critical terms contained in their declarations such as "sexual harassment." Defendants' counsel immediately met with the declarants who were slated to testify the next day. During this meeting the witnesses were coached to look up or study the meaning of critical terms like "sexual harassment" so that they would be able to explain the declarations that they had signed under oath several months prior. Ms. Maradiaga met with Mr. Sullivan after the first round of depositions during which the witnesses' testimony evidenced that they did not understand the term "sexual harassment." She testified that after her meeting with Mr. Sullivan to prepare her for her deposition the following day, she went home and tried to look up the definition of the term "sexual harassment." Maradiaga Deposition at 28-29.[5] Ms. Ghafoorzai testified that Mr. Sullivan told her to think about what "sexual harassment" means before her deposition the next day. Ghafoorzai Deposition at 19-20. See also Veizaga Deposition at 18-19 (witness was told to think about what sexual harassment means).

Amended Complaint paragraph 83 alleges that "Mr. Chreky, his agents, and his attorneys knew that in executing the declarations, the declarants provided unreliable, deceptive, and perjurious testimony under oath." As discussed in detail above, Defendants and their counsel were clearly on notice that the declarants did not possess sufficient language skills to understand the statements they were affirming under oath. It is notable that Defendants and their counsel largely sought (or perhaps only obtained) declarations from employees for whom English was

---

[5] As discussed earlier, it was clear to Defendants and their counsel that many of these witnesses did not possess sufficient English language skills to competently execute the declarations in question. This point is driven home by the fact that even after being instructed to go home and look up the term "sexual harassment," Ms. Maradiaga was still unable to define it the next day at her deposition, and asked that the term be translated before she responded to questions about it. Maradiaga Deposition at 100.

not their native tongue. All of the witnesses testified that they met with Mr. Sullivan for a maximum of 10 to 15 minutes before they were presented with their declarations as drafted by counsel for Defendants. The declarants did not revise the declarations before executing them. Defendants' counsel, who drafted these declarations, knew that the declarations were almost uniformly identical carbon copies of each other.[6] In addition, as Defendants well knew, many of the declarants did not possess valid D.C. cosmetology licenses and would not be able to secure employment at another salon if they were terminated.[7] Under these circumstances - where the declarants clearly did not understand the statements they were signing under oath, felt pressured to provide their employer with the declarations he sought, and where the declarants made no effort to alter the identical declarations counsel had drafted for them - Defendants and their counsel were certainly aware that the entire exercise of obtaining the executed declarations rendered sworn statements that were unreliable, deceptive, and perjurous.

As demonstrated above, Plaintiff's supplemental allegations concerning Defendants' obstruction of justice are supported by ample evidence obtained during the course of discovery. Defendants' argument that the allegations are not supported by the record evidence, and are therefore made in bad faith, is completely without merit.

**B.   D.C. Licensing Violations**

The Amended Complaint contains allegations regarding Defendants' practice of hiring and retaining professionals who did not have valid District of Columbia cosmetology licenses.

---

[6] These "cookie cutter" declarations are attached and incorporated herein as Exhibit 16. See Declaration of Linda Mahboub, February 16, 2007; Declaration of Edil Karkas, March 9, 2007; Declaration of Khadija Darif, February 16, 2007; Declaration of Mila Petrosyan, February 16, 2007; Declaration of Anisa Ghafoorzai, February 16, 2007; Declaration of Rodney Pinion, February 16, 2007; Declaration of Xiomara Maradiaga, February 16, 2007; Declaration of Elena Vantsovskaya, March 8, 2007; and Declaration of Faviola Veizaga, February 16, 2007.

[7] In fact, as discussed below, 2 of the declarants were unlicensed workers who had worked at the Salon for years. Mr. Chreky permitted them to work without the appropriate licenses. It was only after they provided the declarations he sought, and approximately 1 month after they were deposed, that Mr. Chreky summarily terminated their employment.

Amended Complaint ¶¶ 68-75.  These allegations are not made in bad faith because, as demonstrated below, discovery has generated substantial credible evidence, both from Plaintiff's and Defendants' witnesses, that this practice was well-known and long standing.

Maria Guzman worked for the Salon from 1997 to 2007 as a shampoo assistant and a colorist.  She testified that after working for Mr. Chreky for almost 8 years without a license he terminated her employment in November of 2007 because she did not have a D.C. license. Deposition of Maria Guzman, December 18, 2007 (hereafter "Guzman Deposition"), attached and incorporated herein as Exhibit 13, at 71.  Even though Mr. Chreky was aware that Ms. Guzman did not have a license at any time during her employment, he only saw fit to terminate her for this reason once Plaintiff began seeking discovery on the issue of his employees' licenses. Ms. Guzman testified that two other employees, Aouatif Mahboub and Edil Karkas, were similarly terminated on the same day as her after working for years without licenses.  Id. at 81. Ms. Guzman also confirmed Plaintiff's allegation that unlicensed workers were sent to perform services at the White House for the First Family, testifying that she went to the White House on 2 to 3 occasions, that she did not have a cosmetology license at the time, and that Mr. Chreky knew it.  Id. at 74.

Ms. Mahboub, one of the other unlicensed employees fired in November of 2007, testified in October that she had never had a license in D.C., and that as of the date of her deposition she continued to work at the Salon.  Mahboub Deposition at 9.  She also performed services at the White House, as often as once every 3 weeks, despite the fact that Mr. Chreky knew that she did not have a cosmetology license.  Id. at 85.

Mr. Karkas testified in October of 2007 that he had worked at the Salon for over a year without a D.C. license and that Mr. Chreky was aware of the fact that he was unlicensed.  Karkas

Deposition at 16-17.  Like Ms. Guzman and Ms. Mahboub, Mr. Chreky terminated Mr. Karkas a month after his deposition, apparently for not having a valid license.  <u>See</u> <u>also</u> Veizaga Deposition at 13-14 (admitted that she had been working as a colorist at the Salon without a license and that Mr. Chreky was aware of this).

Maurice Clarke, a long time supervisor and manager at the Salon testified that during his 7-year tenure at the Salon, there were several employees who did not have the necessary licenses.  Deposition of Maurice Clarke, October 16, 2007 (hereafter "Clarke Deposition"), attached and incorporated herein as Exhibit 14, at 138-141.  <u>See</u> <u>also</u> Critzos Deposition at 46 (it was well known that Mr. Chreky employed several people without licenses); Deposition of Rodney Pinion, October 1, 2007 (hereafter "Pinion Deposition"), attached and incorporated herein as Exhibit 15 at 99-100 (same).  Mr. Clarke described a practice employed by the Salon to ensure that the D.C. licensing authorities did not discover that Mr. Chreky had unlicensed professionals working for him.  He testified that on at least one occasion, inspectors from the District of Columbia arrived at the Salon to conduct an unannounced inspection.  The receptionist held up the inspector at the front door while all of the unlicensed workers snuck out the back door and waited in the alley until the inspection was completed.  Clarke Deposition at 141-42 and 186-190.  Ms. Critzos testified that this practice was carried out on 2 or 3 occasions. Critzos Deposition at 49.  Ms. Guzman was aware of the practice but testified that she was not one of the employees who had to hide in the alley.  Guzman Deposition at 80.  <u>See</u> <u>also</u> Pinion Deposition at 101-102.

Plaintiff's supplemental allegations regarding D.C. licensing ordinances are well supported by the evidence in the case and are not, as Defendants argue, proposed in bad faith.

C.    <u>**Violations of I.R.S. Regulations Regarding the Reporting of Tips**</u>

Amended Complaint paragraphs 56-57 contains allegations that Mr. Chreky instructed

his employees to violate IRS regulations and under-report their tips. As with all of the other

supplemental allegations contained in the Amended Complaint already discussed, discovery has

produced ample evidence substantiating these allegations.

Ms. Critzos testified on this point:

Q: You would agree with me that most of the salon employees would average
their tips on the tip reports, correct?
THE WITNESS: Yes
Q: And this was a common practice, correct?
A: Yes
Q: And in all likelihood when employees reported their tips they were probably
under-reporting, correct?
THE WITNESS: Yes
Q: And this is something that was well-known to Mr. Chreky?
THE WITNESS: Yes
Q: In fact, this was something that Mr. Chreky encouraged his professionals to do,
correct?
THE WITNESS: Yes
Q:  Well, you heard him –
A: I have heard him discuss things with us.
Q: And you heard him tell employees, different employees, you should report this
amount you should report that amount, correct?
A: Yes.  Not exactly in those words though.
Q: Well, I am going to let your recollection rule today.  What do you remember
him saying?
A: I just remember him telling how to spend the cash.
Q: How to spend the cash?
A: Yes.  To pay cash for everything so there is no record.
Q: So, he was advising employees on how to dispose of tips which they had not
reported?
A: Correct
Q: You overheard him doing this?
A: Yes.

Critzos Deposition at 80-82 (foundation objections omitted).  Ms. Critzos further testified that

Mr. Chreky retaliated against a former employee by reporting her to the IRS for under-reporting

her tips.  <u>Id.</u> at 72, 78-79.

Ms. Guzman testified that the numbers she reported on her tip reports were incorrect and that she was not the only employee who under-reported her tips. Guzman Deposition at 303. She further testified that Mr. and Mrs. Chreky advised her and other employees to under-report their tips so as to minimize the taxes they would have to pay on such earnings. Id. at 304-308.

* * *

With regard to all the allegations Plaintiff seeks leave to add with her Amended Complaint, these allegations support Plaintiff's larger claim that Defendants so commonly and so willfully violated federal law, local ordinances, and the rules of this Court, that her rights as an employee and a citizen were of no importance to Defendants. All of the allegations are supported by evidence obtained during the course of discovery. As inconvenient as the facts pled in the Amended Complaint may be for Defendants, Plaintiff's efforts to include them in her Amended Complaint are not made in bad faith.

III.     **PLAINTIFF'S MOTION SHOULD BE GRANTED BECAUSE THE NEW FACTUAL ALLEGATINS SUPPLEMENT FACTUAL ALLEGATIONS CONTAINED IN ORIGINAL COMPLAINT**

With her Motion, Plaintiff seeks leave to file an Amended Complaint that contains additional factual allegations that supplement the factual allegations articulated in paragraph 55 of the Complaint.

Where an Amended Complaint supplies additional relevant facts which support and related back to existing factual allegations in the original complaint, the courts liberally grant motions to amend. See Stevelman v. Alias Research, Inc., 174 F.3d 79, 87 (2nd Cir. 1999). If the amendment "explains, expands or amplifies what was alleged in support of the cause of action already asserted," it relates back under Rule 15. Wiren v. Paramount Pictures, Inc., 206 F.2d 465, 467-68 (D.C. Cir. 1953); see also F.D.I.C. v. Conner, 20 F.3d 1376, 1386 (5th Cir.

1994) (asserting that if plaintiff seeks to amplify the facts alleged in the prior complaint, then

relation back is allowed); Gray v. Upchurch, 2006 WL 3694604, at *4 (S.D. Miss. Dec. 13,

2006) (granting motion for amended complaint and maintaining that when party further

expounds upon facts previously alleged, the proffered amended complaint relates back); Oliner

v. McBride's Industries, Inc., 106 F.R.D. 9, 12 (S.D.N.Y. 1985) (maintaining new allegations

contained in an amended pleading will relate back if allegations amplify the facts alleged in

original pleading or set forth those facts with greater specificity).

     In this case, Plaintiff's amendments do not allege a new cause of action but rather

reinforce and provide greater specificity with regard to factual allegations already pled in the

operative Complaint.  Specifically, Paragraph 55 of the operative Complaint states:

> The unlawful actions complained of in this matter occurred in a workplace where
> the owners, operators and officers believed that the law did not apply to them.  In
> the same way that Defendants violated Ms. Barrett's civil rights, stole tips from
> her, and denied her compensation she was lawfully entitled to, so too have the
> defendants disregarded a myriad of laws, statutes, regulations and ordinances
> governing the operation of their business.

Paragraph 55, in turn, supports all of Ms. Barrett's claims as it demonstrates that Ms. Barrett

worked in an environment in which it was the norm to disregard laws and regulations, violate

employees' rights by sexually harassing female employees, denying overtime compensation, and

breaching employment contracts.  The additional allegations further support this connection

providing specificity with regard to the laws and ordinances Defendants routinely ignored – be

they IRS regulations, D.C. consumer safety regulations, or prohibitions on the obstruction of

justice.  Mr. Chreky repeatedly asserted, "This is my business, and I will run it the way I want."

Complaint ¶ 45.  The new allegations show just what Mr. Chreky meant when he made this

statement.

**IV.     PLAINTIFF'S AMENDMENTS ARE NOT FUTILE**

Defendants assert that Ms. Barrett's amendments are futile.  To support this assertion, Defendants rely upon <u>Radcliff v. Unites States</u>, 519 F. Supp 2d 84 (D.D.C. 2007) and <u>Willoughby v. Potomac Elec. Power Co.</u>, 100 F.3d 999 (D.D.C. 1996).  Both of these cases, however, are distinguishable from the situation at hand.  In <u>Radcliff</u>, the plaintiff simply sought to amend the complaint by paring down the number of claims in the face of the defendant's motion to dismiss.  519 F. Supp. 2d at 86.  The court held that, without factual allegations to support each of the claims, the claims could not survive the motion to dismiss, which rendered the motion to amend futile.  <u>Id.</u>  Similarly, in <u>Willoughby</u>, the Plaintiff moved to amend the complaint in the face of a motion to dismiss in order to add new claims of discrimination which were not supported by factual allegations.  100 F.3d 1003.  As such, the court denied the plaintiff's motion to amend the complaint as futile and granted the defendant's motion to dismiss.  <u>Id.</u>  In both cases the proposed amendment added or altered the legal claims under which the plaintiff sought relief.  In this case, however, Plaintiff does not seek to add new legal claims.

The standard to determine futility is if the amended complaint "merely restates the same facts as the original complaint in different terms, reasserts a claim on which the court previously ruled, fails to state a legal theory, or could not withstand a motion to dismiss."  <u>Simpson v. Socialist People's Libyan Arab Jamahiriya</u>, 2008 WL 90238, at *3 (D.D.C. 2008) (citing <u>Robinson v. Detroit News, Inc.</u>, 211 F. Supp. 2d 101, 114 (D.D.C. 2002).  The court may deny a motion to amend a complaint as futile "when the proposed complaint would not survive a motion to dismiss."  <u>Dehaemers v. Wynne</u>, 2007 WL 4208780, at *2 (D.D.C. 2007) (citing <u>James Madison Ltd. v. Ludwig</u>, 82 F.3d 1085, 1099 (D.C.Cir.1996)); <u>see also</u> <u>Monroe v. Williams</u>, 705

F. Supp. 621, 623 (D.D.C. 1988) ("It has been repeatedly held that an amended complaint is 'futile' if the complaint as amended would not survive a motion to dismiss."); <u>Yankelevitz v. Cornell University</u>, 1996 WL 447749, at*4 (S.D.N.Y. 1996) (holding that since "plaintiff only seeks to add to his complaint factual allegations which support his existing claims against defendants, absent an attack by defendants on the validity of these claims, by a motion to dismiss for failure to state a claim or otherwise, plaintiff's motion to amend cannot be denied on the basis of futility.").

Ms. Barrett's Complaint states valid claims and requests for relief, supported by sufficient factual allegations that would be supplemented by the proposed amendments.  The amendments supplement the facts that were available to Ms. Barrett at the time of the filing of the initial complaint.  Ms. Barrett does not seek to make any amendments that would render the complaint unlikely to survive a motion to dismiss.  Thus, the proposed amendments are not futile.

V.    **CONCLUSION**

For all the foregoing reasons, Defendants' Opposition should be denied and Plaintiff's

Motion for Leave to File an Amended Complaint for Declaratory and Monetary Relief and Jury

Demand should be granted and the Clerk directed to file the Amended Complaint.

Respectfully submitted,


＿＿＿＿＿/s/ Ari M. Wilkenfeld＿＿＿＿
Debra S. Katz (Bar No. 411861)
Ari M. Wilkenfeld (Bar. No. 461063)
Katz, Marshall & Banks, LLP
1718 Connecticut Avenue, N.W.
6th Floor
Washington, D.C. 20009
(202) 299-1140
(202) 299-1148 (fax)

Attorneys for Plaintiff Ronnie Barrett

Dated:  January 30, 2008

## DECLARATION OF DAMON TAYLOR

I, DAMON TAYLOR, hereby state that I am over eighteen (18) years of age, am competent to testify and have personal knowledge of the facts stated herein:

1.     I joined the staff at the Andre Chreky Salon ("the Salon") as a Receptionist in May 2005 and left the Salon in June 2006. I was a full time student at American University during the time that I worked at the Salon.

2.     I worked with both Ronnie Barrett and Jennifer Thong at the Salon.

3.     When I first began working at the Salon I noticed that Andre Chreky, the owner of the Salon, routinely made comments to Ms. Barrett, Ms. Thong, and other female employees about their bodies and appearance. I saw Mr. Chreky behave in a sexually inappropriate fashion toward Ms. Barrett and Ms. Thong, often getting inappropriately close when speaking to them. I also was aware that Ms. Barrett and Ms. Thong tried to avoid Mr. Chreky in the Salon, and that Mr. Chreky often tried to isolate them in the Salon.

4.     Mr. Chreky also commented to me about female employees, asking me if I thought they were sexy or cute. On one occasion he called me on the phone at the receptionist desk from his office upstairs and asked me what I thought about the appearance of a new front desk female employee, Laura. Apparently, Mr. Chreky had been watching me interact with Laura on the video cameras before he called down to the receptionist desk. He told me that Laura used to work at Victoria's Secret, and stated, "Don't you think she's sexy?" I did not think it was appropriate for Mr. Chreky to be discussing Laura or other female employees in this way, and attempted to avoid these conversations with him. However, Mr. Chreky persisted and tried repeatedly to involve me in sexually explicit conversations about female employees at the Salon. I also heard Mr. Chreky refer to female staff and clients using derogatory terms like "bitch."

5.     On one occasion, just a few months before I stopped working at the Salon, after an attractive female client left, Mr. Chreky approached me and asked if I wanted to "party" with her for my birthday. Mr. Chreky then told me that the woman was a stripper and that I should go to the club on my birthday and let the woman "give you head." He also stated that he thought I should "fuck her" for my birthday. I could only react with a nervous laugh, because I was extremely uncomfortable with Mr. Chreky's comments and thought they were totally inappropriate.

6.     While I worked in the Salon I often observed that Mr. Chreky became angry with Ms. Barrett and Ms. Thong and treated them in a hostile and abusive manner. They often looked scared of him, and worried about his temper. When he became angry with either of them, he altered their schedules by instructing me or one of the other receptionists to remove their clients from their schedules. He also directed us not to give them any new clients. In the evening, after reviewing the schedule for the following day, Mr. Chreky often called down to the Receptionist's area and instructed me to remove Ms. Barrett and Ms. Thong's clients from their schedules, and

RONNIE BARRETT,
v.
ANDRE CHREKY, et al

C.A. No. 07-CV-0250 (RCL)

Exhibit 1

to assign them to another stylist. He also frequently instructed me not to assign new clients to either Ms. Barrett or Ms. Thong. When Mr. Chreky took away Ms. Thong or Ms. Barrett's clients, he often assigned them to Mindy Roberts, an employee who many at the Salon believed was involved in a romantic relationship with Mr. Chreky.

7.      I heard rumors from other employees in the Salon that Ms. Roberts and Mr. Chreky had a sexual relationship. I believed these rumors were true because Ms. Roberts and Mr. Chreky were often together in the Salon late into the evening, and they interacted in an overly familiar way with each other.

8.      Mr. Chreky directed me not to tell Ms. Barrett or Ms. Thong about the changes he made to their schedules. In fact, on several occasions he threatened that he would terminate my employment if I told them about the changes he directed me to make to their schedules.

9.      I was present in the Salon on Ms. Barrett's last day of employment in December of 2005. Ms. Barrett and I were downstairs in the Reception area when Amelle Darri came downstairs and told Ms. Barrett to go upstairs and stock the product shelves. Ms. Barrett told Ms. Darri that she had already clocked out for the day. Ms. Darri then went upstairs and returned with Mr. Chreky who began yelling and cursing at Ms. Barrett. He said "get the fuck out of here, this is my house and I don't want to see your face again." Ms. Barrett was crying hard. Mr. Chreky continued to yell at her and tell her to get out of the Salon. I understood that he had fired her. I helped Ms. Barrett gather her things and she left the Salon. I felt that Mr. Chreky was extremely abusive to her, and his behavior appeared to be physically threatening to Ms. Barrett. I was worried about her safety.

10.     While I worked in the Salon, I noticed that Ms. Thong was becoming increasingly unhappy. Mr. Chreky worked her especially hard, often assigning her to serve up to four clients per hour. I also noticed that Mr. Chreky was becoming increasingly hostile towards her. On one occasion, about a month before I left the Salon, I saw Mr. Chreky grab Ms. Thong's upper arm and forcefully pull her down to the couch in the waiting area. He was yelling and cursing at her. He said "What the fuck, you have got to listen to me, what are you doing." Ms. Thong appeared scared of him and quite upset by his treatment of her.

11.     After Jennifer Thong left the Salon, Mr. Chreky approached me and asked me if clients were calling in and asking for Ms. Thong. Mr. Chreky had instructed us to lie about the whereabouts of anyone who left the Salon. I told Mr. Chreky that clients had called the Salon, but that I did not tell them where she went. Mr. Chreky then accused me of giving Ms. Thong's client information, and began yelling and screaming at me. Mr. Chreky demanded that I sign a paper that said that Ms. Thong called me to get client information. This statement was not true, but Mr. Chreky insisted that I make it under threat of termination.

12.     I was hired at the rate of $8 per hour. I worked full time for the first month of my employment at the Salon and worked over forty hours. I was not paid overtime for the hours I worked over 40 hours that week. I called the Salon and asked Serena Chreky about my overtime hours. She informed me that from that point on I would receive a raise and time and one-half for overtime. I received a raise to $12 per hour. I worked part-time for most of the rest of my

employment with the Salon because I was in school full-time at American University. During the time that I worked at the Salon I was aware that most of the other employees did not receive pay for overtime hours regardless of how many hours they worked in a given week.

13.    During the time that I worked at the Salon, Mr. Chreky instructed that all tips be collected and held until they could be divided and distributed to employees on Saturday night after closing. I frequently heard stylists complain that their tips had been stolen.

14.    In June of 2006, Mr. Chreky terminated my employment after I called in sick to work.

15.    In December, 2006, I was contacted by phone by Sammy a former colleague from the Salon, who was working for Mr. Chreky. Sammy told me "Damon, you need to go over to Andre's office and meet with him immediately. Andre is a very powerful man and he can have you thrown in jail if you don't." It is my belief that Mr. Chreky instructed Sammy to call and make the threat. I was particularly scared from the threatening phone call, because I had seen that Mr. Chreky had a propensity for physical violence, having heard that Mr. Chreky had attacked a homeless man outside the Salon. I have been genuinely scared for my safety since this call.

I SOLEMNLY SWEAR OR AFFIRM under the penalties of perjury that the matters set

forth in this Declaration are true and correct to best of my personal knowledge, information and

belief. Executed on this 2nd day of February 2007.


_____

DAMON TAYLOR



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
                              :
RONNIE BARRETT,               :
                              :
        Plaintiff,            :
                              :
    vs.                       :        C.A. No.
                              :        07-CV-0250(RCL)
ANDRE CHREKY,                 :
ANDRE CHREKY SALON/ANDRE      :
CHREKY INC., SPAC, LLC,       :
                              :
        Defendants.           :
- - - - - - - - - - - - - - - x
                              :
JENNIFER THONG,               :
                              :
        Plaintiff,            :
                              :        Civil No.
    vs.                       :        1:06-1807(RCL)
                              :
ANDRE CHREKY SALON, et al.,   :
                              :
        Defendants.           :
                              :
- - - - - - - - - - - - - - - x

                Washington, D.C.
                Tuesday, October 30, 2007

    The deposition of DAMON TAYLOR, called for

examination by counsel for Defendants in the

above-entitled matter, pursuant to Notice, in the

offices of Sheppard, Mullin, Richter & Hampton, LLP,

1300 I Street, N.W., 11th Floor East, Washington,

RONNIE BARRETT,
v.
ANDRE CHREKY, et al

C.A. No. 07-CV-0250 (RCL)

Exhibit 2

15

1    a sheet of paper which basically told the job

2    description and the salary, the $8 an hour starting

3    pay, and just some basic paperwork.

4        Q.    Are you familiar with or have you read the

5    Complaints filed against the salon by either Jennifer

6    Thong or Ronnie Barrett?

7        A.    I haven't specifically seen the

8    documentation.  I am aware of some of the charges

9    that they would be filing, but I don't know exactly

10   what it is or the actual documentation that was being

11   filed.

12       Q.    So, if you haven't read the documents, how

13   have you come to learn about the allegations in the

14   lawsuits?

15            MR. ROSE:  Objection.  Lacks foundation.

16   BY MR. SULLIVAN:

17       Q.    You can answer.

18       A.    Newspaper.  It was in the Post a few months

19   ago.

20       Q.    So, you read about it in the Post?

21       A.    Yes.

22       Q.    Have you talked to either Jennifer or Ronnie

94

```
 1            MR. SULLIVAN:  Asked and answered.
 2            THE WITNESS:  That is correct.
 3   BY MR. ROSE:
 4       Q.    Directing your attention to paragraph 15 of
 5   your declaration, it says:  In December 2006 I was
 6   contacted by phone by Sami, a former colleague from
 7   the salon.
 8            That is Sami Tellawi?
 9       A.    Yes.
10       Q.    He was working for Mr. Chreky at that time;
11   is that correct?
12       A.    Yes.
13       Q.    It goes on to say:  Sami told me, quote,
14   "Damon, you need to go over to Andre's office and
15   meet with him immediately.  Andre is a very powerful
16   man and he can have you thrown in jail if you don't."
17            Do you see that?
18       A.    Yes.
19       Q.    That quote is accurate?
20       A.    It is.
21       Q.    That is what Sami told you?
22       A.    That is what he told me.
```

1      Q.    Did you have reason to fear that threat that

2    Sami was delivering to you from Mr. Chreky?

3      A.    I was afraid.  Yes.

4      Q.    And you understood Sami's call to be a

5    threat coming from Mr. Chreky, correct?

6          MR. SULLIVAN:  Foundation.

7          THE WITNESS:  I did.

8    BY MR. ROSE:

9      Q.    Do you recall how long it had been since you

10   had last spoken with Sami before that phone call

11   threatening that you might go to jail if you didn't

12   go and speak with Mr. Chreky?

13     A.    I'm sorry.  Could you repeat that?

14     Q.    The question is when was the time before

15   that phone call in December 2006 when Sami called you

16   threatening that Mr. Chreky could have you thrown in

17   jail if you didn't come over and speak with him, how

18   long before that had it been since you had spoken

19   with Sami?

20     A.    It must have been one of the last days of my

21   employment there.  I mean, I hadn't talked to Sami in

22   several months.

 COPY

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
RONNIE BARRETT,                  :

            Plaintiff,           :

      vs.                        :        C.A. No.
                                 :        07-CV-0250(RCL)
ANDRE CHREKY,                    :
ANDRE CHREKY SALON/ANDRE         :
CHREKY INC., SPAC, LLC,          :

            Defendants.          :
- - - - - - - - - - - - - - - - x
                                 :
JENNIFER THONG,                  :

            Plaintiff,           :

                                 :        Civil No.
      vs.                        :        1:06-1807(RCL)

ANDRE CHREKY SALON, et al.,      :

            Defendants.          :
- - - - - - - - - - - - - - - - x

                  Washington, D.C.
                  Wednesday, November 14, 2007


      The deposition of NORAH DUNLAVEY CRITZOS,

called for examination by counsel for Defendants in

the above-entitled matter, pursuant to Notice, in the

offices of Sheppard, Mullin, Richter & Hampton, LLP,

JARDIM REPORTING ASSOCIATES
(703) 867-0396

RONNIE BARRETT,
v.
ANDRE CHREKY, et al
C.A. No. 07-CV-0250 (RCL)

Exhibit 3

46

1     A.    It was I believe she was Ethiopian, a

2  manicurist.

3     Q.    Was her name Aki?

4     A.    Yes.

5     Q.    And you found out about this because Aki

6  told you?

7     A.    She told a lot of people.

8     Q.    That is what we understand.

9          Was it well-known that Mr. Chreky employed

10  people to perform services on people's hair who did

11  not have licenses in the District of Columbia?

12     A.    Yes.

13     Q.    Can you name any employees who worked for

14  Mr. Chreky who were unlicensed?

15     A.    I heard that Linda didn't have a license.

16     Q.    That would be Linda Mahoub, a colorist?

17     A.    I can't recall her last name.

18     Q.    Was she a colorist?

19     A.    Yes.  She was a colorist.

20     Q.    Do you know whether this Linda went to the

21  White House and performed services at the White

22  House?

JARDIM REPORTING ASSOCIATES
(703) 867-0396

49

1      Q.    In what respect?

2      A.    Because he was just -- he was off-the-wall.

3      Q.    We have heard that too.

4            Do you recall any instances while you were

5      employed at the Andre Chreky Salon when members of

6      the D.C. Licensing Board came in for an inspection?

7      A.    Yes.

8      Q.    And in those instances isn't it true that

9      the unlicensed employees would scurry out the back of

10     the salon?

11     A.    Yes.

12     Q.    As the member of the D.C. Licensing Board

13     was kept waiting down in the reception area?

14     A.    Yes.

15     Q.    And Mr. Chreky was aware of this, correct?

16     A.    Yes.

17     Q.    How many times can you recall this

18     occurring?

19     A.    Maybe two, three.

20     Q.    How did you receive your tips at the Andre

21     Chreky Salon?

22     A.    In envelopes.

1  business.

2      Q.    With respect to tips, you have described

3  already that there were instances where it was

4  widespread that service providers believed that tips

5  had been stolen.

6      A.    Yes.

7      Q.    And you said that Mr. Chreky was made aware

8  of these concerns and issues.

9      A.    Yes.

10     Q.    Are you aware of any instances where

11  Mr. Chreky contacted the IRS to pursue an employee

12  over tip disclosure issues in a punitive manner?

13     A.    I understood one of the colorists who left,

14  it was rumored that he had done that to.

15     Q.    Do you recall the name of this colorist?

16     A.    It was Yolanda.

17     Q.    Yolanda?

18     A.    Yes.

19     Q.    That was a well-known rumor?

20     A.    Yes.

21     Q.    Had you heard that from a manager?

22     A.    This was years ago.  I couldn't tell you.

1    on their paychecks what their tips were, correct?

2        A.    Repeat please.

3        Q.    These tips are reported to the salon so the

4    salon is able to report on their paychecks what their

5    tips were for that two-week period?

6        A.    Correct.

7        Q.    And you understand that at the end of the

8    year when the W-2s come out they reflect what the

9    tips were based on those biweekly reports?

10       A.    Yes.

11       Q.    And you, like every other professional in

12   the salon, understood that the failure to accurately

13   report these tips was illegal, correct?

14       A.    Yes.

15       Q.    With that background in mind, what exactly

16   did you understand that Mr. Chreky did to Yolanda?

17       A.    You are asking me what I heard that he did?

18       Q.    Correct.

19       A.    I believe he called the IRS and said that

20   she under-reported her tips.

21       Q.    How long had Yolanda been working for

22   Mr. Chreky at the time he made this report?

79

1    A.    He didn't do it until after she left.

2    Q.    Do you know about how long she worked for

3  him?

4    A.    A couple of years.

5    Q.    So, as far as you know, during that two-year

6  period when she was working there, I am talking about

7  Yolanda, he never reported Yolanda while she was

8  working there?

9    A.    No.

10    Q.    It was after she left that he made this

11  report to the IRS?

12    A.    Yes.

13    Q.    Do you have any reason to believe that

14  Mr. Chreky became aware of her fraudulent tip reports

15  only after she was let go?

16         MR. SULLIVAN:  Foundation.

17  BY MR. WILKENFELD:

18    Q.    Let me rephrase.

19         Mr. Chreky was aware during her employment

20  of what her tip reports were?

21         MR. SULLIVAN:  Foundation.

22         THE WITNESS:  Yes.

80

```
 1   BY MR. WILKENFELD:
 2       Q.    And his belief that she was under-reporting
 3   her tips was a belief that he formed, as far as you
 4   know, during her employment?
 5               MR. SULLIVAN:  Foundation.
 6               THE WITNESS:  Yes.
 7   BY MR. WILKENFELD:
 8       Q.    But he didn't report them until after she
 9   left?
10       A.    No.
11       Q.    You would agree with me that most of the
12   salon employees would average their tips on the tip
13   reports, correct?
14               MR. SULLIVAN:  Foundation.
15               THE WITNESS:  Yes.
16   BY MR. WILKENFELD:
17       Q.    And this was a common practice, correct?
18       A.    Yes.
19       Q.    And in all likelihood when employees
20   reported their tips they were probably
21   under-reporting, correct?
22               MR. SULLIVAN:  Foundation.
```

81

```
 1              THE WITNESS:  Yes.
 2              BY MR. WILKENFELD:
 3      Q.    And this is something that was well-known to
 4  Mr. Chreky?
 5              MR. SULLIVAN:  Foundation.
 6              THE WITNESS:  Yes.
 7  BY MR. WILKENFELD:
 8      Q.    In fact, this was something that Mr. Chreky
 9  encouraged his professionals to do, correct?
10              MR. SULLIVAN:  Foundation.
11              THE WITNESS:  Yes.
12              BY MR. WILKENFELD:
13      Q.    Well, you heard him --
14      A.    I have heard him discuss things with us.
15      Q.    And you heard him tell employees, different
16  employees, you should report this amount, you should
17  report this amount, correct?
18      A.    Yes.
19              Not exactly in those words though.
20      Q.    Well, I am going to let your recollection
21  rule today.
22              What do you remember him saying?
```

82

```
 1      A.    I just remember him telling how to spend the
 2  cash.
 3      Q.    How to spend the cash?
 4      A.    Yes.  To pay cash for everything so there is
 5  no record.
 6      Q.    So, he was advising employees on how to
 7  dispose of tips which they had not reported?
 8      A.    Correct.
 9            MR. SULLIVAN:  Foundation.
10  BY MR. WILKENFELD:
11      Q.    You overheard him doing this?
12      A.    Yes.
13      Q.    You testified in response to something
14  Mr. Sullivan asked you that he talked about people's
15  boobs and butts.
16            Is that accurate?
17            MR. SULLIVAN:  Asked and answered.
18            THE WITNESS:  Yes.
19  BY MR. WILKENFELD:
20      Q.    You would agree with me that you heard
21  Mr. Chreky on several occasions comment on different
22  female employee's breasts?
```

84

1              MR. SULLIVAN:  Asked and answered.

2              THE WITNESS:  I didn't hear that.

3     BY MR. WILKENFELD:

4         Q.    Did a private investigator attempt to

5     contact you?

6         A.    Yes.

7         Q.    How did this private investigator try to

8     contact you?  Was it by phone or in person?

9         A.    By phone and then showed up kind of like she

10    was a new client.

11        Q.    Was this a man or a woman?

12        A.    A woman.

13        Q.    Do you know her name?

14        A.    I can get it for you.  It is in my wallet.

15        Q.    Could you retrieve that for me?

16        A.    (Witness complies.)

17        Q.    Was it Anna Mass?

18        A.    I have her card.

19             MR. WILKENFELD:  I am not going to take this

20    card, but the record will reflect that I am looking

21    at a business card that says:  Vital Investigation,

22    Anna Mass, M-A-S-S, President.  The address is 2022

1   Columbia Road, Northwest, Suite 511, Washington, D.C.

2   20009.  Phone number (202) 415-6277.  Fax (202)

3   330-5583.  E-mail is anna@vitalinvestigations.com.

4           MR. NICKERSON:  Do you want to see it?

5           MR. SULLIVAN:  I will take his word for it.

6           BY MR. WILKENFELD:

7       Q.   So, this person, Ms. Mass, showed up at your

8   place of work?

9       A.   Yes.

10      Q.   And when she showed up at your place of work

11  she was posing as a potential client, correct?

12      A.   Yes.

13           Then she identified herself after starting

14  to ask me questions.  And I said, who are you again?

15      Q.   So, she asked you a number of questions

16  before she identified herself?

17      A.   Yes.

18      Q.   And then eventually you asked her, who the

19  hell are you, correct?

20      A.   Well, I couldn't understand what she was

21  saying.

22      Q.   So, you asked her who she was?

86

```
 1      A.    Yes.

 2      Q.    And at that point did she tell you?

 3      A.    Yes.

 4      Q.    What did she tell you?

 5      A.    She told me she was an investigator

 6  sub-lawyer for -- I guess that would be for you.

 7            MR. WILKENFELD:  Let the record reflect that

 8  the witness is pointing directly at Mr. Sullivan.

 9            THE WITNESS:  I'm sorry.

10            BY MR. WILKENFELD:

11      Q.    That is okay.

12            Once she identified herself, did she

13  continue to ask you questions?

14      A.    Yes.  Absolutely.

15      Q.    Did you answer her questions?

16      A.    No.

17      Q.    How long would you say it was that she

18  continued to ask you questions once you refused to

19  answer?

20      A.    About a minute-and-a-half.

21      Q.    How did you end your conversation?

22      A.    I said that if she wanted to know what I
```

87

1   said in this, you need to go to the lawyers.

2           She was just asking if I was getting paid,

3   all kinds of just weird questions.  And I was, first

4   of all, I don't know who you are, so you don't need

5   to ask me anything.

6       Q.    So, this person who you never met before

7   asked you questions about whether or not you were

8   being compensated for your sworn testimony in this

9   case, correct?

10      A.    Yes.

11      Q.    And before that day you never met this

12  person, correct?

13      A.    No.  Never met her.

14      Q.    Did you find the fact that a private

15  investigator came to your place of work and began

16  questioning you and insinuating that you were paid

17  for your testimony, did you find that at all

18  intimidating?

19      A.    Absolutely.

20      Q.    In what respect?

21      A.    She was really up there in my face.  I mean,

22  just right there in my face.  And I was, you know, I

88

1  don't know who you are.  But it was accusatory
2  questions.
3      Q.   And after this experience of meeting this
4  private investigator, did you become nervous about
5  the fact that you had provided a statement in this
6  case?
7      A.   Yes.
8      Q.   Would you agree with me that the atmosphere
9  in the Andre Chreky Salon when you worked there could
10 be described as a highly sexualized working
11 environment?
12     A.   Yes.   That is the nature of the business.
13     Q.   When you say it is the nature of the
14 business, in your experience are all salons highly
15 sexualized in the way that Mr. Chreky's business was?
16     A.   No.
17     Q.   So, even within the realm of the salon
18 industry, this was highly sexualized and
19 inappropriate?
20     A.   I can't say as to inappropriate or not.  It
21 was my workplace.
22     Q.   Did you find the workplace inappropriate

92

1    inappropriate?

2        A.    No.

3        Q.    Changing subjects here.

4             Why did you become nervous, according to

5    your words, hopefully accurately, if I am not, please

6    correct me, why did you become nervous about the fact

7    that you provided a statement in this case?

8        A.    I felt nervous because I didn't know who

9    this lady was and she was extremely confrontational.

10   As I said, this is my personal space.  She was well

11   within that.  And she was a very large woman.

12       Q.    So, you were nervous because of her

13   closeness I guess and demeanor you are saying?

14       A.    And I have never done this before and I

15   didn't know what this was coming from.  And if she

16   was part of the investigation or whatever part of

17   this, she would have this information.  Maybe I am

18   incorrect.  I don't know.  I didn't feel comfortable.

19       Q.    You didn't feel comfortable talking to her?

20       A.    Talking to her.

21             And then it was just like, huh, I felt very

22   strange about it.


COPY

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - x
                            :
RONNIE BARRETT,             :
                            :
          Plaintiff,        :
                            :
     vs.                    :      C.A. No.
                            :   07-CV-0250(RCL)
ANDRE CHREKY,               :
ANDRE CHREKY SALON/ANDRE    :
CHREKY INC., SPAC, LLC,     :
                            :
          Defendants.       :
                            :
- - - - - - - - - - - - - - x
                            :
JENNIFER THONG,             :
                            :
          Plaintiff,        :
                            :      Civil No.
     vs.                    :   1:06-1807(RCL)
                            :
ANDRE CHREKY SALON, et al., :
                            :
          Defendants.       :
                            :
- - - - - - - - - - - - - - x

                    Washington, D.C.
                    Wednesday, November 14, 2007

          The deposition of CYNTHIA TORRICO, called

for examination by counsel for Defendants in the

above-entitled matter, pursuant to Notice, in the

offices of Sheppard, Mullin, Richter & Hampton, LLP,

1300 I Street, N.W., 11th Floor East, Washington,

JARDIM REPORTING ASSOCIATES
(703) 867-0396

RONNIE BARRETT,
v.
ANDRE CHREKY, et al
C.A. No. 07-CV-0250 (RCL)

Exhibit 4

44

1   said, I will be there tomorrow to meet with you.  I

2   said, okay, at 11:00.  She didn't even give me the

3   chance to get her information, her name.  And when

4   she came in the next day I received her and basically

5   told her I had no comment.

6       Q.    What did she ask you in particular, if you

7   remember?

8       A.    If I worked at Andre Chreky, which was

9   correct, but I still said no comment.  Why is it that

10  I don't want to talk to her?  I said, I have no

11  comment to say to you.

12          She just kept on being pushy about every

13  question.  I said, let me show you your way out.  I

14  just showed her out.

15      Q.    Did you find it at all intimidating that a

16  private investigator showed up at your workplace and

17  asked you questions repeatedly after you declined to

18  answer?

19      A.    Yes.

20      Q.    Did it make you nervous about your

21  involvement in this case?

22      A.    Yes.

62

```
 1          What exactly about the private investigator
 2  intimidated you?
 3          MR. ROSE:  Form.
 4          THE WITNESS:  I'm sorry.  Can you rephrase
 5  that again?
 6  BY MR. SULLIVAN:
 7      Q.   Can you tell me what it was about the
 8  private investigator that intimidated you?
 9      A.   Just the way she was pushy asking questions
10  about the whole case.
11      Q.   When you say pushy, what was pushy about her
12  approach?
13      A.   Basically she started getting upset when I
14  wouldn't answer her questions.  Every question she
15  would ask me was a no comment answer and she kept on
16  pushing, kept on asking and asking and asking, and
17  basically she wasn't getting anywhere because my
18  answer was no comment constantly.  So, at that point
19  that is when I told her let me show you the way out.
20      Q.   And when you suggested that she should leave
21  did she leave?
22      A.   She followed me, yes, to leave out and as we
```

64

|    |    |
|----|----|
| 1  | EXAMINATION BY COUNSEL FOR PLAINTIFF |
| 2  | RONNIE BARRETT |
| 3  | BY MR. WILKENFELD: |
| 4  | Q.    Just to be clear, this private investigator |
| 5  | showed up at your work, correct? |
| 6  | A.    Correct. |
| 7  | Q.    She attempted to interview you? |
| 8  | A.    Correct. |
| 9  | Q.    She asked you questions and you refused to |
| 10 | give answers? |
| 11 | A.    Correct. |
| 12 | Q.    And then you asked her to leave? |
| 13 | A.    Correct. |
| 14 | Q.    You attempted to show her to the door? |
| 15 | A.    Correct. |
| 16 | Q.    And after you had told her you are not going |
| 17 | to be interviewed and you are not going to give |
| 18 | answers, she continued to ask questions, correct? |
| 19 | A.    Correct. |
| 20 | MR. SULLIVAN:  Asked and answered. |
| 21 | MR. WILKENFELD:  Nothing further. |
| 22 | MR. SULLIVAN:  I guess we are done. |

 COPY

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - x
                           :
RONNIE BARRETT,            :
                           :
          Plaintiff,       :
                           :
     vs.                   :    C.A. No.
                           :    07-CV-0250(RCL)
ANDRE CHREKY,              :
ANDRE CHREKY SALON/ANDRE   :
CHREKY INC., SPAC, LLC,    :
                           :
          Defendants.      :
- - - - - - - - - - - - - - x
                           :
JENNIFER THONG,            :
                           :
          Plaintiff,       :
                           :    Civil No.
     vs.                   :    1:06-1807(RCL)
                           :
ANDRE CHREKY SALON, et al.,:
                           :
          Defendants.      :
- - - - - - - - - - - - - - x

                    Washington, D.C.
                    Monday, October 1, 2007


     The deposition of MILA PETROSYAN, called for

examination by counsel for Plaintiffs in the

above-entitled matter, pursuant to Notice, in the

offices of Katz, Marshall & Banks, 1718 Connecticut

JARDIM REPORTING ASSOCIATES
(703) 867-0396

RONNIE BARRETT,
v.
ANDRE CHREKY, et al

C.A. No. 07-CV-0250 (RCL)

Exhibit 5

14

1   to meet with Mr. Sullivan today, correct?

2       A.    What do you mean job?

3       Q.    As an employee of Mr. Chreky, it was your

4   job today, one of your duties as his employee today,

5   to go meet with Mr. Sullivan?

6       A.    Yes.

7       Q.    What did Mr. Sullivan tell you?

8       A.    He told me just tell the truth of what you

9   know and just the truth.  We never discussed about

10  other things.

11      Q.    How long did this meeting go on for?

12      A.    Maybe 10 or 15 minutes.  We came here after.

13      Q.    So, in those 10 to 15 minutes he told you

14  make sure you tell the truth?

15      A.    Yes.

16      Q.    What else did he tell you?

17      A.    Nothing.

18      Q.    Well, you were together for at least ten

19  minutes.

20      A.    He told me to just tell the truth.  If you

21  are asked something, tell the truth to what you know.

22      Q.    For ten minutes he just told you over and

32

1          MR. BREDEHOFT:  We can stipulate it was not

2     a confidential communication if it helps.

3          MR. WILKENFELD:  That is fine.

4          BY MR. WILKENFELD:

5     Q.    And your meeting with Mr. Sullivan was very

6     brief, right?

7     A.    Yes.

8     Q.    It was less than ten minutes?

9     A.    Yes.  10 or 15 minutes.

10    Q.    10 or 15 minutes.

11         And during that time he asked you a number

12    of questions?

13    A.    Yes.

14    Q.    And they were mostly yes or no questions,

15    did this happen, did this happen, did this happen?

16    A.    Yes, no, and I told my opinion too.

17    Q.    Did you clock out to go meet with

18    Mr. Sullivan?

19    A.    No.

20    Q.    Because it was part of your job?

21    A.    Yes.

22    Q.    You met with Mr. Sullivan a few weeks later

39

Q.    And your understanding of what the
allegations were came from Mr. Sullivan?

A.    No.  I understand just something happens and
Jennifer and Ronnie complain about this sexual
harassment.

Q.    Well, let me ask you about that.

As you sit here today what is your
understanding of what sexual harassment is?

A.    I read it in this case.

Q.    Let me ask you this.

If someone, let's say someone like me, asks
you what is sexual harassment, what does it mean,
what do you understand sexual harassment to mean
under the law?

A.    I can't explain exactly, but when men are
not nice with a woman.

Q.    Are we talking about not being nice in a
physical way?

A.    Yes.  Physical way.

Q.    Anything else?

A.    I can't explain.  I'm sorry.  But I
understand what is sexual harassment.


COPY

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x

RONNIE BARRETT,               :

          Plaintiff,          :

     vs.                      :    C.A. No.
                              :    07-CV-0250(RCL)
ANDRE CHREKY,                 :
ANDRE CHREKY SALON/ANDRE      :
CHREKY INC., SPAC, LLC,       :

          Defendants.         :

- - - - - - - - - - - - - - - x
                              :
JENNIFER THONG,               :

          Plaintiff,          :

     vs.                      :    Civil No.
                              :    1:06-1807(RCL)
ANDRE CHREKY SALON, et al.,   :

          Defendants.         :
                              :
- - - - - - - - - - - - - - - x

                         Washington, D.C.
                         Tuesday, October 2, 2007

     The deposition of XIOMARA MARADIAGA, called

for examination by counsel for Plaintiffs in the

above-entitled matter, pursuant to Notice, in the

offices of Katz, Marshall & Banks, 1718 Connecticut

Avenue, N.W., Sixth Floor, Washington, D.C., convened

JARDIM REPORTING ASSOCIATES
(703) 867-0396

RONNIE BARRETT,
v.
ANDRE CHREKY, et al

C.A. No. 07-CV-0250 (RCL)

Exhibit 6

28

1    Q.    Is it like a test to see if you are good?

2    A.    No.  He said this is too short.

3          Well, now, he doesn't have hair, but before

4    he had a lot of hair.

5          MR. ROSE:  Let the record reflect he is here

6    and he is smiling at that.

7          THE WITNESS:  Sorry.

8          BY MR. ROSE:

9    Q.    It happens.  It happens.  It happens.

10         When you met with Mr. Sullivan yesterday,

11   how long did you meet with him?

12   A.    20 minutes.

13   Q.    And as best you can recall, what did he

14   advise you?

15   A.    Faviola.  Because I tell her, I'm sorry, but

16   I don't speak very good English and I don't

17   understand some words and I need help.

18   Q.    You are saying, if I understood you, you

19   just said the name Faviola.  I was asking about

20   Mr. Sullivan.

21         Faviola assisted you in understanding what

22   Mr. Sullivan was saying?

29

1     A.    Translated for me a little bit because she

2  focused and she had the question.  He said you say

3  the truth and take your time.  That is it.  Not too

4  much.

5     Q.    Did he ask you about sexual harassment?

6     A.    Faviola asked about that.  I don't

7  understand the harassment.

8           I say harassment and my brother don't

9  understand me.  I am very confused.  But I look in

10  the dictionary and I say, okay, I understand.  And I

11  asked my fiance what is harassment.

12     Q.    Just so that I understand, after your

13  meeting with Mr. Sullivan you went and looked up the

14  word harassment in the dictionary?

15     A.    No.  I look after.

16     Q.    After your meeting with Mr. Sullivan you

17  went and looked up the definition of harassment?

18     A.    Yes.

19     Q.    Why did you do that?

20     A.    I tell Faviola what is that.  I think she

21  don't understand too because she never tell me.

22           Because I don't pronounce very good.  I said

33

1    you keep papers?

2        A.    In my home.

3        Q.    You did look at home to see if you had

4    anything?

5        A.    Yes.  I looked in my home and my brother

6    read for me.  Yes.

7        Q.    Did you have any documents that are

8    responsive to the subpoena, any notes or anything

9    that refer or relate in any way to Ronnie Barrett or

10    Jennifer Thong's allegation against Mr. Chreky or

11    anything relating to your declaration?

12        A.    I don't understand.

13        Q.    Do you know what a declaration is?

14        A.    No.

15        Q.    Let me refer you to the end of this

16    document.  This is the declaration.

17            Do you recognize this document?

18            Have you ever seen this document before?

19        A.    Yes.  I recognize this.

20        Q.    This is a declaration.

21            Do you see on the second page you signed

22    this document?

37

```
 1      A.    No.
 2      Q.    And the reason you didn't punch out is
 3  because you were told to go and meet with
 4  Mr. Sullivan while you were at work, correct?
 5            You need to actually say.
 6      A.    No.  I don't understand that.
 7      Q.    You keep your time at the salon, right, by
 8  taking a card and punching it in when you come in?
 9      A.    I don't punch.
10      Q.    But when you went to go talk with
11  Mr. Sullivan you didn't clock out?
12      A.    No.
13      Q.    You were still on the clock?
14      A.    Yes.
15      Q.    And the reason you did that was because it
16  was part of your job, you were asked to go and talk
17  with your boss' lawyers, correct?
18      A.    Yes.
19      Q.    So, when you met with Mr. Sullivan that day
20  in the Starbucks how long did you meet with him?
21      A.    Ten minutes.
22      Q.    What did Mr. Sullivan say to you?
```

79

1      A.    No.

2      Q.    In fact you weren't even aware of what the

3   word harassment meant until you looked at it in the

4   dictionary last night, correct?

5      A.    Yes.

6      Q.    And you looked up the word harassment after

7   you had met with Mr. Sullivan, Mr. Chreky's attorney,

8   correct?

9      A.    Yes.

10     Q.    Have you received in your seven years as a

11  full time employee at the Andre Chreky Salon, have

12  you ever received any sexual harassment training?

13     A.    No.

14     Q.    If in fact you felt that you or someone else

15  around you that you saw had been sexually harassed,

16  who would you report that to?

17          (Discussion between the Interpreter and the

18  witness.)

19          THE INTERPRETER:  She said to the owners.

20          Should I say what I am saying in English

21  afterwards?

22          MR. BREDEHOFT:  If I may, you said something

81

1    A.    No.  His wife.

2    Q.    You would go tell his wife?

3    A.    Or the manager.

4    Q.    That would probably be worse.

5          So, you would go to a manager or not

6    Mr. Chreky if you saw him acting in what you believed

7    to be an inappropriate way, a sexually inappropriate

8    way?

9          Do you know what I mean by sexually

10   inappropriate?

11   A.    Inappropriate, no.

12   Q.    Okay.

13         If I understood your testimony before, there

14   were many weeks when you worked your four ten hour

15   days as Mr. Chreky's assistant when you might work

16   another day at the White House; is that correct?

17   A.    Yes.

18   Q.    Is it true that you weren't paid by the

19   salon for that time that you went to the White House?

20         MR. BREDEHOFT:  Asked and answered.

21         BY MR. ROSE:

22   Q.    He is just making an objection for the

100

```
1      A.    Yes.

2      Q.    The first sentence says:  I worked with both

3   Jennifer Thong and Ronnie Barrett at the Andre Chreky

4   Salon.  I never witnessed, heard, or heard of either

5   being sexually harassed by anyone at the Andre Chreky

6   Salon.

7            What did you mean by sexually harassed?

8   What does sexually harassed mean to you when you said

9   these words to Mr. Sullivan in or about early

10  February 2007?

11     A.    Because I never hear or saw it.

12     Q.    What is the it?  What do you understand

13  sexually harassed to mean?

14     A.    I understand like -- okay.  (Speaking

15  Spanish.)

16     Q.    I'm sorry.  I just want to say you need some

17  translation to understand what sexually harassed

18  means?

19     A.    Yes.

20     Q.    Okay.

21           (Discussion between the witness and

22  Interpreter.)
```

 

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x

RONNIE BARRETT,            :

       Plaintiff,      :

   vs.                    :        C.A. No.
                    :        07-CV-0250(RCL)
ANDRE CHREKY,              :
ANDRE CHREKY SALON/ANDRE   :
CHREKY INC., SPAC, LLC,    :

     Defendants.        :

- - - - - - - - - - - - - - - x
                    :

JENNIFER THONG,            :

       Plaintiff,      :

                    :        Civil No.
   vs.                    :        1:06-1807(RCL)

ANDRE CHREKY SALON, et al.,  :

     Defendants.        :

- - - - - - - - - - - - - - - x

           Washington, D.C.
           Tuesday, October 2, 2007

     The deposition of ANISA GHAFOORZAI, called

for examination by counsel for Plaintiffs in the

above-entitled matter, pursuant to Notice, in the

offices of Katz, Marshall & Banks, 1718 Connecticut

Avenue, N.W., Sixth Floor, Washington, D.C., convened

JARDIM REPORTING ASSOCIATES
(703) 867-0396

19

1    A.    Maybe 6:00 o'clock.

2         I was nervous and I wanted to ask David

3    about it because I had never been.  He said just tell

4    the truth and you don't have to be nervous, see you

5    tomorrow there, just tell the truth.  That is it.

6    Q.    Is it going okay so far?

7    A.    Yes.

8    Q.    Good.

9         Who else was at this meeting at the Hilton

10   yesterday?

11   A.    Yesterday it wasn't a meeting.  It was me,

12   Rodney, Faviola and Xiomara.  Just a few minutes I

13   saw David.  And when we were leaving I saw Andre and

14   we just shaked hands and we went home.

15   Q.    During that meeting you were told to think

16   about what sexual harassment means to you, right?

17   A.    Yes.

18   Q.    And Mr. Sullivan said that, right?

19   A.    No.

20        The case I know.  He said you know tomorrow

21   we are going to be there about this situation.

22   Q.    Right.

20

1              And he said this is a case that involves
2    sexual harassment, right?
3         A.    Yes.
4         Q.    Mr. Sullivan said that?
5         A.    Yes.
6         Q.    He said that you should think about what the
7    word sexual harassment means because of the language
8    barrier?
9         A.    Yes.
10         Q.    So, he told you to think about what the word
11    sexual harassment means to you and figure out a way
12    to explain?
13         A.    He said we have to read the documents he
14    gave us.
15         Q.    Just so I am clear, Mr. Sullivan told you
16    that you should think about how you would be able to
17    explain what sexual harassment is because you might
18    have a problem with the language barrier?
19         A.    I don't know.
20         Q.    Do you remember anyone telling you that you
21    should think about how to best explain sexual
22    harassment in English?

44

1    Mr. Sullivan after you?

2        A.    I think so.

3        Q.    How did you know what time you were supposed

4    to go to meet with Mr. Sullivan?

5        A.    I don't know.  Just they told me.

6        Q.    Who are they?  Who told you?

7        A.    I don't remember.  I don't remember.

8        Q.    But it was somebody at the salon?

9        A.    I think so.  I don't remember.

10       Q.    Well, did a customer tell you to go see

11   Mr. Sullivan?

12       A.    No.  Not a customer.

13       Q.    Did a person on the street tell you to see

14   Mr. Sullivan?

15       A.    No.  Somebody from the salon.

16       Q.    So, it was somebody from the salon?

17       A.    Yes.

18       Q.    Did you clock out when you went and saw

19   Mr. Sullivan?

20       A.    No.

21       Q.    And you didn't clock out because when you

22   went to see Mr. Sullivan you were doing your job,

52

```
 1              Do you see that?
 2        A.    Yes.
 3        Q.    So, when you got this packet, Exhibit A, did
 4    you read the Complaints?
 5        A.    Yes.
 6        Q.    Had you seen the Complaints before that?
 7        A.    Complaints?
 8        Q.    The documents contained in Exhibit 1.
 9        A.    Yes.
10        Q.    The lawsuits.
11        A.    Yes.
12        Q.    Had you ever seen the lawsuits before?
13        A.    No.
14        Q.    And you understand that the lawsuits contain
15    the allegations in this case, right?
16        A.    What means allegation?
17        Q.    Why don't you tell me what you think the
18    word allegation means?  It is in your declaration.
19        A.    Those are different words.  You have to
20    explain it to me.
21              I am not American to know 100 percent the
22    words.
```

55

1      Q.    Did Mr. Sullivan say anything like if a

2  person lies under oath, they could be criminally

3  prosecuted?

4          Did he say that to you?

5      A.    I don't know.

6      Q.    Do you think you would remember that if he

7  had said that?

8      A.    I don't know.

9      Q.    In paragraph number seven of your

10  declaration, the second sentence, it says:  I have

11  been promised no benefit, nor threatened with any

12  reprisal in connection with this Declaration.

13          What are you trying to say in that

14  paragraph?

15      A.    You have to explain it to me a different way

16  to understand.

17      Q.    I can't explain it any differently because

18  these are your words.

19          Let's start with just individual words.

20          What does the word reprisal mean?  This word

21  right here.

22          Do you see the word reprisal?

56

```
 1        A.    Yes.

 2              I don't do anything and somebody give me

 3    something to pay for it or something to do this

 4    thing.  That is what I think.

 5        Q.    Do you work hard during the day?

 6        A.    A job is a job.  Sometimes you are busy

 7    back-to-back.  Sometimes you have time.

 8        Q.    Are you usually busy?

 9        A.    It just depends on the day, the week.

10        Q.    How many clients do you usually see a day?

11        A.    Sometimes we do more facial and less wax.

12    Sometimes more wax than facial.  It is hard to say.

13        Q.    But how many people do you see during the

14    day?

15        A.    I don't count.

16        Q.    When was the last day you worked?

17        A.    Saturday.

18        Q.    How many people did you see that day?

19        A.    I don't know.  Ten.

20        Q.    Ten.

21              Is that a regular amount?

22        A.    I told you it depends.  If I do just
```

104

1          THE WITNESS:  Excuse me?

2   BY MR. ROSE:

3      Q.    What does the word reprisal mean?

4      A.    Could you read it?

5      Q.    I am just asking you.

6      A.    What is it?

7      Q.    The word reprisal.  It was a word you used.

8            What does it mean?

9      A.    Like somebody asked me if you do this, I

10  will give you a prize.

11     Q.    I am asking you if you know what the word

12  reprisal means?

13     A.    Maybe I know a different way.

14     Q.    What does the word discrimination mean?

15     A.    Discrimination is like don't treat you

16  right.

17     Q.    Is that it?

18     A.    Yes.

19     Q.    Don't treat you right?

20     A.    Don't treat you right.

21           Like pay for one is good and another one is

22  different.



```
              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - x
                            :
RONNIE BARRETT,             :
                            :
          Plaintiff,        :
                            :
     vs.                    :      C.A. No.
                            :    07-CV-0250(RCL)
ANDRE CHREKY,               :
ANDRE CHREKY SALON/ANDRE    :
CHREKY INC., SPAC, LLC,     :
                            :
          Defendants.       :
                            :
- - - - - - - - - - - - - - x
                            :
JENNIFER THONG,             :
                            :
          Plaintiff,        :
                            :      Civil No.
     vs.                    :    1:06-1807(RCL)
                            :
ANDRE CHREKY SALON, et al., :
                            :
          Defendants.       :
                            :
- - - - - - - - - - - - - - x
```

                    Washington, D.C.
                    Monday, October 1, 2007

     The deposition of AOUATIF MAHBOUB, called

for examination by counsel for Plaintiffs in the

above-entitled matter, pursuant to Notice, in the

offices of Katz, Marshall & Banks, 1718 Connecticut

Avenue, N.W., Sixth Floor, Washington, D.C., convened

9

```
 1        A.    Normally like we can transfer our license to
 2     a USA license.
 3        Q.    Have you done that?
 4        A.    Not yet.
 5        Q.    Has Mr. Chreky ever told you to do that?
 6        A.    Yes.
 7        Q.    Is there a reason you haven't done that?
 8        A.    Just busy with the kids.
 9        Q.    A four-year old and a nine-month old.  That
10     is a reason.
11              I take it that at no time during the course
12     of your employment with the Chreky Salon that you
13     held a license; is that right?
14        A.    No.
15        Q.    You have never?
16        A.    Yes.
17        Q.    From this country?
18        A.    Yes.
19        Q.    Other employees at the salon are also
20     unlicensed; is that correct?
21        A.    I don't know about other employees.
22        Q.    But I take it Mr. Chreky has told you go
```

16

```
 1        Q.    The Hilton on Connecticut Avenue?

 2              THE WITNESS:  Was it the Hilton?

 3              MS. KATZ:  He is not here to answer

 4     questions.

 5              MR. BREDEHOFT:  We are not allowed to help.

 6              BY MS. KATZ:

 7        Q.    Just give us your best recollection.

 8              There has been testimony by a prior witness

 9     that you met at the Hilton.

10        A.    I think so.

11        Q.    Mr. Chreky asked you to come to that

12     meeting; is that right?

13        A.    Yes.

14        Q.    And he told you to come to the meeting

15     because he was concerned that you feel a comfort

16     level about this deposition; is that right?

17        A.    Correct.

18        Q.    And he told you, did he not, that he was

19     afraid that you would get tripped up or tricked by

20     the questions that could be asked of you today; is

21     that right?

22        A.    Correct.
```

17

```
 1        Q.    And he told you that he thought it was very

 2    important that you have the assistance of his lawyers

 3    to make sure that you don't get tripped up; is that

 4    right?

 5        A.    Yes.

 6        Q.    And it is fair to say that you want to do

 7    your best to assist Mr. Chreky; is that right?

 8        A.    Yes.

 9        Q.    And you are very loyal to Mr. Chreky, right?

10        A.    I am very loyal to him.

11        Q.    And you feel very indebted to Mr. Chreky, do

12    you not?

13        A.    I can't understand the word.

14        Q.    You feel that you owe him a debt of

15    gratitude because of his employment of you; is that

16    right?

17        A.    Because he is a nice guy.

18        Q.    And it is fair to say that you also feel

19    very loyal to Serena Chreky?

20        A.    I do.

21        Q.    And it is fair to say that you would like

22    nothing that you say or do to negatively affect
```

23

1   with him in the Starbucks near the salon, correct?

2       A.    Correct.

3       Q.    And you were directed to go to that meeting

4   with Mr. Sullivan by Serena Chreky?

5             Who told you to go meet with Mr. Sullivan?

6       A.    Serena Chreky.

7       Q.    And she told you she wanted you to meet with

8   the lawyer for the salon to give a declaration,

9   correct?

10      A.    Yes.   Correct.

11      Q.    And you knew going into this meeting with

12  Mr. Sullivan that your purpose was to give a

13  declaration that would help the salon defend these

14  lawsuits, correct?

15      A.    Correct.

16      Q.    And when you met with Mr. Sullivan it was a

17  very short meeting, was it not?

18      A.    It was a very short meeting.

19      Q.    Five-minutes?

20      A.    More than that.

21      Q.    How many?

22      A.    Ten minutes.

27

```
 1        Q.    And these are the words that he put to what

 2   you told him; is that right?

 3        A.    Correct.

 4        Q.    These are not your words?

 5        A.    It is my words.

 6        Q.    He drafted this, right?

 7        A.    Yes.

 8        Q.    These are not your words.  Am I right about

 9   that?

10              These are not your words.  These are the

11   words that Mr. Sullivan gave to you, correct?

12        A.    Right.

13        Q.    What is sexual harassment?

14        A.    When someone pushes you to do things that

15   you don't want to do.

16        Q.    Things of a sexual nature?

17        A.    Yes.

18        Q.    Is there anything else that is sexual

19   harassment to your knowledge?

20        A.    No.

21        Q.    So, you understand sexual harassment to be

22   if someone pushes you to have sex with them and you
```

28

```
 1    don't want to?
 2         A.    Correct.
 3         Q.    But that is your total understanding of what
 4    sexual harassment is; is that right?
 5         A.    Yes.
 6         Q.    You have never been provided any kind of
 7    training of sexual harassment?
 8         A.    No.
 9         Q.    And the salon has never given you any
10    instruction on what sexual harassment could be; is
11    that right?
12         A.    No.
13         Q.    So, to your knowledge, making sexual
14    comments about someone would not be sexual harassment
15    because it wouldn't be forcing someone to have sex?
16               Is that your testimony?
17         A.    Yes.
18         Q.    And hugging or kissing someone is not sexual
19    harassment because it is not forcing them to have
20    sex; is that right?
21         A.    Right.
22         Q.    And by sex you mean sexual intercourse?
```

35

```
 1        Q.    And did you take any notes?

 2        A.    No.

 3        Q.    To help you refresh your memory?

 4        A.    No.

 5        Q.    Did you speak to any people to help you

 6   refresh your memory?

 7        A.    To my family.

 8        Q.    To your husband?

 9        A.    Yes.

10        Q.    I take it that you don't want to be here

11   today?

12        A.    No.  I do want to be here.

13        Q.    And I take it that one of the reasons you

14   want to be here is you want to try to do what you can

15   to help Mr. Chreky?

16        A.    Correct.

17        Q.    And I take it that your job is very

18   important to you?

19        A.    Very important to me.

20        Q.    And you would not want to lose that job; is

21   that right?

22        A.    No.
```

36

```
 1        Q.    And I take it that you will do whatever you

 2   think needs to be done to keep that job; is that

 3   right?

 4        A.    Yes.

 5        Q.    Did Mr. Chreky call you over the weekend and

 6   ask you to come in today early to meet with his

 7   lawyers?

 8        A.    Yes.  He called me.

 9        Q.    And is that typical for Mr. Chreky to call

10   you at home?

11        A.    No.

12        Q.    So, it was unusual to receive a call from

13   Mr. Chreky asking for your help in this regard; is

14   that right?

15        A.    He calls me like if he needs me for like

16   clients if there is nobody working.  Yes.

17        Q.    But I take it that his call to you asking

18   for your help to come and speak with the lawyers

19   today was a different kind of request from

20   Mr. Chreky?

21        A.    A different kind of request.  Yes.

22        Q.    And I take it that he was concerned that you
```

39

1        Q.    Did Mr. Sullivan ever come to the salon to

2   interview you at the salon?

3        A.    At the salon?  No.

4        Q.    Just prior to you meeting with Mr. Sullivan

5   at the salon what Chreky employee met with him?

6             Do you know?

7        A.    At the salon?

8        Q.    No.  At Starbucks.

9        A.    At Starbucks most of the employees met with

10  him.

11       Q.    And it is fair to say that Serena said that

12  the employees had to go meet with Mr. Sullivan,

13  right?

14       A.    Right.

15       Q.    And everybody knew that they were required

16  to do that; is that right?

17       A.    Right.

18       Q.    And everyone knew that they were required to

19  give a declaration on behalf of Mr. Chreky, right?

20       A.    Right.

21       Q.    Did anybody tell you that they didn't want

22  to give a declaration?

40

1      A.    No.

2      Q.    Okay.  But it is fair to say that everyone

3   knew that giving a declaration was a job requirement,

4   right?

5      A.    Right.

6            MR. BREDEHOFT:  Foundation.  Form.

7            MS. KATZ:  Paula, did you get her answer?

8   She said right.

9            COURT REPORTER:  Yes.

10           THE WITNESS:  I didn't understand the

11   question.

12           BY MS. KATZ:

13     Q.    Well, just because Mr. Bredehoft says

14   objection as to form he is preserving certain

15   objections for the record.  That doesn't mean you

16   cannot answer the question.  And I asked you a

17   question which was you understood --

18     A.    Like he is pushing people to do that?

19     Q.    No.  Just listen to my question.

20           Serena Chreky said all employees had to go

21   meet with Mr. Sullivan, the salon's lawyer, right?

22           MR. BREDEHOFT:  Foundation.

85

```
 1      A.    Never.
 2      Q.    Is it fair to say that from about April 2001
 3   to about January 2005 you went to the White House
 4   about once a month to do Mrs. Bush's color?
 5      A.    Yes.  Once a month.  Sometimes once every
 6   three weeks.
 7      Q.    The records we have reflect that you were at
 8   the White House a total of 53 times during that
 9   period.
10            Does that sound about right?
11      A.    I don't remember.
12      Q.    But about every three weeks?
13      A.    Yes.
14      Q.    And it is true, is it not, that when you
15   went to the White House you were not licensed?
16      A.    Correct.
17      Q.    And Mr. Chreky knew that?
18      A.    Correct.
19            But it is a private place.  It is not
20   working over at the salon.
21      Q.    I understand that.
22            I am asking you a question about whether
```

JARDIM REPORTING ASSOCIATES
(703) 867-0396

🗍 **COPY**

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
                                :
RONNIE BARRETT,                 :
                                :
           Plaintiff,           :
                                :
      vs.                       :       C.A. No.
                                :    07-CV-0250(RCL)
ANDRE CHREKY,                   :
ANDRE CHREKY SALON/ANDRE        :
CHREKY INC., SPAC, LLC,         :
                                :
           Defendants.          :
                                :
- - - - - - - - - - - - - - - x
                                :
JENNIFER THONG,                 :
                                :
           Plaintiff,           :
                                :       Civil No.
      vs.                       :    1:06-1807(RCL)
                                :
ANDRE CHREKY SALON, et al.,     :
                                :
           Defendants.          :
                                :
- - - - - - - - - - - - - - - x

                    Washington, D.C.
                    Tuesday, October 2, 2007

      The deposition of FAVIOLA VEIZAGA, called

for examination by counsel for Plaintiffs in the

above-entitled matter, pursuant to Notice, in the

offices of Katz, Marshall & Banks, 1718 Connecticut

Avenue, N.W., Sixth Floor, Washington, D.C., convened

**JARDIM REPORTING ASSOCIATES**
(703) 867-0396

RONNIE BARRETT,
v.
ANDRE CHREKY, et al
C.A. No. 07-CV-0250 (RCL)

Exhibit 9

13

Q.    So, you were a shampoo assistant?

A.    Yes.

Q.    So, during this period of time before your license came over and you were working at the salon you would assist other people give shampoos?

A.    Shampoos.  Yes.

Q.    So, there would be two people giving a shampoo at the same time?

A.    What do you mean?

Q.    Let me try and back it up.

You said you were shampoo assistant.  Does that mean that you were assisting someone else to give shampoos?

A.    No.  We just call it a shampoo assistant. We are assisting the colorists or the stylists.

Q.    What kind of assistance were you giving?

A.    For color sometimes mixing color if I could or the stylist shampooing their clients, doing treatments.

Q.    Just so that I am clear, during the period of time before you had your license transferred over you were mixing colors for clients at the salon; is

14

1   that correct?

2      A.   Yes.

3      Q.   And during the period of time before you got

4   your license at the salon you were providing

5   treatments?

6      A.   Yes.

7      Q.   The clients who you mixed colors for, were

8   they told that you didn't have a license in D.C. yet?

9      A.   No.

10     Q.   Were the clients you mixed colors for

11  charged the same price as every other client?

12     A.   I don't remember.  I didn't do the pricing.

13     Q.   Same question for treatments.

14          What does it mean to give a treatment?

15     A.   Just a deep conditioner.

16     Q.   On the hair?

17     A.   On the hair.  Yes.

18     Q.   The clients you did treatments for, were

19  they told that you didn't have a license?

20     A.   No.

21     Q.   I have already introduced everybody on this

22  side of the table.

18

Q.   Who was at that meeting?

A.   Who was at that meeting?

My co-workers.  Rodney, who was here earlier this morning, Xiomara, Anisa and myself.

Q.   And during that meeting you discussed in general terms, not you personally, but the group discussed in general terms, what the deposition might be like, correct?

A.   Yes.

Q.   And you were told that you should tell the truth?

A.   Yes.

Q.   And you were told listen carefully so you are not confused by the questions?

A.   Yes.

Q.   And in addition to that, there was a discussion about what sexual harassment means; is that right?

A.   Yes.

Q.   Who explained what sexual harassment means?

A.   Nobody.

Q.   You said there was a discussion about sexual

19

1    harassment.  What was the discussion?

2        A.    They just said, you know, because a lot of

3    us English is our second language, they said just

4    think about what that means to you.  That is the only

5    thing.

6        Q.    Who said that you should think about what

7    sexual harassment means to you?

8        A.    I said it to my co-worker in Spanish,

9    Xiomara.

10       Q.    Did someone say it to you first?

11       A.    Did someone say it to me first?

12       Q.    Yes.

13       A.    No.

14             Well, she asked me.

15       Q.    Xiomara did?

16       A.    Yes.  And I just explained to her.  I kind

17   of translated.

18       Q.    Were there any other words that you

19   suggested that she should think about what they mean?

20       A.    No.

21             I just told her to take her time answering

22   questions, kind of translating, and just tell the

22

```
 1   Hilton --
 2       A.    Well, just we were going to meet.  We didn't
 3   know where yet.
 4       Q.    So, she said you should go to the Hilton.
 5       A.    That was Monday.  Yes.  Yesterday.
 6       Q.    And you understood though that -- I'm sorry.
 7   I have already forgotten the name.  Who called you?
 8       A.    Elena.
 9       Q.    Elena.
10             You understood Elena didn't set up this
11   meeting?
12       A.    No.
13       Q.    She was simply advising you of when the
14   meeting was, right?
15       A.    Yes.
16       Q.    When she told you that you should go to this
17   meeting, you understood that she was speaking for
18   Mr. Chreky?
19       A.    Yes.
20       Q.    And so it was really Mr. Chreky telling you
21   to go to this meeting?
22       A.    Yes.
```

23

1     Q.    And that is fine because you work for

2    Mr. Chreky?

3     A.    Yes.  That is fine.

4     Q.    And it was part of your job to go to this

5    meeting yesterday?

6     A.    Yes.

7     Q.    And it is part of your job to be here today;

8    is that correct?

9     A.    Yes.

10    Q.    You were served with a subpoena to appear

11   here today, correct?

12    A.    Yes.

13          MR. WILKENFELD:  Could I get this marked as

14   Exhibit 1?

15                    (Veizaga Exhibit No. 1 was marked

16                     for identification.)

17          BY MR. WILKENFELD:

18    Q.    I am showing you now what has been marked as

19   Exhibit 1.  This is a copy.

20          Is this the document that you received?

21    A.    Yes.

22    Q.    If you turn to the third physical page, this

40

1      Q.   And do you remember when that was?

2      A.   I don't remember.  I think it was a cold

3  day.  Early spring maybe.

4      Q.   And you weren't the only one that met with

5  him that day, correct?

6      A.   No.  I don't think so.

7      Q.   There were other employees that met with him

8  before you?

9      A.   Yes.

10      Q.   And there were employees that met with him

11  after you?

12      A.   Yes.

13      Q.   How did you know that you were going to meet

14  with David Sullivan that day?

15      A.   One of the receptionists just came upstairs

16  and let me know that I was going to meet with Andre's

17  lawyer.

18      Q.   Do you remember which one?

19      A.   No.

20      Q.   When the receptionist told you that you were

21  going to go and meet with Mr. Chreky's lawyer, you

22  understood that that instruction was coming from the

41

1    company, not from the receptionist, correct?

2        A.    Yes.

3        Q.    And you understood that it was part of your

4    job to go speak with Mr. Sullivan?

5        A.    Yes.

6        Q.    And that if you didn't go speak with

7    Mr. Sullivan, you wouldn't be doing your job?

8        A.    No.

9              What do you mean I wouldn't be doing my job?

10       Q.    Well, it was as an employee you had to go

11   speak to Mr. Sullivan?

12       A.    Yes.

13       Q.    And when you went to speak with Mr. Sullivan

14   you went so with the intention of being of assistance

15   to Mr. Chreky in defending this lawsuit?

16       A.    I didn't know why I was going.  When I got

17   there, yes.

18       Q.    Did you know that there were lawsuits before

19   you sat down?

20       A.    Yes.

21       Q.    When did you first hear that there were

22   lawsuits?

72

```
1        Q.    How do you know that she met with
2    Mr. Sullivan?
3        A.    We all met.  Everyone in the salon did.
4        Q.    Every single employee in the salon met with
5    Mr. Sullivan?
6        A.    That is what I understood.  Yes.
7        Q.    And that makes sense because it was their
8    job to meet with Mr. Sullivan, correct?
9        A.    I guess.  Yes.
10       Q.    There is nothing wrong with it.  I mean,
11   everybody was doing their job, right?
12       A.    Yes.
13       Q.    And when you signed the declaration you were
14   doing your job?
15            MR. BREDEHOFT:  Asked and answered.
16            MR. WILKENFELD:  I will strike the question.
17            BY MR. WILKENFELD:
18       Q.    When you spoke to Mr. Chreky about the
19   incident with Joshua --
20       A.    I didn't mention names.  I didn't say
21   Joshua.
22       Q.    I'm sorry.
```

 COPY

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - x
                             :
RONNIE BARRETT,              :
                             :
            Plaintiff,       :
                             :
      vs.                    :      C.A. No.
                             :      07-CV-0250(RCL)
ANDRE CHREKY,                :
ANDRE CHREKY SALON/ANDRE     :
CHREKY INC., SPAC, LLC,      :
                             :
            Defendants.      :
                             :
- - - - - - - - - - - - - - x
                             :
JENNIFER THONG,              :
                             :
            Plaintiff,       :
                             :      Civil No.
      vs.                    :      1:06-1807(RCL)
                             :
ANDRE CHREKY SALON, et al.,  :
                             :
            Defendants.      :
                             :
- - - - - - - - - - - - - - x

                    Washington, D.C.
                    Monday, October 1, 2007

        The deposition of KHADIJA DARIF, called for

examination by counsel for Plaintiffs in the

above-entitled matter, pursuant to Notice, in the

offices of Katz, Marshall & Banks, 1718 Connecticut

Avenue, N.W., Sixth Floor, Washington, D.C., convened

JARDIM REPORTING ASSOCIATES
(703) 867-0396

RONNIE BARRETT,
v.
ANDRE CHREKY, et al

C.A. No. 07-CV-0250 (RCL)

Exhibit 10

96

1            (The reporter read the following requested
2    portion of the record.)
3            "QUESTION:  When you were being asked to
4    sign the declaration did you fear in any way that if
5    you didn't sign it that your employment at the salon
6    might be in jeopardy?"
7            THE WITNESS:  What does in jeopardy mean?
8            BY MR. ROSE:
9        Q.    I'm sorry.  That you might be terminated.
10       A.    Yes.
11       Q.    You did understand that?
12       A.    Yes.
13       Q.    If you didn't sign that, you might be
14    terminated?
15       A.    Yes.
16       Q.    Directing your attention back to the
17    declaration.  This is the last two pages of
18    Exhibit 1.  Let's go through some of the text of this
19    declaration.
20            You said I have never heard Andre Chreky
21    make comments of a sexual nature.
22            Did you ever hear Mr. Chreky make statements

 COPY

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - x
                            :
RONNIE BARRETT,             :
                            :
          Plaintiff,        :
                            :
     vs.                    :    C.A. No.
                            :    07-CV-0250(RCL)
ANDRE CHREKY,               :
ANDRE CHREKY SALON/ANDRE    :
CHREKY INC., SPAC, LLC,     :
                            :
          Defendants.       :
                            :
- - - - - - - - - - - - - - x
                            :
JENNIFER THONG,             :
                            :
          Plaintiff,        :
                            :    Civil No.
     vs.                    :    1:06-1807(RCL)
                            :
ANDRE CHREKY SALON, et al., :
                            :
          Defendants.       :
                            :
- - - - - - - - - - - - - - x

                    Washington, D.C.
                    Monday, October 1, 2007

          The deposition of ELENA VANTSOVSKAYA, called

for examination by counsel for Plaintiffs in the

above-entitled matter, pursuant to Notice, in the

offices of Katz, Marshall & Banks, 1718 Connecticut

Avenue, N.W., Sixth Floor, Washington, D.C., convened

JARDIM REPORTING ASSOCIATES
(703) 867-0396

RONNIE BARRETT,
v.
ANDRE CHREKY, et al

C.A. No. 07-CV-0250 (RCL)

Exhibit 11

15

1        Q.    I understand that, but listen to the

2    question that I ask you and this will go much

3    quicker.

4              Did someone request that you meet with the

5    lawyers?  Yes or no?

6        A.    Yes.

7        Q.    Who made that request?

8        A.    Andre.

9        Q.    Did he make that request to you directly?

10       A.    Yes.

11       Q.    In what form did he make that request to

12   you?  Was that in person or in some other way?

13       A.    It was in person.

14       Q.    What did he say to you?

15       A.    He said that tomorrow we will have to meet

16   with the lawyers.  And it was when I already got the

17   subpoena.  So, I realized that I would probably have

18   to do that.

19       Q.    And when he told you that you will have to

20   meet with the lawyers, did he tell you where you

21   would meet with the lawyers?

22       A.    Yes.

18

```
 1        A.    It was just for my confidence in telling the

 2   truth and being able not to be stressed in the

 3   position since it was the first time when I had to do

 4   that.   It was more comforting than anything else.

 5        Q.    Mr. Chreky told you, did he not, that the

 6   lawyers for Ms. Barrett and Ms. Thong would try to

 7   trip you up in their questions, did he not?

 8        A.    No.

 9        Q.    Did he tell you that this could be very

10   confusing?

11        A.    He did mention that.

12        Q.    And he told you that the lawyers would

13   deliberately create some confusion for you, right?

14        A.    Yes.

15        Q.    And he told you that we would be here trying

16   to trick you, so it would be important to talk to his

17   lawyers first to find out how not to be tricked; is

18   that right?

19        A.    No.

20        Q.    Words to that effect?

21        A.    I'm sorry?

22        Q.    He said words to that effect?
```

48

1              When your employer asks you to give a

2    declaration, I take it that you feel that you have an

3    obligation to comply with that employer's request?

4        A.    Yes.

5        Q.    And Mr. Chreky, as we established, is

6    sitting here at this deposition today; is that right?

7        A.    That is correct.

8        Q.    And you earlier mentioned that your

9    conversation with him was to give some degree of

10   comfort for you; is that correct?

11       A.    That is correct.

12       Q.    So, I take it that you look to Mr. Chreky to

13   be a source of comfort for you.

14             Is that a fair statement?

15       A.    Yes.

16       Q.    And I take it that you have a high degree of

17   loyalty to Mr. Chreky?

18       A.    That is correct.

19       Q.    And I take it that you feel that he has been

20   very good to you; is that right?

21       A.    That is correct.

22       Q.    And I take it that your job has been very

📋 **COPY**

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - x
                              :
RONNIE BARRETT,              :
                              :
          Plaintiff,         :
                              :
     vs.                     :      C.A. No.
                              :   07-CV-0250(RCL)
ANDRE CHREKY,                :
ANDRE CHREKY SALON/ANDRE     :
CHREKY INC., SPAC, LLC,      :
                              :
          Defendants.        :
                              :
- - - - - - - - - - - - - - x
                              :
JENNIFER THONG,              :
                              :
          Plaintiff,         :
                              :      Civil No.
     vs.                     :   1:06-1807(RCL)
                              :
ANDRE CHREKY SALON, et al.,  :
                              :
          Defendants.        :
                              :
- - - - - - - - - - - - - - x

                    Washington, D.C.
                    Monday, October 1, 2007

          The deposition of EDIL KARKAS, called for

examination by counsel for Plaintiffs in the

above-entitled matter, pursuant to Notice, in the

offices of Katz, Marshall & Banks, 1718 Connecticut

Avenue, N.W., Sixth Floor, Washington, D.C., convened

JARDIM REPORTING ASSOCIATES
(703) 867-0396

16

1    the District of Columbia?

2        A.    In Washington.   Yes.

3        Q.    When in 2004?

4        A.    The month of I believe April.

5        Q.    So, you worked at the salon for about a year

6    before you were licensed in the District of Columbia?

7              Is that your testimony?

8        A.    Yes.

9        Q.    Did Mr. Chreky at the time you were hired

10   ask you if you were licensed in the District of

11   Columbia?

12       A.    Yes.  He did.

13       Q.    What did you say?

14       A.    I was working on it.

15       Q.    You said you were working on it?

16       A.    Yes.

17       Q.    And what did he say?

18       A.    Just do it as fast as possible, we need the

19   license to be working in the District of Columbia, in

20   D.C. you have to have a license.

21       Q.    But he employed you for a year when you

22   didn't have a license; is that correct?

17

    1       A.    But I was just waiting for the moment, for

    2    the time.

    3       Q.    I'm sorry.  Did you not understand my

    4    question?

    5            MR. ROSE:  Please read back my question.

    6            Listen to it please very carefully.

    7            (The reporter read the requested portion of

    8    the record.)

    9            THE WITNESS:   Yes.

   10            BY MR. ROSE:

   11       Q.    What did you do during that year?  Did you

   12    inform the clients who came in that you didn't have a

   13    license to cut hair?

   14       A.    Like I said, I was working on it.  I was

   15    working on getting the license.

   16       Q.    Again, you need to listen to the question

   17    that has been asked.  It will make things go much

   18    more quickly.

   19            MR. ROSE:  Please re-read it.

   20            (The reporter read the requested portion of

   21    the record.)

   22            MR. BREDEHOFT:  Objection to form.

37

```
 1        Q.    And that has always been the case, he has
 2   never represented you; is that correct?
 3        A.    Yes, sir.
 4        Q.    When I say Mr. Bredehoft, I am also
 5   including his associate Mr. Sullivan.
 6              Do you understand that?
 7        A.    Yes.
 8        Q.    And that is true?
 9              They have never represented you, correct?
10        A.    Correct, sir.
11        Q.    So, when Mr. Chreky asked you to show up at
12   the Capitol Hilton this morning to meet with his
13   attorneys before coming over for this deposition, did
14   you feel you could say no?
15        A.    As far as what no?  Why would I say no?
16              MR. ROSE:   Please re-read my question.
17              BY MR. ROSE:
18        Q.    If there is something about my question that
19   you don't understand, just let me know.  Otherwise
20   please just respond.
21              (The reporter read the requested portion of
22   the record.)
```

38

```
 1              THE WITNESS:  No.
 2              BY MR. ROSE:
 3      Q.   And the reason is because he is your boss,
 4  correct?
 5      A.   My boss.  I am just saying what I have seen.
 6  I mean you can call him my boss.
 7      Q.   Are you being paid to be here today?
 8      A.   No, sir.
 9      Q.   You are here because you are being compelled
10  by a subpoena to appear, correct?
11      A.   I didn't understand the last word.
12      Q.   Have you been subpoenaed?  Did you receive a
13  subpoena?
14      A.   What does a subpoena mean?
15      Q.   Hang on one second.  We will clear it up.
16              MR. ROSE:  Can we mark this one please?
17                    (Karkas Exhibit No. 1 was marked
18                     for identification.)
19              BY MR. ROSE:
20      Q.   I am showing you a document that has been
21  marked Exhibit 1, Mr. Karkas.
22              Did you receive this?
```

1    Q.    Instead of a script.

2        MR. BREDEHOFT:  Argumentative.  The question

3    has been answered.

4        And, counsel, if you are accusing me of

5    scripting the witness, please do it and get your

6    testimony on the record.  Otherwise don't use the

7    word.

8        MR. ROSE:  I wasn't suggesting you.  I was

9    suggesting a script.  I don't think there has been

10   anything elicited that would suggest that you gave

11   him a script.

12       MR. BREDEHOFT:  Or that anyone has given him

13   a script.  So, please don't use the word.

14       MS. ROSE:  It could be self-imposed.

15       (The reporter read the following requested

16   portion of the record.)

17       "QUESTION:  Did Mr. Chreky ever go up to his

18   office with an employee at any point during the

19   workday that you are aware of?"

20       THE WITNESS:  No.

21       BY MR. ROSE:

22   Q.    In your entire four years you have never

71

1    seen Mr. Chreky leave his chair and go to his office

2    with another employee?

3        A.    End of the work.  End of the day.

4        Q.    Who would he go upstairs to his office with?

5        A.    It could be me, Mindy, Josephine, one of the

6    manicurists.

7        Q.    Could be or was?

8        A.    No.  I saw her.  I saw the manicurist and

9    pedicurist.

10       Q.    Anybody else?

11       A.    Mindy.  Me.  Sometimes the shampoo girls.

12       Q.    What does sexual harassment mean to you?

13       A.    Sexual harassment means when you sexually

14   harass a woman, when you beat a woman or when you

15   force the woman to do something she doesn't want to

16   do.

17             That is what sexual harassment means to me.

18       Q.    To beat a woman or force a woman to do

19   something that they don't want to do?

20       A.    Yes.

21       Q.    Like what?  You mean what in particular?

22       A.    Sex.

74

```
 1        Q.    That is a true statement?

 2        A.    Yes.

 3        Q.    So, you have never seen him force himself

 4   sexually on someone to have sexual intercourse.

 5             Is that your understanding?

 6        A.    Yes.

 7        Q.    It says:  I have never heard Andre Chreky

 8   make comments of a sexual nature.

 9             Do you see that?

10        A.    The second page?

11        Q.    I'm sorry.  I am in the second sentence of

12   paragraph two.

13             Do you see that?

14        A.    Yes.

15        Q.    What did you mean by that?

16        A.    I just mean by that I have never seen him

17   doing it, doing that.

18        Q.    When you say doing it, what do you mean?

19        A.    Like what I was reading here, what I was

20   reading.

21        Q.    I am asking you about a sentence of your

22   declaration which you signed under oath.  It says:  I
```

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

------------------------------x

JENNIFER THONG,                    :

              Plaintiff,           :

        v.                         :        Civil No.

ANDRE CHREKY SALON, et al.,        :        1:06-1807

              Defendants.          :

------------------------------x


            Deposition of MARIA C. GUZMAN

                 Washington, D.C.

           Tuesday, December 18, 2007

                   3:06 p.m.


Job No. 1-118838

Pages 1 - 343

Reported by:  Jacquelyn C. Jarboe

RONNIE BARRETT,
v.
ANDRE CHREKY, et al

C.A. No. 07-CV-0250 (RCL)

Exhibit 13

Page 71

1      Q      Why are you no longer employed at the salon?

2      A      Well, honest with you, because Andre, he

3 says he wants to give me lay off because I don't have

4 my -- how do you say --

5             MR. WILKENFELD:  License?

6             THE WITNESS:  Yes.

7 BY MR. ROSE:

8      Q      So Andre said he wanted to lay you off

9 because you didn't have your license?

10     A      Yes, sir, because -- I don't know, I said,

11 "Okay, fine."  And I was crying, I was, like, "Okay,

12 fine."  But I told him, I don't do colors, I'm just

13 like a helper, and I do shampoos most of the time.

14     Q      When you did a color, how much -- what was

15 the price to get your hair colored at the Andre Chreky

16 Salon?

17     A      Well, I not get the -- they know the price,

18 I no make the ticket.  But some clients for color I

19 know it's 80.

20     Q      It's $80?

21     A      Yes.

22     Q      Is that for partial or full?

```
 1     Q     You're looking at me puzzled.

 2     A     Ask me, I cannot -- ask slow.

 3     Q     Do you understand that the salon used to

 4 have a contract with the White House?

 5     A     Yes.

 6     Q     You remember that?

 7     A     Yes.

 8     Q     Did you ever go perform services --

 9     A     Yes.

10     Q     -- for anyone at the White House?

11     A     I went once, two, three times.

12     Q     Two, three times you went to the White

13 House?

14     A     (Nods head.)

15     Q     What did you do at the White House?

16     A     Well, I applied the color for Mrs. Bush.

17     Q     So you did the color for Mrs. Bush?

18     A     I just mixed -- yes, I did, I applied.

19     Q     You just applied it?

20     A     Yes.

21     Q     Who mixed the color?

22     A     Andre.
```

Page 80

1    A    Yes.

2    Q    And what would happen when the licensing

3 board person would come to the salon?

4    A    Well, for me it was normal, because nothing

5 would happen.

6    Q    So you wouldn't be one of the people running

7 out of the back of the salon?

8    A    Thank God, no.

9    Q    But you remember -- we've had a lot of

10 testimony in this case that people would run out the

11 back of the salon.

12         MR. SULLIVAN:  Form.

13    A    Because I never knew that, I never the -- I

14 never knew they went, because they dressed normally,

15 like you or him or me.  So I never knew that they were

16 there.  So I don't know they run or not.  I never seen

17 nobody run.

18 BY MR. ROSE:

19    Q    You never once saw employees leave their

20 station after the licensing board person came?

21    A    No, because most of the time I'm in the

22 shampoo area, so --

1      Q     So you would never leave?

2      A     No.

3      Q     So Mr. Chreky, when he fired you, said it

4 was because the state licensing board people were

5 checking into things?

6      A     Yes.

7      Q     Is that what he said?

8      A     (Nods head.)

9      Q     Do you know of anyone else who was fired as

10 a result of Mr. Chreky's concern for licensing or

11 documentation issues?

12     A     Yes.

13     Q     Who else was fired?

14     A     Well, talking true, Adil.

15     Q     Adil?

16     A     Yes.

17     Q     Was fired?

18     A     Yes, and Linda.

19     Q     And Linda.  They were fired?

20     A     Yes.

21     Q     When was the last time that they worked at

22 the salon?

Page 303

```
 1      Q     Okay, but you will agree with me --

 2      A     You know what I mean?

 3      Q     You will agree with me that these numbers

 4 are off, correct?

 5      A     Yes.

 6      Q     Okay.  And you will agree with me that

 7 submitting numbers that are off on your tip reports is

 8 normal practice in the Andre Chreky Salon?

 9      A     What I mean number?

10            MR. SULLIVAN:  Asked and answered.

11 BY MR. WILKENFELD:

12      Q     You weren't the only one doing that, giving

13 numbers that were off, correct?

14      A     It's not only me?

15      Q     It wasn't only you, right?  Other employees

16 put down information that wasn't fully correct?

17      A     I don't know.  I don't never -- I don't

18 know, I no say nothing.  I don't know.  I can tell

19 about me, but not somebody else.

20      Q     And the reason you put down numbers on these

21 forms that were less than accurate is because Andre

22 Chreky advised you that you should come up with a
```

1 number that made sense, correct?

2    A    No.  Believe me or not -- okay, let me say

3 this.  I don't care, like I say, you know, the thing

4 is when they do -- when they do meetings and

5 everything, they told us you have to report tips,

6 right?  They have to know how much you make a month,

7 and then they say IRS do taxes something, like, after

8 the -- or we have to decide.  I mean, to know how much

9 we have to report a tip.  Do you understand what I'm

10 saying, you get me?

11    Q    Right.  So they told you it was your

12 decision to decide how much to report?

13    A    Honest with me, honest, they no say it's my

14 decision, because they don't count my tip.

15    Q    Right.

16    A    So it was our decision.

17    Q    Right.

18    A    In this case, what they say, whatever we

19 make, we have to -- taxes, do you understand what I'm

20 saying?

21    Q    Yes.

22    A    And then we report whatever we think we do a

Page 305

1 month, like after taxes.

2     Q     Right, so you were supposed to report your

3 best estimate, right?

4     A     What you mean?

5     Q     You were told --

6     A     I told you, I told you, I make 400 a week,

7 right?  I say -- agree with you, I say yes, I no about

8 to say no, no.  I told you, yes.

9     Q     Right.

10     A     You know?  And we do this a month, and then

11 end of the month you make a balance, how much you

12 make, and then you take the taxes away.  Do you

13 understand that, are you with me?

14     Q     So they told you that you should reduce the

15 amount that you put on here --

16     A     Yeah.

17     Q     -- to compensate for taxes?

18     A     Yes, because what I think what they do, this

19 tax, taxes, IRS take from my check --

20     Q     Right.

21     A     -- every month.  But that's what I see my

22 paycheck.

Page 306

1    Q    Right.

2    A    How much you report, and the IRS take from

3 your check.

4    Q    Right.  So what they told you -- and this is

5 making sense now.  What they told you is that put --

6 you know, the amount that you put down, you should

7 figure out how much you made each month in tips --

8    A    Yeah.

9    Q    -- but take into account the fact that taxes

10 are going to be removed from this amount.

11   A    Yeah.

12   Q    And then, once you've calculated the tax

13 hit, you're going to take, then come up with the

14 number?

15   A    Yeah.

16   Q    Okay.

17   A    You understand?

18   Q    So the number you're putting down here in

19 these forms is to try to account for the taxes that

20 are going to have to be withheld.

21   A    Yes.

22   Q    It's not actually the amount of money that

1 you earned --

2      A    Yes.

3      Q    -- it's the amount of money you earned minus

4 the taxes that were going to have to be taken out.

5      A    (Nods head.)

6      Q    And you did that, because that's what

7 management told you to do?

8      A    Yes.

9      Q    Okay.  And management includes Andre and

10 Serena Chreky, correct?

11      A    Yes.

12      Q    All right.

13      A    Yeah, because by example, I'll say I make

14 400 a week, $300 a week.  So under the months, we need

15 to calculate.

16      Q    Calculate.

17      A    And see, and then this money I write in

18 there, 150, IRS take in my check.

19      Q    Right.

20      A    They don't give it to me, this is gone

21 already.

22      Q    Right.

Page 308

1      A      So what they say, they say do the best you

2  can and don't get in trouble, because this is not go

3  with Andre, this is come to me, because I'm the one

4  that declares, it's not Andre, because he never count

5  my tip, he never show -- take my tip.

6      Q      Okay.

7              Now, Mr. Chreky, Mrs. Chreky, and

8  management, they knew that this number, these numbers

9  that you put down for tips, they knew that in making

10  those numbers you were doing this calculation where

11  you took the actual tips and reduced it by the amount

12  of taxes and came up with a new number, they knew that

13  you were doing that, right?

14              MR. SULLIVAN:   Form.

15      A      Yeah.

16  BY MR. WILKENFELD:

17      Q      Okay, so they knew that these numbers on

18  your tip reports weren't the -- didn't match up with

19  the amount that you actually earned in tips.

20      A      That's what I say.

21      Q      Okay.

22      A      I told you already.   I don't know you



1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
RONNIE BARRETT,                   :
        Plaintiff,               :
                                 :
    vs.                          :        C.A. No.
                                 :        07-CV-0250(RCL)
ANDRE CHREKY,                     :
ANDRE CHREKY SALON/ANDRE          :
CHREKY INC., SPAC, LLC,           :
                                 :
        Defendants.              :
                                 :
- - - - - - - - - - - - - - - - x
JENNIFER THONG,                   :
        Plaintiff,               :
                                 :        Civil No.
    vs.                          :        1:06-1807(RCL)
                                 :
ANDRE CHREKY SALON, et al.,       :
                                 :
        Defendants.              :
                                 :
- - - - - - - - - - - - - - - - x

                    Washington, D.C.
                    Tuesday, October 16, 2007

        The deposition of MAURICE CLARKE, called for

examination by counsel for Defendants in the

above-entitled matter, pursuant to Notice, in the

offices of Sheppard, Mullin, Richter & Hampton, LLP,

1300 I Street, N.W., 11th Floor East, Washington,

RONNIE BARRETT,
v.
ANDRE CHREKY, et al
C.A. No. 07-CV-0250 (RCL)

Exhibit 14

138

```
 1      A.   Yes.  I do.

 2      Q.   Do you know whether she had a license?

 3      A.   No.  She didn't.

 4      Q.   And you were aware of that, correct?

 5      A.   Yes.

 6      Q.   And Mr. Chreky was aware of that, correct?

 7      A.   Yes.

 8      Q.   And what about Edil?

 9           Do you know who Edil is?

10      A.   Yes.

11      Q.   And did he have a license?

12      A.   He might have had a Virginia license at one

13 time.

14      Q.   Okay.

15           But he didn't have a D.C. license, correct?

16      A.   No.

17      Q.   And he was working at the salon in D.C.,

18 correct?

19      A.   Yes.

20      Q.   And Mr. Chreky was aware of this, correct?

21      A.   Yes.

22      Q.   Anyone else that you can remember
```

139

1    specifically that provided hair care, was a hair care

2    professional, and was unlicensed?

3        A.    Actually she worked at the White House.

4    Tanya.

5        Q.    Tanya.

6              Linda Habob or Habib, she also worked at the

7    White House, didn't she?

8        A.    Yes.

9        Q.    She was over there pretty frequently, wasn't

10   she?

11       A.    Yes.

12       Q.    She did the coloring for the First Lady,

13   didn't she?

14       A.    Yes.

15       Q.    Almost every 20 days.  Is that about right?

16       A.    In the beginning.

17       Q.    So, Mr. Chreky knowingly sent someone over

18   to do the First Lady's hair coloring when he knew she

19   didn't have a license; is that correct?

20       A.    True.

21       Q.    Anyone else that you knew for a fact did not

22   have a license?

140

```
 1      A.    Xiomara.

 2      Q.    What did Xiomara do?

 3            MR. BREDEHOFT:  I was going to object on

 4  form because we don't know which one.

 5  BY MR. ROSE:

 6      Q.    Which Xiomara?

 7      A.    The assistant.

 8      Q.    Not the receptionist.  The receptionist

 9  Xiomara that you talked to us about earlier, she

10  didn't touch people's hair, correct?

11      A.    No.  Not at all.

12            MR. ROSE:  This is your client.

13            BY MR. ROSE:

14      Q.    So, she didn't have a license?

15      A.    No.

16      Q.    Did she get sent to the White House?

17      A.    Yes.

18      Q.    And Mr. Chreky knew she didn't have a

19  license, correct?

20      A.    Yes.

21      Q.    That was yes?

22      A.    Yes.
```

141

```
 1       Q.    Okay.

 2             Is there anyone else that you knew did not

 3   have a license while you worked at the Andre Chreky

 4   Salon that nevertheless provided hair care for

 5   customers?

 6       A.    At the moment I can't think of anyone else,

 7   but I do know we had several employees and a scenario

 8   arise to where the State Board came in and actually

 9   we had the employees to go outside, out the back

10   door.

11       Q.    I see.

12             So, you had the unlicensed employees scurry

13   out of the back door?

14       A.    Yes.

15       Q.    Is that the one through the lunchroom?

16       A.    Yes.

17       Q.    Out to the alley?

18       A.    Yes.

19       Q.    Was there only one occasion that you can

20   recall where that occurred or was there more than one

21   occasion?

22       A.    That occasion only occurred once while I was
```

142

1    there.  But subsequently I have heard that it

2    happened a couple of more times.

3         Q.    You heard that in those instances after you

4    were no longer working there that similarly the

5    unlicensed employees scurried out of the back?

6         A.    Yes.

7         Q.    Which agency of the District Government was

8    in charge of licensing?

9         A.    Professional License.

10        Q.    Did you ever discuss with Mr. Chreky any

11   concerns that you had that he had on his staff

12   unlicensed professionals that were providing hair

13   care to Andre Chreky Salon clients?

14        A.    Yes.

15        Q.    And what did Mr. Chreky say?

16        A.    He didn't say anything.

17        Q.    Did the salon disclose to customers that

18   they were having services provided by unlicensed

19   professionals?

20        A.    Absolutely not.

21        Q.    Did the salon discount the fees paid by

22   clients who were --

186

1    unlicensed workers were scurried out the back door.

2        A.    Yes.

3        Q.    And I think you already answered this

4    question, but I will ask you to try again.

5            Do you remember what year that was?

6        A.    No.  I don't.

7        Q.    And again, to the best of your knowledge,

8    what was the purpose of this visit from these D.C.

9    Government workers?

10           MR. BREDEHOFT:   Foundation.

11           I'm sorry, sir.  Please don't pay any

12    attention to me.

13           THE WITNESS:  It should have been a regular

14    situation to where it is the Licensing Board

15    responsibility to go around and check all salons on

16    whether or not they had professional people working

17    there, whether or not it was sanitary, whether or not

18    the environment was then operating in a way that it

19    is supposed to perform.

20    BY MR. WILKENFELD:

21        Q.    And is this what they would call a spot

22    inspection, an unannounced inspection?

187

```
 1      A.    Yes.

 2      Q.    And how did you become aware that the

 3 government was in the building?

 4      A.    Well, usually they had a clipboard and they

 5 would announce themselves at the front door.

 6      Q.    So, just directing your attention to this

 7 one particular occasion where all the unlicensed

 8 workers had to be rushed out the back door.

 9      A.    Sure.

10      Q.    Do you recall how you learned on that day

11 that the employees from the District of Columbia were

12 in the building?

13      A.    This particular time it was actually a male.

14 And because of the way the structure of the salon is

15 set up he announced who he was.  And then he was

16 asked to step over to the side of the salon while the

17 appropriate person was found for him to be able to

18 communicate with.

19      Q.    And who was the appropriate person for him

20 to communicate with?

21      A.    Well, it could have been any one of the

22 management.  It could have been Serena.  It could
```

188

1    have been Andre.

2         Q.    And as soon as he was moved over to the side

3    how was the flight of the unlicensed workers

4    orchestrated?

5         A.    Because it was visually -- the way that the

6    salon is set up it is clear to be able to see because

7    it is an open area.  The front is open to both the

8    second and first floor.  So, it is open that you can

9    actually see.  And, of course, by nature of how the

10   mirrors and everything is set up in the salon you can

11   truly see throughout the salon.

12          So, again, it wasn't like a far stretch to

13   be able to understand that this is the possibility of

14   somebody coming in here to inspect the salon.

15        Q.    And how did the unlicensed workers know that

16   what they should do in that situation was get out of

17   the salon?

18        A.    I would deem it almost the same way as

19   somebody crossing the border.  They know.

20        Q.    And did you and Mr. Chreky assist these

21   people in getting out of the building unseen?

22        A.    I didn't assist.

189

```
 1      Q.    Who did assist them, if anybody?

 2      A.    Like I said, pretty much they knew exactly

 3   what they needed to do and they moved out of the

 4   salon.

 5      Q.    And for those of you who were licensed and

 6   remained working after the unlicensed workers were

 7   out of the salon, is it fair to say that it was

 8   obvious to all of you that there were some people

 9   missing?

10      A.    Absolutely.

11      Q.    Because there was a full house of clients

12   and all of a sudden there were fewer people to work

13   on them, correct?

14      A.    Yes.

15      Q.    And Mr. Chreky was aware that when the

16   Licensing Board showed up a sizeable portion of his

17   staff went out the back door?

18      A.    Yes.

19      Q.    Was this like a routine fire drill when the

20   Licensing Board would show up?

21      A.    It wasn't routine because they didn't come

22   around often enough.
```

190

```
1        Q.    When they did come around the unlicensed

2   people knew and the drill is get downstairs, get to

3   the lunchroom, get out the door and wait in the

4   alley?

5            MR. BREDEHOFT:  Foundation.  Asked and

6   answered.

7            THE WITNESS:  Yes.

8   BY MR. WILKENFELD:

9        Q.    Okay.

10           Now, when you were describing in your

11  declaration, and during your testimony when Mr. Rose

12  was questioning you, that you heard Andre say on a

13  number of occasions to employees he was yelling at

14  you're never going to work in this town again, did

15  you feel that Mr. Chreky had the ability to affect

16  your ability to be employed outside of the salon?

17       A.    No.

18       Q.    Did other employees, to your knowledge, have

19  a concern that Mr. Chreky could affect their

20  employment opportunities outside of the salon?

21       A.    Yes.

22       Q.    And so when Mr. Chreky said you're never
```

 COPY

1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x

RONNIE BARRETT,                   :

       Plaintiff,         :

     vs.                        :     C.A. No.

                            :    07-CV-0250(RCL)

ANDRE CHREKY,                     :
ANDRE CHREKY SALON/ANDRE
CHREKY INC., SPAC, LLC,           :

      Defendants.           :

- - - - - - - - - - - - - - - x
                            :

JENNIFER THONG,                   :

       Plaintiff,         :

     vs.                        :     Civil No.

                            :    1:06-1807(RCL)

ANDRE CHREKY SALON, et al.,       :

      Defendants.           :

- - - - - - - - - - - - - - - x

               Washington, D.C.
               Tuesday, October 2, 2007

    The deposition of RODNEY PINION, called for

examination by counsel for Plaintiffs in the

above-entitled matter, pursuant to Notice, in the

offices of Katz, Marshall & Banks, 1718 Connecticut

Avenue, N.W., Sixth Floor, Washington, D.C., convened

## JARDIM REPORTING ASSOCIATES
## (703) 867-0396

99

1   you reviewed it?

2       A.    No.

3       Q.    You didn't raise any questions with

4   Mr. Chreky or any other manager or any other employee

5   of the salon with respect to the contents of the

6   manual?

7       A.    No.

8       Q.    Are you an American citizen?

9       A.    Yes.

10      Q.    Have you always been an American citizen?

11      A.    Yes.

12      Q.    Where were you born?

13      A.    Mississippi.

14      Q.    Were you ever given written performance

15  appraisals?

16            Do you understand what I mean by a written

17  performance appraisal?

18      A.    No.

19      Q.    I think a lot of people would agree a good

20  practice would be for companies to evaluate their

21  employees on a regular basis, at least annual basis,

22  in writing, based on some sort of objective standards

100

1   to be able to evaluate their performance as being

2   good or not so good and areas where they might be

3   able to improve.

4        My question is is there such a procedure at

5   the Andre Chreky Salon?

6   A.   There has been.

7   Q.   There has been?

8   A.   Yes.

9   Q.   And how many times have you been evaluated

10  in your ten years?

11  A.   I don't know.

12  Q.   Once?

13  A.   More than once.

14  Q.   Twice?

15  A.   More than twice.  After that I don't know.

16  Q.   When was the last time that you received a

17  written performance evaluation?

18  A.   I don't know.

19  Q.   Were you given a copy of your evaluation?

20  A.   I believe so.

21  Q.   How much do you make a year?

22       What did you make in 2006?

1              I understand it is possible your taxes might

2    not yet be due if you filed an extension.

3          A.    $84,000.

4          Q.    $84,000.    That was including the tips?

5          A.    No.

6          Q.    That was not including the tips?

7          A.    No.

8          Q.    So, how much do you think you made in excess

9    of $84,000 based on your tips?

10          A.    I would say $2,000 or $3,000 maybe.

11          Q.    Only $2,000 or $3,000?

12          A.    Yes.

13          Q.    Your estimate is that you made $300 to $800

14    per month and even at the low end of that scale, if

15    it were every month, which wouldn't be consistent

16    with your testimony, that would come out to -- my

17    math is bad, but roughly $3,600.

18          A.    Okay.

19          Q.    Does that sound about what you made or was

20    it more?

21          A.    Maybe $3,000 or $4,000.

22          Q.    So, you didn't make $300 to $800 per month,

102

```
 1   you made $300 per month?

 2        A.    I don't know.  I don't keep a log.

 3        Q.    But that is something that is a fairly

 4   important component of your compensation is your

 5   tips, correct?

 6              Your tips are not an important part of your

 7   compensation?

 8        A.    Not that important.

 9        Q.    Really?

10        A.    No.

11        Q.    It just doesn't matter?

12        A.    It matters, but it is not that big a

13   concern.

14        Q.    Just so that I am clear, as we sit here

15   today, in 2006 you made roughly between $3,000 and

16   $4,000 in tips?

17              Is that your testimony?

18        A.    No.  I don't know.

19        Q.    You have no idea?

20        A.    No.

21        Q.    When did you file your taxes?

22        A.    They were filed for me in January.
```

# DECLARATION OF LINDA MAHBOUB

My name is Linda Mahboub. I hereby declare as follows:

1.    I am employed by the Andre Chreky Salon as a colorist, and have held this position for approximately eight (8) years.

2.    In my eight (8) years of employment at the Andre Chreky Salon, I have never seen Andre Chreky act in a sexually inappropriate manner toward anyone. I have never heard Andre Chreky make comments of a sexual nature. Andre Chreky maintains a professional atmosphere appropriate for an upscale salon at all times at the Andre Chreky Salon.

3.    I worked with both Jennifer Thong and Ronnie Barrett at the Andre Chreky Salon. I never witnessed, heard, or heard of either being sexually harassed by anyone at the Andre Chreky Salon. Similarly, I never heard Jennifer Thong or Ronnie Barrett complain of sexual harassment during their employment with the Andre Chreky Salon.

4.    The Andre Chreky Salon would not have such a large base of loyal clients if the clients witnessed sexual harassment. Clients paying the fees charged at the Andre Chreky Salon demand a high quality, professional atmosphere. The salon market in the Washington, DC metropolitan area is too competitive for a salon to survive if the atmosphere were anything but the highest quality and completely professional. Clients of the salon can see almost everything that takes place inside the salon.

5.    If I witnessed sexual harassment in the workplace, I would not stand for it. If I witnessed sexual harassment at the Andre Chreky Salon, I would work elsewhere. I have not witnessed any such harassment and I have not heard any other employees complain of any such harassment.

RONNIE BARRETT,
v.
ANDRE CHREKY, et al

C.A. No. 07-CV-0250 (RCL)

Exhibit 16

6.    I have made this Declaration voluntarily.  I have been promised no benefit, nor threatened with any reprisal in connection with this Declaration.

7.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


EXECUTED

02/16/07
Date

_____
LINDA MAHBOUB


::ODMA\PCDOCS\DOCSNFK\1186841\1

2

# DECLARATION OF EDIL KARKAS

My name is Edil Karkas.  I hereby declare as follows:

1.    I am employed by the Andre Chreky Salon as a stylist, and have held this position for four years.

2.    In my years of employment at the Andre Chreky Salon, I have never seen Andre Chreky act in a sexually inappropriate manner toward anyone.  I have never heard Andre Chreky make comments of a sexual nature.  Andre Chreky maintains a professional atmosphere appropriate for an upscale salon at all times at the Andre Chreky Salon.

3.    I worked with both Jennifer Thong and Ronnie Barrett at the Andre Chreky Salon. In fact, my work station was right next to Jennifer Thong's.  I never witnessed, heard, or heard of either being sexually harassed by anyone at the Andre Chreky Salon.  Similarly, I never heard Jennifer Thong or Ronnie Barrett complain of sexual harassment during their employment with the Andre Chreky Salon.

4.    I often gave Jennifer Thong rides home from work.  During these rides, she would talk almost exclusively about things at work and Andre Chreky, but she never once mentioned any sexual harassment or anything even close to sexual harassment.  The only complaints she ever mentioned about Andre Chreky were related to her concern that he didn't pay enough attention to her.

5.    Based on what I saw at work and heard from Jennifer Thong directly, I think Jennifer was pursuing Andre Chreky and became disappointed when her pursuit was unsuccessful. Jennifer followed Andre Chreky around the Salon quite a bit, often following him when he tried to take short breaks, and Andre Chreky would frequently ignore Jennifer and focus

on his work or focus on assisting others. This would frustrate Jennifer, and I think she was upset over it.

6.    When Jennifer Thong told me she was quitting the Andre Chreky Salon, she told me her reason for doing so was so that she could open up her own salon; she never mentioned any harassment from Andre Chreky. She even asked me if she could give me her new business cards so that I could hand them out to her clients when they came to the Andre Chreky Salon.

7.    Ronnie Barrett complained frequently about her personal and professional life, almost constantly, and never once mentioned sexual harassment.

8.    The Andre Chreky Salon would not have such a large base of loyal clients if the clients witnessed sexual harassment. Clients paying the fees charged at the Andre Chreky Salon demand a high quality, professional atmosphere. Clients of the salon can see almost everything that takes place inside the salon.

9.    The employees of the Chreky Salon have access to all areas of the salon. It is almost impossible to be alone anywhere in the salon for any period of time.

10.    I have never noticed any problem with my tips. I am confident the Andre Chreky Salon does not take any tips left for stylists, as the tip counting is done by the stylists.

11.    I have never seen Andre Chreky move a request client off a stylist's schedule. Similarly, I have never seen Andre Chreky direct the assignment of non-request clients other than for the purpose of generating business for a new stylist, keeping the best performing stylists busy, or balancing the schedules of the available stylists. These policies are reasonable and legitimate, and I have never had reason to question them or suspect that the assignment of clients was based on any improper factors.

2

12.    I have made this Declaration voluntarily.  I have been promised no benefit, nor threatened with any reprisal in connection with this Declaration.

13.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


EXECUTED


3 | 9 | 07
Date

EDIL KARKAS


.::ODMA\PCDOCS\DOCSNFK\1193552\1


3

Chreky 000005

## DECLARATION OF KHADIJA DARIF

My name is Khadija Darif. I hereby declare as follows:

1.     I am employed by the Andre Chreky Salon as a colorist, and have held this position for approximately seven (7) years.

2.     In my seven (7) years of employment at the Andre Chreky Salon, I have never seen Andre Chreky act in a sexually inappropriate manner toward anyone. I have never heard Andre Chreky make comments of a sexual nature. Andre Chreky maintains a professional atmosphere appropriate for an upscale salon at all times at the Andre Chreky Salon.

3.     I worked with both Jennifer Thong and Ronnie Barrett at the Andre Chreky Salon. I never witnessed, heard, or heard of either being sexually harassed by anyone at the Andre Chreky Salon. Similarly, I never heard Jennifer Thong or Ronnie Barrett complain of sexual harassment during their employment with the Andre Chreky Salon.

4.     The Andre Chreky Salon would not have such a large base of loyal clients if the clients witnessed sexual harassment. Clients who pay relatively high fees at the Andre Chreky Salon demand a high quality, professional atmosphere. The salon market in the Washington, DC metropolitan area is too competitive for a salon to survive if the atmosphere were anything but the highest quality and completely professional.

5.     If I witnessed sexual harassment, I would leave and find work elsewhere. I have not witnessed any such harassment and I have not heard any other employees complain of any such harassment.

6.    I have worked at other salons, and I have chosen to stay with the Andre Chreky Salon for over seven years.  I am happy and satisfied working at the Chreky Salon enough to commute 1.5 hours each way to work every day.

7.    I have heard about the allegations made by Jennifer Thong and Ronnie Barrett against Andre Chreky.  Not only are these allegations false, but if anything, Jennifer Thong was guilty of following Andre Chreky around.  She was always following him around the salon and was eager to be around him.  She certainly didn't appear to be suffering from any type of harassment or discrimination.

8.    I have made this Declaration voluntarily.  I have been promised no benefit, nor threatened with any reprisal in connection with this Declaration.

9.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


EXECUTED

02 / 16 / 07
Date

KHADIJA DARIF

::ODMA\PCDOCS\DOCSNFK\1186791\1

2

Chreky 000014

## DECLARATION OF MILA PETRSOSYAN

My name is Mila Petrsosyan. I hereby declare as follows:

1.      I am employed by the Andre Chreky Salon as an esthetician, and have held this position for five years.

2.      In my years of employment at the Andre Chreky Salon, I have never seen Andre Chreky act in a sexually inappropriate manner toward anyone. I have never heard Andre Chreky make comments of a sexual nature. Andre Chreky maintains a professional atmosphere appropriate for an upscale salon at all times at the Andre Chreky Salon.

3.      I worked with both Jennifer Thong and Ronnie Barrett at the Andre Chreky Salon. I never witnessed, heard, or heard of either being sexually harassed by anyone at the Andre Chreky Salon. Similarly, I never heard Jennifer Thong or Ronnie Barrett complain of sexual harassment during their employment with the Andre Chreky Salon.

4.      Andre Chreky is extremely busy with clients all day long at the salon. From the time he starts his day until the salon closes, Andre Chreky is working with clients. Andre Chreky takes very few breaks at all, and any breaks he takes are very short. Not only do I not believe the allegations that have been made against Andre Chreky by Jennifer Thong and Ronnie Barrett, I don't think Andre Chreky has any time in his day for such actions.

5.      I have made this Declaration voluntarily. I have been promised no benefit, nor threatened with any reprisal in connection with this Declaration.

6.      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED

2-16-07

_____

Date

*Mila Petrosyan*

MILA PETRSOSYAN

::ODMA\PCDOCS\DOCSNFK\1187110\1

2

Chreky 000016

## DECLARATION OF ANISA GHAFOORZAI

My name is Anisa Ghafoorzai. I hereby declare as follows:

1.      I am employed by the Andre Chreky Salon as an esthetician, and have held this position for approximately seven (7) years.

2.      In my seven (7) years of employment at the Andre Chreky Salon, I have never seen Andre Chreky act in a sexually inappropriate manner toward anyone. I have never heard Andre Chreky make comments of a sexual nature. Andre Chreky maintains a professional atmosphere appropriate for an upscale salon at all times at the Andre Chreky Salon.

3.      I worked with both Jennifer Thong and Ronnie Barrett at the Andre Chreky Salon. I never witnessed, heard, or heard of either being sexually harassed by anyone at the Andre Chreky Salon. Similarly, I never heard Jennifer Thong or Ronnie Barrett complain of sexual harassment during their employment with the Andre Chreky Salon.

4.      The Andre Chreky Salon would not have such a large base of loyal clients if the clients witnessed sexual harassment. Clients paying the fees charged at the Andre Chreky Salon demand a high quality, professional atmosphere. The salon market in the Washington, DC metropolitan area is too competitive for a salon to survive if the atmosphere were anything but the highest quality and completely professional. Clients of the salon can see almost everything that takes place inside the salon.

5.      If I witnessed sexual harassment in the workplace, I would look for work somewhere else. I have not witnessed any such harassment and I have not heard any other employees complain of any such harassment.

6.    I have heard about the allegations made by Jennifer Thong and Ronnie Barrett against Andre Chreky.  Not only are these allegations false, but if anything, Jennifer Thong was guilty of following Andre Chreky around.  She was always following him around the salon and was eager to be around him.  She certainly didn't appear to be suffering from any type of harassment or discrimination.

7.    I have made this Declaration voluntarily.  I have been promised no benefit, nor threatened with any reprisal in connection with this Declaration.

8.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


EXECUTED


_2 . 16 . 07_
Date

_Anisa Ghafoorza_
ANISA GHAFOORZAI


::ODMA\PCDOCS\DOCSNFK\1186807\1

Chreky 000018

## DECLARATION OF RODNEY PINION

My name is Rodney Pinion. I hereby declare as follows:

1.     I am employed by the Andre Chreky Salon as a stylist, and have held this position since the Chreky Salon opened.

2.     In my years of employment at the Andre Chreky Salon, I have never seen Andre Chreky act in a sexually inappropriate manner toward anyone. I have never heard Andre Chreky make comments of a sexual nature. Andre Chreky maintains a professional atmosphere appropriate for an upscale salon at all times at the Andre Chreky Salon.

3.     I worked with both Jennifer Thong and Ronnie Barrett at the Andre Chreky Salon. I never witnessed, heard, or heard of either being sexually harassed by anyone at the Andre Chreky Salon. Similarly, I never heard Jennifer Thong or Ronnie Barrett complain of sexual harassment during their employment with the Andre Chreky Salon.

4.     The Andre Chreky Salon would not have such a large base of loyal clients if the clients witnessed sexual harassment. Clients paying the fees charged at the Andre Chreky Salon demand a high quality, professional atmosphere. The salon market in the Washington, DC metropolitan area is too competitive for a salon to survive if the atmosphere were anything but the highest quality and completely professional. Clients of the salon can see almost everything that takes place inside the salon.

5.     The employees of the Chreky Salon have access to all areas of the salon. It is almost impossible to be alone anywhere in the salon for any period of time.

6.     I have never noticed any problem with my tips. I am confident the Andre Chreky Salon does not take any tips left for stylists, as the tip counting is done by the stylists.

7.     I have never seen Andre Chreky move a request client off a stylist's schedule. Similarly, I have never seen Andre Chreky direct the assignment of non-request clients other than for the purpose of generating business for a new stylist, keeping the best performing stylists busy, or balancing the schedules of the available stylists.   These policies are reasonable and legitimate, and I have never had reason to question them or suspect that the assignment of clients was based on any improper factors.

8.     I have made this Declaration voluntarily.  I have been promised no benefit, nor threatened with any reprisal in connection with this Declaration.

9.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


EXECUTED

2/16/07
Date

_Rodney S. Pinion_
RODNEY PINION


::ODMA\PCDOCS\DOCSNFK\1186897\1

2

## DECLARATION OF XIOMARA MARADIAGA

My name is Xiomara Maradiaga.  I hereby declare as follows:

1.     I am employed by the Andre Chreky Salon as an assistant to Andre Chreky, and have held this position for approximately seven (7) years.   As an assistant to Andre Chreky, I work side by side with Andre Chreky all day long.

2.     In my seven (7) years of employment at the Andre Chreky Salon, I have never seen Andre Chreky act in a sexually inappropriate manner toward anyone.  I have never heard Andre Chreky make comments of a sexual nature.   Andre Chreky maintains a professional atmosphere appropriate for an upscale salon at all times at the Andre Chreky Salon.

3.     I worked with both Jennifer Thong and Ronnie Barrett at the Andre Chreky Salon. I never witnessed, heard, or heard of either being sexually harassed by anyone at the Andre Chreky Salon.  Similarly, I never heard Jennifer Thong or Ronnie Barrett complain of sexual harassment during their employment with the Andre Chreky Salon.

4.     The Andre Chreky Salon would not have such a large base of loyal clients if the clients witnessed sexual harassment.  Clients paying the fees charged at the Andre Chreky Salon demand a high quality, professional atmosphere.  The salon market in the Washington, DC metropolitan area is too competitive for a salon to survive if the atmosphere were anything but the highest quality and completely professional.

5.     I have heard about the allegations made by Jennifer Thong and Ronnie Barrett against Andre Chreky.  Not only are these allegations false, but if anything, Jennifer Thong was guilty of following Andre Chreky around.  She was always following him around the salon and was eager to be around him.  She certainly didn't appear to be suffering from any type of

harassment or discrimination.   Ronnie Barrett acted similarly, and often followed Andre Chreky around the salon.

6.    I understand that the allegations of Jennifer Thong and Ronnie Barrett include allegations that Andre Chreky conditioned being assigned to White House duties on submitting to sexual advances.  This is absolutely false.  I often worked at the White House and with the President's family on behalf of the Andre Chreky Salon, and I have never been the victim of sexual harassment, sexual advances, or sexual requests of any kind in connection with such work.  I was offered such work – like everyone else – strictly based on merit.

7.    I have made this Declaration voluntarily.  I have been promised no benefit, nor threatened with any reprisal in connection with this Declaration.

8.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


EXECUTED

02/16/07
_____
Date

_____
XIOMARA MARADIAGA


::ODMA\PCDOCS\DOCSNFK\1186819\1

2

Chreky 000022

## DECLARATION OF ELENA VANTSOVSKAYA

My name is Elena Vantsovskaya. I hereby declare as follows:

1.      I have worked at the Andre Chreky Salon for three years. My current position is receptionist manager. As the receptionist manager, I am responsible for managing the client scheduling function and closing the salon in the evening.

2.      In my years of employment at the Andre Chreky Salon, I have never seen Andre Chreky act in a sexually inappropriate manner toward anyone. I have never heard Andre Chreky make comments of a sexual nature. Andre Chreky maintains a professional atmosphere appropriate for an upscale salon at all times at the Andre Chreky Salon.

3.      I worked with both Jennifer Thong and Ronnie Barrett at the Andre Chreky Salon. I never witnessed, heard, or heard of either being sexually harassed by anyone at the Andre Chreky Salon. Similarly, I never heard Jennifer Thong or Ronnie Barrett complain of sexual harassment during their employment with the Chreky Salon.

4.      I do not believe that the Andre Chreky Salon would have such a large base of loyal clients if the clients witnessed sexual harassment, because clients expect a high quality, professional atmosphere. The clients of the salon can see almost everything that occurs inside the salon. Furthermore, the vast majority of the clients of the Andre Chreky Salon are women.

5.      Not only do I not believe the allegations made by Jennifer Thong and Ronnie Barrett, I know that Andre Chreky does not have time during his busy schedule to commit the acts alleged. The only time Andre Chreky leaves the main floors of the salon, other than for very short breaks, is after the salon closes for business. As the last employee in the salon when I

Chreky 000025

close, I see what takes place after the salon closes for business, and I have never seen anything inappropriate or sexual in nature.

6.    Andre Chreky does not move request clients from the requested stylist.  As for non-request clients, the salon has a booking policy that I maintain.  The booking policy is a guide for assigning non-request clients.  While the specifics of the policy must change periodically, the policy is generally designed to assign non-request clients to newer stylists with less busy schedules or the best performing stylists with availability.

7.    I have made this Declaration voluntarily.  I have been promised no benefit, nor threatened with any reprisal in connection with this Declaration.

8.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


EXECUTED


_3/08/07_
Date

_____
ELENA VANTSOVSKAYA


::ODMA\PCDOCS\DOCSNFK\1187113\1

2

## DECLARATION OF FAVIOLA VEIZAGA

My name is Faviola Veizaga. I hereby declare as follows:

1.      I am employed by the Andre Chreky Salon as a colorist and colorist manager, and have held these positions for a total of three (3) years.

2.      In my three (3) years of employment at the Andre Chreky Salon, I have never seen Andre Chreky act in a sexually inappropriate manner toward anyone. I have never heard Andre Chreky make comments of a sexual nature. Andre Chreky maintains a professional atmosphere appropriate for an upscale salon at all times at the Andre Chreky Salon.

3.      I worked with both Jennifer Thong and Ronnie Barrett at the Andre Chreky Salon. I never witnessed, heard, or heard of either being sexually harassed by anyone at the Andre Chreky Salon. Similarly, I never heard Jennifer Thong or Ronnie Barrett complain of sexual harassment during their employment with the Andre Chreky Salon.

4.      The Andre Chreky Salon would not have such a large base of loyal clients if the clients witnessed sexual harassment. Clients paying the fees charged at the Andre Chreky Salon demand a high quality, professional atmosphere. The salon market in the Washington, DC metropolitan area is too competitive for a salon to survive if the atmosphere were anything but the highest quality and completely professional. Clients of the salon can see almost everything that takes place inside the salon.

5.      I have heard about the allegations made by Jennifer Thong and Ronnie Barrett against Andre Chreky. Not only are these allegations false, but if anything, Jennifer Thong was guilty of following Andre Chreky around. She was always following him around the salon and

was eager to be around him. She certainly didn't appear to be suffering from any type of harassment or discrimination.

6.    I have made this Declaration voluntarily. I have been promised no benefit, nor threatened with any reprisal in connection with this Declaration.

7.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


EXECUTED


_____2/16/07_____
Date

FAVIOLA VEIZAGA


::ODMA\PCDOCS\DOCSNFK\1186892\1

2

Chreky 000028

# ◢◣Katz, Marshall & Banks, LLP

**Debra S. Katz, Partner**
**Direct Dial: 202-299-1143**
katz@kmblegal.com

**By Electronic and First Class Mail**
December 12, 2006

John M. Bredehoft, Esquire
Kaufman & Canoles, P.C.
150 West Main Street
Suite 2100
Norfolk, VA 23510

RE: <u>Ronnie Barrett v. Andre Chreky & Andre Chreky Hair Salon and Spa</u>

Dear John:

I am writing to follow up on our meeting of December 7, 2006, and to call your attention to what appears to be an attempt by an agent of the Andre Chreky Salon to intimidate a material witness in the above-captioned matter following our meeting.

In the interest of promoting a settlement dialogue, we agreed to allow you to review signed statements we had obtained from witnesses with the understanding that no effort would be made to contact the witnesses unless we were notified first. Obviously we were under no obligation to share these statements with you, but did so assuming that you and your client were acting in good faith and were trying to resolve this matter.

In addition to showing you the declarations that various witnesses had already signed, Ari and I shared our notes from interviews of other witnesses who had not yet signed declarations, but who had indicated a willingness to do so. We shared in some detail the statement Damon Taylor had given us which included information about affairs Mr. Chreky had evidently had with three employees named Mindy, Amelle and Christina. We also advised you that Mr. Taylor reported that Mr. Chreky was prone to violent outburst and that it was the Salon's practice not to pay overtime.

Mr. Taylor has since reported to us that at approximately 2:00 pm on Thursday, he received a threatening phone call from a Salon employee who stated that Mr. Chreky was irate that Mr. Taylor was not willing to provide a statement to his lawyers, and that if he did not report to the salon immediately, Mr. Chreky would have him arrested. Mr. Taylor was intimidated by this call and now fears that he will be retaliated against him because he was known to have cooperated with Ms. Barrett's attorneys.

Both Ari and I have voice mail messages alerting you to this serious matter and requesting that you contact us at once to discuss this witness intimidation issue. As I am sure you are aware, attempting to intimidate a potential witness to a charge of discrimination pending before the District of Columbia Office of Human Rights is a criminal act punishable by a fine and up to 10 day in prison. <u>See</u> D.C. Code § 2-1402.65 (Falsifying documents and testimony).

RONNIE BARRETT,
v.
ANDRE CHREKY, et al

C.A. No. 07-CV-0250 (RCL)

Exhibit 17

# ◢◢KATZ, MARSHALL & BANKS, LLP

John M. Bredehoft, Esq.
December 12, 2006
Page 2

Please contact me or Ari immediately to explain what actions you intend to take to ensure that your client does not continue to intimidate witnesses likely to testify in this matter.

Sincerely,

*[signature]*

Debra S. Katz

cc: Ms. Ronnie Barrett

# ◢KATZ, MARSHALL & BANKS, LLP

Debra S. Katz, Partner
Direct Dial: 202-299-1143
katz@kmblegal.com

**By Electronic Mail and First Class Mail**
September 18, 2007

John M. Bredehoft, Esq.
Kaufman & Canoles, P.C.
150 West Main Street, Suite 2100
Norfolk, VA 23510

      RE:    <u>Ronnie Barrett v. Andre Chreky & Andre Chreky Hair Salon and Spa</u>

Dear John:

      This letter is written in response to your letter dated September 14, 2007, in which you accuse us of violating Rule 4.4(a) - presumably of the District of Columbia's Rules of Professional Conduct. Your accusations are factually inaccurate and ironic in the extreme given the methods defendants and their agents have used to gather information in this case.

      After reading your description of the alleged telephone exchange with Ms. Wareham, we can only conclude that you have been grossly misinformed. Idris Patterson, one of our legal assistants, is the only person who has been attempting to contact witnesses in this case for the past several weeks. Your letter indicates that the person who called Ms. Wareham was female. Mr. Patterson has a very deep voice and it is inconceivable that he could have been mistaken for a female caller. More importantly, as your letter acknowledges, Mr. Patterson was careful to identify himself, his employer and the party on whose behalf he was seeking information.

      We did not instruct Mr. Patterson to interview Mr. Wareham, or any spouse of any witness for that matter. Mr. Patterson had no intention whatsoever of interviewing Mr. Wareham and made not attempt to do so. His recollection is clear that he called the Wareham residence and asked for Ms. or Mr. Wareham – not knowing, based on the records he had available to him, which of the two worked at the salon. Ms. Wareham did call Mr. Patterson and did speak to him voluntarily. At no time during this call did Mr. Patterson ask to speak to Mr. Wareham – nor did he ask any questions about Mr. Wareham. In any event, we can attempt to interview anyone we wish as long as we properly identified ourselves to the witness - a necessary practice that your investigators apparently do not adhere to.

RONNIE BARRETT,
v.
ANDRE CHREKY, et al

C.A. No. 07-CV-0250 (RCL)

Exhibit 18

◢◢ KATZ, MARSHALL & BANKS, LLP

John M. Bredehoft, Esq.
September 18, 2007
Page 2

Rule 4.4(a) of the District of Columbia Rules of Professional Conduct provides:

In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or knowingly use methods of obtaining evidence that violate the legal rights of such a person.

Neither Ms. Barrett's attorneys, nor any other individual acting on their behalf or at their direction have done anything that would remotely implicate the prohibitions contained in Rule 4.4(a).

We are perplexed that you have raised the specter of a violation of the Rules of Professional Conduct by our firm given our strict adherence to the rules - and particularly when confronted with the tactics used by private investigators working on defendants' behalf. Several former employees of the Salon have reported to us that a private investigator working for Defendants has been attempting to interview them even after they have adamantly declined to speak with her. One witness has reported that this private investigator, posing as a regular client, made five separate appointments for haircuts with him, attempted to obtain information about the case on all five occasions, and never revealed that she was working on behalf of the defense. Such "under-cover" tactics are clearly prohibited by Rule 4.1 - Truthfulness in Statements to Others.

We will be seeking discovery of the tactics used by the various private investigators retained by the defense and will raising this troubling matter with the Court.

This is by no means the first time that Mr. Chreky, or persons acting on his behalf, have attempted to intimidate or mislead material witnesses in this case. We have previously brought to your attention Mr. Chreky's efforts to obtain a declaration from a former employee by threatening to have him arrested if he did not cooperate. We are aware that current Salon employee's have been threatened with termination if they did not cooperate with the defense and sign declarations. Now we have learned that the defense has hired private investigators who use subterfuge and bullying tactics to obtain information from persons likely to testify at trial. In the past you have responded to these issues by indicating that you cannot control your client's conduct. Given the conduct of the private investigators, presumably hired by your firm, it is now clear that you have a duty, under the rules of Professional Conduct, to ensure that witnesses are not harassed, threatened, or deliberately misinformed as to the person seeking information from them.

# ◢◢KATZ, MARSHALL & BANKS, LLP

John M. Bredehoft, Esq.
September 18, 2007
Page 3


      I ask that you respond to this letter immediately and explain the steps you plan to take to control your client and the person or persons working on behalf of the defense. Further, please advise us immediately as to whether or not your firm has sanctioned the tactics used by the private investigators working on behalf of the defense. If you have sanctioned such tactics we would appreciate an explanation as to how you believe such tactics conform to the rules of Professional Conduct.

      Sincerely,

      Debra S. Katz

cc: Ms. Ronnie Barrett
    Jonathan Rose, Esq.