IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| RONNIE BARRETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-cv-0250 |
| | ) | |
| ANDRE CHREKY, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR SUMMARY
JUDGMENT ON ALL COUNTS IN THE COMPLAINT**


September 2, 2008                    Respectfully submitted,

John M. Bredehoft
D.C. Bar No. 375606
David Sullivan
Anna R. Smith
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, Virginia 23510
757-624-3225 (direct voice)
757-624-3169 (facsimile)
jmbredehoft@kaufcan.com

## Table of Contents

DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT ON ALL COUNTS IN THE COMPLAINT ................................. 1

DEFENDANTS' STATEMENT OF MATERIAL FACTS NOT SUBJECT TO GENUINE
DISPUTE .......................................................................................................................... 2

BACKGROUND ...............................................................................................................12

SUMMARY OF ARGUMENT ........................................................................................13

SUMMARY OF ARGUMENT, D.C. HUMAN RIGHTS ACT CLAIMS............................13

SUMMARY OF ARGUMENT, OTHER CLAIMS .............................................................19

ARGUMENT ....................................................................................................................20

I.  SUMMARY JUDGMENT IS APPROPRIATE ON MS. BARRETT'S CLAIMS RELATING
TO THE TERMINATION OF HER EMPLOYMENT ..........................................................21

    A.  Ms. Barrett's Claim that She Was Fired Unlawfully Is Barred by the D.C. Human
Rights Act Statute of Limitations ................................................................................21

    B.  Ms. Barrett Cannot Provide Any Evidence of Damages or Injury Arising from the
Termination of Her Employment...................................................................................26

    C.  If Ms. Barrett's Testimony Is True, She Was Fired for a Lawful Reason, and There Is
No Evidence of Pretext .................................................................................................30

II.  SUMMARY JUDGMENT IS APPROPRIATE ON MS. BARRETT'S CLAIMS OF
UNLAWFUL CONDUCT DURING HER EMPLOYMENT ..................................................33

    A.  No Acts of Harassment or Retaliation Occurred Within the One-Year Limitations
Period Prior to Filing....................................................................................................33

    B.  Ms. Barrett Cannot Provide Any Evidence of Damages or Injury Arising from Acts
Within the Limitations Period ......................................................................................35

    C.  Ms. Barrett Took No Action – Much Less the Reasonable Steps Required by Law – to
Minimize or Limit Harassment.....................................................................................36

    D.  Most of the Allegations Ms. Barrett Makes Do Not Rise to the Level of Severe and
Pervasive Harassment or Actionable Retaliatory Conduct ...........................................37

III. SUMMARY JUDGMENT IS APPROPRIATE ON MS. BARRETT'S CLAIMS NOT ARISING UNDER THE D.C. HUMAN RIGHTS ACT ........................................................39

    A.  Claims Relating to Tip Withholding .......................................................................39

    B.  Claims of Negligent Supervision ...........................................................................41

    C.   Breach of Contract Claims                                                     42

CONCLUSION ...................................................................................................................44

PROPOSED ORDER GRANTING MOTION FOR SUMMARY JUDGMENT ON ALL COUNTS IN THE COMPLAINT

CERTIFICATE OF ELECTRONIC FILING

## Table of Authorities

### *Cases*

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)....................................................20

*Berger v. Iron Workers Reinforced Rodmen, Local 201,* 170 F.3d 1111 (D.C. Cir. 1999)........29

*Bernstein v. Fernandez,* 649 A.2d 1064 (D.C. 1991)...............................................30

*Brown v. Marsh*, 777 F.2d 8 (D.C. Cir. 1985) .......................................................26

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) .............................................36

*Burlington N. & S.F.R. Co.  v. White*, 548 U.S. 53 (2006).........................................38

*Carter v. George Washington Univ.,* 180 F. Supp. 2d 97 (D.D.C. 2001) .................................21

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ........................................................20

*Coleman v. Potomac Electric Power Co.,* 310 F. Supp. 2d 154 (D.D.C. 2004).......................22

*Faragher v. Boca Raton*, 524 U.S. 775 (1998) ......................................................36

*Fogg v. Gonzales,* 492 F.3d 447 (D.C. Cir. 2007) ...................................................28

*Ford Motor Co. v. U.S. EEOC*, 458 U.S. 219 (1982) .............................................28

*Forman v. Small,* 271 F.3d 285 (D.C. Cir. 2001)....................................................31

*Freedman v. MCI Telecomm. Corp.,* 255 F.3d 840 (D.C. Cir. 2001) ......................................20

*Gleken v. Democratic Congressional Campaign Comm.,* 199 F.3d 1365 (D.C. Cir. 2000) ......21

*Greer v. Paulson,* 505 F.3d 1306 (D.C. Cir. 2007)............................................21, 25

*Griffin v. Acacia Life Ins. Co.,* 925 A.2d 564 (D.C. 2007)........................................42

*Harris v. Forklift Sys., Inc.,* 510 U.S. 17 (1993).....................................................38

*Hoffman Plastic Components, Inc. v. NLRB,* 535 U.S. 137 (2002) .........................................28

*Hussain v. Nicholson,* 435 F.3d 359 (D.C. Cir. 2006) .............................................37

*Jefferson v. Milvets System Technology, Inc.,* 986 F. Supp. 6 (D.D.C. 1997)..........................29

*Jones v. District of Columbia,* 346 F. Supp. 2d 25 (D.D.C. 2004), aff'd in part and rev'd in part, 429 F.3d 276 (D.C. Cir. 2005) .................................................................................... 17, 21, 37

*Jordan v. Malley,* 711 F.2d 211 (D.C. 1983) ......................................................................... 30

*Martini v. Fannie Mae,* 178 F.3d 1336 (D.C. Cir. 1999), *cert. denied*, 528 U.S. 1147 (2000) .. 29

*Mayers v. Laborers' Health & Safety Fund of No. Am.,* 478 F.3d 364 (D.C. Cir. 2007) ........... 35

*Pearson v. Dodd,* 410 F.2d 701 (D.C. Cir.), *cert. denied,* 395 U.S. 947 (1969) ...................... 41

*Price v. Greenspan,* 374 F. Supp. 2d 177 (D.D.C. 2005), aff'd in pertinent part, 470 F.3d 384 (D.C. Cir. 2006) ...................................................................................................................... 32

*Prouty v. National Rail Passenger Corp.*, 572 F. Supp. 200 (D.D.C. 1983) ............................ 44

*Pyramid Secs. Ltd. v. IB Resolution, Inc.,* 924 F.2d 1114 (D.C. Cir. 1991) ............................. 21

*Russ v. Van Scoyoc Assoc., Inc.,* 122 F. Supp. 2d 29 (D.D.C. 2000) .................................. 32, 39

*Salpaugh v. Monroe Community Hospital,* 4 F.3d 134 (2d Cir. 1993) ...................................... 28

*Schrader v. Tomlinson,* 311 F. Supp. 2d 21 (D.D.C. 2004) ............................................... 26, 35

*Street v. Hedgepath,* 607 A.2d 1238 (D.C. 1992) .................................................................... 30

*Sullivan v. Heritage Foundation,* 399 A.2d 856 (D.C. 1999) .................................................. 43

*Sure-Tan, Inc. v. NLRB,* 467 U.S. 883 (1981) ........................................................................ 28

*Townsend v. Exchange Insur. Co.,* 196 F. Supp. 2d 300 (W.D.N.Y. 2002) .............................. 28

*Waters v. Gonzalez,* 374 F. Supp. 2d 187 (D.D.C. 2005) ........................................................ 32

*Zanville v. Garza*, 561 A.2d 1000 (D.C. 1989) ....................................................................... 30

## ***Statutes***

42 U.S.C. §§ 2000e ............................................................................................................... 1

D.C. Code § 32-1301 (3) ...................................................................................................... 40

D.C. Code § 2-1403.16 (D.C. Human Rights Act) ............................................... 13, 16, 22, 42

D.C.M.R. 4-704 ..................................................................................................................... 22

D.C.M.R. 4-705 ..................................................................................................................... 29

D.C. Code §§ 47-2851.10(c)(2) ........................................................27

D.C. Code §§ 47-2853.81 ........................................................27

D.C. Code §§ 2853.27(a) ........................................................27

D.C.M.R. 17-3702.2 ........................................................27

D.C.M.R. 17-3727.4(g) ........................................................28

D.C.M.R. 17-3727.5 ........................................................27


***Restatements***
Restatement (Second) of Agency § 442 ........................................................43

Restatement (Second) of Contracts § 278(i) ........................................................44

Restatement (Second) of Torts §§ 222A ........................................................41

Restatement (Second) of Torts §§ 242 ........................................................41

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RONNIE BARRETT,                          )
                                         )
    Plaintiff,                           )
                                         )
        v.                            )          C.A. No. 07-cv-0250
                                         )
ANDRE CHREKY, *et al.,*                   )
                                         )
    Defendants.                          )

**DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR SUMMARY
<u>JUDGMENT ON ALL COUNTS IN THE COMPLAINT</u>**

      This is a sexual harassment case under the District of Columbia Human Rights Act.

(There are no claims under Title VII of the federal Civil Rights Act of 1964, 42 U.S.C. §§ 2000e,

*et seq.*, although there are D.C.-law claims for unpaid wages, breach of contract, conversion, and

negligent supervision.)  The defendants are Andre Chreky; the hair salon he operates (Andre

Chreky, Inc., or the "Chreky Salon"), and SPAC, LLC, which is the corporation that owns the

building.  The plaintiff is Ronnie Reitenbach Lau Barrett, formerly Ronnie Santos, formerly

Ronnie Shojaie.[1]  Ms. Barrett worked at the Chreky Salon as a cosmetologist until December

2005.

      All three defendants have moved for summary judgment under Fed. R. Civ. P. 56 on all

claims in this civil action.  The motion should be granted, and judgment should be entered in

favor of the defendants.

---

[1]      Some of the documents (notably Exhibit 12) refer to Ms. Barrett by a former name.

## DEFENDANTS' STATEMENT OF MATERIAL
## FACTS NOT SUBJECT TO GENUINE DISPUTE

Defendants submit that the following facts are not genuinely in dispute, and that based on these facts defendants are entitled to judgment in their favor as a matter of law.  Certain of these facts find additional support in the evidentiary citations included in the Argument section of this Memorandum.

1.      There are nine counts pled in the Complaint.  Ms. Barrett has agreed voluntarily to dismiss Count Three (asserting an overtime claim under the federal Fair Labor Standards Act), Count Four (asserting an analogous overtime claim under the D.C. Wage and Hour Act), and Count Eight (asserting a negligence claim against defendant SPAC, LLC, the landlord of the Salon defendant, on a premises liability theory).  Those three counts should, accordingly, be dismissed.  Deposition of Ronnie Barrett, Exhibit 1 ("Barrett Dep.") at 75 (memorializing agreed dismissal of three counts).  Since Count Eight is the only claim asserted against SPAC, LLC, that defendant should be dismissed from the case in its entirety.

2.      Ms. Barrett has agreed voluntarily to limit her damages claims to lost income and punitive damages.  Barrett Dep. at 75-77 (memorializing stipulations regarding limited damages claims, including disavowal of "consequential economic damages").  Correlatively, Mr. Barrett has refused to respond to discovery respecting issues pertinent to any claim for damages other than pure lost income.  *See, e.g.,* Barrett Dep. at 77-78 (memorializing discussions, which are also reflected in plaintiff's discovery responses, Exhibit 16, and correspondence from plaintiff's counsel including Exhibit 17).  Accordingly, the only compensatory damages recoverable in this case are pure lost income damages.

3.      Ms. Barrett began working with Mr. Chreky at a different salon in 1994.  Complaint, ¶ 11.  She claims that Mr. Chreky made "intrusive inquiries about my personal life"

beginning in 1994, and began to subject her to sexual harassment in 1996. Exhibit 4, Barrett Affidavit submitted to D.C. Office of Human Rights, ¶ 2 at page RB00092. Some of Ms. Barrett's allegations of harassment during the period include sexual touching of an offensive nature. *Id.* at ¶ 3, pages RB00092-93. There is no evidence that Ms. Barrett complained to the owner of the salon, her employer, her managers, or to anyone else regarding this alleged conduct at the other salon.

4.    In 1997, Mr. Chreky opened his own salon on K Street in the District of Columbia, the Chreky Salon. Notwithstanding her claim that Mr. Chreky had harassed her severely and for years, Ms. Barrett followed Mr. Chreky to work with him at his new salon. Barrett Affidavit, Exhibit 4, ¶ 4, page RB00093.

5.    Ms. Barrett alleges that she resigned from the Chreky Salon in May 1998, but her resignation letter documents the date as April 15, 1999. Compare Complaint ¶ 11 to Exhibit 3 (resignation letter). Although she says that she quit due to harassment, her resignation letter says "the main reason for making this decision is that I want to be able to both cut and color hair, as well as be paid by commission." Exhibit 3 at first page. Ms. Barrett's April 1999 resignation letter also refers to the Chreky Salon's "very well qualified personnel which are very talented, willing to help, to learn and please everyone." *Id.,* at second page. The letter concludes, "I am leaving with great regret and I want you to know that I am [grateful] to [have] been given the opportunity to work side by side with Andre and been able to learn so much from him. I will miss all of the staff as well as our clients." *Id.*

6.    Notwithstanding her claims that Mr. Chreky had acted inappropriately towards her from 1994 to 1997 (at their earlier employment) and from 1997 through 1999 (at the Chreky Salon), and notwithstanding having identified her desire to be paid by commission as a "main

reason" for her resignation, Ms. Barrett returned to work at the Chreky Salon, yet again, in

September 2003, seeking a position not paid on commission.  Barrett Dep. at 6, 8-9.

7.     Ms. Barrett claims that she was promised a salary of $1,900 per week (compared

to her compensation at her non-Chreky Salon position of $500 per week, Barrett Dep. at 13),

with a review in three months anticipated to raise her compensation to $2,100 per week.

Complaint ¶ 13.  Her actual compensation when she began working was, however, set at $21.00

per hour, and she did not receive a performance or salary review in December 2003 (three

months after returning), nor in January or February 2004.  Barrett Dep. at 19, 22.  Nevertheless,

Ms. Barrett continued to work at the Chreky Salon for the compensation she was actually paid,

and she accepted her compensation.  Barrett Dep. at 50-51 (compensation unchanged), 62

(always accepted compensation as paid).

8.     Ms. Barrett was, at all times, an at-will employee of the Chreky Salon.  Exhibit 2,

Salon Handbook.  She never was party to any written agreement setting forth any aspect of her

employment status.  Barrett Dep. at 61-62.

9.     Ms. Barrett claims that she approached Mr. Chreky to inquire about her salary

review in February 2004.  She claims that Mr. Chreky met with her in his office at the Salon.

She claims that, although the door to the office was open and Mr. Chreky's wife's desk was mere

feet away, Mr. Chreky grabbed her and demanded oral sex.  Ms. Barrett says that she ran out of

the office.  Ms. Barrett says that she never complained to any manager at the Chreky Salon about

this incident; never mentioned it to Mr. Chreky's wife, who oversaw personnel issues at the

Salon; never mentioned it to her husband, and (despite her claims that Mr. Chreky assaulted and

battered her) never reported it to the police.  Barrett Dep. at 22 through 29; 47.  Ms. Barrett

4

claims that Mr. Chreky subsequently promised that such an incident would never happen again. Barrett Dep. at 34. There has been no suggestion that any such incident ever happened again.[2]

10.    Ms. Barrett claims that Mr. Chreky made sexual comments regarding her breasts, rubbed up against her on a handful of occasions, and frequently made sexually-tinged comments in the workplace. Most, but not all, of the specific incidents she recalls occurred during 2004, before she left for maternity leave in December 2004. *See, e.g.,* Barrett Dep. at 118-119, 128, 131, 133, 134, 138-39.

11.    Ms. Barrett claims that Mr. Chreky retaliated against him for her expressions of dismay at his alleged sexual harassment, although sometimes she simply ignored him. Barrett Dep. at 123-24. In her deposition Ms. Barrett testified that Mr. Chreky occasionally behaved better after she upbraided him. Barrett Dep. at 38 (Mr. Chreky "off my back for a while" and "was nice" after February 2004 incident).

12.    Ms. Barrett claims that Mr. Chreky retaliated against her, in part, by forcing her on occasion to re-stock inventory in the Salon. However, all of the stylists were required, from time to time, to re-stock inventory. Deposition of Amal Zaari, Exhibit 15, at 105. There is no evidence that Ms. Barrett was treated differently from other stylists in this regard, or that asking her to restock inventory was retaliatory or even at the specific behest of Mr. Chreky. See Barrett Dep. at 124-25 (no knowledge as to whether other stylists required to restock inventory).

13.    Ms. Barrett claims that Mr. Chreky retaliated against her, in part, by designating her as the "first one to leave" when the Salon was not busy late in the day. Ms. Barrett was

---

[2]    It bears mention that Mr. Chreky testified under oath that nothing remotely similar to what Ms. Barrett contends ever happened. There are no other witnesses, either to the incident itself or to any of Ms. Barrett's claimed conduct thereafter -- which included "escaping" through the crowded salon during business hours – although not only Mr. Chreky's wife but the entire business office of the Salon is located just outside the open door to Mr. Chreky's office. Nevertheless, on summary judgment the Court may take Ms. Barrett's account as true.

unable to specify any particular occasion on which she was the first person designated to leave, however, and her deposition testimony says that she was the "first one to leave" no more than three times a month (*i.e.,* at least ninety percent of the time some other stylist was the "first one to leave"). Barrett Dep. at 125. There is no admissible evidence that Ms. Barrett was treated differently from other stylists in this regard. See Barrett Dep. at 51 ("I guess people would always be sent home [when] . . . there [were] not enough clients").

14.     Ms. Barrett claims that Mr. Chreky retaliated against her, in part, by requiring her to stand while servicing clients during the period she was pregnant. (Mr. Chreky denies this.) Since Ms. Barrett was pregnant entirely during the year 2004, none of this alleged retaliation could have occurred later than December 2004. There also is no admissible evidence that Ms. Barrett was treated any differently than any other employee, and certainly no direct evidence of retaliatory animus related to this assertion.

15.     Ms. Barrett claims that Mr. Chreky retaliated against her, in part, by manipulating her schedule and not assigning her an appropriate portion of the "no particular stylist requested" customers. However, the evidence indicates Mr. Chreky had no such role in the allocation of clients to or from customers, and Ms. Barrett testified that her contrary understanding is based on hearsay and rumor. Barrett Dep. at 113-14, 118. There is no admissible evidence that Ms. Barrett was treated differently from other stylists in this regard.

16.     Ms. Barrett left the Chreky Salon on maternity leave at the end of December 2004, and did not return until five months later, in May 2005. Barrett Dep. at 48-9. During the period she was away from the Salon, she had no contact at all with Mr. Chreky. Barrett Dep. at 49. During the five months she was away from the Salon, and notwithstanding her claims of sexual harassment and improper conduct extending back more than a decade, she made no effort

6

whatsoever to find alternative employment.  Barrett Dep. at 49.  She simply returned to the Salon when she was ready to go back to work

17.     Ms. Barrett returned to work at the Chreky Salon on May 12, 2005.  Barrett Dep. at 49.

18.     As a cosmetologist, Ms. Barrett is required by District of Columbia law to maintain a valid, current license from the D.C. Barber and Cosmetology Board.  When she came to work for the Chreky Salon, she had such a license.  Barrett Dep. at 55-56.

19.     At some point in 2005, but not later than September 20, 2005, Ms. Barrett's D.C. cosmetologist license expired.  Exhibit 12 (December 2005 Order of the D.C. Office of Administrative Hearings).  Ms. Barrett was cited by the District of Columbia Department of Consumer and Regulatory Affairs for practicing cosmetology without a license in September 2005; the Notice of Infraction was served on Ms Barrett both on September 23 and on October 26, 2005.  *Id.,* and particularly p. 1 n. 2.  In responding to the Notice of Infraction, Ms. Barrett "has admitted violating the law . . . by practicing cosmetology at a salon spa" without a license. *Id.,* p. 2.    There is no evidence that she informed the Chreky Salon of the fact that she no longer had a license, or that she had been cited for the unlawful practice of her profession.

20.     In December 2005, after Ms. Barrett left the employ of the Chreky Salon, the D.C. Office of Administrative Hearings issued an Order finding her in violation of the law by practicing cosmetology without a license.  A fine was imposed.  The fine was reduced from a guidelines amount of $2,500 down to $500, based in part on Ms. Barrett's representation to the Office of Administrative Hearings that she had already applied for a renewal of her license. Exhibit 12, page 3.  Ms. Barrett was ordered to pay the fine within twenty days (*i.e.,* by January

8, 2006); she was informed that her failure to pay the fine by January 8, 2006 would authorize the revocation of her license, if it had been renewed. *Id.*

21.    Ms. Barrett asserts that she sent in renewal payments for her license, but has not produced any evidence of such payments or renewal applications, despite request.  Barrett Dep. at 59-61.

22.    There is no dispute that Ms. Barrett did not pay the December 2005 fine until June 28, 2008, over two and one-half years after it was assessed and just days before her deposition in this case.  Exhibit 13 (receipt for payment of fine); Barrett Dep. at 58-9.

23.    There is no dispute that, at all times since her departure from the Chreky Salon in December 2005, Ms. Barrett held no D.C. cosmetology license.  Barrett Dep. at 57-8. Accordingly, at no time since her departure from the Chreky Salon has Ms. Barrett been lawfully permitted to practice cosmetology, the job she left in December 2005.  In responding to discovery in this case, Ms. Barrett earlier falsely asserted that she held a valid license until late 2006.  Exhibit 18.  (The relevant administrative Order from December 2005 was not produced in discovery until just days before her deposition.)

24.    Ms. Barrett claims that she suffered an incident of sexual harassment on November 15, 2005, when Mr. Chreky allegedly asked her to "start a relationship" with him and thereafter "ran his hand down the front of her shirt over her breast as other stylists looked on." Complaint ¶¶ 35, 36.  However, Ms. Barrett's deposition testimony places these events unequivocally before November 2005, and at the latest during the Summer of 2005, if not earlier. Barrett Dep. at 134-37.

25.    Ms. Barrett left the employ of the Chreky Salon on Saturday, December 6, 2005. In a November 2006 Affidavit provided to the D.C. Office of Human Rights, Ms. Barrett swore

that she resigned voluntarily, and was constructively discharged. Exhibit 4. However, in a January 2007 Declaration provided to the D.C. Office of Human Rights, Ms. Barrett swore that she did not resign and was not constructively discharged, but rather was fired. Exhibit 5. At her deposition, Ms. Barrett again swore unequivocally that she did not quit, and that she was fired. Barrett Dep. at 145. She has, accordingly, abandoned any constructive discharge claim; her claim is that she was fired unlawfully.

26.    Ms. Barrett's deposition testimony indicates that she was fired on December 6, 2005, because she willfully refused to obey, at least twice, direct orders from her manager to leave the Salon building after she finished working for the day. Barrett Dep. at 146-51. There is no evidence suggesting that Ms. Barrett's admitted, repeated, and intentional insubordination is "pretextual" in any sense of the word.

27.    There is no evidence that Ms. Barrett was fired because of her sex.

28.    There is no evidence that Ms. Barrett was fired in retaliation for a complaint of retaliation. Ms. Barrett testified at her deposition that she did not complain of any sexual harassment by Mr. Chreky because "there was no one to complain to." Barrett Dep. at 141-42; see Exhibit 11 (D.C. Office of Human Rights intake questionnaire indicating that Ms. Barrett never complained about sexual harassment). The November 15, 2005 incident described above, her opposition to which Ms. Barrett cites as the key factor in her "retaliatory" discharge in December 2005, actually happened many months before she left the Salon. There is, of course, no direct evidence of retaliatory animus in connection with the claimed unlawful firing.

29.    Although Ms. Barrett's Complaint alleges that she complained of Mr. Chreky's sexual harassment to Maurice Clarke, a Salon manager, Mr. Clarke testified that Ms. Barrett complained only about her pay, and never about sexual harassment. Exhibit 9, Deposition of

Maurice Clarke, at 52.  Despite the allegation in her Complaint that she complained to

Mr. Clarke "increasing in frequency towards the end of her employment" in December 2005,

Ms. Barrett admitted in her deposition that Mr. Clarke was no longer employed by the Salon at

any time towards the end of her employment.  Barrett Dep. at 141-42.

      30.     Ms. Barrett did not provide any information to the D.C. Office of Human Rights

about any claim pertinent to this case before, at the earliest, November 8, 2006.  Exhibit 8.  This

date is less than a month before the one-year statute of limitations on claims under the D.C.

Human Rights Act expired for all of her claims.

      31.     Ms. Barrett did not provide any information to the D.C. Office of Human Rights

about her claim that she was fired unlawfully before, at the earliest, January 19, 2007.  Exhibit 5.

This is after the expiration of the one-year statute of limitations on unlawful termination claims

under the D.C. Human Rights Act.

      32.     Before January 19, 2007, Ms. Barrett provided repeated documentation to the

D.C. Office of Human Rights asserting, in many cases under oath, that she resigned voluntarily

and was not fired.  Exhibit 5 (initial provision of information to D.C. Office of Human Rights by

counsel for Ms. Barrett, including Affidavit claiming she resigned); Exhibit 10 ("Charge" form

signed by Ms. Barrett claiming she resigned, but not even checking the box for discharge

claims); Exhibit 11 (D.C. Office of Human Rights intake questionnaires for retaliation,

constructive discharge, and retaliation, but not claiming that she was fired, much less that she

was fired for any unlawful reason).

      33.     Ms. Barrett's Charge form states the date for the **latest** act of unlawful conduct to

be November 15, 2005, not the date of her termination in December.  Exhibit 10.

34.    Ms. Barrett's claim was docketed in the D.C. Office of Human Rights on December 11, 2006, after the expiration of the one-year statute of limitations on her D.C. Human Rights Act claims.  Exhibit 7 (letter from the D.C. Office of Human Rights setting forth docketing date of December 11, 2006).  See also Exhibits 10 (indicating that Mr. Barrett signed her Charge form on December 11, 2006).

35.    After Ms. Barrett left the Chreky Salon, she did not search at all for more remunerative employment.  Rather, she immediately began working for another salon at a lower rate of compensation.  She left on a Saturday night and started her new job within three days.  Barrett Dep. at 86.

36.    In her November 2006 Affidavit, Ms. Barrett swore that she had accepted her new job earlier, before the end of her employment on December 6, 2005, and that her altercation with Mr. Chreky on that date occurred because she told him she was leaving.  Exhibit 4.

37.    Ms. Barrett has presented no evidence of lost income from the incident she claims occurred on November 15, 2005 (the only incident even possibly within the statute of limitations for her claims).  The alleged nature of the incident (verbal harassment and an offensive brushing against her shirtfront) makes it unlikely in the extreme that any lost income could possibly have resulted.

38.    Ms. Barrett can adduce no admissible evidence (as distinct from rumor or multiple hearsay) that Mr. Chreky ever interfered in the distribution of tips to her, or to any other person.  Ms. Barrett's testimony (which Mr. Chreky denies) is that Mr. Chreky withheld a single tip envelope from her at some unspecified time in 2004.[3]  Barrett Dep. at 71-2.  Ms. Barrett has no evidence even to support a guess as to the amount of money (if any) that was inside the

---

[3]    Barrett's inability to specify the date is important, because part of 2004 is outside the statute of limitations.

envelope that was allegedly withheld.  Barrett Dep. at 68-9.  See Barrett Dep. at 98 (in her new job, she keeps no records of tips received, and her amended tax returns – after originally not reporting her tips – are based on "guesses").

## BACKGROUND

This is a sexual harassment case brought under the District of Columbia Human Rights Act.  The plaintiff, Ms. Ronnie Barrett, worked as a hairdresser with defendant Andre Chreky on and off since 1994.  Mr. Chreky is a prominent hair stylist with a loyal following, which at one time included the female members of the First Family (accounting for some of the media interest Ms. Barrett was able to generate when this case was filed).

Ms. Barrett claims Mr. Chreky sexually harassed her between 1996 and 2005 (and acted inappropriately in a "personal" manner for years before that).  Ms. Barrett worked with Mr. Chreky at a salon from 1994 through 1997 and (notwithstanding her allegations of harassment) followed Mr. Chreky to his new business when Mr. Chreky opened up his own Andre Chreky Salon in 1997.  She resigned from the Chreky Salon  – thanking him for the experience (notwithstanding her allegations of harassment) – in 1999.[4]

Nothing daunted, she returned to work at the Chreky Salon in 2003 (notwithstanding her allegations of harassment).  She took maternity leave beginning in December 2004 and returned again (notwithstanding her allegations of harassment) in May 2005.  She finally left early in December 2005.  Now she has filed this multi-million-dollar suit against Mr. Chreky, against the corporation that owns and operates the Chreky Salon, and against SPAC, L.L.C., the company that owns the Chreky Salon's building.

---

[4]        Ms. Barrett's 1999 resignation letter stated, in part, "I am leaving with great regret and I want you to know that I am [grateful] to [have] been given the opportunity to work side by side with Andre and been able to learn so much from him.  I will miss all of the staff as well as our clients."  Exhibit 3 at p. 2.

The Complaint pleads nine counts.  Three of these counts have been abandoned voluntarily by Ms. Barrett, including the only claim against SPAC, LLC.[5]  Counts One and Two invoke the D.C. Human Rights Act, Count One pleading sex discrimination and Count Two alleging retaliation.  The remaining four counts allege various other D.C.-law claims.  For purposes of clarity, this Memorandum summarizes the argument as to the two Human Rights Act claims separately from the remaining claims.

## SUMMARY OF ARGUMENT

## SUMMARY OF ARGUMENT – D.C. HUMAN RIGHTS ACT CLAIMS

This is a single-plaintiff sexual harassment case against a respected Washington, D.C. hair salon and its owner.  The issues presented are somewhat more well-defined than in an ordinary hostile environment case, however.  This is due in part to Ms. Barrett's decision to limit her damage claims, and due in part to her failure to file her claims in a timely manner.  There are three key issues and several subsidiary reasons why Ms. Barrett's claims fail as a matter of law, and defendants are entitled to summary judgment.

First, in an attempt to avoid responding to discovery about any pre-existing or independently-arising emotional and medical conditions, plaintiff Ronnie Barrett voluntarily has abandoned any claim for "general compensatory damages."  That is, she makes no claim to recover for emotional distress, inconvenience, or indeed any compensatory damages other than plain-vanilla lost income – if any can be proved.  Any claim for compensatory damages rises and falls solely on her **proof of lost income attributable to alleged unlawful acts**.[6]  (Of course,

---

[5]    Ms. Barrett has stipulated to dismiss a claim of premises liability against the building owner, and two claims (one under D.C. law and one under federal law) for unpaid overtime.  Deposition of Ronnie Barrett Lau, Exhibit 1 (referred to hereafter simply as "Barrett Dep."), at 75.

[6]    Ms. Barrett's stipulations were memorialized on the record of her deposition at pages 75-78.

Ms. Barrett also seeks many millions of dollars in punitive damages.)  If she has no proof of

recoverable lost income from an unlawful act, she has no claim under the D.C. Human Rights

Act.  She has no such proof.

Second, Ms. Barrett has abandoned – under oath – her only conceivably timely-filed

claim relating to the termination of her employment.  Ms. Barrett worked for the Chreky Salon

until December 6, 2005.  In providing information to the District of Columbia in November

2006, she swore that her employment ended because she found another job; that she considered

herself "constructively discharged;" that she resigned, and that she then informed Mr. Chreky

that she was quitting.  Exhibit 4 (November 8, 2006 letter from plaintiff's counsel to D.C. Office

of Human Rights, attaching "Complaint Form," and "Affidavit of Ronnie Barrett").  In other

words, Ms. Barrett's sole possibly-timely allegation about her departure from the Salon was that

she resigned.[7]  In fact, she swore under oath in November 2006 that she first found another job

and only then voluntarily quit her job at the Chreky Salon.  Barrett Affidavit, Exhibit 4, ¶¶ 17,

19, pages RB00100-101).  This presents, at best, a claim of constructive discharge.

However, Ms. Barrett has abandoned her constructive discharge claim.  In January 2007,

after the statute of limitations for any claim relating to her termination had expired, Ms. Barrett

swore to a considerably different story.  At that time she forwarded an "amendment" to "clarify"

her pending claims, and swore under oath that she **never** quit.  Exhibit 5 (January 19, 2007 letter

from plaintiff's counsel to D.C. Office of Human Rights, attaching "Declaration of Ronnie

---

[7]         As discussed below, Ms. Barrett's initial provision of information to the Office of Human Rights did not
constitute a timely filing of a charge – even her constructive discharge claim was not docketed until mid-
December, after the statute of limitations had expired.  None of her claims are timely, as argued below.  To avoid
repetition, this caveat will not be repeated every time the Memorandum refers to the November filing as possibly-
timely or, indeed, as a "filing" as opposed to the mere provision of information (which does not, itself, toll the
statute of liminations).

Barrett").  In January 2007 she swore that she had been **fired** in December 2005, not that she quit.  Barrett Declaration, Exhibit 5, ¶¶ 7-8, page RB00114.

Shortly thereafter, on January 30, 2007, her lawyers asked the District to dismiss her administrative charge so she could file a lawsuit.  Exhibit 6.  On February 12, 2007, D.C. complied by closing the matter "administratively with no finding made on the merits of the allegations;" in closing the file, the D.C. Office of Human Rights expressly noted that the "Charge of Discrimination . . .  was docketed on December 11, 2006,"  Exhibit 7, which is also the date on which Ms. Barrett finally executed her Charge papers, *e.g.* Exhibit 10.

By the time of the February 12, 2007 dismissal of her agency claim, Ms. Barrett had already filed her Complaint in this Court, on February 1, 2007, in violation of the statutory requirement that a D.C. Human Rights Act claim may be pursued in court or before the agency, but not both at the same time.[8]

In any event, at her deposition Ms. Barrett testified consistently with her January 2007 story.  She swore unequivocally that she never quit (and, accordingly, that she was never "constructively discharged").  She swore – contrary to her November 2006 Affidavit and the only possibly timely claim – that she was fired.  Barrett Dep. at 145.

Of course, a plaintiff cannot create a genuine issue of fact by swearing that both "X" and "not-X" are true.  But Ms. Barrett is in an even more problematic situation.  The only timely-filed claim relating to the ending of her employment is that she **quit** (*i.e.,* was constructively discharged).  Yet she has now sworn, both in her "clarified" declaration to the D.C. Office of Human Rights and in her deposition to this Court, that she was **not** constructively discharged and that she **never** quit.  In other words, she has abandoned the only possibly-timely claim relating to

---

[8]      Ms. Barrett was represented by her attorneys at the time she prepared and submitted her November 2006 materials, as well as for the provision of the January 2007 "clarification."

the end of her employment.  She seeks to assert a different claim that was never asserted in **any** forum within the one-year statute of limitations.  That unlawful firing claim, first mentioned in January 2007, is barred by the one-year statute of limitations.

Third, Ms. Barrett missed her 300-day deadline for filing any Title VII claims regarding harassment or retaliation during her employment itself.  She informed the District government of her claims of harassment and retaliation less than a month (at best) before the expiration of the one-year statute of limitations under the D.C. Human Rights Act.  While Ms. Barrett's Complaint and her November 2006 correspondence both assert that an isolated act of sexual harassment did occur within the year before filing (on November 15, 2005), her deposition testimony under oath places that interaction several months earlier, emphatically in the summer, and emphatically outside the limitations period.  There is no evidence of any harassment or retaliation within the one-year limitations period.  There is also no evidence of injury – no lost income – from this alleged discrete incident.

These three failures  – no evidence of lost income (and therefore no injury or damages) arising from unlawful actions, no acts of harassment within the limitations period, and abandonment of the sole possible timely-filed claim arising out of her departure – standing alone warrant summary judgment for the defendants on the D.C. Human Rights Act claims, Count One and Count Two.

There are a number of other independent reasons why Ms. Barrett's claims under the D.C. Human Rights Act fail to survive summary judgment.  For example, Ms. Barrett seeks to recover damages for lost income after her departure from the Chreky Salon, because her new cosmetologist job did not pay as much as Chreky paid her for her cosmetology services.  Yet Ms. Barrett cannot recover these "damages:" among other things, she let her license to practice

16

cosmetology lapse shortly before she left the Chreky Salon. She was cited -- and fined -- by the District for practicing without a license in late December 2005, after her departure from the Salon. Exhibit 12. As of today (or, at least, as of her July 2008 deposition in this case), she has **never** held a license to practice cosmetology since leaving the Chreky Salon. She did not even pay her fine until late June 2008, just days before her deposition. Exhibit 13. Payment of that fine was a condition precedent to any renewal of her license. Ms. Barrett's practice of cosmetology in D.C. without a license is a criminal offense; it is something D.C. law does not permit her to do. She cannot recover back pay (or "front pay") for lost income as a cosmetologist for a period when she was prohibited by law from being a cosmetologist.

Summary judgment is appropriate for another reason. Sexual harassment plaintiffs generally are required to take appropriate action to stop or avoid the alleged harassment. In most cases, under the well-known *Faragher-Ellerth* affirmative defense, if an employer has promulgated a policy against harassment and the employee refuses to make a complaint under the policy, the employer has a complete defense against any liability. (The doctrine is broader, however, than the simple "complaint/no complaint" dichotomy might suggest: a plaintiff is under an obligation to take "any preventative or corrective opportunities provided by the employer **or avoid harm otherwise.**"[9]) Recognizing this, Ms. Barrett's Complaint pleads that she complained to a manager, Mr. Maurice Clarke, and that she complained to Mr. Clarke with "increasing frequency" towards the end of her tenure with the Salon in December 2005. Ms. Barrett's attorneys even obtained a declaration from Mr. Clarke suggesting that Ms. Barrett complained to him numerous times about sexual harassment. The problem is that – when deposed – Mr. Clarke swore forthrightly that Ms. Barrett had **never** complained to him about

---

[9]    *Jones v. District of Columbia,* 346 F. Supp. 2d 25, 43 (D.D.C. 2004) (Lamberth, J.) (quoting *Faragher*) (emphasis added), *aff'd in part and rev'd in part,* 429 F.3d 276 (D.C. Cir. 2005).

harassment.[10]  (She could not have complained to Mr. Clark with "increasing frequency" towards

the end of her tenure in December 2005 in any event, since he left the Salon more than a year

earlier.)  And at her deposition, Ms. Barrett admitted that the allegation regarding "complaints of

harassment" in her Complaint to this Court was false.  Barrett Dep. at 141-42.  *See* Exhibit 11

(D.C. Office of Human Rights Intake Questions: Sexual Harassment) ("When and to whom did

you report the incident to a supervisor or management?" "There was not anybody for me to

report to."); Barrett Dep. at 141-43 (statements on questionnaire form are accurate).

Ms. Barrett's failure to take any action to avoid or minimize the alleged harassment is

independently fatal to her claims.  And her silence is more damning still when put in context and

the details of her allegations considered:  she was harassed in 1996 (and subjected to intrusive

personal comments for years before that) but followed Mr. Chreky to the new salon in 1997.  She

was harassed in 1998 but thanked him when she resigned in 1999.  Despite her story of extensive

harassment, she returned to the Salon of her own volition in 2003.  She tells a story of an abusive

incident in February 2004 which, she claims, took place in Mr. Chreky's office during working

hours with his office door **open** – scant feet from Mr. Chreky's **wife's desk** just down the hall –

but never mentioned it to Ms. Chreky (the individual responsible for personnel decisions and a

co-owner); Barrett complained to no one.  She continued to work next to Mr. Chreky through

2004, again without complaints to any manager.  She left for a five-month maternity period after

having been, she claims, harassed by Mr. Chreky from 1996 through December 2004, but

returned to work with him in May 2005 (having, by her own admission, never taken a single step

through the five months she was away to complain or even to look for alternative employment).

As a factual matter, this suggests strongly that the claims of harassment are after-the-fact

---

[10]     Deposition of Maurice Clarke, Exhibit 9, at 52 ("Q: Did Ronnie Barrett come to you with complaints about
Andre?  A:  Complaints about her salary, her position.  Q:  Any other complaints?  A:  No.").

inventions.  For summary judgment purposes, the undisputed evidence demonstrates that Ms.

Barrett took **no** action to avoid or minimize the harassment, a result fatal to her claims.

The discovery taken in this case has gone in a myriad of directions and encompassed a

plethora of "facts," assertions, rumors, and innuendo.  About two score depositions have been

taken.  Yet for purposes of summary judgment, the **<u>material</u>** facts are relatively few and

straightforward.  The undisputed material facts show there is no genuine dispute for trial, and

that the defendants are entitled to summary judgment on Ms. Barrett's claims under the D.C.

Human Rights Act.

<u>**SUMMARY OF ARGUMENT – OTHER CLAIMS**</u>

In addition to two counts pled under the D.C. Human Rights Act, Ms. Barrett has asserted

four other cursory claims: that her tips were taken from her (constituting both common-law

conversion and a violation of the D.C. Wage Payment Act); that the Chreky Salon breached an

alleged oral agreement to pay her at the rate of $1,900 per pay period (to be reviewed months

later and possibly increased), and that the corporation operating the Salon is liable for "negligent

supervision" in allowing Mr. Chreky to violate the D.C. Human Rights Act.  None of these

claims are viable.

The two counts relating to the withholding of tips from Ms. Barrett are based on

speculation and rumor alone.  Mr. Chreky had nothing to do with the collection and distribution

of tips to Salon employees, and Ms. Barrett's testimony is not to the contrary.  Ms. Barrett says

she has personal knowledge of **one single time** when one single tip was diverted from her due to

her violation of a work rule; it was given, she says, to a receptionist.  She has no idea when this

happened or how much was involved.  This evidence does not state a claim for conversion or a violation of the Wage Payment Act.[11]

The "negligent supervision" claim against the salon corporation fails as a matter of black-letter D.C. law.  The District of Columbia Court of Appeals has decided squarely that there is no cause of action for "negligent supervision" arising out of purported violations of the D.C. Human Rights Act.  In any event, such liability would be purely derivative.

Finally, Ms. Barrett has no breach of contract claim based on any asserted oral undertaking to pay her at any specific rate.  She was an at-will employee, whose salary may be varied from pay period to pay period.  There is no writing memorializing the alleged contract, which is accordingly unenforceable pursuant to the Statute of Frauds.  And Ms. Barrett's own deposition testimony is fatal to the claim on a number of key points.  There was no enforceable agreement.  There is no contract, and at worst Ms. Barrett acquiesced in a waiver.

Summary judgment is appropriate on all remaining claims in the Complaint.

## ARGUMENT

A defendant moving for summary judgment bears the initial burden of showing that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  Once the moving party makes such a showing, the burden shifts to the non-moving party to provide specific, admissible evidence demonstrating a genuine issue of material fact for trial.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).  "The mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson,* 477 U.S. at 252; *Freedman v. MCI*

---

[11]     There is also no evidence suggesting that this single incident was within the three-year statute of limitations.  Ms. Barrett says it happened at some unspecified time in 2004, Barrett Dep. at 72; some of 2004 was within, and some of 2004 is without, the three-year limitations period.

*Telecomm. Corp.,* 255 F.3d 840, 845 (D.C. Cir. 2001); *Jones v. District of Columbia*, 346 F.

Supp.  2d at 36-37.

In opposing a motion for summary judgment, "sheer hearsay . . . counts for nothing."

*Greer v. Paulson,* 505 F.3d 1306, 1315 (D.C. Cir. 2007), quoting *Gleken v. Democratic*

*Congressional Campaign Comm.,* 199 F.3d 1365, 1369 (D.C. Cir. 2000).  Neither will "self-

serving affidavits" or the plaintiff's own contradictory sworn statements defeat summary

judgment.  *Pyramid Secs. Ltd. v. IB Resolution, Inc.,* 924 F.2d 1114, 1123 (D.C. Cir. 1991)

(plaintiff's "self-serving affidavit" "may not create a material issue of fact (on summary

judgment) simply by contradicting prior sworn testimony"); *Carter v. George Washington Univ.,*

180 F. Supp. 2d 97, 110 (D.D.C. 2001) ("self-serving affidavits alone" cannot defeat summary

judgment").

Defendants' motion for summary judgment is predicated almost entirely upon

Ms. Barrett's own deposition testimony and the documents she provided to the D.C. Office of

Human Rights, supplemented by some materials she produced in discovery.  Mr. Chreky's own

sworn testimony is clear: Ms. Barrett is wrong on every allegation of harassment or retaliation

she makes.  But even assuming Ms. Barrett's testimony is correct, summary judgment is proper.

I.     **SUMMARY JUDGMENT IS APPROPRIATE ON MS. BARRETT'S
       <u>CLAIMS RELATING TO THE TERMINATION OF HER EMPLOYMENT</u>**

    A.     **Ms. Barrett's Claim that She Was Fired Unlawfully is Barred
           <u>By the D.C. Human Rights Act Statute of Limitations</u>**

Ms. Barrett's claim is that she was fired unlawfully on Saturday, December 6, 2005.  She

did not raise any claim of unlawful firing until January 19, 2007, when she filed a

"supplemental" declaration with the D.C. Office of Human Rights.[12]  Any claim arising out of

the termination of her employment is therefore barred by the one-year statute of limitations.  The

only claim relating to the end of her employment that she mentioned before the running of the

statute was the different claim of constructive discharge – that she quit, not that she was fired –

and Ms. Barrett has now abandoned that claim.

Claims under the D.C. Human Rights Act are barred unless they are filed within one year

of the violation.  D.C. Code § 2-1403.16(a); *Coleman v. Potomac Electric Power Co.,* 310 F.

Supp. 2d 154, 159 (D.D.C. 2004).  The filing may be made with a court or with the District of

Columbia Office of Human Rights (albeit not with both), but the claim must be filed within a

year or it is barred.  The administrative complaint must be in writing, be sworn, and state the

**specific allegations** upon which it is based.  D.C.M.R. 4-705.

The court Complaint in this case was filed on February 1, 2007; in the normal course, any

claims arising before February 1, 2006 would be barred.  Ms. Barrett left the employ of the

Chreky Salon on December 6, 2005, so all of her claims would be barred.  However,

Ms. Barrett's filing of her administrative complaint with the Office of Human Rights tolled the

statute of limitations while it was before the agency.  D.C. Code § 2-1403.16.

The Office of Human Rights regulations distinguish between the "filing" of a "charge"

and the mere "acceptance" of "information", D.C.M.R. 4-704.  Although Ms. Barrett's lawyers

plainly provided information to the agency in November, the record reflects that no charge was

filed until **December 11, 2006**, making all of Ms. Barrett's D.C. Human Rights Act claims, of

whatever type, time-barred.  The "Charge Form" itself, which contains the affidavit of filing, was

signed by Ms. Barrett on December 11, 2006.  The "EEOC Affidavit" part of the Charge Form is

---

[12]     Ms. Barrett's counsel characterized the January 19, 2007 filing as a "supplemental charge," not as an
amendment to the existing charge.  Exhibit 5, plaintiff's counsel's letter to D.C. Office of Human Rights dated
January 19, 2007.

dated December 15, 2006.  Exhibit 10 at second and third pages.  In dismissing the administrative complaint, the D.C. Office of Human Rights expressly wrote that the claim was docketed on December 11, 2006 (Exhibit 7).  The "Complainant's Affidavit" section of the Charge (which was apparently never signed by Ms. Barrett) bears the December 11, 2006 signature of the agency investigator.  Exhibit 10, last page.

Based on this record, it appears clear that no administrative complaint was made to the Office of Human Rights (as opposed to "information" simply being "accepted") until December 11, 2006.  That date is more than one year after Ms. Barrett's December 6, 2005 departure from the Chreky Salon.  **All** of her claims under the D.C. Human Rights Act – termination, constructive discharge, harassment, or retaliation – are barred based on the December 11, 2006 filing date with the agency.

The record does not reflect with clarity whether there was a lag between the Office of Human Rights' dismissal of the complaint and the filing of the Complaint in court.  It appears that the Complaint was filed on February 1, 2007, and that the administrative complaint was not dismissed until February 12, 2007.[13]

If the Court chooses to disregard the official docketing date, the date on the Charge form signed by Ms. Barrett, and the other indicia of late filing, the earliest conceivable operative date for statute of limitations purposes for the D.C. Human Rights Act claims would be November 8, 2006, the date on Ms. Barrett's initial (but subsequently "clarified") Affidavit and her counsel's letter to the Office of Human Rights is dated.  Under this **best**-case scenario, then, any claims based on acts before November 8, 2005 – which are still essentially every act Ms. Barrett alleges

---

[13]     Since the administrative charge was dismissed on February 12, 2007, as the D.C. Office of Human Rights file reflects, Exhibits 6, 7, Ms. Barrett had **no right to bring this action in Court** on February 1, 2007.  A complaint under the Human Rights Act may be pending in a court, or before the agency, but not before both at the same time.

– are time-barred.  For limitations purposes, her claim encompasses **at most** the last twenty-eight days of her employment.  Her failure to provide any evidence that any unlawful act of harassment or retaliation occurred during that period is, as discussed below, fatal to her harassment and retaliation claims.

Ms. Barrett's termination claim stands on an even shakier basis.  It is plainly time-barred.  Her November 2006 letter and Affidavit, upon which she must rely for any tolling effect, claims only that she **quit**.  Accordingly, the only possibly timely-filed claim relating to her separation from employment was that she was constructively discharged.  Yet she has **abandoned** her constructive discharge claim.  She now asserts unequivocally not that she quit, but that she was fired.  And there can be no dispute – factual or legal – that the very first time Ms. Barrett claimed in any forum to have been unlawfully fired, rather than to have quit, was in January 2007, outside the limitations period.

The intake materials, the information Ms. Barrett provided to the agency, the agency's forms, Ms. Barrett's sworn Charge, and Ms. Barrett's sworn Affidavit all make a plain and clear distinction between quitting and being fired.  Section 6 of the D.C. Office of Human Rights Complaint Form, Exhibit 4 at page RB00085, required Ms. Barrett to identify the "action . . . taken that made you feel you were treated differently."  She checked constructive discharge, but did not check the box for discharge.  In the agency's Intake Questionnaire (which Ms. Barrett testified at her deposition was accurate), Ms. Barrett completed the Intake Questions for a claim of "Constructive Discharge," but not for any claim of "Discharge" or unlawful firing of any type.  Exhibit 11.  Indeed, Ms. Barrett expressly told the agency that she was forced to resign "under the circumstances" based on conditions to which she was subjected on a specific date, November 15, 2005.

Similarly, Ms. Barrett's November 2006 Affidavit refers to her claims of "sexual harassment and retaliation," but does not mention any claim of unlawful discharge. Barrett Affidavit, Exhibit 4, page RB000092, at introduction. Ms. Barrett's Affidavit swears that the end of her employment was "an involuntary resignation," *id.,* page RB00100, at ¶ 17. She describes her argument with Mr. Chreky on December 6, 2005 as being triggered by her informing him of her decision to quit. *Id.* She swore, in short, "I quit my job at the Salon on December 6, 2005." *Id.*

The absence of any claim of unlawful termination in Ms. Barrett's case is made even clearer by her formal Charge of Discrimination, which she finally executed under penalty of perjury on December 11, 2006. Exhibit 10. This sworn Charge says that the **last "act" complained of** took place on November 15, 2005 (not on the day she now claims she was fired, December 6). If the "last act" was in November, it was not in December. The second page of the sworn Charge contains Ms. Barrett's statement that she was "forced into an involuntary resignation" and concludes, "On December 6, 2005, I resigned my employment with Respondent. . . ." *Id.*

There is nothing ambiguous about this claim, and nothing ambiguous about any of these documents. Ms. Barrett asserted, at most, a timely-filed administrative claim alleging a constructive discharge. And Ms. Barrett has unequivocally abandoned this claim. "I didn't quit. I was fired." Barrett Dep. at 145. "I was fired. I didn't quit." *Id.* "Constructive discharge" – a voluntary resignation in response to perceived harassment – is simply not the same claim, not even the same type of claim, as an unlawful firing claim. Constructive discharge is really a "graver" form of hostile environment harassment, not an unlawful firing. *Greer v. Paulson,* 505

F.3d 1306, 1320 (D.C. Cir. 2007) (failure to make out hostile environment claim is necessarily fatal to "graver claim" involving constructive discharge).

To this Court, Ms. Barrett swears that she was unlawfully fired in December 2005. None of her administrative filings so much as hint at such a claim until January 2007. Indeed, those pre-January filings contain sworn statements from Ms. Barrett that are inconsistent, and incompatible, with any suggestion that she was fired. Because Ms. Barrett did not assert an unlawful firing claim until more than a year after she left Chreky Salon, her claim of unlawful firing is time barred and summary judgment is appropriate. "[T]he plaintiff who fails to comply, to the letter, with administrative deadlines 'ordinarily will be denied a judicial audience.'" *Schrader v. Tomlinson,* 311 F. Supp. 2d 21, 27 (D.D.C. 2004), quoting *Brown v. Marsh*, 777 F.2d 8, 13 (D.C. Cir. 1985) (citations omitted) (Title VII case).

### B.    Ms. Barrett Cannot Provide Any Evidence of Damages Or Injury Arising from the Termination of Her Employment

An employee who is fired for reasons that violate the D.C. Human Rights Act may generally recover lost income damages. For Ms. Barrett, she has stipulated that lost income damages are the only form of damages she claims from her termination.[14] She cannot recover any such damages, and her inability to evidence injury or damages is an independent reason for summary judgment on any claims arising from the termination of her employment (however the end of the employment relationship is characterized).

Ms. Barrett cannot recover lost income damages based on the termination of her employment as a cosmetologist with the Chreky Salon, because at the time of her termination – and for years thereafter, perhaps until today – she has not been lawfully **permitted** to practice

---

[14]    Ms. Barrett also asserts a claim to punitive damages. However, and as discussed below, under well-settled D.C. law punitive damages may not be awarded in the absence of an award of compensatory damages.

26

cosmetology.  For well over two years (until the week or so before her July 2008 deposition in

this case) she failed to take even the minimum necessary step to renew her license: she did not

pay the fine D.C. assessed her for unlicensed practice, which payment is a condition precedent to

license renewal.

The undisputed facts relevant to this issue are few and clear:

- The D.C. Code requires a license for the practice of cosmetology.  D.C. Code § 47-2853.81 (defining practice of cosmetology); 2853.27(a) (unlicensed practice may be punished with fine of up to $10,000 and one year incarceration).  *See* D.C.M.R. 17-3702.2 (no person to engage in the practice of cosmetology without a valid license); D.C.M.R. 17-3727.5 (practice of cosmetology without a license is a misdemeanor punishable by a fine of up to $5,000 and 90 days in jail for each day of unlicensed practice).

- Although Ms. Barrett held a valid license while she was working for the Chreky Salon, it expired shortly before she left.  Barrett Dep. at 57; Exhibit 12.

- Ms. Barrett responded to the notice of violation issued by the District in December of 2005.  After receiving her response admitting her violation, on December 19, 2005 the District imposed a $500 fine on her for unlicensed practice. Barrett Dep. at 57; Exhibit 12.

- The payment of this fine was required before any application for reinstatement of her license could be processed.  D.C. Code § 47-2851.10(c)(2) (no application to be processed until all applicable fines and fees have been paid in full).

- Nevertheless, Ms. Barrett did not pay the 2005 fine until June 28, 2008, shortly before her deposition in this case.  Barrett Dep. at 57-59; Exhibit 13 (receipt from D.C. government showing payment of fine by Ms. Barrett in late June 2008).[15]

---

[15]     Ms. Barrett testified that she paid renewal fees – albeit never the fine – in the interim.  She concedes she never received a license.  Documents showing the payment of the renewal fees have been requested, but Ms. Barrett has never produced them.  Barrett Dep. at 59-61.  Even if a license had been issued erroneously, it would

- At no time since her December 2005 departure from the Chreky Salon has Ms. Barrett been lawfully permitted to practice cosmetology (although she apparently continues to do so). Barrett Dep. at 57-59.

While no D.C. case has addressed precisely this issue, the governing principles are clear from analogous situations. A plaintiff who is disabled from work, for example, is not permitted to recover lost income damages for the period of disability. *Salpaugh v. Monroe Community Hospital,* 4 F.3d 134, 144 (2d Cir. 1993); *Townsend v. Exchange Insur. Co.,* 196 F. Supp. 2d 300, 307 (W.D.N.Y. 2002). The reason is that the recovery of lost income damages presupposes that the plaintiff be available to perform the work. Similarly, in computing lost income awards under the National Labor Relations Act, the Board excludes any period during which a worker was not lawfully admitted to work in the United States; at such time the worker was not "available" to work "and the accrual of backpay [was] therefore tolled." *Sure-Tan, Inc. v. NLRB,* 467 U.S. 883, 902-03, 904-05 (1981).[16] *See also Fogg v. Gonzales,* 492 F.3d 447, 477 (D.C. Cir. 2007) (not error to deny both back pay and front pay to plaintiff based on false representation regarding qualifications for the position).[17] These cases stand for the proposition that even an unlawfully-fired plaintiff may not recover lost income damages based on loss of a job, where the job was one the plaintiff was forbidden by law to perform. That is the case here.

More broadly and conventionally, Ms. Barrett's lost income claims arising from the end of her employment are also barred by her failure to mitigate her damages. She never sought

---

have been subject to immediate revocation, as the December 2005 Order itself informed Ms. Barrett. D.C.M.R. 17-3727.4(g) (revocation of license for failure to pay civil fine).

[16] Subsequent to enactment of the Immigration Reform and Control Act of 1986, the Supreme Court held that backpay for unlawfully-admitted workers was barred, not just tolled. *Hoffman Plastic Components, Inc. v. NLRB,* 535 U.S. 137 (2002). The pre-1986 Act situation is more analogous to that of Ms. Barrett.

[17] Of course, any award of lost income damages is equitable, not mandatory, even where warranted by cognizable evidence of lost income, which this claim is not. *Ford Motor Co. v. U.S. EEOC,* 458 U.S. 219 (1982).

higher-paying employment.  (Indeed, if one believes her sworn November 2005 Affidavit, she

applied for and accepted her new job before December 6, 2005.)  Her deposition makes clear that

she never interviewed for, applied at, or even looked for any more remunerative employment.

> Q:    When did you start [working at Urban Style Labs]?
>
> A:    I was fired from Andre in December 2005, so I started there two days later –
>       actually started there three days later.
>
>                   *  *  *  *  *
>
> Q:    When did you first start talking to Kelly or Melanie [the owners] about working
>       for Urban Style Labs?
>
> A:    On [*sic,* In] September 2005.

Barrett Dep. at  86-87.[18]  Ms. Barrett did nothing else to look for a job after leaving the Chreky

Salon.  Barrett Dep. at 156.  Even the most dilatory employment-law plaintiff at least scans the

"want ads" once in a while; Barrett didn't.[19]

    But first and foremost, Ms. Barrett's failure to pay the $500 fine D.C. assessed against

her in December 2005 – a continuing failure Ms. Barrett acknowledges and which barred her

from re-licensure – surely is itself at least a signal "failure to mitigate" her damages.  She cannot

recover damages based on the termination of her employment as a cosmetologist, if she is

forbidden by law to work as a cosmetologist.

    In the absence of compensatory damages on a particular claim, D.C. law prohibits any

award of punitive damages.  *Martini v. Fannie Mae,* 178 F.3d 1336 (D.C. Cir. 1999), *cert.*

---

[18]    Although Ms. Barrett worked at Urban Style Labs in December 2005, she did not report the income she made there on her 2005 federal income taxes.  Barrett Dep. at 103.

[19]    *See also Berger v. Iron Workers Reinforced Rodmen, Local 201,* 170 F.3d 1111, 1134 (D.C. Cir. 1999) ("If the discriminate accepts significantly lower-paying work too soon after the discrimination in question, he may be subject to a reduction in back pay on the ground that he willfully incurred a loss by accepting an unsuitably low paying position.); *Jefferson v. Milvets System Technology, Inc.,* 986 F. Supp. 6, 8 (D.D.C. 1997) (Sporkin, J.) (voluntary under-employment constitutes a failure to mitigate for both back pay and front pay purposes).

*denied,* 528 U.S. 1147 (2000) (D.C. Human Rights Act claim).  *See generally Jordan v. Malley,* 711 F.2d 211 (D.C. 1983); *Street v. Hedgepath,* 607 A.2d 1238 (D.C. 1992); *Bernstein v. Fernandez,* 649 A.2d 1064 (D.C. 1991); *Zanville v. Garza*, 561 A.2d 1000 (D.C. 1989) (per curiam).

With respect to any claim arising out of the end of her employment, Ms. Barrett can claim no economic damages.  She has stipulated away all other compensatory damages, attempting to avoid discovery.  In the absence of compensatory damages she cannot recover punitive damages.  Summary judgment for defendants is appropriate on all D.C. Human Rights Act claims arising out of the termination of Ms. Barrett's employment.

### C.    If Ms. Barrett's Testimony is True, She Was Fired for A Lawful Reason, and There is No Evidence of Pretext

If we believe Ms. Barrett's deposition testimony about her departure from employment with the Chreky Salon, she was properly fired for insubordination.  She clocked out from work but remained in the Salon.  "The day had already ended for me.  I was off."  Barrett Dep. at 146.  She was asked to help others in restocking inventory but refused, since she was "off the clock."  Barrett Dep. at 147.  She was again told to leave, not to remain chatting with employees who were still working.  Rather than leaving, she had a cigarette.  Barrett Dep. at 147-48.  Her manager came outside and spoke with Ms. Barrett as she was smoking, and told her that Mr. Chreky was "very mad with you right now.  If I were you, I would leave."  Barrett Dep. at 148.  She was, she testified, waiting to attend a "shower" for a co-worker, to be held in the Salon during working hours (although no one asked Mr. Chreky if that was permissible). Barrett Dep. at 154.  These interactions happened, Ms. Barrett testified, with another manager (not Mr. Chreky), although the manager claimed she was transmitting Mr. Chreky's sentiments.  Barrett Dep. at 153.

Having been told by a manager twice to leave, because she had signed out and was not working, Ms. Barrett decided to ignore the instructions. She decided to return to the Salon while she was off the clock, and decided to remain. Let her tell it:

> I am not a dog, and I should have some kind of pride, so what I did was, I am not going to leave. He cannot treat me like this. So what I did was, I will talk to him at the end of the baby shower. . . . I put my things in a plastic bag, and I went upstairs and I told my other co-workers. . . . They said, You ought to leave. You know how he is. I said, No, I am not going to leave. We have a baby shower. I have to give a present to her. So I stayed in the baby shower and everything.

Barrett Dep. at 148-49. Ms. Barrett then says she was confronted after the shower by a violent, profane Mr. Chreky, who noted that Ms. Barrett was also calling her manager "a liar." Barrett Dep. at 150. Ms. Barrett concludes the story with Mr. Chreky saying, "You are fired." "He fired me. . . . I didn't say I quit." Barrett Dep. at 151.

Ms. Barrett's deposition testimony does contain alleged invective, alleged yelling, and alleged profanity. What her evidence does not contain is any denial that she was being insubordinate, and that her willful acts of insubordination – constituting a trespass, by the way – were what led (in her version) Mr. Chreky to fire her.[20]

This is not illegal. Period. The "question before the Court is limited to whether [the plaintiff] produced sufficient evidence of . . . discrimination, not whether she was treated unfairly." *Forman v. Small*, 271 F.3d 285, 291 (D.C. Cir. 2001). As this Court has written:

---

[20]    *See also* Deposition of Andre Chreky ("A. Chreky Dep."), Exhibit 14 at 235-36 (Barrett was told to leave because "she punched out, and I want the employees to finish the work. She keeps talking to them and they don't do their work."). Barrett was being disruptive (A. Chreky Dep. at 239) and interfering with others doing their work, A. Chreky Dep. at 240. Ms. Barrett was insubordinate in that she did not take direction from manager. A. Chreky Dep. at 237.

> [Despite the existence of a prima facie case of unlawful discharge],
> [s]ummary judgment may be granted to a . . . defendant who
> presents uncontroverted evidence that its employment decisions
> were made for nondiscriminatory reasons, because it is the plaintiff
> who must 'create a triable issue of pretext.'

*Price v. Greenspan,* 374 F. Supp. 2d 177, 186 (D.D.C. 2005) (Lamberth, J.), *aff'd in pertinent part,* 470 F.3d 384 (D.C. Cir. 2006).  Or, more directly, "Courts do not 'second-guess' an employer in personnel decisions unless there is a demonstrably discriminatory motive. . . . [T]he ultimate burden of persuasion remains at all times with the plaintiff."  *Waters v. Gonzalez,* 374 F. Supp. 2d 187, 194 (D.D.C. 2005) (Lamberth, J.) (internal citations omitted).  "It is clear that merely being yelled at by your supervisor does not rise to the level of an adverse employment action."  *Russ v. Van Scoyoc Assoc., Inc.,* 122 F. Supp. 2d 29, 32 (D.D.C. 2000) (Lamberth, J.).

If Ms. Barrett's deposition testimony is credited, she was fired because she ignored repeated direction by a manager to leave the premises.  She knew full well that she was acting in an insubordinate manner – "I should have some kind of pride, so what I did was, I am not going to leave.  He cannot treat me like this" – and based on her testimony was certainly not surprised to be fired.  Ms. Barrett's deposition does not present a pleasant picture of the end of her employment.[21]  But it does not provide any evidentiary support for the proposition that she was fired because she was female, or because she resisted some act of harassment at some time in the past.

If Ms. Barrett's deposition testimony is accurate, she does not even present the typical plaintiff's "proximity in time" fall-back: Was Ms. Barrett **fired** in December 2005 in retaliation for resistance she showed to Mr. Chreky beginning in 1996, notwithstanding her being **hired** by Mr. Chreky in 1997, and hired by him again in 2003, and again in 2005 (after her pregnancy)?

---

[21]    Again, Mr. Chreky denies Ms. Barrett's story, but her story is the one to which we look for purposes of summary judgment.

Or did Mr. Chreky wait twenty-two months to retaliate against Ms. Barrett for her alleged refusal to give him oral sex in February 2004?  Ms. Barrett's deposition testimony shows plainly and unequivocally that she was fired for disobeying lawful instruction from her manager not to remain on the premises after she signed out from work.[22]

## II.    SUMMARY JUDGMENT IS APPROPRIATE ON MS. BARRETT'S CLAIMS OF UNLAWFUL CONDUCT DURING HER EMPLOYMENT

### A.    No Acts of Harassment or Retaliation Occurred Within The One-Year Limitations Period Prior To Filing

While Ms. Barrett's administrative Charge and her court Complaint in this action allege that some act of harassment occurred on November 15, 2005 – within the limitations period by a bare week – the testimony from Ms. Barrett's own deposition makes clear that these allegations actually relate to a substantially earlier time period.  No act of harassment or retaliation occurred during the one-year limitations period, and her claims respecting harassment or discrimination during the course of her employment are untimely.

The Complaint alleges that Mr. Chreky attempted to "start a relationship" with Ms. Barrett on November 15, 2005.   Complaint ¶ 35.  Her Charge to the D.C. Office of Human Rights specifies that he solicited the relationship in November 2005 and that, on November 15, 2005, Mr. Chreky also "ran his hand down the front of [her] shirt over [her] breast as other stylists looked on."  Charge, Exhibit 10, at ¶ 16.  Ms. Barrett's administrative filings identify November 15, 2005 as the last, most recent discriminatory or harassing act.  Charge, Exhibit 10 at first page ("Date(s) latest discrimination took place: 11-15-2005").

---

[22]    Ms. Barrett's administrative filings suggest that her departure was in retaliation for resisting specified acts of harassment on November 15, 2005.  As the next section demonstrates, Ms. Barrett is badly off when she suggests that these acts took place in November 2005; they were no closer to December 2005 than the previous summer, negating any suggestion that an inference of retaliation is appropriate.

However, Ms. Barrett's sworn deposition testimony places this interaction much earlier, well outside the one-year limitations period. She was asked about the "relationship" discussion with Mr. Chreky.

> Q:     There were some indications that Mr. Chreky told you that you should leave your husband and start a relationship with him. Did those occur?
>
> A:     He offered to get me an apartment. . . . I was going through a pretty tough time with my husband. . . .
>
> Q:     When was that discussion?
>
> A:     This was after the baby . . . ***summertime. . . . I go by seasons.***

Barrett Dep. at 135-37 (emphasis added). "Summertime" is not mid-November. Similarly, Ms. Barrett's deposition places the "shirt touching" incident well before November 2005.

> Q:     There are allegations in your complaint that he attempted to put his hand down your shirt. Tell me when that happened?
>
> A:     Well, there was one specific time ***when I was pretty pregnant [i.e., December 2004 or earlier]. . . .***
>
> Q:     Any other times that he attempted to grab your breasts?
>
> A:     Not that I can recall right now. I am sure there were, but I can't recall right now.

Barrett Dep. at 134-35 (emphasis added). Accordingly, the **only** incidents of harassment or retaliation that Ms. Barrett offers as timely are shown, by her own testimony, to have happened outside the limitations period.

Ms. Barrett's Complaint contains a litany of other alleged acts of harassment. In point of fact, none of them ever happened.[23] Of more salience on summary judgment, her own testimony

---

[23]    In particular, Mr. Chreky testified under oath that none of the "incidents" described by Ms. Barrett ever happened. See A. Chreky Dep., Exhibit 14, at pp. 63 (never made sexual advance to employee); 66-68 (never touched employee in a sexual manner, never touched the breasts of an employee, never had any type of sexual

establishes that none of them possibly **could** have happened within the one-year statutory period. *See, e.g.,* Barrett Dep. at 127-28 (one time smacked on buttocks with towel, before birth of baby in December 2004); at 130-31 (spanking at the end of "2003, I believe"); at 131 (any other spanking incident was during pregnancy, which ended in December 2004); at 138-39 ("brushing against me" in lunchroom during period, before 2004 pregnancy, when Ms. Barrett smoked cigarettes). The most detailed allegation she makes, of an incident in Mr. Chreky's office, happened in February 2004, almost three years outside the limitations period, and more than three years before this case was filed in this Court.[24]

### B.    Ms. Barrett Cannot Provide Any Evidence of Damages Or Injury Arising from Acts Within the Limitations Period

As with her termination claim, Ms. Barrett has limited her damages claim for retaliation or harassment to demonstrable and direct loss of income. She has not adduced any evidence of those types of injury during the limitations period. Even if the "November 15, 2005" incidents actually happened on November 15, 2005 – a conclusion made impossible by Ms. Barrett's deposition testimony – she has no claim since they generated no cognizable damages. Brushing

---

relations with an employee); 71-2 (never invited female employee to office for purpose of any form of sexual contact, never suggested oral sex to an employee); 75 (never had a romantic relationship with an employee); 76-77 (never asked employee to perform sex act); 93-95 (never groped or spanked employee or smacked employee's buttocks with a towel "even jokingly"); 101 (never made comments about Barrett's breasts during pregnancy); 103-04 (never spoke to employee about employee's sex life); 254-55 (no sexual or physical conduct during first stretch of employment); 259 (no comments about Barrett's husband, sex life, sexual prowess); 267-68 (never asked any employee to go to fifth floor for reasons of sex, never opened pants in front of Barrett); 269-70 (never touched Barrett's breasts, buttocks).

[24]    The "continuing violation" doctrine has no application to a case, like this one, where none of the alleged acts took place during the limitations period. *Mayers v. Laborers' Health & Safety Fund of No. Am.,* 478 F.3d 364, 368 (D.C. Cir. 2007) (doctrine has no applicability where no act took place within the filing period). Moreover, essentially every "act" of harassment Ms. Barrett recites – the single incident in Mr. Chreky's office, the removal of a client from her schedule, a "smacking" on the buttocks with a towel – constitutes a discrete act. The continuing violation doctrine is inapplicable to a series of discrete acts, however closely related they are alleged to be. *Id. See also Schrader v. Tomlinson,* 311 F. Supp. 2d 21, 27 (D.D.C. 2004) (D.C. Circuit has "clearly held that a plaintiff may not rely on the continuing violation theory where she was aware of the discriminatory conduct at the time it occurred"). Ms. Barrett plainly was "aware" of the discriminatory conduct ten years ago, if not earlier.

against the front of an employee's shirt or engaging in an inappropriate conversation is conduct that does not belong in the workplace, but it does not result in lost income.[25]

### C.    Ms. Barrett Took No Action – Much Less the Reasonable Steps Required by Law – to Minimize or Limit Harassment

Ms. Barrett has abandoned the allegations of her Complaint – that she reported the alleged harassment to a manager, Maurice Clarke, with increasing frequency towards the end of her tenure – in recognition of the fact that Mr. Clarke denies the claim (and that he was not even a Chreky Salon employee in 2005). Rather, Ms. Barrett has retreated to the story she told the Office of Human Rights – that she did not complain to anyone, since there was no one to complain to. Barrett Dep. at 142.

The Salon has a zero-tolerance policy against sexual harassment, as reflected in the Handbook provided to every employee, a policy acknowledged in writing by Ms. Barrett on two separate occasions. Exhibit 2 (Handbook and acknowledgement forms). Ms. Barrett never sought to seek assistance or guidance from any manager, much less to make a complaint under the policy. Under *Faragher, Ellerth,* and their progeny, this would be sufficient to warrant summary judgment for the defendants. *See generally Faragher v. City of Boca Raton,* 524 U.S. 775 (1998); *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742 (1998).

Ms. Barrett, of course, says she complained to Mr. Chreky himself by resisting him (although she also says that she often just ignored him, Barrett Dep. at 123-24). That is beside the point, although it might be persuasive if the **only** reason for the *Faragher/Ellerth* doctrine were to provide notice to the employer. The doctrine is not so limited: a critical purpose of the doctrine is to encourage, indeed require, the employee to take some meaningful action **"to avoid**

---

[25]    Ms. Barrett has disavowed any claim for loss of income that might arise as an **effect** of emotional distress; her only claims are for direct losses. Barrett Dep. at 76-77.

**harm otherwise.**"  *Jones v. District of Columbia,* 346 F. Supp. 2d at 43 (emphasis added). And here, Ms. Barrett did **nothing** to "avoid harm otherwise."  She followed Mr. Chreky to his new salon in 1997; she returned in 2003 after she resigned in 1999; she returned after her lengthy maternity leave in 2005, and she never even looked for a job during the five months of 2005 she was away from the Salon.  And while she alleged she complained to manager Maurice Clarke years ago – an assertion he denies under oath – she concedes that for the last months or years of her employment she did not raise her concerns with anyone **at all** in management, or who was otherwise in a position to address them.  And that is precisely the reason for the *Faragher/Ellerth* doctrine to begin with: to permit employers to address concerns of harassment before they rise to the severe and pervasive level of illegality.

Even the alleged February 2004 incident, when Ms. Barrett claims Mr. Chreky expressly asked her to perform oral sex, was not followed by any complaint.  Nor did she report the alleged assault to the police, or even tell her husband.  Barrett Dep. at 26-29, 47-48.  And, of course, she did not complain to any manager, much less Ms. Chreky – whose desk was just feet away, outside the **open** door of Mr. Chreky's office!  (Ms. Barrett's admission that the door was open during this meeting with Mr. Chreky is unsurprising, since the door to that office does not lock. A. Chreky Dep. at 10.)  Ms. Chreky is responsible for personnel matters through her supervision of the other managers in the Salon, but the policy allows complaints to be made to any manager. A. Chreky Dep. at 35; Handbook Exhibit 2.  The evidence is clear: Ms. Barrett did **nothing** to "avoid harm otherwise."  Her claim fails.

> **D.    Most of the Allegations Ms. Barrett Makes Do Not Rise
> To the Level of Severe and Pervasive Harassment or
> Actionable Retaliatory Conduct**

The adverse action required for a claim of hostile environment or retaliation under the D.C. act is not trivial.  *Hussain v. Nicholson,* 435 F.3d 359 (D.C. Cir. 2006).  *See generally*

*Harris v. Forklift Sys., Inc.,* 510 U.S. 17 (1993); *Burlington N. & S.F.R. Co. v. White,* 548 U.S. 53 (2006). While the February 2004 incident alleged by Mr. Barrett (and denied by Mr. Chreky) seems "severe" within the meaning of the law – if isolated, rather than pervasive – much of what Ms. Barrett focuses upon comprise far less substantial complaints. Some of them are trivial. Some of them happened too infrequently, even if we believe Ms. Barrett, to constitute an actionable wrong.

Ms. Barrett's claimed retaliation consists of being asked to re-stock inventory and of having "new clients" assigned to other stylists.[26] Barrett Dep. at 124 (in response to question, "Ever. Tell me everything.") Yet her deposition testimony makes clear that her allegation that Mr. Chreky assigned clients – or not – in retaliation is based on hearsay. Barrett Dep. at 113-114, 118. Similarly, she has no reason to believe that other colorists and stylists were not asked to re-stock inventory, Barrett Dep. at 125-26, and in point of fact all other stylists also were asked to perform these tasks on occasion. Deposition of Amal Zaari, Exhibit 15, at 105 (other employees were asked to re-stock inventory all the time). Her claim that she was retaliated against by being the first stylist to be sent home also is illusory: there were several stylists, and Ms. Barrett was the first "sent home" in the absence of work only infrequently:

Q:    How many times a week were you the first person sent home?

A:    Maybe one time.

Q:    Once a week?

A:    Yes, but not every week. Maybe like a couple times, three times a month, maybe.

---

[26]    Mr. Chreky does not "play an active role in deciding what stylists should be assigned to new customers," A. Chreky Dep. at 107, and never gave instructions to remove or re-assign any client. *Id*. at 107-08. There is no "favorites list" and Mr. Chreky never intervened to make changes to a stylist's schedule. A. Chreky Dep. at 127-28. In particular, Mr. Chreky never took any client away from Ms. Barrett. A. Chreky Dep. at 260-61.

Barrett Dep. at 125. A couple or three times a month constitutes less than ten percent of the 30-plus days the Salon is open in a month.

These are not the stuff of an harassment or a retaliation claim.[27] For example, in *Russ v. Van Scoyoc Assoc., Inc.,* 122 F. Supp. 2d 29 (D.D.C. 2000), this Court reviewed a claim based on an abusively-yelling supervisor, comments admiring an employee's breasts, a comment that the vice president/supervisor wanted to have sexual relations with the employee, and a statement that the vice president wanted to perform oral sex on the employee. This conduct, this Court quite properly held, "while certainly offensive and unfortunate, is not severe enough to reach the level of actionable conduct." 122 F. Supp. 2d at 32-33.

## III.    SUMMARY JUDGMENT IS APPROPRIATE ON MS. BARRETT'S CLAIMS NOT ARISING UNDER THE D.C. HUMAN RIGHTS ACT

### A.    Claims Relating to Tip Withholding

This claim is based on rumor and an inchoate feeling that Ms. Barrett's clients surely tipped her more than she received. To be sure, Ms. Barrett complained about the tips she received. So did "most of the people" – "pretty much everyone." Barrett Dep. at 68. Indeed, Ms. Barrett herself helped sort and distribute the tips on occasion – and on those occasions **other** employees complained that **they** did not receive all of their tips! Barrett Dep. at 70. But there is no evidence that Mr. Chreky was responsible for any misallocation that may have occurred. The evidence is almost entirely to the contrary. As Ms. Barrett testified, "[u]sually Linda was in charge of the tips." Barrett Dep. at 62. Tips were kept in bags, handled by "[e]ither Linda or

---

[27]     Ms. Barrett's "retaliation" claim is made all the less compelling by her testimony that, even the February 2004 incident was followed, in Ms. Barrett's words, by Mr. Chreky treating her "nice" and "leaving [her] alone" for a while. Barrett Dep. at 38. She had Mr. Chreky's assurance it would never happen again; it concededly did not re-occur. Barrett Dep. at 33-34. This reaction on the part of Mr. Chreky would be inconsistent with any retaliatory animus.

Mindy or Amal," **not** Mr. Chreky.  Barrett Dep. At 64. Mr. Chreky has, in fact, never taken a tip

from any employee.  A. Chreky Dep. at 118 ("Never. . . .  Positive").

Ms. Barrett's admissible (albeit incorrect) evidence is limited to a single occasion on

which she claims Mr. Chreky diverted one of her tip envelopes to a receptionist (which, she says,

was disciplinary in nature because she failed to follow a work rule for that client).  She has no

other evidence whatsoever that any tip money was ever diverted from her.

> Q:     Did you ever see Andre [Chreky] take your tips?
>
> A:     **No**. . . .  I am sorry.  Actually, there was **one time** that I forgot to – we were
>        supposed to put formula [for hair product ingredients] down after every client that
>        we had performed, it was mandatory.  So if we didn't – sometimes he would
>        come up with some different rules, and the rule was if we didn't put the formula
>        down, we would get one tip envelope away from us, so there was **one time** that I
>        had **one tip envelope** taken from me because I hadn't put in one of my formulas.
>
> Q:     When was that?
>
> A:     I don't really remember a date –
>
> Q:     A year?
>
> A:     That was **in 2004**.
>
> Q:     Do you know **how much** was in the envelope?
>
> A:     **No**.  I believe that was given to the receptionist.

Barrett Dep. at 71-72 (emphasis added).

Whether characterized as "conversion" (Count Six) or as violation of the D.C. Wage

Payment Act (Count Five), this is not enough for this claim to survive summary judgment.

First, there is no evidence that Ms. Barrett's "2004" incident fell within the applicable

three-year limitations period, which applies both to the conversion and the statutory claim.

 Second, as a legal matter, it is not at all clear that a gratuity constitutes money "owed by

the employer" within the meaning of the statute, D.C. Code § 32-1301 (3) (defining "wages" for

purposes of the Act).  A tip is not owed; it is not provided by the employer, and counsel for

defendants is unaware of any reported decision holding that a "tip" constitutes a "wage" under

the D.C. Act.

Third, there is no evidence from which any quantum of damages could be shown.  Any

claim of "lost income" would be purely speculative as well as miniscule.  Ms. Barrett has no idea

how much money was in the one envelope she says was withheld.  Barrett Dep. at 72.  She has

no records from which any damage evidence could be generated on this claim.  She did not keep

records of the number of "tip envelopes" which were provided by customers for her, and she did

not keep any records of how much she received in tips.  Barrett Dep. at 68-9.  Even after leaving

Chreky Salon, in amending her income tax returns (just before her deposition) to finally report

some of her tips, she based her reporting on mere "guesses."  Barrett Dep. at 98.  The absence of

any evidence of the amount of money (if any) in the single tip envelope she claims was diverted

is, standing alone, fatal to Ms. Barrett's conversion claim.  "The most distinctive feature of

conversion is the measure of damages which is the value of the goods converted."  *Pearson v.

Dodd,* 410 F.2d 701, 705 (D.C. Cir.) (J.S. Wright, J.), *cert. denied,* 395 U.S. 947 (1969).[28]  Any

award of damages under the Wage Payment Act also would be purely speculative.

## B.    Claims of "Negligent Supervision"

Count Seven, asserted against the Chreky Salon (Andre Chreky, Inc.) as employer for its

failure to supervise Mr. Chreky as employee, should not have been brought.  It is settled District

---

[28]     Judge Wright's opinion in *Pearson* contains a detailed discussion of the tort of conversion under D.C. law, albeit in a sharply differing context (the unauthorized photocopying of then-Senator Dodd's documents by columnists Drew Pearson and Jack Anderson).  Both *Pearson* and the Restatement (Second) of Torts suggest another reason Ms. Barrett's conversion claim should fail: she does not allege a taking of a tangible **chattel**.  For many purposes, the tort is limited – due to its historical roots in the tort of trover – to misappropriation of chattel property.  *See Pearson,* 410 F.2d at 708 and n.34; Restatement (Second) of Torts § 222A (conversion is misappropriation of chattel property); § 242 (discussing conversion in the context of misappropriation of documents, such as stock certificates, embodying intangible rights).

of Columbia law that no negligent supervision claim may be predicated on an alleged violation

of the D.C. Human Rights Act (or upon any other alleged statutory violation).  *Griffin v. Acacia*

*Life Ins. Co.,* 925 A.2d 564 (D.C. 2007).[29]

### C.    Breach of Contract Claims

Ms. Barrett's breach of contract claim against the Salon, Count Nine, fails for at least

four reasons.  First, what Ms. Barrett's testimony actually describes is, at best, an undertaking by

the defendants to *review* her compensation after three months of work.

> A:    He did guarantee me that after three months I was going to have my review.
>
> Q:    And those are the words he used?
>
> A:    Yes.

Barrett Dep. at 9-10.  It also, similarly appears that Ms. Barrett's claim was based on her initial

misunderstanding between gross and net compensation.  In fact, it appears that her dissatisfaction

arose from her failure to take into account paying taxes on her pay:

> Q:    When you started up in September of '03 at the Chreky Salon, what was your pay?
>
> A:    I'm sorry.
>
> Q:    What was your compensation?
>
> A:    Where?
>
> Q:    At Chreky in September of '03?
>
> A:    Well, [it] was supposed to be $1900 salary, but it turned out not to be what I thought it was going to be.  It turned out to be a $21-an-hour.
>
> Q:    And how many hours did you work in a week?

---

[29]    Accordingly, the Court does not need to parse the analytically interesting but legally superfluous question of whether a closely-held corporation can be liable in tort, as a separate claim, for failure to supervise its owner.

A:     I started with – supposed to be 45 hours – I had to be there 45 hours a week in order to get 40 hours, so supposedly I had $1900, but the numbers really didn't add up to $1900 regardless.

Q:     Why didn't they add up?

A:     Because they just didn't. . . .  But after the taxes and everything, I didn't come out having $1900 in my paycheck.  I never had $1900 in my paycheck, but maybe one time or twice.

Barrett Dep. at 18-19.  Ms. Barrett's compensation remained unchanged at $21.00 per hour until she left in December 2005.  Barrett Dep. at 50-51.

Second, Ms. Barrett's breach of contract claim fails because she was an employee at will. Salon Handbook, Exhibit 2, at 2.  She knew that she was being paid at a rate different than she now (five years later) alleges to have been agreed.  Yet the continued employment of an at-will employee, coupled with acceptance of the compensation paid, is in essence a termination of the employment relationship initially "agreed to" and the establishment (for each pay period) of a new relationship, at the rate being actually paid.  Ms. Barrett did not have to stay and accept her new compensation (or return to the same compensation system in May 2005 after five months' absence)  – she could have left and sued for the money she felt she was owed for her initial pay period at the end of September 2003 – but she did not.  She continued to work as an at-will employee at the new rate.  Her at-will status means that she has no claim for breach of contract (at least, no claim other than for her sole initial pay period in September 2003, which would have been time-barred by the time the Complaint was filed more than three years later).  "Unless otherwise agreed . . .  mutual promises to employ and to **serve at the agreed rate** create **obligations terminable at will** by either party."  *Sullivan v. Heritage Foundation,* 399 A.2d 856, 860 (D.C. 1999) (emphasis added), citing Restatement (Second) of Agency §442.

43

Third, it is undisputed that Ms. Barrett always accepted her salary when and as paid.

Barrett Dep. at 62. It is black-letter law that this acceptance discharges the Salon's common-law

contractual duty to pay her at any different rate. Restatement (Second) of Contracts § 278(i) ("If

an obligee accepts in satisfaction of the obligor's duty a performance offered by the obligor that

differs from what is due, the duty is discharged.")

Finally, enforcement of specific terms of an alleged open-ended oral contract (and

Ms. Barrett never had a written employment agreement, Barrett Dep. at 61-62), is barred by the

Statute of Frauds. *Prouty v. National Rail Passenger Corp.*, 572 F. Supp. 200, 203-04 (D.D.C.

1983) (claim of violation of oral agreement asserting, *inter alia*, claim for unpaid compensation

is barred by the Statute of Frauds; documents showing rate of pay insufficient to constitute

binding memorandum in writing).

## <u>CONCLUSION</u>

Defendants are entitled to summary judgment on each of the claims remaining in this

case.

September 2, 2008                                Respectfully submitted,

                                        _____/s/_____
                                        John M. Bredehoft
                                        D.C. Bar No. 375606
                                        David Sullivan
                                        Anna R. Smith
                                        KAUFMAN & CANOLES, P.C.
                                        150 West Main Street, Suite 2100
                                        Norfolk, Virginia 23510
                                        757-624-3225 (direct voice)
                                        757-624-3169 (facsimile)
                                        jmbredehoft@kaufcan.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| RONNIE BARRETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-CV-0250 |
| | ) | |
| ANDRE CHREKY, ET AL. | ) | |
| | ) | |
| Defendants. | ) | |

---

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter came before the Court on the motion, pursuant to Fed. R. Civ. P. 56, made by each of the defendants for summary judgment.  Upon review of the pertinent submissions and argument of counsel for the parties, and the entire record in this matter, the Court determines that there is no genuine dispute as to any fact material to the motion, and that defendants are entitled to judgment as a matter of law.  Accordingly, it is hereby ORDERED:

1.    The parties having agreed to the dismissal of Count Three, Count Four, and Count Eight, those claims are accordingly DISMISSED.

2.    Since defendant SPAC, LLC, is made a defendant with respect only to Count Eight, and that claim has been dismissed on the consent of the parties, defendant SPAC, LLC is hereby dismissed as a party from this matter.

3.    With respect to the remaining claims, encompassing Counts One, Two, Five, Six, Seven, and Nine, there is no genuine dispute as to any material issue of fact and defendants Andre Chreky and Andre Chreky, Inc., are entitled to judgment as a matter of law.  Accordingly,

the motion for summary judgment on these remaining claims should be, and hereby is, GRANTED.

SO ORDERED.


ENTERED: _____     _____
                                     Hon. Royce C. Lamberth
                                     United States District Judge
                                     United States District Court
                                     for the District of Columbia

## <u>CERTIFICATE OF ELECTRONIC FILING</u>

September 2, 2008                              Respectfully submitted,


_____/s/_____
John M. Bredehoft
D.C. Bar No. 375606
David Sullivan
Anna R. Smith
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, Virginia 23510
757-624-3225 (direct voice)
757-624-3169 (facsimile)
jmbredehoft@kaufcan.com



COPY

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - -x
                      :
RONNIE BARRETT,          :

       Plaintiff,     :

   vs.              :  Civil Action
                      :
ANDRE CHREKY,         :  No. 07-CV-0250
ANDRE CHREKY SALON/ANDRE  :
CHREKY, INC., SPAC, LLC,   :

       Defendants.    :
                      :
- - - - - - - - - - - - - - -x

                   Washington, D.C.
                   Monday, July 7, 2008

       The videotaped deposition of RONNIE BARRETT,

called for examination by counsel for Defendant in

the above-entitled matter, pursuant to Notice, in the

offices of Katz, Marshall & Banks, 1718 Connecticut

Avenue, N.W., Sixth Floor, Washington, D.C., convened

at 9:58 a.m., before CATHY JARDIM, a notary public in

and for the District of Columbia, when were present

on behalf of the parties:



EXHIBIT

1

2

APPEARANCES:


    On Behalf of the Plaintiff Ronnie Barrett:

        DEBRA KATZ, ESQUIRE
        ARI M. WILKENFELD, ESQUIRE
        HANAN IDILBI, ESQUIRE
        Katz, Marshall & Banks, LLP
        1718 Connecticut Avenue, N.W.
        Sixth Floor
        Washington, D.C. 20009
        (202) 299-1140


    On behalf of the Defendants:

        JOHN M. BREDEHOFT, ESQUIRE
        DAVID SULLIVAN, ESQUIRE
        ANNA RICHARDSON SMITH, ESQUIRE
        Kaufman & Canoles
        150 West Main Street
        Suite 2100
        Norfolk, Virginia 23510
        (757) 624-3225


    Also Present:  ANDRE CHREKY


    Videographer:  RON MEEK

3

C O N T E N T S

WITNESS

EXAMINATION BY COUNSEL FOR
DEFENDANTS        PLAINTIFF

RONNIE BARRETT                    5                    - -

E X H I B I T S

NONE.

4

1              P R O C E E D I N G S

2              THE VIDEOGRAPHER:  This is Tape Number 1 in

3    the video deposition of Ronnie Barrett in the matter

4    of Ronnie Barrett versus Andre Chreky filed in the

5    United States District Court for the District of

6    Columbia.

7              Today's date is July 7, 2008.  The time is

8    9:58 a.m.  We are located at the offices of Katz,

9    Marshall & Banks, 1718 Connecticut Avenue, Northwest,

10   Washington, D.C.

11             Will counsel identify themselves and anyone

12   with them beginning with the attorney giving notice?

13             MR. BREDEHOFT:  My name is John Bredehoft

14   from the firm of Kaufman & Canoles.  With me from

15   that firm are David Sullivan and Anna Richardson

16   Smith.  We represent all the defendants.  Also

17   present is the individual defendant, Andre Chreky.

18             MR. WILKENFELD:  Ari Wilkenfeld,

19   representing Ronnie Barrett.  To my right is the

20   plaintiff, Ronnie Barrett.  To my left is my

21   associate, Hanan Idilbi.

22             VIDEOGRAPHER:  Also present are the court

5

1    reporter, Cathy Jardim, and the videographer, Ron

2    Meek, representing Jardim Reporting Associates of

3    Arlington, Virginia.

4        Whereupon,

5                    RONNIE BARRETT

6    was called for examination by counsel for Defendant

7    and, having been first duly sworn by the notary

8    public, was examined and testified as follows:

9              EXAMINATION BY COUNSEL FOR DEFENDANT

10             MR. WILKENFELD:  Could we take our first

11   break?

12             MR. BREDEHOFT:  Of course.

13             VIDEOGRAPHER:  Now going off the video

14   record at 9:59 a.m.

15             (Discussion off the record.)

16             VIDEOGRAPHER:  We are now back on the video

17   record.  The time is 10:03 a.m.

18             EXAMINATION BY COUNSEL FOR THE DEFENDANTS

19             BY MR. BREDEHOFT:

20   Q.    Are you doing okay?

21   A.    Yes.

22   Q.    You know, whenever you want, you can take a

6

1    break for any reason.

2        A.    Okay.

3        Q.    Even if you are just sick of my face.

4        A.    I don't think that is going to happen.  I
5    hope not.

6        Q.    How did it come that you went to work for
7    Mr. Chreky back in September of 2003, the second
8    time?

9        A.    It was one time that I went back to visit
10   the salon and to visit some old co-workers, and Andre
11   asked me where was I working, and I said I was
12   working at the Toka at the time, and he said, Well,
13   why don't you come back and work here?  And I said
14   that I was fine where I was, and he said, Well, but
15   you know, you can make more money here.  Come back
16   and talk to me.  I said, Okay, I will come back
17   another time and talk to you.

18       Q.    And you did then come back and talk to him,
19   right?

20       A.    Then I did come back to talk to him with my
21   husband, my fiance at the time.

22       Q.    What is his name?

7

1    A.    William Barrett.

2    Q.    Do you remember when that was?

3    A.    That was around end of August or beginning

4    of September of 2003.

5    Q.    Tell me everything you remember about the

6    discussion you had with Andre when you came back.

7    A.    Okay.  I came in with William and he said,

8    Well, let's go to fifth floor to talk about it, and I

9    came with William, and he said, No, he can wait

10    downstairs, so we went to fifth floor to talk about

11    employment, and he asked me how much I was making and

12    I told him and he said, Well, why don't you come back

13    and work here?  You can make more money.  We have a

14    lot of clientele.  You can make more of a career

15    here, and you can be more successful, you can make

16    more money.

17        Sorry --

18    Q.    That is all right.  Take your time.  There

19    is no time limit.  Just be comfortable.

20    A.    I told him, well, I was a little bit

21    hesitant about going back, and I told him that I just

22    wanted to make sure that if I did come back to work

1   there, that it wouldn't -- that he would respect me
2   professionally, that I was there to make a career,
3   and I was about to get married and that I wanted to
4   make $2500 every two weeks.  Am I going over what you
5   asked me?
6       Q.   No.  I asked you for everything you remember
7   about your discussions with Andre that led to you
8   being hired that time in September of 2003?
9       A.   So I told him I wanted to start making $2500
10  every two weeks, and he said he couldn't explain to
11  Serena starting someone at $2500 every two weeks
12  salary, but he could start at $1900 salary every two
13  weeks.
14          I really didn't like that, and I was
15  hesitant about the $1900, and he said, But don't
16  worry, we will have a review every three months.  We
17  always have reviews every three months, and then you
18  will get your raise after that.  Everybody has
19  reviews.
20          So, I was under the impression that it was a
21  salary, I was going to work there on a salary basis,
22  and I did make it very clear to him that he was going

9

1    to respect me professionally, that he was not going

2    to hit on me, try anything on a sexual basis, because

3    I was trying to start a family and I was being very

4    serious and that was definitely my biggest fear of

5    going back, but I also knew that the salon had a big

6    potential for me to make money and be successful and

7    get a good number of clientele.

8         I hope I covered everything.

9    Q.    Well, let me ask you, do you remember

10   anything else that you said in that meeting?

11   A.    Maybe I have said other things, but not at

12   this time, I don't remember.

13   Q.    Do you remember anything else that Andre

14   said in that meeting?

15   A.    He said, Don't worry about that, that is all

16   in the past.  I don't have time for that any more.  I

17   am very busy.  Don't worry, honey, I have changed,

18   things are not like that any more, I am very serious

19   about work.

20   Q.    Anything else?

21   A.    He did guarantee me that after three months,

22   I was going to have my review.

10

1    Q.    And are those the words that he used?

2    A.    Yes.

3    Q.    Why didn't you bring your fiance to the

4  meeting with you?

5    A.    I tried, but he said, No, leave him

6  downstairs.  I want to talk to you alone.

7    Q.    Andre said that?

8    A.    Yes.  William stayed downstairs.  I

9  introduced him, but he told him to wait downstairs on

10  the couch.

11    Q.    Did you say during this meeting, Okay, I

12  will come?

13    A.    I said, Okay, that sounds fair.  I said, Are

14  you sure I am going to get this review?  And again, I

15  made clear to him about him trying anything with me,

16  and again he told me, no, don't worry about that,

17  that is all in the past.

18        He also told me that -- I do remember him

19  telling me that -- Remember that check you got from

20  the -- we got some check from -- some overpayment --

21  not payment, some money that was owed -- I don't know

22  exactly how to explain, but it was overtime that they

11

1   owed to people, and I received that while I was

2   working at Roche, and I believe it was about 450 or

3   something, I am not very sure of the amount because

4   it is so long ago, and he told me, You shouldn't have

5   cashed that check.  Serena was very upset about that.

6   She has a list of the names of the people that cashed

7   the check.  I said, But Andre, how could I have not

8   cashed a check?  Who does not cash a check they

9   received from the mail?  No, she was very upset with

10  you because you cashed the check.  She has a list of

11  the name of the people.

12          He said, Come on, start tomorrow, and I

13  said, No, let's think about it.  We will talk again

14  and I will call you.  He said, you start tomorrow,

15  and I said, No, I have clients, and I said I have to

16  talk to William too, because I had to talk to my

17  fiance about it, so I didn't make the decision right

18  away.

19      Q.    Is there anything else you remember about

20  anything said by any person in that meeting between

21  you and Andre?

22      A.    No, it was just him and I.

12

1    Q.    When Andre said that this is all in the

2    past, did you believe him?

3    A.    Yes, I did.

4    Q.    Why?

5    A.    Because he is pretty convincing when he

6    talks.

7    Q.    Were you offended when he called you honey?

8    A.    I wasn't offended.  I mean -- just, no.

9    Q.    Did you then go back and talk with your

10   fiance about this?

11   A.    Yes, I did.

12   Q.    Tell me about those discussions, everything

13   you can remember.

14   A.    Well, I told him about my conversation with

15   Andre, and I said about the amount of money that we

16   discussed, and that I told him about the $2500 and

17   that he was going to start me at $1900 salary

18   guaranteed, but after three months I would get my

19   raise and my review.

20        I told him that he had said that his wife --

21   he couldn't explain to his wife why he would start

22   someone at $2500, that everyone there made good

13

1    money, but I did omit to him about the fact that --

2    the rest of the conversation.

3        Q.   Why?

4        A.   Because I didn't feel that I needed to bring

5    back something that had happened in the past.

6        Q.   Did you and William then make the decision

7    that you should go back there?

8        A.   Yes.

9        Q.   And did you communicate that to Andre

10   somehow?

11       A.   Yes.

12       Q.   How?

13       A.   I don't quite remember how, whether I called

14   or if I called the salon -- I can't remember the

15   details of how I did it, to be honest with you.

16       Q.   And did you start working there on September

17   2, 2003?

18       A.   Correct.

19       Q.   How much were you making at Toka?

20       A.   At Toka I was making about -- maybe 500

21   every week.

22       Q.   Was that hourly compensation?

14

1      A.    No, commission.  Sometimes a little bit
2    more, and I don't quite remember exactly the numbers.
3    It is on my income tax.
4      Q.    Were you compensated at Toka by anything
5    other than commission, did you get other kinds of
6    money?
7      A.    Yes, I got tips too.
8      Q.    Is that included in the estimate of 500?
9      A.    No.
10      Q.    About how much a week did you make a week in
11    tips at Toka?
12      A.    To be honest with you, I really don't
13    remember the numbers.  Everything is on my taxes.  I
14    have it -- I should have it somewhere here if you
15    want to look at it.
16      Q.    Did you report all of the tips you got at
17    Toka?
18      A.    Yes, I did.
19      Q.    And that would be in your 2003 taxes?
20      A.    Yes, I ended up paying taxes that year.
21      Q.    When did you start at Toka?
22      A.    It was in 2002.

15

1    Q.    And do you remember what month or what time

2    of year?

3    A.    I need a minute to think about that one.

4    Q.    Of course.  Let me ask you this question, do

5    you remember being there for more than a year?

6    A.    Yes, probably a year.

7    Q.    Did you work anywhere else in 2003 other

8    than Chreky and Toka?

9    A.    No.

10    Q.    Did you ever have a home-based business?

11    A.    No.

12    Q.    Did you ever operate any sort of business as

13    a sole proprietor?

14    A.    I think I got a 1099 in 2003, which was the

15    Toka.

16    Q.    Did you ever operate a business as its

17    owner?

18    A.    No.

19    Q.    Does your husband operate a business as an

20    owner?

21    A.    No.

22    Q.    Does your husband do hairdressing?

16

1    A.    No.

2    Q.    Other than from Toka and Chreky, did you

3 make any money from anywhere in 2003?

4    A.    Not that I remember.

5    Q.    Where did you work before you worked at

6 Toka?

7    A.    Roche.

8    Q.    When did you start there?

9    A.    Right after I left Andre.  It was in '98, I

10 believe.  I also did --

11    Q.    Don't let me cut you off.

12    A.    I also did bartending for a couple of months

13 or something at Olives.  There that is also on my

14 W-2s.

15    Q.    And that was all before 2002?

16    A.    Yes.

17    Q.    What did you do at Roche, what was your

18 position?

19    A.    Hairdresser.

20    Q.    And what does that involve?

21    A.    Cutting, coloring, doing perms, up-dos.

22    Q.    What was your position at Toka?

17

1      A.     The same thing, hairdresser.

2      Q.     Why did you leave Roche to go to Toka?

3      A.     Because I went to Brazil when I was at

4    Roche, I went to Brazil for about a couple of months,

5    and I came back -- I think I was already working at

6    Roche maybe for like four years and decided to go to

7    Toka.

8      Q.     Were you asked to leave Roche?

9      A.     In a way, but it was mutual.  I didn't like

10   there any more, but I left on good terms.  I am still

11   on good terms with them.

12     Q.     When you say, in a way you were asked to

13   leave, what does that mean?

14     A.     Because they wanted me to go to the other

15   store, and I didn't want to go to the other store.

16     Q.     Where is the other store?

17     A.     In Bethesda -- Wisconsin Avenue.  It is

18   still in D.C. but toward Chevy Chase.

19     Q.     How much were you making at Roche?

20     A.     I don't remember the numbers.

21     Q.     Why did you leave Toka?

22     A.     Because I went to see -- visit the people

18

1  there at Andre's, and he asked me if I wanted to come

2  back, and I did.

3      Q.  Were you asked to leave Toka?

4      A.  No.

5      Q.  Who were the co-workers you were visiting

6  when you ran into Andre at the salon?

7      A.  There was Jennifer, there was Nora that

8  worked there, there was Maria that worked there, so

9  many people I knew that worked with me before.  Just

10 stopped by to say hi.

11     Q.  Had you stopped by to say hi before that?

12     A.  Not that often, but I have.

13     Q.  About how many times in those years?

14     A.  Maybe a couple of times, maybe three times a

15 year -- maybe two times a year, at the most.

16     Q.  Did you see those same folks, Jennifer,

17 Nora --

18     A.  Not specifically, just to say hi, you know.

19     Q.  When you started up in September of '03 at

20 the Chreky Salon, what was your pay?

21     A.  I am sorry.

22     Q.  What was your compensation?

19

```
1      A.    Where?

2      Q.    At Chreky in September of '03.

3      A.    Well, I was supposed to be $1900 salary, but

4   it turned out not to be what I thought it was going

5   to be.  It turned out to be a $21-an-hour.

6      Q.    And how many hours did you work in a week?

7      A.    I started with -- supposed to be 45 hours --

8   I had to be there 45 hours a week in order to get 40

9   hours, so supposedly I had $1900, but the numbers

10  really didn't add up to $1900 regardless.

11     Q.    Why didn't they add up?

12     A.    Because they just didn't.

13     Q.    Twenty-one dollars a week times 40 -- 40

14  hours a week at $21 an hour is $2100 every two weeks.

15     A.    But after the taxes and everything, I didn't

16  come out having 1900 in my paycheck.  I never had

17  $1900 in my paycheck, but maybe one time or twice.

18     Q.    Why didn't you quit?

19     A.    Because I had already signed a non-compete

20  agreement.

21     Q.    What did that non-compete agreement mean to

22  you?
```

20

1      A.    It meant if I left the salon, I couldn't

2    work within a five- or six-mile radius within the

3    salon.

4      Q.    For how long?

5      A.    For six months.  Nor could we contact our

6    clients.

7      Q.    How far is the Roche office in Bethesda from

8    the Chreky Salon?

9      A.    I have no idea.

10     Q.    More than five miles?

11     A.    I don't know.  I never been there.  I don't

12   even think they opened -- I don't think they ended up

13   opening the salon.

14     Q.    Where does a five-mile circle from the

15   Chreky Salon fall?

16     A.    I don't know.  I am not a mathematician, but

17   I know that in Crystal City, you can't work in there,

18   and for a clientele, it makes a big deal even if you

19   move seven blocks from a salon.

20     Q.    Why did you sign the non-compete?

21     A.    Because you have to sign the non-compete.

22   If you don't sign the non-compete, you cannot work

1  for him.

2      Q.    Did you ever talk to anyone about whether

3  the non-compete was enforceable?

4      A.    It was forceable in there.  You had to sign

5  it if you wanted to work for him.

6      Q.    Did you ever talk to anyone about whether it

7  was a valid agreement that he could enforce against

8  you?

9      A.    No.

10      Q.    Not to anyone?

11          Are you aware of any time that the Chreky

12  Salon successfully enforced its covenant not to

13  compete?

14      A.    I know for a fact that Andre, he made clear

15  in meetings and stuff that he had gone after other

16  people, he tried to sue other people, he sued other

17  people, so I didn't think that he was not going to

18  come after me.

19      Q.    Are you aware of any time that he won?

20      A.    He always gloated about him winning cases

21  right and left.  I don't know anything about

22  specifically about his private life, if he won or he

22

1    didn't.

2        Q.    Did you ever look into the matter?

3        A.    No.

4        Q.    Is there any other reason you didn't quit at

5    that point, we are talking early on, September-

6    October '03?

7        A.    Well, that was really the main reason,

8    because of my family.  I couldn't just leave right

9    away.  I had my guaranteed money.  I had my family.

10    I couldn't just leave.

11        Q.    Did you get that three-month review?

12        A.    No.

13        Q.    Did you talk to Andre about the fact that

14    you didn't get the three-month review?

15        A.    Yes.

16        Q.    When was that?

17        A.    I approached him four months later.

18        Q.    Was that February of 2004?

19        A.    Yes.

20        Q.    Tell me everything that you remember about

21    that discussion.

22        A.    Well, I told Andre that I needed to talk to

23

1   him about my review, and he told me, for me to go to

2   the fifth floor so he could talk about the review.

3   So, I went to the fifth floor and he told me to have

4   a seat on the couch, and the couch was -- he was in a

5   chair sitting here and I sat on the couch.  The door

6   was open, and he said, Okay, so how you doing, honey?

7   I was like, well, I came here, Andre, to talk to you

8   about my raise, and he said, Come on, all you think

9   about is money, and I said, No, it is my right.  You

10  told me from the beginning that I was going to get my

11  review every three months.  I haven't had my raise.

12  I didn't start making the money that you told me I

13  was going to, and he said, Come on, honey, just give

14  me a blow job, and I said -- I got up and I said, You

15  know, I am just wasting my time.

16          He got up as I was walking, he pushed me --

17  he was opening his pants.  He was grabbing me by the

18  arm, he pushed me to the chair, and he wanted a blow

19  job.  He said Sammy had gone out for lemonade.  I

20  pushed him really hard and I left.

21      Q.    Do you need to take a moment or two?

22          Let's go off the record for a moment.

JARDIM REPORTING ASSOCIATES
(703) 867-0396

24

1        VIDEOGRAPHER:  We are now going off the

2   video record at 10:27 a.m.

3        (Discussion off the record.)

4        (Brief recess.)

5        VIDEOGRAPHER:  We are now back on the video

6   record.  The time is 10:36 a.m.

7        BY MR. BREDEHOFT:

8    Q.    We were talking about the February 2004

9   meeting with Andre on the fifth floor.  Sammy had

10  gone out for lemonade.  Was this around lunchtime

11  that you had this meeting?

12   A.    No, I believe that was on a Monday, that

13  actually I had gone there to talk to him, if I am not

14  mistaken.

15   Q.    So it was during the course of the business

16  day?

17   A.    The salon -- it was on a Monday, so Andre

18  was not working that day.  I don't know what he was

19  doing, if it was office work or what he was doing,

20  but he was not working that day on clients.

21   Q.    Did you call him in advance and ask that he

22  be there --

25

```
 1      A.    Yes, it was already set for me to go there
 2  and have a meeting with him.
 3      Q.    When did you make that appointment to have
 4  the meeting?
 5      A.    I don't remember, to be honest with you.
 6      Q.    A couple of days in advance, weeks in
 7  advance, months in advance?
 8      A.    No, no, it wasn't months.
 9            MR. WILKENFELD:  Can you repeat that?  Did
10  you say it wasn't months or it was months?
11            THE WITNESS:  No, no, no.
12            BY MR. BREDEHOFT:
13      Q.    What time of day was it?
14      A.    It was in the morning.
15      Q.    You came in, you sat on the couch, right?
16      A.    Right.
17      Q.    And Andre made this comment, and then he
18  grabbed your arm and pushed you down into the chair.
19  How did that work?
20      A.    I was sitting on the couch, and as I started
21  talking to him about the raise, he made the comment
22  to me, and as I was getting up, we were both
```

26

1   standing, and that is when he was opening his pants,

2   and he was holding me by the shoulder and trying to

3   push me down as he was opening his pants, and as I

4   was turning, I was towards the door already, and

5   there was another chair, that is when I fell into the

6   chair.

7       Q.    So you fell into the chair by the door?

8       A.    Right.

9       Q.    Andre had one --

10      A.    He had his hand on my shoulder.  He was

11  pushing me down.

12      Q.    Was that his right hand?  The reason I ask

13  is you are holding your shoulder such that if I were

14  looking at you, it would be the right hand?

15      A.    He was opening his pants with his right

16  hand.

17      Q.    So he was holding your shoulder with his

18  left hand; is that correct?

19      A.    Right.

20      Q.    Yet he was --

21      A.    He was opening his pants with his right hand

22  and he was holding me with the left and pushing me

27

1   down into the chair.

2       Q.    Now, if you had just stood up from the

3   couch, wouldn't the chair that you just described

4   being pushed into be over Andre's right shoulder?

5       A.    No, there was another chair by the door.

6       Q.    Which side of the door was is it on as you

7   are looking out of the office, left to right?

8       A.    This side.

9       Q.    Which side?

10      A.    The left.  It was by the door.

11      Q.    Under the bulletin board?

12      A.    On the side of the bulletin board.

13      Q.    What kind of chair was it?

14      A.    It was a wooden, large chair.

15      Q.    And you have your arms about four feet

16  apart, three and a half feet apart; is that right?

17      A.    I am sorry.

18      Q.    How big was the chair?

19      A.    It was a large chair, and it had wood things

20  to it on the side.

21      Q.    Did he successfully open his pants?

22      A.    I saw him opening his belt.

28

1    Q.    Was he pulling down his zipper?

2    A.    Yes, but I didn't see everything.

3  Everything went so fast.  All I know is that he

4  pushed me down on the chair, he was pushing me down

5  on my shoulder, and I pushed him back and I ran away.

6  That is all I remember.  I don't remember all of the

7  details.

8    Q.    I don't mean to upset you.  It is not my

9  purpose to upset you, I don't want to upset you, but

10 I do need to ask you.

11   A.    I know.  We can go on and on.  I will repeat

12 it over and over.  That is fine.

13   Q.    If we have reached the end of your

14 recollection, you tell me and I will stop.  Let me

15 just ask you a couple of questions.

16         Did he open his zipper?

17   A.    I saw him opening his zipper.  If it was all

18 the way open, I don't remember.  I don't recall.

19   Q.    Did you see his penis?

20   A.    No.

21   Q.    Boxers or briefs?

22   A.    I just saw hair.

29

```
 1      Q.    You saw hair.  No underwear?

 2      A.    I just saw hair when he was opening his

 3  pants.  That is all I saw.

 4      Q.    Anything that you haven't told me yet about

 5  that incident that you remember?

 6      A.    Not that I can remember at this time.

 7      Q.    You say you ran away?

 8      A.    Yes.

 9      Q.    Tell me about that.

10      A.    I went down the stairs.

11      Q.    All the way to the first floor?

12      A.    Yes, and I left the salon.

13      Q.    Were you crying?

14      A.    Yes.

15      Q.    Were you yelling or screaming?

16      A.    No, just crying.

17      Q.    Who was at the front desk when you left?

18      A.    I don't recall.  There was a receptionist

19  there, but I don't recall who it was.

20      Q.    When you come out of the staircase on the

21  first floor, you have to make a left and go around

22  where there is a table and then you make a right to
```

30

1   get out.  Was anyone working?

2       A.   No.  The salon was pretty empty.  There was

3   someone at the front desk, but I don't remember who.

4       Q.   Was there anyone working anywhere else on

5   the first floor?

6       A.   Not that I recall.

7       Q.   Did you look for anyone on the first floor?

8       A.   No.

9       Q.   Did you look on the second floor as you ran

10  through there?

11      A.   No.

12      Q.   Why not?

13      A.   I just wanted to get out of there.

14      Q.   So now you are outside.  What do you do?

15      A.   I left.

16      Q.   How?  Did you drive -- where did you go?

17      A.   I think I went home.

18      Q.   Did you drive?

19      A.   Yes.

20      Q.   Had you parked your car in a garage?

21      A.   Yes.

22      Q.   So the first thing you did was you went to

31

1  the garage, right?

2      A.   I don't recall it.

3      Q.   Do you know --

4      A.   I remember stopping.  I know that I was

5  crying for a while.  I know that Andre called, and he

6  told me that if I am going to forget about it, that

7  was not going to happen again.  I told him I was not

8  going to come back to work anymore.

9      Q.   Did he call you on your cell phone?

10     A.   Yes.

11     Q.   What number was that cell phone?

12     A.   Two four zero number.

13     Q.   Two four zero --

14     A.   Yes, 271.

15     Q.   Two seven one?

16     A.   Zero nine seven one.

17     Q.   Zero nine seven one.  How long did you talk

18  to Andre?

19     A.   I believe that was the number.  If it was

20  not the old number, I am not sure.

21     Q.   What is the old number?

22     A.   I don't know remember if it was 209 number,

32

1   I am not sure.

2       Q.   Tell me what the old number was?

3       A.   301-209-0129.  I believe it should have been

4   the 271 number.

5       Q.   What was your carrier?

6       A.   AT&T -- no, Cingular.

7       Q.   For both?

8       A.   I think it was Sprint.  I am not very sure

9   about the other number, to be honest with you.  I can

10  get back to you on that one.  I am not sure.

11      Q.   Were you in your car when he called you?

12      A.   I am not sure if he called me at that time

13  or if it was afterwards, or if it was home.  All I

14  know is I was really upset.  I was crying.  I was

15  thinking bout incident.

16          I know there was a conversation that took

17  place between him and I.  I don't want to give you

18  information of when it happened, exactly when it

19  happened, because it was a little bit blurry about --

20  I was really upset about the event that happened.

21      Q.   Could it have been that Andre called you on

22  your cell phone before you got to your car in the

33

1 parking garage?

2      A.    Could have, but I am not sure.  I need to --

3 I don't know.

4      Q.    Let's just probe your memory.  It could have

5 been while you were in your car, right?

6      A.    No.

7      Q.    It wasn't while you were in the car?

8      A.    No.

9      Q.    It wasn't before you got your car --

10      MR. WILKENFELD:  Objection.

11      THE WITNESS:  Like I said, I can't remember

12 if it was before I got in the car or if it was after,

13 when I was home.  I really don't know exactly when

14 the conversation happened.

15      BY MR. BREDEHOFT:

16      Q.    If it was at home, did he call you on your

17 cell phone?

18      A.    Could have been the home number too.  I am

19 not sure.  Most likely was the cell phone.

20      Q.    Was it that same day?

21      A.    Yes.

22      Q.    About how long was the phone conversation?

34

```
 1      A.    In minutes?

 2      Q.    Yes, about how long?

 3      A.    I can tell you about how the conversation

 4  went.  I don't know about the minutes.

 5      Q.    Okay.  Tell me how it went.

 6      A.    I mean, he told me -- he assured me that was

 7  not going to happen again.  I told him I was not

 8  coming back any more.  He told me that I needed to

 9  think about my family, my career, where was I going

10  to go, that I wasn't young any more, I had a son to

11  think about.  If I went to work somewhere else, I

12  wouldn't be able to make the same amount of money

13  right away, and I told him I needed to think about

14  it.

15          I wasn't sure if I could come back, and he

16  said that he had plans for the salon, and he was

17  going to do some advertising, and the coloring

18  department, and what happened was a mistake, and

19  blah, blah, blah.  That is it.  I told him I was

20  going to think about it.

21      Q.    Did you call him a bastard?

22      A.    He also reminded me about the non-compete
```

35

1  agreement.

2      Q.   Did you call him a bastard, did you curse

3  him out?

4      A.   I didn't curse at him.  I did tell him that

5  what he had done was wrong.  I told him why did he do

6  that to me?  There were so many other people in the

7  salon, and I was like -- I was married already at the

8  time and had a son.  I just didn't understand why he

9  was doing that to me, especially after like all I had

10  done, you know, I was working hard, I was doing my

11  best.  It is like why did he want me to sleep with

12  him in order to be making money?  It just wasn't

13  right.

14      Q.   Did you tell him that on the phone?

15      A.   Yes, I did.

16      Q.   What did he say?

17      A.   He kind of laughed, Oh, it is not that.

18      Q.   Can you remember anything else about that

19  telephone discussion?

20      A.   All I remember is that I wanted to leave,

21  and then every time I wanted to leave, I always get

22  scared of leaving because of that non-compete

36

1    agreement and then again my family.  He knew exactly

2    the words to use, because he knew my vulnerability,

3    which was my family.  He knew exactly the words to

4    use.

5        Q.    In February '04, to whom were you married?

6        A.    William Barrett.

7        Q.    How many kids did you have?

8        A.    I only had one son at the time.

9        Q.    And his name?

10       A.    Jason.

11       Q.    Last name?

12       A.    Ramos.

13       Q.    And who is his dad?

14       A.    Jesse Ramos.

15       Q.    J.C.?

16       A.    Jesse.  He is not around.

17       Q.    Were you ever married to Mr. Ramos?

18       A.    Just like when Jason was -- for like just a

19   year.

20       Q.    Do you have additional children now?

21       A.    Yes, I do.

22       Q.    When were they born?

37

1     A.    Kierin Barrett.

2     Q.    When was Kierin born?

3     A.    January 3, 2005.

4     Q.    No kids other than Kierin?

5     A.    No.

6     Q.    When was Jason born?

7     A.    On my birthday, February 25, '88.

8     Q.    Our birthdays are fairly close.  Mine is the

9  22nd.

10    A.    Pisces.

11    Q.    We are Pisces.

12         The first time you worked at the Chreky

13  Salon back in the late '90s, you had a non-compete

14  then?

15    A.    Yes.

16    Q.    Was it, as far as you recall, the same

17  restrictions, six months five miles?

18    A.    Yes.

19    Q.    When you left Chreky in '98 -- was it '98?

20    A.    Right.

21    Q.    When you left Chreky in '98, you went to

22  Roche?

38

```
 1      A.    Right.

 2      Q.    Where was Roche?

 3      A.    It was in Georgetown.

 4      Q.    Is that within five miles of the Chreky

 5  Salon?

 6      A.    It is less than five miles.

 7      Q.    And when Mr. Chreky sued you, what happened?

 8      A.    He didn't sue me.

 9      Q.    How long were you at Roche?

10      A.    For like three and a half years, four years.

11      Q.    Were there any other former Chreky employees

12  that worked with you?

13      A.    No.

14      Q.    Did any former Chreky employees work with

15  you at Toka?

16      A.    No.

17      Q.    What happened after the phone call, what did

18  you do?

19      A.    I didn't -- I guess I went home, I just

20  thought it through.  I believe I didn't go back to

21  work -- I am not very sure if it was a day or two,

22  but then Andre was off my back for a while.  He was
```

39

1    nice.

2        Q.    Let me take you to before this February 2004

3    incident.   In September, October, November, December

4    of '03 and January of '04, when Andre asked you in

5    February '04 to go to the third floor, were you

6    scared?

7        A.    I wasn't comfortable, but I --

8        Q.    Had he -- sorry.   Never let me cut you off.

9    If I did do, it is not intentional.

10       A.    I wasn't comfortable, but he said that Sammy

11   was around, he had gone out to get a lemonade,

12   something like that.

13       Q.    Had Andre sexually harassed or abused you in

14   your second stint there before this February 2004

15   meeting?

16       A.    Can you repeat the question?

17       Q.    Sure.   Here is where I am going.   In

18   February 2004, you call up, you have a special

19   meeting with Andre, he comes in on his day off, you

20   come in on your day off -- that was your day off?

21       A.    Yes.

22       Q.    To talk about getting a raise.   Andre says

40

1    let's go up to the fifth floor, and you go even

2    though you had some concerns.  Had he sexually

3    harassed you between you coming back in September and

4    this meeting in February?

5        A.    Yes.

6        Q.    What had he done?

7        A.    Well, before -- when I first started working

8    for him, he was fine, he was friendly and

9    professional and everything, but then, as he knew

10   that I was going to get married, he kept telling me,

11   Why you going to get married?  You shouldn't get

12   married.  You shouldn't get married to an American

13   man, American men are not good in bed.  He would get

14   a little smile on his face.  You need a man in bed.

15       I understood that he was making jokes about

16   himself.  He would sometimes make a comment about,

17   like the way -- I know that sometimes in salon people

18   make comments about how you dress and how you look,

19   but there is a fine line when it turns out to be a

20   little bit too much, and I had told him, Enough is

21   enough, Andre.  I am getting married.  I am

22   professional here.  I am trying to concentrate here

41

1    on my work -- concentrate on my work, and to me that

2    was sexual harassment.  He wasn't too aggressive

3    about it, meaning he was not attacking me as he did

4    on February 4, if that is answering your question.

5        Q.    It is.  Let me ask you some questions about

6    that though.  When did you get married?

7        A.    December 30, 2003.

8        Q.    So if Andre was first professional and

9    friendly, would that be, what, September, October,

10   November?

11       A.    I would say like September, October --

12   September.

13       Q.    Where were you when he made the comment that

14   you shouldn't get married to an American man because

15   they are not good in bed?

16       A.    Either when we are in the lunchroom, having

17   a cigarette outside.  He had said that when he had

18   cut my hair.

19       Q.    He cut your hair frequently when you worked

20   there, right?

21       A.    He has cut my hair a few times.

22       Q.    More than once or twice?

42

1     A.    Yes.

2     Q.    Fairly frequently?

3     A.    Not too frequently, but, yes.

4     Q.    He cuts your mom's hair too, right?

5     A.    He hasn't cut my mom's hair in a long time.

6     Q.    Not recently?

7     A.    No.

8     Q.    But when you were working there, between

9 September of '03 and December of '05, he did cut your

10 mom's hair, right?

11    A.    Maybe once.

12    Q.    Is that yes, maybe one time --

13    A.    Maybe one time.  Not frequently.  I cut my

14 mom's hair.

15    Q.    When you started working there in September

16 '03?

17    A.    And I didn't like it very much.

18    Q.    I am sorry, did I cut you off?

19    A.    I am sorry.

20    Q.    When you started working there in September

21 of '03, what were you doing?

22    A.    What I was doing when I started in September

43

1    '03?

2        Q.    What was your job?

3        A.    I was a colorist, but I also cut hair

4    because I had brought clients with me that I also

5    cut.

6        Q.    Who were those clients?

7        A.    You want their names?

8        Q.    Yes.

9        A.    I don't know everybody's names, but I can

10    give you some of them.   There is Lesley Bernstein,

11    Carol Benta -- are you serious?   Oh my God.

12            Hold on.

13            Can I look in my cell phone?

14        Q.    Let me just know the ones you remember right

15    now.

16        A.    Laura Sullivan -- okay --

17        Q.    If you remember others --

18        A.    No.   I am going to remember them.   Patty

19    Fitzgibbons.

20            (Pause.)

21            BY MR. BREDEHOFT:

22        Q.    If you remember others during the course of

44

1    the day, you can let me know who they are.  Okay?

2        A.    Okay.

3        Q.    Where was your work station?

4        A.    It was next to Andre's.

5        Q.    On the second floor?

6        A.    Yes.

7        Q.    Not in the very front of the salon, but not

8    in the very back either, sort of in the middle area;

9    is that correct?

10       A.    When you go up the steps, he had a station

11   here.  He put me at first in a station right next to

12   him in the middle.

13       Q.    Just at the top of the steps?

14       A.    Yes.

15       Q.    Was that your station the whole time you

16   worked there?

17       A.    No.  Later on I moved myself to the back.

18       Q.    Also on the second floor?

19       A.    Yes.

20       Q.    Did you cut hair when you were in the back

21   or just do color --

22       A.    He didn't want me to cut, but I still cut

45

1    some of those people's hair because they didn't want

2    anybody else.

3        Q.    When you cut their hair, did you cut them at

4    your station in the back?

5        A.    Yes.

6        Q.    When did you move back?

7        A.    When I got pregnant.

8        Q.    Did you move back there because you got

9    pregnant?

10       A.    Yes, pretty much -- no, it was before I got

11   pregnant.

12       Q.    Why did you move back there?

13       A.    Because I really didn't want to work right

14   next to him.  I wanted my privacy to be a little away

15   from him.

16       Q.    Before you moved back, who else worked with

17   you in that area on the second floor?

18       A.    Linda worked up there.  Sometimes Dee Dee.

19       Q.    Can you give the court reporter Linda and

20   Dee Dee's last name?

21       A.    I don't know her last name.  Khadisha was

22   the last name.

46

1    Q.    Anyone else?

2    A.    And Linda.    Sometimes people switched

3    around, but mostly there, working from there.    Who

4    else worked up there on the second floor?

5    Q.    Sure.

6    A.    It was Jennifer Thong worked up there, Mindy

7    Roberts -- the place is like an L.

8    Q.    And Jennifer worked on the side right close

9    to K Street, right, by the windows, on the long end

10    of the L?

11    A.    Right.

12    Q.    Who else when you worked in the back area,

13    who else worked with you there?

14    A.    There was -- sometime Khadisha would work

15    back there, Faveola, Ramero, Maria, Carla, the

16    shampoo girls, Juanita, Isabel.    It is a lot of

17    names.    You are testing my names memory.

18    Q.    I am terrible with names myself.    You seem

19    to be pretty good.

20         You said at one point that this was February

21    4 --

22    A.    Anna, Anna too.    Anna worked right next to

47

1   me.

2       Q.    Good.

3             You said at one point this was February 4

4   this happened -- do you remember the date that the

5   incident with Andre occurred?

6       A.    I don't remember the date at this time.

7       Q.    I heard you say February 4, and I wasn't

8   sure if you were saying February 2004 -- you don't

9   remember the date?

10      A.    Not at this time.

11      Q.    You went back home.  Did you talk to your

12  husband about this?

13      A.    No.

14      Q.    Did you report it to the police?

15      A.    No.

16      Q.    Why?

17      A.    Well, first of all, I really didn't think

18  anybody would believe me, to be honest with you.  And

19  second of all, I don't even know how to explain, and

20  I am not even trying to make excuses for myself.  I

21  was just trying to think about what I needed to do at

22  the time and what was going to be best for me and my

48

```
 1   family and what was the right thing to do.  It was

 2   always like -- it always boiled down to Ronnie

 3   Barrett's word against Andre Chreky.  So I --

 4              MR. WILKENFELD:  Are you finished?

 5              THE WITNESS:  Yes.

 6              BY MR. BREDEHOFT:

 7        Q.   So you didn't tell your husband?

 8        A.   No.

 9        Q.   You didn't report it to the police?

10        A.   No.

11        Q.   Did you tell anyone else about it?

12        A.   Not at the time.

13        Q.   So you went back to work a couple of days

14   later, and Andre was nice to you for a while?

15        A.   Yes.  He left me alone.

16        Q.   At that point, were you still at the work

17   station right next to him?

18        A.   No.  I was working in the back.

19        Q.   When did you go on maternity leave?

20        A.   Maternity leave?

21        Q.   Yes.

22        A.   Well, that was December -- we had a
```

49

1    Christmas break, I guess.  I stopped working -- the

2    Saturday I worked, and I had him on the Monday, I had

3    an emergency C-section.

4        Q.    Everything okay?

5        A.    No.

6        Q.    You returned to work in May of 2005?

7        A.    Yes.

8        Q.    During the time you were out, late December

9    '04 to mid-May '05, did you see Andre at all?

10       A.    No.

11       Q.    During the time you were out, did you think

12   about finding other employment?

13       A.    Yes.

14       Q.    What did you do, if anything, to seek other

15   employment?

16       A.    Nothing.

17       Q.    What did you think about?

18       A.    All I really thought about at that time was

19   taking care of my premature son and trying to get him

20   healthy, to be honest with you.

21       Q.    How premature was he?

22       A.    He was not that premature.  He was 36 weeks,

50

1    but he was very under-developed.  He was only four

2    pounds when he was born and he went under four

3    pounds.  He couldn't keep his body weight and there

4    was no physical, it was just -- I wasn't eating well

5    and he wasn't developed enough.

6        Q.    So were you thinking about finding different

7    employment during that period or not?

8        A.    You know, I wanted to, but I couldn't.

9        Q.    When in your view was your son sufficiently

10   developed that you started thinking about going back

11   into the workplace?

12       A.    When he was about five months already, five

13   months old.  That is when I went back to work.  He

14   was maybe the size of a two-month-old by then.

15       Q.    At the time you decided to go back to work

16   at the end of this five-month period, did you at that

17   point make an effort to find someplace other than the

18   Chreky Salon?

19       A.    I had no time, no.

20       Q.    Did you ask anybody?  Did you call Toka?

21       A.    No.

22       Q.    You never got the raise, right?

51

1      A.    No.

2      Q.    So you were still on a salary at $21 an

3  hour; is that correct?

4      A.    Correct.

5      Q.    Forty hours a week paid for; is that right?

6      A.    No, I wasn't working 40 hours.

7      Q.    It was $21 an hour?

8      A.    It was $21 an hour.

9      Q.    Did that change at all during the time you

10  were at the Chreky Salon this second time?

11     A.    It always changed.  If there wasn't enough

12  clients during the day, Andre would send one of us

13  out saying, There is not enough clients, so now you

14  need to go home, so that would already lessen our

15  hourly -- it was supposed to be a salary to begin

16  with, but it wasn't a salary.  I was always sent home

17  or -- I guess people would always be sent home.  I

18  don't know if I am answering -- explaining myself

19  right.

20     Q.    The $21 an hour stayed the same, right?

21     A.    The $21 stayed the same.

22     Q.    When did you get your first license to

52

1    practice cosmetology?

2        A.    It was back in 1994, I believe, best of my

3    knowledge.

4        Q.    And was that a Maryland license?

5        A.    Maryland.

6        Q.    Where were you working then?

7        A.    First place I have ever worked -- I even

8    forgot the name of the place.  They closed down.  It

9    was in Maryland.  I worked there for three months.

10   They closed down and then I worked for Bubbles.

11       Q.    Can you spell that?

12       A.    B-U-B-B-L-E-S.

13       Q.    Where was that?

14       A.    I started at one in Maryland, and then they

15   transferred me to Union Station and I worked there

16   for six months.

17       Q.    At the time you were working for Bubbles in

18   Union Station, did you have a Maryland license?

19       A.    Yes.

20       Q.    Did you have a D.C. license?

21       A.    I had a Maryland license.

22       Q.    And then where did you work?

53

1    A.    Then I went to work for Andre at Piaf --

2  actually, I started working for his sister.

3    Q.    At Piaf, P-I-A-F?

4    A.    Yes.

5    Q.    When was that?

6    A.    I believe it was 1994, but I don't know the

7  month.

8    Q.    Late '94 then, right?

9    A.    Yes.  It wasn't cold then,  remember that,I

10  it wasn't too cold, if that helps.

11    Q.    But you got your license in '94, right?

12    A.    Yes.

13    Q.    And then you worked three months at up some

14  place and then Bubbles --

15    A.    A couple of months.  They bankrupt or

16  something.

17    Q.    You are at Piaf.  How did you get the job

18  there?

19    A.    Well, I met Andre through a mutual friend,

20  and I used to be his client, and he was the one that

21  told me to work at Bubbles first, for six months, and

22  get experience there before I went to work there, at

54

1    Piaf.

2        Q.    Was Andre the one who told you to work at

3    Bubbles or the friend?

4        A.    Andre.

5        Q.    Who is the friend?

6        A.    Sergio Rosa.

7        Q.    You worked at Bubbles.  Did you then follow

8    up and call Andre -- how did it come that you worked

9    at Piaf?

10       A.    Like I said, he used to cut my hair, I used

11   to be his client also.  After I worked at Bubbles, he

12   said, Okay, you are ready to come over.  He put me

13   first as his sister's assistant because he had Ba

14   first, and then I started working with his sister and

15   I started working with him too.

16       Q.    Was it about 1995 that you started working

17   directly with Andre at Piaf?

18       A.    Yes.  I didn't stay there for too long.

19       Q.    Where did you go?

20       A.    He moved, and there was a big commotion

21   there with his sister, they had a fight, so we

22   left -- we had to leave.

55

1    Q.    And where did you go?

2    A.    We went to his brother's salon, Daniel's.

3    Q.    Do you remember what year that was?

4    A.    That was in 1995, 1996.

5    Q.    And where did you go after you left there?

6    A.    Ninety-six or '97.  He opened the new place.

7    Q.    Where was Piaf located when you worked

8    there?

9    A.    It is sill located at 15th Street and

10   Vermont, best of my knowledge.  K Street is right

11   there.

12   Q.    I can never tell with all of the angles in

13   D.C.  What about Daniel's, where is that located?

14   A.    That I know.  1831 M Street.

15   Q.    When you went to work at Piaf, did you have

16   a Maryland license?

17   A.    Yes.

18   Q.    Did you have a D.C. license at that time?

19   A.    No.  I think I had a Maryland license.

20   Q.    Then when you went to Daniel's, you had your

21   Maryland license, right?

22   A.    To be honest with you, I don't remember the

56

1  very details.  One I switched from Maryland to D.C.,

2  when I did the reciprocity -- I may not have done it

3  until he opened the new place.  I am not sure to be

4  honest with you.

5      Q.   Let me ask you a question that may be

6  repetitive of what I just asked.  Do you know when

7  you got your D.C. cosmetology license?

8      A.   That is was I was trying to say.  I am not

9  sure of the dates at all.  It may have only been when

10  he got the new place, but I am not sure.  It should

11  be on my paperwork.

12      Q.   But in any event, at one point you did get a

13  D.C. cosmetology license?

14      A.   Yes.

15      Q.   Did you keep your Maryland license?

16      A.   No.

17      Q.   Do you hold a Maryland license now?

18      A.   No.  I am sure I can get it, but, no.

19      Q.   Did you abandon or not renew your Maryland

20  license around the same time you got the D.C.

21  license?

22      A.   I didn't renew it any more.

57

1      Q.    So you haven't had a Maryland license since

2   '96, '97?

3      A.    To the best of my knowledge.

4      Q.    Now, when did your D.C. license expire?

5      A.    That is a little issue right there.  My

6   license expired when I was working at Andre's.  I

7   think it was around September or something, and I

8   wasn't even aware that it had expired, and I even got

9   a fine for that, I think.

10          Then I went to them -- I sent the renewal, I

11   paid them for the renewal, but I never got the

12   renewal back, so I have been sending them payments

13   every year to get the renewal back, but finally

14   everything is squared off, so should be sending me

15   back again.  I don't know if I have received it or

16   not.

17      Q.    Do you have a current valid D.C. license?

18      A.    No, not right now.

19      Q.    Some materials we got from your lawyers last

20   week suggest that you were cited for an infraction of

21   not having a license on September 20, 2005.  Does

22   that comport with your recollection?

58

1    A.    Right.

2    Q.    Had your license just expired at that point,

3    and they just happened to come in?

4    A.    Yes.  To be honest with you, I didn't even

5    know that it was expired.

6    Q.    Do you know when it had expired?

7    A.    Now I know it was expired in September, but

8    I didn't know because my license was upstairs and

9    they had the address of Andre Chreky on my license,

10   not my home address.  So even when I fixed it now,

11   they still had Andre's address for both home and

12   business.  When I went there to see them, I said, But

13   I sent you my change of address.  Why do they still

14   have his address?  I don't know.  So that was D.C.

15   Q.    And the D.C. Department of Consumer Affairs

16   actually had a proceeding and imposed a fine against

17   you; is that correct?

18   A.    Yes.

19   Q.    And the fine was $500?

20   A.    Correct.

21   Q.    And that was imposed by a decision dated

22   December 19, 2005, right?

59

1    A.    Right.

2    Q.    When did you pay the fine?

3    A.    I paid last week.

4    Q.    June 24, 2008?

5    A.    I don't know the date exactly.  Last week or

6    two weeks ago.

7    Q.    Why did you take almost three years to pay

8    the fine?

9    A.    Well, first of all, I have been trying to

10   communicate with them for so long, and I have not

11   gotten answers back.  I gave them change of address.

12   I didn't receive any mailings until December 2007

13   when finally I got a notice from them saying that my

14   application had been closed.

15        I have been sending them payments every year

16   for $225 for the renewal, which they have been

17   cashing in to the money, so I assumed that they had

18   gotten the money that I owed them until finally I got

19   my lawyers involved and they managed to get through

20   to them, and I paid $635 and finally I got everything

21   solved, but I did not know my license had Andre's

22   address on it, and for some reason D.C. had something

60

1  mixed up also with the address.  I don't know, to be

2  honest with you.

3      Q.   Did you have a copy of your license during

4  the past two years?

5      A.   No.  Actually I asked for my license right

6  before -- after Andre fired me, and I came back to

7  get my things and I asked for my license and they

8  said I had never given my license, and I know I did,

9  and they had my license, but they did not give it

10  back.

11     Q.   Are you aware that the District of Columbia

12  imposed a lien on Andre's salon to seize his money,

13  his house, his salon, because you didn't pay the

14  fine?

15     A.   No.

16     Q.   Because you gave them that address; you

17  weren't aware of that?

18     A.   No.

19     Q.   This is probably best directed to your

20  counsel, we have gotten a couple of documents about

21  this, but we don't have a receipt for any of these

22  yearly $225 payments, we don't have any documents

61

1    showing that.  We don't have the December '07

2    document that closed application.  If you could see

3    if those are available, and if they do, we would like

4    them produced.

5           MR. WILKENFELD:  If they exist, you will get

6    them.

7           MR. BREDEHOFT:  Thank you, sir.

8           BY MR. BREDEHOFT:

9      Q.    Were you an office manager at Piaf's?

10     A.    No.

11           Whenever you get a chance, can I take a

12   break?

13           VIDEOGRAPHER:  We are going off the video

14   record at 11:23 a.m..

15           (Discussion off the record.)

16           (Brief recess.)

17           VIDEOGRAPHER:  We are now back on the video

18   record.  The time is 11:38 a.m.

19           BY MR. BREDEHOFT:

20     Q.    A couple more questions about the $1900

21   every two weeks.  Did you ever have a written

22   agreement with Andre?

62

1   A.   No.

2   Q.   Did you ever not cash your paycheck or not

3   accept your salary?

4   A.   Okay, I did ask for the written agreement,

5   but he said, Oh, you don't need that.  I trusted that

6   that is what was going to happen.

7   Q.   Did you ever not cash your paycheck or not

8   accept your salary?

9   A.   No.

10   Q.   Let me ask you about tips.  Can you describe

11   the process by which tips were distributed at the

12   Chreky Salon during the second time you were there,

13   December '03 through your departure?

14   A.   Tips were given to us on a Saturday at the

15   end of the day after everything -- after all things

16   were done, like if supplies were stocked or all

17   clients were gone.  They were given to us once a

18   week.

19   Q.   And how did that work?  Were you all sitting

20   in an area and people would pull out envelopes or how

21   would it work?

22   A.   Usually Linda was in charge of the tips.

1  She would go most of the times to the fifth floor

2  because she was in charge of the tips, and she would

3  separate the tips and then give them into Mindy's

4  hands or Andre's, and then we would go upstairs and

5  get our tips.  She would leave and then the tips were

6  given to us.

7       There were other times when Andre would

8  assign a different person, let's say if Linda wasn't

9  there or someone to help Linda if she had to leave

10  early or something else happened, he would put

11  someone else in charge and other people to help.

12     Q.   You said that Linda would give the money to

13  Mindy or Andre, and then you would go upstairs.  Is

14  that to the fifth floor office?

15     A.   Right.

16     Q.   Was everyone in the office at the same time?

17     A.   Right -- no, not everybody at the same time,

18  but whenever people would finish for the day then we

19  would go or everything -- the bags would be sent down

20  and given to Andre, and then he would give it to us.

21  It would depend on the day.

22     Q.   Were the bags sent down with someone other

64

1    than Andre on occasion?

2        A.    I don't --

3              MR. WILKENFELD:    Objection.

4              MR. BREDEHOFT:    Let's withdraw that question

5    and ask a better one.

6              BY MR. BREDEHOFT:

7        Q.    You said bags were sent down on occasion.

8    Who carried the bags down?

9        A.    Either Linda or Mindy or Amal.

10       Q.    Let me ask you about the front end of the

11   process.  If a client wanted to give you a tip for

12   services you were representing, how would the client

13   do that?

14       A.    They could come and give it to us in the

15   hand, by hand, but Andre didn't like clients to give

16   tips in our hands.

17       Q.    And how do you know that Andre didn't like

18   that?

19       A.    Because he said so in our meetings.

20       Q.    Did he tell you why?

21       A.    No.

22       Q.    Did you on occasion accept tips in your

65

1    hand?

2        A.    Yes, I have.

3        Q.    If the tip was not given to you by hand, how

4    did it get into the process?

5        A.    Again, the tips were given at the end of the

6    day on a Saturday.

7        Q.    I am sorry if I asked that question wrong.

8    I am trying to figure out the front end of the

9    process, how the money from the client, out of the

10   client's hand into the tip process.  If they didn't

11   hand it to you directly, how did the money get from

12   the client into the tip process?

13       A.    The client would give it to the receptionist

14   at the front desk, and then the receptionist would

15   put it away, whether they would put it in a little

16   safe in the front or not, and then they would put it

17   inside a closet in the first floor, the second floor,

18   sometimes by the front door, there was a closet in

19   there, tips were put in a trash bag in there, but we

20   wouldn't get our tips until Saturday.  The money

21   would travel around the salon.

22       Q.    Did there come a time when the tips were no

66

1   longer kept in a closet but were kept in a safe or a

2   locked area?

3       A.    I know the tips, after they come out of the

4   front area -- there is a closet in the front of the

5   reception area and it is not locked, and sometimes

6   the tips were inside trash bags right there.

7   Sometimes they were kept on the second floor, there

8   is a closet, I don't know if there is a water heater

9   or what is in there, and there were trash bags in

10  there, sometimes there were products in there too,

11  and sometimes they were taken upstairs to the fifth

12  floor.

13      Q.    Were they ever put into a safe?

14      A.    I am not aware of them putting in the safe,

15  after the safe in the front desk.

16      Q.    Did you ever see Andre handle the cash from

17  the tips?

18      A.    I have seen Andre holding the trash bag

19  before.   Now, I am not going to recall Andre holding

20  a tip because he had people that worked for him that

21  would carry the tip around, but I have seen him took

22  it from one place to the other.

67

1    Q.    Taking the trash bag from --

2    A.    Either from the front closet or the --

3  usually he had Amal or Mindy, but I am not going to

4  say that it never happened, but I have not seen him

5  carrying one of those bags.

6    Q.    Do you remember a specific date or time that

7  you saw him carrying the bag?

8    A.    No.

9    Q.    Do you remember seeing him carry the bag on

10  more than one occasion?

11    A.    No, I don't remember on this specific time.

12    Q.    Were there times where you believe you

13  didn't receive all of the tips to which you were

14  entitled?

15    A.    I am sorry.  Can you repeat the question?

16    Q.    That is my idiocy trying not to end a

17  sentence with a preposition.  Were there occasions on

18  which you thought you didn't get all of your tips?

19    A.    Yes.

20    Q.    When was that?

21    A.    Most of the times.

22    Q.    Did you ever complain about that to anyone?

68

A.    Yes.

Q.    To whom?

A.    I complained to Andre, I complained to Amal, I have complained to Mindy Roberts, talked about it with other employees.

Q.    Did other employees also believe there were times they didn't get all the tips they were supposed to?

A.    Yes.

Q.    Did pretty much everyone believe that?

A.    Most of the people, yes.

Q.    How much was missing total?

A.    Well, it is hard for me to tell you how much because I really don't know how much was in there.  I can have an idea of the numbers of people per se that I could have done as an example in one week and how many tips I remember in a specific time, how many envelopes I have gotten in one week.

Q.    Did you keep records of how many envelopes with your name on it went into the front end of the process?

A.    No.

69

1     Q.    To the best of your knowledge, did anyone

2  keep track of how many envelopes with your name on it

3  went into the front end of the process?

4     A.    No.

5     Q.    Did you keep records of how much you got on

6  a week-by-week basis at the end of the process on

7  Saturdays?

8     A.    No.

9     Q.    To the best of your knowledge, did anyone

10  keep those records?

11     A.    No -- you are talking about in a record

12  book?

13     Q.    I am talking about a record book or a piece

14  of paper or a slip or a notebook or calendar or

15  anything at all.

16     A.    No.

17     Q.    Did you ever complain in writing about not

18  getting all your tips?

19     A.    No.

20     Q.    Did you ever take any action other than

21  complaining to Andre, Amal and Mindy Roberts to

22  ensure that you got all of your tips?

70

1     A.   The only action that I took was trying to

2  help out sort the tips, trying to get myself involved

3  in sorting the tips out, and so I -- what I did was I

4  tried to help and I suggested to Andre, Why don't you

5  let me help Linda and Faveola. Well, when they need

6  help, then I call you.

7         There were a few times, especially when I

8  was pregnant, that I was allowed to go upstairs and

9  help them out, sort the tips. So there were times

10  that I was able to gather a little bit more tips than

11  if I had not stayed there to sort them out.

12     Q.   On the times that you were helping sort out,

13  did anyone complain about not getting all their tips

14  other than you?

15     A.   Yes, there was always some time that one

16  person or another that would complain about not

17  having enough tips.

18     Q.   Anybody ever say they had too much?

19     A.   No.

20     Q.   Did you ever ask a client to give you tip

21  money by hand as opposed to putting it in an

22  envelope?

71

1      A.    Yes, just some specific ones that I felt

2  like I had enough rapport with them, that I knew well

3  enough, that I wouldn't get in trouble, I knew that

4  they wouldn't turn around and tell Andre or anybody

5  else that I had told them.

6      Q.    Did you ever see Andre take your tips?

7      A.    No.

8      Q.    Do you know anyone who --

9      A.    I am sorry.  Actually, there was one time

10  that I forgot to -- we were supposed to put formula

11  down after every client that we had performed, it was

12  mandatory.  So, if we didn't -- sometimes he would

13  come up with some different rules, and the rule was

14  if we didn't put the formula down, we would get one

15  tip envelope away from us, so there was one time that

16  I had one tip envelope taken from me because I hadn't

17  put in one of my formulas.

18      Q.    When was that?

19      A.    I don't really remember a date --

20      Q.    A year?

21      A.    That was in 2004.

22      Q.    Do you know how much was in the envelope?

72

1    A.    No.    I believe that was given to the

2  receptionist.

3    Q.    Let me ask you about your work activities in

4  2003 a little bit more.  You said you didn't have

5  your own business, but you filed on your 2003 income

6  tax a Schedule C to Form 1040, which is profit or

7  loss from sole proprietorship, giving your business

8  address at 4411 Sheridan Street in Hyattsville, and

9  saying that you got $25,000 from your sole

10 proprietorship.  What business was that?

11   A.    I don't do taxes.  All I know is I worked at

12 Toka as a sole person, so -- I don't understand

13 anything about taxes.

14   Q.    So you didn't have a home business in 2003?

15   A.    No.    I know I paid taxes that year.  Was

16 that H&R Block that prepared it?

17   Q.    I think it is.  It has their address on the

18 bottom.

19        Do you deduct business expenses?

20   A.    What do you mean?

21   Q.    Well, on your taxes, do you, for example,

22 take a deduction for business use of a vehicle?

73

1      A.    I don't know exactly what I take out because

2  to be honest with you, I don't understand anything

3  about taxes.  An accountant prepares my taxes for me,

4  and I don't understand anything about taxes.

5      Q.    I won't ask you anything without showing you

6  them, if we can get down to what is going on, and if

7  we can't, we won't.

8            Are you a U.S. citizen?

9      A.    Yes.

10     Q.    When did you become a U.S. citizen?

11     A.    I think it was 1998.  I am not sure.

12     Q.    Before then, were you lawfully admitted to

13  work in the United States?

14     A.    I had a green card for a while before that,

15  and before that I was just an immigrant, like a lot

16  of people came here as tourist, and I went to school

17  and put myself through school.

18     Q.    What school was that?

19     A.    High school, then I went to college, and I

20  put myself through beauty school.

21     Q.    Which high school did you go to?

22     A.    Springbrook High School, Eiselen High

74

1    School, in Wheaton, Maryland.

2        Q.    And what college?

3        A.    Montgomery College, and I have an A.A.

4    degree in construction management.  I went to

5    University of Maryland, I had been admitted to civil

6    engineering school.  Haven't finished.

7        Q.    We are about to run out of videotape.  It is

8    about noon.  Why don't we break for lunch?

9            VIDEOGRAPHER:  We are now going off the

10   video record at 11:55 a.m. and ending tape 1.

11           (Discussion off the record.)

12           (Whereupon, at 11:55 a.m., the deposition

13   was recessed to reconvene at 12:45 p.m. that same

14   day.)

15

16

17

18

19

20

21

22

75

1           AFTERNOON SESSION

2                          (12:49 p.m.)

3      Whereupon,

4               RONNIE BARRETT

5  having been previously duly sworn, was further

6  examined and testified as follows:

7           VIDEOGRAPHER:  We are now back on the video

8  record.  This is the start of tape 2 in the

9  continuing video deposition of Ronnie Barrett.

10          MR. BREDEHOFT:  As we go back on the record,

11  a couple of housekeeping details.

12          First, it is my understanding that plaintiff

13  has agreed to dismiss count 3 and count 4, which are

14  the wage and hour claims, and count 8, which is the

15  liability claim against SPAC, the premises owner.

16          Am I correct?

17          MR. WILKENFELD:  I don't have the complaint

18  in front of me, but the claims you describe are

19  correct.  I don't know offhand if the count numbers

20  are correct but, yes, the FLSA claim, the D.C. FLSA

21  claim and the claim against SPAC.

22          MR. BREDEHOFT:  There has also been

76

1   correspondence back and forth between counsel and

2   some discovery responses about the type of damages

3   that are in the case and accordingly the type of

4   examination that your counsel will permit.

5         My understanding is that you seek two types

6   of damages, punitive damages and economic losses

7   attributable to the action of the defendants; is that

8   right?

9         MR. WILKENFELD:  Yes, the only damages we

10  will seek in this case are economic damages, purely

11  economic damages and punitive damages.

12        MR. BREDEHOFT:  Not to put too fine a point

13  on it, but I typed all this out, so I want to make

14  sure I get it.  It is my understanding the plaintiff

15  is not seeking damages for pain, suffering or

16  emotional distress; is that correct?

17        MR. WILKENFELD:  Correct.

18        MR. BREDEHOFT:  It is my understanding the

19  plaintiff is not seeking consequential economic

20  damages, in other words, economic damages that might

21  have been caused by emotional distress which

22  generated an inability to work; is that correct?

77

1          MR. WILKENFELD:  Correct.

2          MR. BREDEHOFT:  It is my understanding that

3   you will direct her not to answer questions,

4   accordingly, with regard to her sexual history or

5   medical or drug use, that sort of thing; is that

6   correct?

7          MR. WILKENFELD:  Correct, correct and

8   correct.

9          MR. BREDEHOFT:  And it is also my

10  understanding that you will direct her not to answer

11  any questions relating to medical, emotional,

12  psychiatric or psychological treatment or conditions;

13  is that correct?

14         MR. WILKENFELD:  I will -- that is correct,

15  except for as is germane to the facts of this case.

16  I will permit questions about her pregnancy.

17         MR. BREDEHOFT:  The sequela of the

18  pregnancy, request for accommodations, that sort of

19  thing; is that correct?

20         MR. WILKENFELD:  Correct.  In that the

21  treatment of her while she was pregnant is part of

22  our retaliation claim and overall harassment claim, I

78

1   will permit questions on anything related to her

2   pregnancy.

3            MR. BREDEHOFT:  Good.  I think we are all on

4   the exact same page.

5            EXAMINATION BY COUNSEL FOR DEFENDANTS

6            BY MR. BREDEHOFT:

7       Q.    The respite is over, but I have some easy

8   questions that I haven't asked you yet.  State your

9   full name, please.

10      A.    Ronnie Reitenbach Lau Barrett.

11      Q.    Could you spell that for the court reporter,

12  please?

13      A.    Okay.  R-O-N-N-I-E.  Reitenbach is

14  R-E-I-T-E-N-B-A-C-H.  Lau is L-A-U.  And Barrett is

15  B-A-R-R-E-T-T.

16      Q.    What is your date of birth?

17      A.    February 25, 1969.

18      Q.    Social Security number?

19      A.    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.

20      Q.    Your current residence address?

21      A.    6307 59th Avenue, River Dale, Maryland,

22  20737.

79

1     Q.    You were born in Brazil; is that correct?

2     A.    That is correct.

3     Q.    You have been in the United States for over

4  20 years?

5     A.    Yes.

6     Q.    Do you consider yourself fluent in English?

7     A.    Yes.

8     Q.    Have you ever been involved in a lawsuit

9  before?

10    A.    No.

11    Q.    Now, sometimes this seems to be a trick

12  question because divorces are lawsuits, so let me ask

13  this question:  How many times have you been married?

14    A.    Twice.

15    Q.    Who have been your husbands?

16    A.    Jesse Ramos and Cyrus Shojaie,

17  S-H-O-J-A-I-E.

18    Q.    When were you married to Mr. Ramos?

19    A.    I don't remember when I was married to him.

20  I was pregnant with Jason, so it was in 1997,

21  sometime.

22    Q.    When did you get divorced?

80

1     A.   I really don't know the dates.

2     Q.   It is a good thing to forget some stuff.

3     A.   I totally blocked that out.

4     Q.   Was it a no-fault divorce?

5     A.   Yes.  He didn't even go.

6     Q.   But nobody alleged desertion or cruelty or

7 anything like that?

8           MR. WILKENFELD:  I think we are --

9           MR. BREDEHOFT:  Question withdrawn based on

10 the earlier discussion.  Didn't mean to go there.

11          BY MR. BREDEHOFT:

12    Q.   When did you marry Mr. Shojaie?

13    A.   1992, maybe.  I am not sure.

14    Q.   When did you get divorced?

15    A.   I think the divorce -- no.  Am I saying this

16 right?  I think the divorce didn't get final until

17 around 1997, maybe '98.

18    Q.   When did you marry Mr. Barrett -- you

19 already told me that.

20          Do you know a fellow named Jose Santalan,

21 S-A-N-T-A-L-A-N?

22    A.   I don't remember.  I don't know.

81

1     Q.    Have you ever testified under oath before?

2     A.    Yes.

3     Q.    Tell me when that was, please.

4     A.    I testified under oath for the divorce and

5 then for Mr. Chreky.

6     Q.    What was the occasion for you testifying

7 under oath for Mr. Chreky?

8     A.    Well, there was a fight or altercation that

9 he had with his sister over the salon Piaf when he

10 left, and so he asked me to testify for him and

11 Claude Sayott.  We were his witnesses.

12     Q.    When you testified for him, were you working

13 at Daniel's or were you working at the Andre Chreky

14 Salon?

15     A.    No.  We were working at Daniel's at the

16 time, but for Andre.

17     Q.    Do you remember the substance of your

18 testimony?

19     A.    Yes.  You want me to tell you like the case?

20     Q.    I am interested in what you testified to,

21 so, sure, tell me what you remember.

22     A.    Well, the other side -- it was so long ago,

82

1   I have to remember the details, so give me a little

2   bit of time.

3       Q.    Of course.

4       A.    I remember that Andre wanted to leave the

5   salon, and his sister was trying to sue him because

6   he had taken some of the client lists, they were his

7   clients, and they had an argument at the salon, and

8   he -- she accused him of trying to attack her with a

9   scissors and which he had been taken to a police

10  station at the time when the fight happened.

11           So, my testimony there was to -- they

12  questioned me about Andre, how long I was working for

13  him, if I had seen the fight, I had seen him

14  attacking her with the pair of scissors or knife, and

15  about the clients, that the clients were his, and

16  things like that.

17      Q.    Were you asked if you had had a sexual

18  relationship with him?

19      A.    Yes, she had asked that I was having a

20  sexual relationship with him.

21      Q.    And do you recall your testimony?

22      A.    Yes.  I said no.

83

1    Q.    Was that accurate?

2    A.    Yes, it was accurate.

3    Q.    You have given us the names of your

4    husbands.  What names have you gone by either

5    professionally or personally?

6    A.    Ramos, Lau, Shojaie, and now Barrett.  That

7    is it, no more changing names.

8    Q.    Have you had any children at all other than

9    the two you have already told us about?

10   A.    No.  I would like to.

11   Q.    Where do you work now?

12   A.    I work at Daniel's Hair Salon.

13   Q.    Is that Daniel's II two or just Daniel's?

14   A.    Daniel's, it is apostrophe "S."

15   Q.    Where is that located?

16   A.    1831 M Street.

17   Q.    When did you start there?

18   A.    November of last year, 2007.

19   Q.    What is your position?

20   A.    I am a hairdresser.  I help out with the

21   education and stuff like that, but I am mostly a

22   hairdresser.

84

1    Q.    Have you done anything else for compensation

2    during 2008 other than work at Daniel's?

3    A.    No.

4    Q.    Where else did you work in 2007?

5    A.    Ava Salon.

6    Q.    A-V-A?

7    A.    Yes.

8    Q.    When did you start there?

9    A.    I am sorry.  I am getting a little blank

10   right now.  Can I get back to you, or give me a

11   little time?

12   Q.    Of course.  Do you remember how long you

13   worked there?

14   A.    At Ava -- it wasn't a year.  It was on

15   Capitol Hill, and it didn't work out for me because

16   it was too far.

17   Q.    From your home?

18   A.    No, for my clients too.

19   Q.    Did you work anywhere else in 2007 other

20   than Daniel's and Ava?

21   A.    I kind of freelanced, but I don't call it

22   work.  I did it for fun for about two months.  I

1    bartended for a couple of days.  I wouldn't even call

2    it work, to be honest with you.  Maybe like once a

3    week or something like that, I did that not even for

4    two months, 18th Amendment.

5        Q.    Is that on M Street?

6        A.    No, it is on Pennsylvania Avenue.

7        Q.    Anything else you did for compensation

8    during 2007?

9        A.    No.

10       Q.    What was your position --

11       A.    I am sorry.  I did work at Urban -- Urban, I

12   did work at Urban, and then I went to Ava, so I guess

13   I was busy in 2007.

14       Q.    In 2006, where did you work?

15       A.    Urban Style Lab only.

16       Q.    Did you do anything else for compensation

17   during 2006 other than working at Urban Style Labs?

18       A.    Unh-uh.

19       Q.    You need to say yes or no?

20       A.    I am sorry.  No, I didn't.

21       Q.    What was your job at Urban Style Labs?

22       A.    A hairdresser.  Again, there I was mainly a

1    colorist, but I was also working on clients that I

2    brought in.

3         Q.    When did you start there?

4         A.    I was fired from Andre in December 2005, so

5    I started there two days later -- actually started

6    there three days later.  Maybe the 12th or something

7    like that, of December.

8         Q.    Three days after you left Andre Chreky

9    Salon?

10        A.    Yes.  I started immediately.

11        Q.    When did you apply for that job?

12        A.    Actually, I called the owner.  I knew him

13   because I had worked with him at Roche, one of the

14   owners.

15        Q.    Who is that?

16        A.    Kelly, I can't pronounce his last name, but

17   it is something like G-O-R-S-C-H-U-M, but I can't

18   really pronounce it, and Melanie Smith who is his

19   partner, he spoke with her.

20        Q.    Did you speak with Melanie?

21        A.    No.  He spoke with her.

22        Q.    What did you tell Kelly when you called him?

87

1     A.    I told him what had happened, that I had

2   been fired from Andre.  I had already talked to Kelly

3   previously and Melanie, and they wanted me to go work

4   for them in the first place, but I wasn't ready to go

5   and move to their salon, but when I called him on a

6   Sunday, he said, No, don't worry about it, you can

7   start working, and Melanie called me on Sunday, she

8   actually called me on Sunday and she said, I am sorry

9   for what happened, but we are happy for us, but you

10   can start working for us, and I started for them.

11     Q.    When did you first start talking to Kelly or

12   Melanie about working at Urban Style Labs?

13     A.    On September 2005.

14     Q.    And how did that come about?

15     A.    One of my co-workers used to actually be

16   pretty close -- her sister works there, and I knew

17   her because she had worked for Andre before, and

18   also, again, I knew Kelly because I had worked with

19   him at Roche.  I knew she had opened a new salon.

20     Q.    Who is the -- is it the co-worker's sister?

21     A.    Claudia, but I wasn't very close to her, but

22   I just knew her.

88

1      Q.    Who made the first call, did you call Kelly,
2  did he call you --
3      A.    No, actually I just went there to visit and
4  say hi to Claudia, I went there one time with Anna
5  and just met Melanie and just saw the possibility of
6  myself moving there at some point.  You know, I could
7  be ready to move there.
8      Q.    Did you ever go back to Toka to visit
9  people?
10      A.    Yes.
11      Q.    When is the last time were you there?
12      A.    I actually went to Toka last year, I was
13  there.  I went there also after I had the baby to do
14  my hair.  I didn't leave on bad terms, you know.
15      Q.    About how many times did you talk to someone
16  from Urban Style Labs between this first discussion
17  in September 2005 and your move over there after
18  December 6?
19      A.    I don't recall how many -- I don't
20  understand exactly the question.
21      Q.    You stopped by Urban Style in September 2005
22  and spoke to Melanie and talked about a possible

89

1    move; is that right?

2        A.    Right.

3        Q.    And they said they would like to have you?

4        A.    Yes.

5        Q.    Did you talk to Melanie or Kelly or anyone

6    else from Urban Style Labs before the call you made

7    on that Sunday morning after you left Andre Chreky?

8        A.    Are we talking September?  I don't remember

9    any specific time, but probably not.  I am not sure.

10   That was a busy time of year, between September and

11   December, because fall -- we start getting a lot of

12   clients again, kids come back from school and then

13   the end of the year comes, so I don't know if --

14   maybe I had spoken with them one more time, but I

15   don't recall the exact time.

16       Q.    Other than Urban Style Labs for a couple of

17   weeks at the end of the year and Chreky Salon, did

18   you work anywhere else for compensation during 2005?

19       A.    No.

20       Q.    I am giggling to myself about asking this

21   question and I apologize because it sounds funny, but

22   do you tell fortunes or do psychic stuff or voodoo

90

1    for compensation?

2        A.    No.

3        Q.    I had to ask.  I must have been thinking

4    about somebody else.

5            Let me ask you a couple of questions about

6    some of your tax returns, and we will put them in

7    front of you, and if you can answer them, that is

8    good, and if not, you will just tell me.

9            Why don't we take the originally filed 2007

10   return first.  I am going to ask a handful of

11   questions about these.  Unless you have a burning

12   desire to have them made exhibits or unless we get

13   into something detailed, I wouldn't want to.

14           MR. WILKENFELD:  If we could, wherever, if

15   we could use the Bates stamp numbers so we know what

16   page we are looking at.

17           MR. BREDEHOFT:  That is an excellent idea.

18           BY MR. BREDEHOFT:

19       Q.    If you would flip to the -- you know what

20   the Bates stamp numbers are, those are the little

21   RB zero numbers on the bottom.  Could you flip to RB

22   03152?  Do you see that?

91

1    A.    Yes.

2    Q.    This is a profit or loss from sole

3  proprietorship business form for your husband whose

4  principal business is listed as hairdresser.  It

5  shows $21,000 gross receipts for your husband as a

6  hairdresser in 2007.  Do you know why that is shown?

7    A.    All I know is that I had went back to the

8  accountant that did my taxes, when I looked at

9  hairdresser and we had this corrected, so I don't

10  think we are looking at the correct copy of 2007.

11    Q.    There is a corrected one, and this is not

12  the corrected one.  We will get to the corrected one

13  in a moment.

14        Did your husband have a sole proprietorship

15  as a hairdresser in 2007?

16    A.    No, that is why we corrected it.

17    Q.    Did you have a sole proprietorship as a

18  hairdresser in 2007?

19    A.    No.

20    Q.    If you flip a couple more pages all the way

21  to 3159, that is, again, unamended, but that is your

22  2007 Form 2106, employee business expenses.  It lists

92

1   you as a supervisor.  Were you a supervisor in 2007?

2       A.   No.

3       Q.   And it claims a deduction of over $7200 in

4   vehicle expenses.  Do you see that?

5       A.   Yes.

6       Q.   Which, if you flip to the next page, 3160,

7   shows that you claimed over 14,000, in fact almost

8   15,000 business miles driven in 2007.  Did you drive

9   almost 15,000 miles for unreimbursed business use in

10  2007?

11      A.   I do drive a lot but, again, I don't prepare

12  taxes.  I don't know what you can claim or you cannot

13  claim, to be honest with you, and that is why I have

14  someone else prepare them for me, and I do it in good

15  faith, so that is really all I can say.

16      Q.   Let me ask the question a little different

17  way.  In 2007 you worked for Daniel's and Ava and

18  bartended at the 18th Amendment a little bit and

19  worked for Urban.  Did any of those jobs involve you

20  driving for business other than back and forth to

21  work?

22      A.   No, but I am also taking -- no, I am not

93

1    going -- no.

2        Q.    Let's flip forward to something we just

3    missed, page 3155.  Do you have that?  That is your

4    2007 unamended Form 4137 Social Security and Medicare

5    tax on unreported tip income, and it shows that you

6    reported $1,025 in tips from Urban Style Lab but did

7    not report $120.  My question is how did that $120

8    slip through?

9        A.    I really don't understand anything about

10   this.

11       Q.    When you worked for Urban Style Lab, how did

12   you handle the tips that you receive?

13       A.    I know that they claim tips in there on the

14   W-2s, and actually on every paycheck.  Now, what is

15   this, $120, I don't know.  I took my taxes back to

16   the accountant for him to review everything and make

17   sure everything was corrected.  I really don't

18   understand tax laws or any of these things.

19       Q.    Did you keep records other than your W-2 of

20   the tips you received at Urban Style Lab?

21       A.    No, just my own pay stubs actually with the

22   tips that they put in for us.

94

1      Q.    Do you have any idea where this $120 figure

2    comes from?

3      A.    No.

4      Q.    Did you receive tips in 2007 from Daniel's?

5      A.    Maybe $20 or something like that.  I don't

6    even know.

7      Q.    Did you receive any tips in 2007 from Ava?

8      A.    Whatever I did, I am sure that the

9    accountant put it in there, in the amended form.

10      Q.    We will look at that.  Did you receive tips

11    from Ava in 2007?

12      A.    Yes.

13      Q.    Did you receive any pay for working at the

14    18th Amendment in 2007?

15      A.    Yes, but not really.  I am being honest with

16    you.  It was more of a waste of time.

17      Q.    Let me ask you specific questions.  Did you

18    get a W-2?

19      A.    No.

20      Q.    Did you fill out an employment application?

21      A.    No.

22      Q.    Did you give them a Social Security number?

95

1    A.    No.

2    Q.    Did they fill out an I-9 form on you?

3    A.    No.

4    Q.    Did you receive a paycheck from them?

5    A.    No.

6    Q.    Did you receive any check from them?

7    A.    No.

8    Q.    Were you paid in cash?

9    A.    No.

10    Q.    Were you paid at all?

11    A.    I just got a little bit of tip and then I

12    gave it to the people there in the back bar, and

13    maybe I walked out with 35 or $40.  That was it, so I

14    didn't go back.

15    Q.    Let's take a look at the 2007 amended form.

16    Instead of saying that this is your 2007 amended form

17    because it has obviously got other things in it,

18    let's just go through and look at a couple of pages

19    on this.

20         The second page, page number 3172, do you

21    see that?

22    A.    Yes.

96

1      Q.    This shows that in 2007 you were paid

2   $12,887 William J. Comitz LLC?

3      A.    Yes.

4      Q.    What is that?

5      A.    Ava.

6      Q.    That is the Ava Salon.  Is there a reason

7   that wasn't included on the unamended form?

8      A.    I don't understand the question.

9      Q.    The next page, 3173, Daniel's II, Inc., for

10  2007, shows that you made about $2534; is that right?

11     A.    Okay.

12     Q.    Do you know if that includes any tip income?

13     A.    No, I don't think so.

14     Q.    Page number 3175, which is your W-2 for 2007

15  from Urban Style Lab, shows $12,701.  Do you know if

16  that includes any tip income?

17     A.    Yes, they do.

18     Q.    Now let's go to 3180.  Got that?

19     A.    Yes.

20     Q.    That is Schedule C to Form 1040 profit or

21  loss from business sole proprietorship, 2007, the

22  amended version.  Still shows your husband as a

97

1    hairdresser?

2        A.    I didn't even see that.

3        Q.    Do you know why that is?  This is the

4    amended one.

5        A.    No.  Yes, I see that.

6        Q.    And it shows his income as a hairdresser as

7    $12,890.  Do you know what that is?

8        A.    Obviously he is not a hairdresser.  I don't

9    know why the hairdresser is in there because he is

10   not a hairdresser.  Should be somewhere else shows he

11   is not a hairdresser.

12       Q.    Let's flip to 3183.  That is the 4137 form

13   that is amended, and it shows in addition to the 120

14   of unreported tips from Urban Style Labs, another 280

15   of unreported tips from Daniel's II, Inc.  Where did

16   that number come from?

17       A.    What, with the tips that I received?

18       Q.    Yes.  Is that the tips you received at

19   Daniel's II but did not report?

20       A.    Right.

21       Q.    How did you get that number?

22       A.    Because I only worked for him for the month

98

1    of December, and based upon how much money I made,

2    that is the correct amount.

3        Q.   Did you keep records of your tips?

4        A.   No.

5        Q.   Is this an estimate, a guess?

6        A.   Yes.

7        Q.   Let's put that to the side for a minute and

8    take a look at the 2006 income tax.

9        Did you work at Olives restaurant?

10       A.   Yes.

11       Q.   When?

12       A.   I was working at Olives, but I don't know

13   which year it was.

14       Q.   This is the 2006 tax documents.  We don't

15   have an amended one for 2006.  Did you file an

16   amended one for 2006?

17       A.   No, it didn't need to be amended, 2006.

18       Q.   Are you okay?

19       A.   Yes.  I am just thinking.

20       Q.   Let's look at page 3132.  That shows your

21   total wages, tips and other compensation from Urban

22   Style Lab in 2006 to be $32,447.10; is that right?

99

1    A.    Yes.

2    Q.    And if you flip all the way back to page

3   3141, it shows again that you are taking a deduction

4   of over $7500 for unreimbursed vehicle business

5   expense.  Do you see that?

6    A.    Yes.

7    Q.    While you were working during 19 -- during

8   2006 at Urban Style Labs, did you have occasion to do

9   a lot of business travel other than commuting back

10   and forth to work?

11    A.    Besides classes and work, no.

12    Q.    If you look at the next page, 3142, claims

13   almost 17,000 miles of business travel for you in

14   2006.  That is wrong, isn't it?

15    A.    That is what is in there.

16    Q.    When I say it is wrong, I mean that didn't

17   happen in reality, you didn't have 17,000 miles of

18   unreimbursed business travel in 2006, correct?

19    A.    I am not going to affirm to that because if

20   it is in there, you have to look at my car and all of

21   that.  I don't know the numbers, to be honest with

22   you.  You are asking me something like -- for me to

100

1    affirm something that I don't know.

2        Q.    That is fair.  Let me see if I can ask the

3    same question a little clearer and see if I get a

4    different answer.  Seventeen thousand miles is a

5    round-trip drive from here to Australia and then

6    going to Africa.  What business travel in your car

7    did you do in 2006 other than commuting, if any?

8        A.    Besides driving to Pasadena and taking my

9    son back and forth to day care so I can go to work,

10   that is about it.

11       Q.    Pasadena, Maryland, or California?

12       A.    Maryland.

13       Q.    And what was up in Pasadena, Maryland?

14       A.    It is classes for work.

15       Q.    And how far is that from your house?

16       A.    I don't know.

17       Q.    Less than 100 miles?

18       A.    Yes, one way.  I am becoming an educator for

19   them.

20       Q.    Look at the 2005 unamended tax return --

21   whenever you want to take a break.

22       A.    I just hate numbers.

101

1       Q.    The first page of this pile, 3113, shows

2    that you made a little over $17,650 from Chreky Salon

3    in 2005, right?

4       A.    Yes.

5       Q.    Now, you were on -- you left them in early

6    December, and you were on maternity leave for five

7    months?

8       A.    Came back in May.

9       Q.    So this is half of May, June, July, August,

10   September, October, November, little more than six

11   months, right, about a half a year?

12      A.    Yes.

13      Q.    Let's flip down to 3122.

14      A.    I am sorry.

15      Q.    Page RB 3122 on the bottom right-hand side.

16            This shows you and your occupation as a

17   supervisor.  You were not a supervisor in 2005,

18   right?

19      A.    No.

20      Q.    It also shows almost $6,000 of unreimbursed

21   business vehicle expenses in 2005 when you were

22   working for the Chreky Salon, and if you look at the

102

1    next page, 2123, it claims almost 14,000 miles of

2    unreimbursed business travel.

3         During the time you worked for the Chreky

4    Salon in 2005, did you have occasion to use your car

5    for business travel other than commuting back and

6    forth to your house?

7         A.    For work?

8         Q.    Yes.

9         A.    Ask me the question again.

10        Q.    I am talking about 2005 right now.  During

11   the time you worked for the Chreky Salon, did you

12   have occasion to use your car for business travel?

13   And I am not counting going back and forth to work.

14        A.    Okay.

15        Q.    Did you?

16        A.    Except for work?

17        Q.    Except for commuting to work.

18        A.    I used my car besides for work too; is that

19   what you are asking?

20        Q.    I must be asking this question terribly.  I

21   apologize.

22             In 2005, while you were working for Chreky,

103

1    you used your car to go back and forth to work, to

2    commute; is that right?

3        A.    Yes.

4        Q.    Did you use it for any other purpose related

5    to your work?

6        A.    Related to my work?

7        Q.    For example, did you take business trips,

8    did you drive to California?

9        A.    Not related to my work for Andre Chreky.

10       Q.    Did you use it for business travel related

11   to other work not related to Andre Chreky?

12       A.    Not myself.  My husband maybe did it, but

13   not me.

14       Q.    Do you know if your husband did or did not?

15       A.    He might have, but I don't recall any

16   specific thing.  You have to ask him.

17       Q.    Now, this 2005 tax return didn't show any

18   income that you made at Urban.  Do you know why that

19   is?

20       A.    No.

21       Q.    Let's take a look at the amended 2005

22   return.  That is back in the clipped folder at page

104

1    3185.  Do you have page 3185, amended Form 1040X for

2    2005?

3         A.   Yes.

4         Q.   Now, you just filed this what, about a week

5    ago?

6         A.   Yes, maybe two weeks ago.

7         Q.   June 30; is that right?

8         A.   I don't know.  Where is the date?

9         Q.   There is a signature line --

10        A.   That is right.  This is when I took it to

11   the office.

12        Q.   Why did you amend your 2005 return?

13        A.   Because they needed to be corrected because

14   we were reviewing it and noticed there were some

15   inconsistencies, and to be honest with you, I am not

16   good at -- I don't know anything about taxes.

17             And the thing about my husband -- what

18   raised the flag was I was looking through my taxes

19   and I was looking at my husband as being the

20   hairdresser, and that is what got to me.  My husband

21   is not a hairdresser.  So I went back to my

22   accountant and I told him we need to fix this, and I

105

1    asked him to look them again to be sure there was

2    nothing else wrong with my taxes.  That is why we did

3    it, and he said there was nothing wrong with the

4    other ones.  I assumed he had fixed it.  That is how

5    much I looked at it.  Because the hairdresser for my

6    husband is still there, and I didn't even look.  I

7    guess I am going to have to go back there again and

8    fix it again and read everything.

9        Q.    Your testimony is you were just reviewing

10   your tax returns --

11       A.    I was overlooking all my documents, make

12   sure everything was okay, because I had to submit

13   everything for you guys.

14       Q.    And you noticed your husband was listed as a

15   hairdresser?

16       A.    Yes.

17       Q.    And that is what led you to go back?

18       A.    Right.  That was when I started looking at

19   things and I was, like, I have to make sure

20   everything is okay because I knew you guys were going

21   to come over and try to look at every single little

22   thing.  I went to him and said make sure this thing

106

1    is okay, because I don't understand this stuff at

2    all, and I want to make sure it was corrected.

3        Q.    While you were working for Chreky in 2005

4    did you report at least some of your tips to the

5    Chreky Salon?

6        A.    Yes.

7        Q.    Page 3189, Social Security and Medicare tax

8    on unreported tip income.

9        A.    Where am I?

10       Q.    3189.

11       A.    Not this, right?

12       Q.    That is right.  Do you see 3189?

13       A.    Yes.

14       Q.    Social Security and Medicare tax on

15   unreported tip income, Form 4137, shows that for

16   2005, and this is your amended return, you actually

17   got $1865 in tips; you see that, line 1?

18       A.    Yes.

19       Q.    And you reported none of them.  Do you see

20   that, line 2?  Is that an accurate statement.

21       A.    I don't know what you are saying because all

22   I know is that on Andre's W-2 forms, he didn't used

107

1    to put in some parts -- tips were included in our

2    salary or something; is that what you are saying?

3        Q.    I am just asking, not saying.

4        A.    Because you are asking me something that I

5    don't understand much about.  This is a tricky

6    question.  You say, is that right?  And I said yes,

7    and I don't know what I am saying yes to.

8        Q.    I am not trying to make it tricky, but they

9    are all important.

10       A.    But I don't understand it.

11       Q.    Line 2 on this page 3189 shows that you

12   reported no tips to Andre Chreky Salon in 2005; is

13   that correct?

14       A.    No, because I reported tips.

15       Q.    Now, the line before that, which is

16   equivalent to the line after that, line 3, the income

17   that you must include, $1865, where did that number

18   come from?

19       A.    I am not an accountant.  I don't know.

20       Q.    When you amended this a week and a half

21   ago--

22       A.    But I did not do this.  I did not do my

108

1   taxes.  I did not do this.  I know my W-2s, I can

2   look at my W-2, I can look at my salary and how much

3   I made an hour.  I can try to go that route.

4        Q.    Let me see if I can frame it better.  On

5   page 3185, which is the first part of the amended tax

6   return, down at the bottom, it bears your signature,

7   June 30, 2008, which is less than two weeks ago.

8        A.    Right.

9        Q.    And right where you signed it says:  Under

10  penalty of perjury, I declare I have filed an

11  original return, and that I have examined this

12  return.  Is that a true statement?

13       A.    It is a true statement.

14       Q.    Including the accompanying schedules and

15  statements; was that true?

16       A.    Yes.

17       Q.    To the best of my knowledge and belief, the

18  amended return is true and accurate and complete.

19       A.    I take full responsibility for it.  I signed

20  it, but I am not a tax preparer.  You can ask me

21  about what a line means or what the other line means

22  and I am going to tell you I don't know what it

1  means, and, yes, I did sign to the best of my

2  knowledge, and that is all I can say.  Maybe I will

3  get in trouble with the IRS.  So then be it.  It was

4  to the best of my knowledge I did a correct thing.

5      Q.    I am trying to find out where this number

6  came from, the 1865 in unreported tips.  Let me ask

7  this question, and you don't have to look at any of

8  the pages.  In connection with preparing your amended

9  2005 return, did anyone ask you how much you received

10  in tips in 2005?

11      A.    Yes, when I first did my taxes at the time,

12  it was a ballpark around how much money I made, so

13  that is how we kind of came up with how much I made.

14      Q.    Your first one doesn't have anything on

15  unreported tip income.  I am asking about the amended

16  one.

17      A.    Right.  But in the first one, as far as I

18  know, when the salary includes -- when Andre reports

19  it, it includes our tips and everything we report

20  every month, so our tips are included in our salary.

21      Q.    That makes perfect sense and that would

22  indicate that this --

110

1    A.    So we are reporting at the same time, so it

2    is not like we are not reporting anything at all.

3    Q.    And that would indicate that this unamended

4    2005 is accurate.  You went back a week and a half

5    ago and told the IRS, wait a minute --

6    A.    Let me add more money here, and I don't

7    think they are going to complain.

8    Q.    They seldom complain when you give them more

9    money.  My question is:  In connection with preparing

10   the amended return two weeks ago, did anyone ask you

11   what number should be there, what was your unreported

12   tip income in 2005?

13   A.    Not necessarily, no.

14   Q.    Let's keep flipping down here to the amended

15   2004 return.  That starts on page 3192 -- actually,

16   it doesn't say amended, but I assume it is since we

17   just got it.  It is signed by the preparer but not

18   dated.  3192, do you see that?

19   A.    If it doesn't say amended, then it is not

20   the amended one.

21   Q.    This is your 2004 return, right?  In 2004

22   you worked only for Chreky, right?

111

1    A.    Correct.

2    Q.    Flip, if you would to page 3195.  Did you

3  report during 2004 any tips at all to the Chreky

4  Salon when you received them?

5    A.    Yes.

6    Q.    On page 3195, we have the same thing that we

7  saw in connection with the '05 amended return, total

8  cash and charge tips reported to your employer in

9  2004, it doesn't have anything.  Do you know why that

10  is absent?

11    A.    I don't know.  Again, for what I can see --

12  correct me if I am wrong -- for what I could find

13  out, I never received anything.  Maybe it is not a

14  W-2 -- maybe you can show it to me, how much money I

15  have reported to Andre Chreky that is in a separate

16  part.  I didn't see it.  As far as I know, he

17  included in the salary how much I have made there.

18  So it was not separate.  That is what I understand.

19    Q.    Do you know where the number 4130 comes from

20  on page 3195?

21    A.    No.

22    Q.    If you go to the next page, 3196, it has

1    employee business expenses.  It has for you during

2    2004 a little over $3600 in business expenses.  Do

3    you know what those are from?

4        A.   I don't remember right now.

5        Q.   What business expenses did you incur while

6    you were a hairdresser for the Chreky Salon in 2004?

7        A.   Aside from tools and everything else?

8        Q.   When you say tools, are you talking about

9    clippers, shears, that sort of thing?

10       A.   Yes, shoes, things like that, uniforms, all

11   those things do add up, but I don't know everything

12   off the top of my head.  I do have some receipts at

13   home, I think.  I should.  I don't know.

14       Q.   Talking about receipts, we were talking

15   about your mileage in terms of the business mileage.

16   On each of those mileage forms, you checked a

17   certification that said you had contemporaneous

18   written records of all your business miles.  Is that

19   an error as well?

20       A.   Where?

21       Q.   Well, for example -- I have in front of me

22   the 2007 unamended form, 2106, which is page number

113

1    3159, and you see where it has that $7200 in a

2    deduction, and then the next page it shows that that

3    was derived based on 14,873 business miles, and then

4    on line 20, Do you have evidence to support your

5    deductions?  You checked yes.  If yes, is the

6    evidence written?  You checked yes.  Do you have

7    written evidence that supports your business use of

8    the vehicle?

9        A.    I don't know.  I don't know.  I don't have

10   any.  I don't know if my husband has any.  I don't

11   know.

12       Q.    Why don't we take a five-minute break?

13            VIDEOGRAPHER:  Now going off the video

14   record at 1:49 p.m.

15            (Discussion off the record.)

16            (Brief recess.)

17            VIDEOGRAPHER:  We are now back on the video

18   record.  The time is 2:06 p.m.

19            BY MR. BREDEHOFT:

20       Q.    How were clients assigned to people who

21   worked at the Chreky Salon when you were there?

22       A.    By Andre.

114

1    Q.    How did he do it?

2    A.    He tells people, the receptionist, who is

3    supposed to get clients that day.

4    Q.    Does he tell them in a general meeting of

5    everyone?

6    A.    Well, what I have heard is that he tells

7    specifics, today, these are the people that are

8    supposed to get clients, or the new clients get to

9    these people, or don't give clients to those people.

10    Q.    That is what you have heard?

11    A.    Yes.

12    Q.    From whom?

13    A.    From the receptionists themselves.

14    Q.    Which ones?

15    A.    Throughout the years I have heard from

16    Damon, I have heard from Crystal, I have heard from

17    Nicole, I heard from so many of them, some I don't

18    even remember the names, but Damon, Mary, from

19    Cynthia -- again, I have heard through a lot of the

20    receptionists.

21    Q.    Do you know of any clients who requested you

22    who were not scheduled for you on a day that you were

115

1    working?

2        A.    I am sorry.  Can you repeat the question?

3        Q.    Sure.  Do you know of any clients who

4    requested they be scheduled with you who were not

5    scheduled to see you on a day that you were working?

6        A.    If I knew clients that were --

7        Q.    Let me see if I can figure it a different

8    way.  When some people call for the salon for an

9    appointment, they just say, I want an appointment,

10   they don't request anyone in particular, correct?

11       A.    Yes.

12       Q.    And when some people call the salon they

13   say, I want Jennifer, I want Ronnie, I want Andre,

14   they request a specific person; is that correct?

15       A.    Right.

16       Q.    Do you know of anyone who called and

17   requested you who didn't get you on the day you were

18   working?

19       A.    Yes.

20       Q.    Who were those folks?

21       A.    I have, for example, several of my clients

22   that have requested me, and they said that I was

116

1    booked.  They tried to put them with other people.  I
2    know they have done that to Nicole Buckley, I know
3    they have done that to Carol Benta, I know they have
4    done that to Mark Gooding, Johanna Gooding, they have
5    done that to Sandra Smegay.  They have done that with
6    several of my clients.

7        Q.    When?

8        A.    I don't know any specific dates, but that
9    was throughout my employment with Andre, at certain
10   specific times, but I don't know dates.

11       Q.    Did it start when you came back in September
12   2003?

13       A.    No, no, when I started.

14       Q.    When did it start happening?

15       A.    It usually would happen when Andre was upset
16   with me or when he wasn't very pleased with me.  That
17   is when usually those things would happen.

18       Q.    Can you identify any particular time, date,
19   month that Andre was upset with you about a
20   particular item, that one of these people called and
21   you were available and you didn't get booked?

22       A.    I would be able to recall, yes, if you could

117

1    give me a little bit of time.

2        Q.    Take all you want.

3        A.    You want a date?

4        Q.    What I would like --

5        A.    I can't give you a date.  I know that for a

6    fact, because it was several times this happened

7    throughout my employment, and I know there was a time

8    that I had a conversation with Andre, for example,

9    when I was pregnant, and my -- he was making comments

10   about my boobs, and he was saying that he wanted to

11   see my breasts, and I was telling him that that was

12   inappropriate, for him to stop doing that, and so on

13   and so on, and he would -- first he would laugh, he

14   thought I was joking, and I said, I am serious.  I am

15   a married woman, I am pregnant, and this is not

16   acceptable to me, and then every time I would either

17   be upset with him or tell him something I didn't

18   like, then either I wouldn't get new clients or for

19   some reason my clients would call me and say -- or

20   they would be in someone else's chair and say,

21   Ronnie, I thought you weren't here, or I thought you

22   were booked, I called in and they said you were

118

1    booked.   These people were specifically told to tell

2    my clients that, and to me that was too much of a

3    coincidence.

4        Q.    Who are these people and specifically who

5    instructed them?

6        A.    The receptionists.

7        Q.    Were specifically instructed by whom?

8        A.    By Andre.

9        Q.    Did you see Andre or overhear him give those

10   instructions?

11       A.    No.

12       Q.    Let's focus on what you just said.   Andre

13   said he wanted to see your breasts and he laughed

14   when you were pregnant, so we know that it is after

15   May of 2004, right, because that is when you were

16   pregnant, right?

17       A.    Yes.

18       Q.    But before December 26, 2004, right, because

19   that is when you went on maternity leave?

20       A.    After I came back also, but you are talking

21   about before.

22       Q.    I am talking about whenever it happened.   In

119

1    the period May to December of 2004 while you were

2    pregnant, how many times did Andre tell you he wanted

3    to see your breasts and laughed?

4        A.    On a regular basis.

5        Q.    What does that mean?

6        A.    He would make comments about my breasts on a

7    regular basis.

8        Q.    What does that mean, twice a day, five times

9    a day?

10       A.    Almost every day.

11       Q.    And where was he when he made these

12   comments?

13       A.    In the lunchroom, even upstairs if it wasn't

14   too busy.  Whenever he would have an opportunity he

15   would make a comment about my breasts.

16       Q.    Where was he when he made these comments?

17       A.    I just said, in the lunchroom or upstairs if

18   it wasn't too busy.

19       Q.    You mean the second floor?

20       A.    Yes, and he said that in front of the

21   shampoo girls and in front of people.

22       Q.    Give me the names of the people that have

JARDIM REPORTING ASSOCIATES
(703) 867-0396

120

1  overheard him say this?

2      A.    Cecelia.

3      Q.    What is her last name?

4      A.    I don't know her last name.

5      Q.    What is her position?

6      A.    She was a shampoo person.

7      Q.    And he was there in the second half of 2004

8  when you were pregnant?

9      A.    Yes, she was.

10     Q.    Who else?

11     A.    So many people have heard that.  Jennifer

12  heard him say that, Jennifer Thong heard that.

13     Q.    When, the second half of 2005?

14     A.    Both times, before and after, both times.

15  After I came back, he would make comments about my

16  breasts.  He said he wanted to taste my breast milk.

17     Q.    I am just asking you when Jennifer overheard

18  the comments that Andre made to you about your

19  breasts, that was both before and after your

20  maternity leave?

21     A.    Correct.

22     Q.    Who else?

121

1        A.    A lot of people there heard.  I can't
2    remember all their names right now.
3        Q.    Were there any clients present when these
4    comments were made?
5        A.    No.
6        Q.    Was this during the business day?
7        A.    Yes.
8        Q.    Was it frequent that there were no clients
9    on the second floor during a business day?
10        A.    He would not talk about that in front of a
11    client.
12        Q.    Was it frequent that there were no clients
13    on the second floor during a business day?
14        A.    He would not talk about that when a client
15    was present.
16        Q.    Sure.  Understood.  Was it frequent that
17    there were no clients on the second floor during the
18    business day?
19        A.    If there were clients in there, he would not
20    say in front of a client.
21        Q.    How often were there no clients on the
22    second floor during a business day?

122

1    A.    Clients weren't around the salon at all the

2    time.  There are times that clients were not in

3    there.  Clients are not in the lunchroom.  Clients

4    are not around the bathroom.  They are not on the

5    first floor all the time, and there are places they

6    are not.

7    Q.    Let me ask you about the lunchroom.  What we

8    have been calling the lunchroom is really an exit

9    corridor; is that right?

10    A.    Yes.

11    Q.    And it is full of supplies and boxes, right?

12    A.    No.

13    Q.    No?

14    A.    No, not all times, no.

15    Q.    Sometimes?

16    A.    Sometimes.  Not all the time.

17    Q.    Are there chairs and tables in the

18    lunchroom?

19    A.    No.  We sit on stairs.

20    Q.    How many people can sit in the lunchroom if

21    they are not sitting on each other's lap?

22    A.    I don't know.  Sometimes the place gets like

123

1    a Metro station.

2        Q.    It gets like a Metro station with three or

3    four people in it, doesn't it?

4        A.    Yes.

5        Q.    It has three or four people in it, doesn't

6    it?

7        A.    Yes.

8        Q.    It is pretty small, isn't it?

9        A.    Yes.

10        Q.    Why would you go into the lunchroom with

11    Andre if he would make these comments about you?

12        A.    Believe me, when Andre is around if I am in

13    the lunchroom eating, then I leave.  But that does

14    not give him, how you say -- he would definitely take

15    the time to make sure he would say something to taunt

16    me, and if I am pregnant with a big belly and sitting

17    down, I can't get up that quickly until I hear some

18    kind of comment from him.

19        Q.    Each time he made the comment, did you let

20    him know it was unwelcome?

21        A.    Yes.

22        Q.    And each time that you made this

124

1    unwelcome --

2        A.    Sometimes I ignore him too.

3        Q.    Each time that you either ignored him or

4    make the unwelcome nature known, did he retaliate

5    against you?

6        A.    Most of the times.

7        Q.    How did he retaliate against you other than

8    telling people to tell your clients that you were

9    booked?

10       A.    Before my pregnancy or during my pregnancy?

11       Q.    Ever.   Everything, tell me everything.

12       A.    Besides hindering me from getting new

13   clients, he would try to get me to stock upstairs as

14   much as he could instead of getting other people to

15   do it also, and he has always known that I had

16   surgery on my right arm.   When I was pregnant he did

17   that as well.   He would make sure that I could be the

18   first one to be sent home or keeping me from getting

19   clients.   Sometimes -- I don't know.   I can't think

20   right now.

21       Q.    How many times a week were you the first

22   person sent home?

125

1    A.    Maybe one time.

2    Q.    Once a week?

3    A.    Yes, but not every week.  Maybe like a

4    couple times, three times a month, maybe.

5    Q.    How many times a month --

6    A.    He would make me do -- how you say -- keep

7    track of what the products are upstairs --

8    Q.    Inventory --

9    A.    Inventory, which was not part of my job

10   description.

11   Q.    Whose job was it to do inventory?

12   A.    Inventory is the managers or the

13   receptionist.  It was not my job description to do

14   inventory.

15   Q.    Did any of the other stylists or colorists

16   do inventory?

17   A.    No.  Maybe he would put Mindy or some other

18   manager to do it, but I didn't see everybody doing

19   it, no.

20   Q.    So you don't know whether other colorists or

21   stylists did it; is that correct?

22   A.    Right.

126

1    Q.    But you don't know whether other colorists

2    of stylists did it?

3    A.    Right.

4    Q.    When you were pregnant, you sat on a stool,

5    right?

6    A.    No.

7    Q.    Didn't you buy a stool?

8    A.    No.

9    Q.    You didn't buy it?

10    A.    No.

11    Q.    Was there any time that you were pregnant

12    and working in the Chreky Salon that you had a stool

13    provided for your use to sit down in?

14    A.    No.

15    Q.    Are there any clients that will say

16    otherwise, that you know of?

17    A.    No.  There was no stool provided to me.

18    Q.    Did you ever sit down while you where

19    pregnant?

20    A.    While I was working, no.

21    Q.    You don't remember the round black stool

22    with the black vinyl color and the silver chrome four

127

1    legs that you paid for, you don't remember that?

2      A.    Excuse me?

3      Q.    That didn't happen?

4      A.    No.

5      Q.    Did Mr. Chreky retaliate against anyone

6    else?

7      A.    I can't speak for other people.

8      Q.    As far as you can tell, based on your

9    personal observations, did he retaliate against

10    anyone else?

11      A.    If he was mean to other people, yes, to some

12    people.

13      Q.    How many times did he spank you?

14      A.    I few times.

15      Q.    When?

16      A.    I don't know the dates, but I know there

17    were a few times he spanked me on the buttocks, one

18    time with a towel as I was passing by on the first

19    floor for, no reason, I was walking by and he hit me

20    on the butt.

21      Q.    With the towel?

22      A.    With the towel, and he thought it was a

128

1    joke, and it was not funny.

2        Q.    Was that before you were pregnant?

3        A.    Before I was pregnant and after I was

4    pregnant -- during I was pregnant he hit me in the

5    butt.

6        Q.    Tell me the times that he hit you on the

7    butt after you had your kid, if he did, or did he

8    stop doing that?

9        A.    I know he smacked me on the butt with the

10   towel, it was before I had the baby.

11       Q.    Was it one time?

12       A.    Yes.  I need a break whenever you can give

13   me one.

14            VIDEOGRAPHER:  We are now going off the

15   video record at 2:21 p.m.

16            (Discussion off the record.)

17            (Brief recess.)

18            VIDEOGRAPHER:  We are now back on the video

19   record.  The time is 2:21 p.m.

20            BY MR. BREDEHOFT:

21       Q.    Ma'am, you were going to extend on your

22   previous answer about the stool?

129

1    A.    Correct.  About the stool, back in, I

2  believe, 1998, I had left knee surgery, and I

3  couldn't work standing up, so I had to come back to

4  work and I really needed to get a stool, so Andre

5  allowed me to buy the stool and work with it, and I

6  believe I worked with the stool for a week, maybe

7  two, so that is when I bought the stool with my

8  money, and after that the stool went home, and when I

9  was pregnant and the doctor recommended me to sit

10 down while I was working because of my legs, I asked

11 Andre -- I told Andre about my doctor's

12 recommendation, and I told him that I could bring the

13 stool so that I could sit down and work, and he said,

14 I can't allow you to bring the stool here because

15 otherwise everybody else will come up with a medical

16 reason to have a stool to sit down, and my reply was

17 my station is by the wall, it was in the corner, it

18 was not going to bother anyone, but he didn't allow

19 it.

20        So I am sorry I didn't answer properly

21 earlier on.

22    Q.    No apology needed.  Did you bring in a

131

1    A.    Right.

2    Q.    Can you tell me the month in which that

3  occurred?

4    A.    I can't really tell you a month, but I can

5  tell you it was at the end of the year because I know

6  it was really cold outside.

7    Q.    The end of 2004?

8    A.    Yes -- no, 2003, I believe.

9    Q.    Did Mr. Chreky spank you any other times?

10   A.    He has spanked me afterwards, but not with a

11  towel.  Maybe another time, but I don't remember a

12  month.

13   Q.    Can you tell me a year for that one?

14   A.    I know when I was pregnant he hit me also in

15  the buttocks.  I don't know which month it was.  I

16  know my belly was showing a little bit already, but I

17  don't remember when.

18   Q.    Did you seek medical attention for any of

19  these incidents?

20   A.    No.

21   Q.    Did Mr. Chreky touch you in this way when

22  clients were around?

132

1      A.    No.

2      Q.    Were there any co-workers who saw him spank

3  you?

4      A.    I honestly don't know if someone saw it or

5  not.  I know there was an incident -- I am not very

6  clear right now at this moment whether it was when he

7  hit me on the buttocks or if it was when he grabbed

8  me by the arm that he left a bruise that I did show

9  to Anna Torrico, and I showed it to Faveola because

10  they were both -- and Carla, they were all in the

11  coloring room, and I showed him my arm and I said,

12  Look at what Andre did to me, and they did see it,

13  but I don't remember the month or anything like that.

14      Q.    Was that after the incident of February 2004

15  on the fifth floor?

16      A.    Yes.

17      Q.    And you motioned when you were just

18  describing that, sort of just above your elbow.

19      A.    Yes, because he was grabbing me by the arm

20  and forcing me to go into like the coloring room, he

21  wanted to talk to me, but he grabbed me too hard, and

22  that was not the first time he grabbed with too much

133

1    strength, but that specific time he did bruise me, I

2    was pretty bruised, my arm.

3        Q.    Did you seek medical attention for that?

4        A.    No.

5        Q.    Was that in 2004?

6        A.    It had to be in 2004.

7        Q.    Was there a sexual component to that

8    grabbing?

9        A.    I don't know.

10        Q.    What did he want to talk to you about?

11        A.    I think he just wanted to get me inside the

12    coloring room to talk to me about a color or a client

13    or something, but basically he just wanted to isolate

14    me inside the coloring room.

15        Q.    Did you go inside the coloring room?

16        A.    Yes, because he pushed me pretty hard in

17    there.

18        Q.    What did he talk about?

19        A.    I don't remember it very well, but it was

20    something about the coloring.

21        Q.    Did Mr. Chreky sexually harass you during

22    the first period that you worked there back in the

134

```
 1   late '90s?

 2       A.    Yes.

 3       Q.    And he pressed his penis up against you at

 4   that point; is that correct?

 5       A.    Correct.

 6       Q.    Did you tell anybody about that?

 7       A.    No.

 8       Q.    Let's go back to the second time, the 2003

 9   to 2005.  There are allegations in your complaint

10   that he attempted to put his hand down your shirt.

11   Tell me when that happened?

12       A.    Well, there was one specific time when I was

13   pretty pregnant, actually, and I was sitting down

14   with a white shirt, and my breasts were pretty

15   swollen and he kind of just like -- I was sitting

16   down and he just put his hand in there and he tried

17   to grab my breasts because he wanted to look at it,

18   and I slapped his hand, and I remember at that point

19   I -- I remember I cried and I told him, I just

20   couldn't understand why he treated me like that, and

21   I remember I told him, I think you just don't like me

22   or -- I just couldn't understand why he behaved the
```

135

1   way he did with me, and maybe because I was so

2   emotional being pregnant.  I just --

3       Q.   Where were you when that happened?

4       A.   I was sitting in the lunchroom.  There was

5   one chair, like this, and I had my feet up on

6   something, I don't know if it was another chair or a

7   box or something, because my legs -- they were not

8   just a little swollen, they were real swollen, and I

9   was just resting my legs, just getting a little lunch

10  break, I guess, I don't know, I was getting a break

11  or something.

12      Q.   Any other times that he attempted to grab

13  your breasts?

14      A.   Not that I can recall right now.  I am sure

15  there were, but I can't recall right now.

16      Q.   There were some indications that Mr. Chreky

17  told you that you should leave your husband and start

18  a relationship with him.  Did those occur?

19      A.   He offered me to get an apartment.  I was

20  going -- sorry.

21      Q.   Take your time.  Tell me everything you

22  recall about that.

136

1    A.    I was going through a pretty tough time with

2  my husband because all these things that were going

3  on at work, all the pressure, I wasn't telling him,

4  and that was causing a lot of pressure on me, and I

5  was snapping at my husband a lot, sort of like, I

6  guess, taking it out on him a little bit.

7        Andre is pretty good at annoying people,

8  like he knows when something is wrong with someone

9  or -- he reads people very well.  He knows when

10 people are vulnerable.

11       So, at one time I was sitting and I was

12 obviously a little upset, and he was like, Honey,

13 what is wrong?  And I was like, Nothing, problem at

14 home, but I don't want to talk about it.  And I was

15 like, yes, but it is okay, we will work it out.  He

16 was like, Just leave your husband.  I told you not to

17 get married.  I will help you get an apartment.  I

18 told you not to marry an American man.  He said, I

19 will help you get an apartment in Virginia, I will

20 visit you.  I totally understood what he was talking

21 about, and he knew that I was vulnerable.  That is

22 the thing about Andre, he knows how to use his words.

137

1    Q.   You told him no?

2    A.   I said, no.  I said, I love my husband.  I

3  just want you to leave me alone.  I want you to

4  respect me and do everything you promised me that you

5  were going to do, I want you to do them.  I want you

6  to give me my raise.  I want you to pay me what I am

7  supposed to get paid.

8    Q.   When was that discussion?

9    A.   This was after the baby, after the baby was

10  born.

11    Q.   So, May, June, July?

12    A.   It was summertime.  I am sorry.  I go by

13  seasons.  It must have been around that time.  It was

14  summertime.

15    Q.   Did anyone else overhear this comment?

16    A.   Not this particular conversation, no.

17    Q.   Did he physically touch you during this

18  interchange?

19    A.   Maybe my back or something.  I don't recall

20  it, but he wasn't touching me in a sexual manner at

21  that time.

22    Q.   Let's take five minutes.

138

1          VIDEOGRAPHER:  We are now going off the

2    video record at 2:44 p.m.

3              (Discussion off the record.)

4              (Brief recess.)

5          VIDEOGRAPHER:  We are now back on the video

6    record.  The time is 2:53 p.m.

7          BY MR. BREDEHOFT:

8      Q.    Other than what we have already discussed

9    today, has Andre touched you in a sexual way since

10   you started again at the salon September 2003 onward?

11     A.    Well, he has brushed himself behind me

12   before, and I think he has tried to kiss me.  He has

13   tried, like, for example, one time I was trying to go

14   outside to smoke a cigarette outside.  Outside the

15   lunchroom there is a door to a little -- it is an

16   alleyway, it is very narrow.  He was standing at the

17   door, and in order to pass through there, he was

18   standing there.  I said, excuse me, so I am thinking

19   he was going to give me passageway.  Instead of that

20   he got close to me, to brush himself against me.

21             That is all I can remember at this time.

22     Q.    Was anyone else present in that incident

1    where he brushed himself against you in the door to

2    the alley?

3        A.    Not that I remember.

4        Q.    Do you remember what year that was?

5        A.    It wasn't just only one time, but that

6    was -- I can't remember the year, but that was the

7    second time I was working there we were talking

8    about.

9        Q.    Was that before you got pregnant?

10       A.    Yes.    Obviously, I was not smoking while I

11   was pregnant, and I did not smoke after.   So, yes, it

12   was before.

13       Q.    How many other times did he brush against

14   you in what you perceived to be a sexual way?

15       A.    Well, also, that you are in the coloring

16   room.   It is also very narrow.   There were times when

17   he would come inside, and if you are standing way too

18   close behind, and you try to move around a little,

19   and it is way too close, to me that is a sexual

20   manner.

21       Q.    When did that happen?

22       A.    Pardon?

140

1    Q.    When did that happen?

2    A.    Again, I can't recall it, when it happened.

3    Q.    When did he try to kiss you?

4    A.    There was one time, again, I can't remember

5    the exact day or the time that that happened.  It was

6    one time that we were in the -- I am just trying to

7    remember if it was on the second floor or it was the

8    first floor.

9         He pushed me inside the bathroom, and -- I

10   don't know if it was the -- I don't know if it was on

11   the first floor or if it was the second floor, and he

12   pushed me inside the bathroom, and he was in front of

13   me and he was trying to get close to me and trying to

14   kiss me, and I told him if he didn't let me go, I was

15   going to yell, and there were people inside the

16   salon.  He did let me go, so he didn't actually kiss

17   me.

18   Q.    Were there people on the same floor of the

19   salon?

20   A.    There were people in there, but Andre wasn't

21   very scared if other people would see, apparently.

22   Q.    And who witnessed that?

141

1    A.    I can't tell you if anybody saw us or not.

2    Q.    Who is Maurice Clark?

3    A.    Maurice, he used to be a manager at the

4    salon.

5    Q.    Your complaint in paragraph 49 says that at

6    various times and with increasing frequency toward

7    the end of your employment, you complained to

8    Mr. Clark about Mr. Chreky.  Is that a correct

9    allegation?

10    A.    When I worked there for the first time, I

11    did complain to Maurice about Andre.  The second time

12    that I worked there, Maurice left not too long after

13    I started working there, and I did make a comment to

14    Maurice about Andre again, but Maurice left the

15    salon, he didn't work there for too long the second

16    time around.

17    Q.    That may give me the answer to my next

18    question which has to do with your intake

19    questionnaire when you filed your charge.  The second

20    page here, intake question, sexual harassment,

21    hostile work environment.  Do you see that?  Have you

22    seen this document before?

142

1      A.   I am sorry.  Where is it?

2      Q.   I am just asking, making sure we are on the

3   right page, and we are.  Have you seen this before?

4      A.   Yes.

5      Q.   Is this your handwriting?

6      A.   No.

7      Q.   This is the intake officer's handwriting; is

8   that right?  Well, you don't know whose it is.

9   Neither do I.  Doesn't matter.

10          Question number 8:  When and to whom did you

11   report the incident to a supervisor or management?

12   There was not anybody for me to report to?

13      A.   Right.

14      Q.   Did you tell that to the intake folks when

15   you filed your complaint?

16      A.   Right.

17      Q.   Was that a true statement?

18      A.   Yes.

19      Q.   Look at that page, intake questions, sexual

20   harassment.  Is there anything on that page that is

21   not correct?

22      A.   The second time?

143

```
 1        Q.    The second page.

 2        A.    I can't understand what it is saying here.

 3        Q.    What number is that that you are pointing

 4   to?

 5        A.    Number 7.

 6        Q.    Let's forget about number 7.  Anything else

 7   there that is not correct?

 8        A.    No.  Everything is correct.

 9        Q.    Do you ever use the term ooh, la-la?

10        A.    No.

11        Q.    Never say that?

12        A.    No.

13        Q.    How about words in the salon, co-workers,

14   clients, anybody, like baby or sweetie or honey?

15        A.    I don't call people -- sometimes I call

16   people sweetie, but that is just like my friends.

17        Q.    Have you ever used a term of endearment for

18   any client in the Chreky Salon?

19        A.    Just my friends, yes.

20        Q.    What terms would you use?

21        A.    Sweetie.

22        Q.    Darling --
```

144

1      A.    But ooh, la-la is not a Brazilian word.    I
2    am sorry.
3      Q.    When customers would arrive, would you ever
4    on occasion hug and kiss them and greet them?
5      A.    Yes, my closest people, yes.
6      Q.    And did you ever hug or kiss co-workers in
7    greeting or otherwise?
8      A.    Yes, I have.
9      Q.    Did you ever hug or kiss Andre hello or
10   goodbye while you were working at the salon?
11     A.    I have.
12     Q.    Let me ask you to take a look at this
13   document, and actually I am going to ask you to flip
14   all the way down to your affidavit which starts on RB
15   92, but my question is going to be about something on
16   RB 100, all the way toward the end.  Do you have
17   that?
18     A.    Yes.
19     Q.    Paragraph number 17, do you see that?
20     A.    Yes.
21     Q.    Why does it say that you quit your job and
22   then Mr. Chreky flew into a rage?

1    A.   Well, I didn't quit.  I was fired.

2    Q.   I understand.  We have seen your

3 supplemental affidavit.  I am asking why your

4 original affidavit sworn to under the penalty of

5 perjury on November 8, 2006, says what it says in

6 paragraph 17, why does it say that?

7    A.   Because it was the way it was said, but I

8 didn't quit.  When I really thought it through

9 exactly, all the details, how the words came out

10 about, I was fired, I didn't quit.

11       I had my bag ready because I knew how Andre

12 was or how he is and how his mood is and how he gets

13 violent at times, so I made sure that I had my bag

14 ready in case -- that is my most important

15 possessions, because I know from times before when he

16 fired people, he doesn't let people take their stuff

17 right away, and then it is a hassle for them to come

18 back and get their own things, so I put my things in

19 a bag, most of my things in a bag, and I said, if he

20 starts doing whatever I think he might do, then I am

21 going to leave, but he is the one that said to me

22 that I was fired in front of a lot of people.

146

1    Q.    What prompted you to get your bag together?

2    A.    I was preparing myself because, again, like

3    I just said, I know how Andre's moods are, I know how

4    his violent temper is, and I wanted to make sure that

5    I had my belongings with me. If I had a chance to

6    grab my license, believe me, I would have gotten my

7    license too, because then I would have had my

8    license.

9    Q.    What had happened before you got your bag

10   ready on December 6, if anything, that led you to get

11   your bag ready?

12   A.    Well, the day had ended already for me. I

13   was off. I had already stocked all the colors, I had

14   put all of the peroxide bottles, I restocked

15   everything on the second floor to make sure that --

16   because we were supposed to have a baby shower for

17   one of the manicurists that night, so I wanted to

18   make sure that I got all these things done because I

19   was going to wait in the salon for the baby shower.

20   I restocked everything, clocked myself out, and I

21   went downstairs.

22        When I was downstairs, there were two people

1    downstairs, Jamal and Bajri, two hairdressers, and

2    they were not working at the time either, they didn't

3    have any clients.  I wasn't talking to any shampoo

4    person.  I wasn't talking to no other employee that

5    was under his clock at the time, and Amal came over

6    and she said, Oh, Ronnie, Andre told me to tell you

7    to go and do the -- restock all the products on the

8    first floor.  We are talking about all the shampoos

9    and all the things downstairs, and I said, Amal, I

10   already clocked out, I did everything upstairs.  She

11   turns around, she is goes upstairs and goes and tells

12   Andre.

13          So, she comes back downstairs again and she

14   said, Ronnie, Andre is very upset at you right now,

15   he doesn't want to see your face in the salon, and

16   for you to leave, and he will -- for you to leave

17   right now.  He doesn't want to see your face in here.

18   He will call you when he needs you.  I am like, okay,

19   if he is so upset, I will go clock back in.  Jamal

20   and Bajri both said, We will help her.  They will

21   restock also.

22          I said okay, fine.  Since you guys are going

1  to help, one of them was going to start writing what

2  we needed as supplies.  I said, fine, I am going to

3  go outside, smoke one cigarette.  I will come back

4  in, clock back in, and then we will go upstairs and

5  get the products.  That is what was said.  I am

6  outside smoking a cigarette.  That is when she told

7  me, Andre said he doesn't want to see your

8  face around here at all.

9      Q.    I am sorry.  Who said that?

10     A.    Amal.  She comes outside while I was smoking

11  a cigarette.  I said Amal, I am going to do it.

12  Jamal and Bajri are writing everything that we need.

13  I am going to go back in there, I am going to clock

14  back in, I am going to do it.  Ask everybody

15  upstairs.  I did everything already.  She said, He

16  says he doesn't want to see your face in here.  He is

17  very mad at you right now.  If I were you, I would

18  leave.  He will call you when he wants you to come

19  back.  She said it twice.

20          At that point, after all that I had gone

21  through with Mrs. Chreky and all of the abuse, I

22  thought that was like too much.  I am not a dog, and

149

1  I should have some kind of pride, so what I did was,

2  I am not going to leave.  He cannot treat me like

3  this.  So what I did was, I will talk to him at the

4  end of the baby shower, but knowing Andre and how

5  violent he is, and I know how he likes to show off in

6  front of people, because he does, he will take an

7  opportunity to rep somebody to make an example of to

8  show off to the other employees, he does it.

9        I put my things in a plastic bag, and I went

10  upstairs and I told my other co-workers, and they

11  were like, Why do have that bag in here?  I am like,

12  I don't know.  There is no answer.  And I told them

13  what happened, and we will see what happens.  They

14  said, You ought to leave.  You know how he is.  I

15  said, No, I am not going to leave.  We have a baby

16  shower.  I have to give a present to her.

17        So, I stayed in the baby shower and

18  everything.  We come to the end of the baby shower,

19  we go downstairs, Andre is still on the second floor,

20  and we are all coming out of the elevator, I am still

21  there with my bag, and from the top of the stairs he

22  is like, What are you still fucking doing here?  I

1  thought I told you to fucking leave.

2          I am like, Why are you yelling?  He said, I

3  talk the way I want.  It is my salon.  When I tell

4  people what to do, I want them to do right away, I

5  want them to jump.  And I was like, But, Andre -- and

6  I was trying to first explain to him, I told Amal.

7  Didn't she tell you?  He said, You are calling Amal a

8  liar.  I don't know what you are trying to call Amal,

9  but this is what happened.  Ask Amal.

10          Then Faveola tried to defend me.  She was

11  the only person that managed to open her mouth to

12  defend me in front of him because nobody else in the

13  place had the guts to say one word because they all

14  knew I was right, but nobody would say anything, and

15  he got mad at her too.

16          And then he is talking to me like with his

17  fingers in my face and everything, and I am backing

18  away.  I mean, come on, do you need to treat people

19  like that, do you need to treat people as if they are

20  animals?  No respect whatsoever.

21          He said, I told you to leave.  I said, So

22  what are you doing, are you firing me?  Take it as

151

1    you want.  I just want you out of here.  I said, No,

2    you are confusing me, Andre.  Do you want me to go?

3    I will call you whenever I want.  I said, No,

4    whenever you want?  You want me to leave or you want

5    me to come back?  Fine, You want to fucking call --

6    you want to file for unemployment, fine.  You are

7    fired.  He fired me.  He is the one that said for me

8    not to come back.  I didn't say I quit.

9        Q.    But on your affidavit sworn under penalty of

10   perjury, you said, I quit, and my question was why

11   did you say that in your affidavit, sworn under

12   penalty of perjury, given all you have just told me

13   about what happened?

14       A.    That was the way I said it, but it was not

15   the way it happened, that is why we fixed it.  I read

16   through it, it was a tape, and I said this is not

17   exactly how it happened.  I didn't say I quit.

18       Q.    Okay.  Let me ask a couple of questions.

19   Give me the names of the witnesses to Mr. Chreky's

20   tirade at you using the F-word?

21       A.    Okay.  Sally was there, Damon was there.

22   There were so many people there.  Faveola was there.

152

1    Q.    Jamal?

2    A.    I think he had already left.  I am not sure,

3    to be honest with you.

4    Q.    I am sorry.  Let me interrupt.  I thought

5    you said Jamal defended you.

6    A.    Faveola defended me.  Jamal, he was there --

7    when Amal came up, I was talking to him, because

8    Andre said I was disrupting the shampoo people and

9    other people that I was talking to, but, no, I was

10   talking to Jamal and Bajri, I wasn't talking to

11   nobody else.

12   Q.    So Faveola was still there when Andre

13   exploded?

14   A.    Yes.  There were so many people over there,

15   but I don't think they are all going to tell the

16   truth.

17   Q.    Who is Amal?

18   A.    She used to be a manager.

19   Q.    She was a manager at that time, right?

20   A.    Yes, but I believe she had left when this

21   thing happened.  When Andre fired me, she had already

22   left.

153

```
 1        Q.    She had left the building?

 2        A.    Yes.  She set the place on fire and she

 3   left.

 4        Q.    You mean that figuratively?

 5        A.    Yes, because she wasn't there.

 6        Q.    You don't know what Amal told Andre or what

 7   Andre told Amal?

 8        A.    No.  She was the middle person.

 9        Q.    So you don't know what she did or what she

10   said or what Andre's direction was or anything else.

11   Do you want to answer?

12        A.    Yes.

13        Q.    I will take an answer.  Is that correct?

14        A.    That is correct.

15        Q.    That was a Saturday night?

16        A.    That was a Saturday night.

17        Q.    And whose shower was it?

18        A.    She was Ethiopian.  I forgot her name.  I

19   really forgot her name.

20        Q.    Where was the shower?

21        A.    It was on the third floor in one of the -- I

22   think it was the green room or something like that.
```

154

```
 1      Q.    At the salon?

 2      A.    At the salon.  And Nigisti was there.

 3      Q.    Who organized the shower?

 4      A.    We all like got together and did this as a

 5   surprise for her.

 6      Q.    Who got Andre to sign on for using the salon

 7   for a party after business hours?

 8      A.    I don't know about that, if Andre signed

 9   anything off.

10      Q.    You don't know if Andre gave permission to

11   the employees to have a party after-hours on the

12   third floor of the salon?

13      A.    It wasn't after-hours.  We were finished by

14   the time he closed the door.

15      Q.    During working hours?

16      A.    The clients had finished -- I don't know.  I

17   am not very sure.  It was around 7:00.  He wouldn't

18   have allowed us to have a party while we had clients.

19   It was just a very quick thing.

20      Q.    Do you know Marlee Norton?

21      A.    Who?

22      Q.    Marlee Norton, a client of yours?
```

155

```
 1      A.    Marlene Norton or --
 2      Q.    I think her name was Marlee, M-A-R-L-E-E?
 3      A.    Marlee Norton, No.
 4      Q.    Do you know a Lauren Ashburn?
 5      A.    Yes.  I remember another name too.  Nicole
 6   Buckley.
 7      Q.    Lots of people around there?
 8      A.    Yes.
 9      Q.    We have enough there.
10            Lauren Ashburn, who is that?
11      A.    She used to be a client of mine.  I lost
12   contact with her.
13      Q.    Did she come to utilize your services?
14      A.    Yes.
15      Q.    Did you undercharge her and pocket the
16   money?
17      A.    No.
18      Q.    No?
19      A.    If I pocket the money from her?
20      Q.    Did you undercharge her?
21      A.    No.  I never pocket nobody's money.
22      Q.    Okay.  I am almost finished.  If we take
```

156

1    another five minutes, I may have another question or

2    two or I may not.

3              VIDEOGRAPHER:  Going off the video record.

4              (Discussion off the record.)

5              (Brief recess.)

6              VIDEOGRAPHER:  We are now back on the video

7    record.  The time is 3:26 p.m.

8              BY MR. BREDEHOFT:

9        Q.   After you left the Chreky Salon in December

10   2005, did you do any job searching other than going

11   to Urban?

12       A.   No.

13       Q.   Did you put out your resume or interview or

14   anything?

15       A.   No.

16       Q.   Lauren Ashburn, did you do off-site work for

17   her, for your own account?

18       A.   Yes.  I did go a couple of times actually

19   on-site.  I forgot about that one.  I did, I did, to

20   the National Geographic, I went there and did a blow

21   dry a couple of times.  On-the-side thing.

22       Q.   Was that during '04 or '05?

157

1      A.    I was work at Urban Style Lab at the time.

2      Q.    You weren't working at Chreky?

3      A.    No.

4            MR. BREDEHOFT:  Nothing further.

5            MR. WILKENFELD:  Nothing from us.

6            MR. BREDEHOFT:  Before we conclude, I

7    understand there are some additional documents that

8    are going to be produced.  We are going to adjourn

9    the deposition, not conclude it.  We will look at

10   those.  I doubt we will have any questions, but we

11   need to reserve the right.

12           MR. WILKENFELD:  Absolutely.

13           VIDEOGRAPHER:  This deposition is now

14   adjourned at 3:27 p.m.

15           (Whereupon, at 3:27 p.m., the taking of the

16   deposition was concluded.)

17           (Signature not waived.)

18                      - - -

19

20

21

22

158

## CERTIFICATE OF NOTARY PUBLIC

I, CATHY JARDIM, the officer before whom the foregoing deposition was taken, do hereby testify that the witness whose testimony appears in the foregoing deposition was duly sworn by me;  that the testimony of said witness was taken by me stenographically and thereafter reduced to a transcript under my direction; that said deposition is a true record of the testimony given by the witness; that I am neither counsel for, nor related to, nor employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto nor financially or otherwise interested in the outcome of the action.

_____
                              Cathy Jardim

Notary Public in and for the
District of Columbia

My commission expires:
July 31, 2012

159

CERTIFICATE OF DEPONENT

      I have read the foregoing 158 pages, which contain the correct transcript of the answers made by me to the questions therein recorded.


_____
RONNIE BARRETT


- - -


     I hereby certify that the individual representing him/herself to be the above-named individual, appeared before me this _____ day of _____ and executed the above certificate in my presence.


_____
Notary Public


My Commission Expires:

160

ERRATA SHEET

To the deponent: Please read the transcript of your deposition and indicate on the lines below your corrections. Then sign and have your signature notarized.

PAGE#, LINE#    CORRECTION    REASON FOR CORRECTION

PURSUANT TO 28 U.S.C., SECTION 1746, I HEREBY DECLARE UNDER PENALTY OF PERJURY THAT I AM THE DEPONENT AND THAT THIS CERTIFICATE OF DEPONENT AND ERRATA SHEET WERE PREPARED BY ME.

_____           _____
  RONNIE BARRETT                    (Signature)

Subscribed to and sworn by:

_____
  Notary Public              My Commission expires:

**161**

INSTRUCTIONS FOR READING AND SIGNING THIS TRANSCRIPT

The witness whose deposition was taken in this matter has requested to read and sign this transcript.  After reading the transcript, the witness should fill out and sign the last two pages in front of a notary public and those two pages should be returned to the attorney responsible for taking this deposition so that it may be filed with the original transcript.

Thank you for your attention to this matter.

JARDIM REPORTING ASSOCIATES, LLC
1221 N. Powhatan Street
Arlington, Virginia  22205
(703)867-0396
jardimreporting@yahoo.com

ANDRE CHREKY®, *the salon spa*

# Staff Manual

EXHIBIT

2

tabbies

Chreky 000096

**Chapter**

# Employment Policy

*The success of Andre Chreky® the salon spa, depends on each and every staff member.*

The employment policy of Andre Chreky® *the salon spa*, (or ACS) serves to protect the company as well as each staff member. ACS believes in equal employment opportunities for every individual and a workplace free of all types of conflict. This manual may be modified at any time in the sole discretion of management. The rest of this chapter outlines the company's policies on employment-at-will, equal employment opportunities, sexual harassment, referral premium, concurrent employment, reference requests, personnel files, and the trial employment period.

## Employment-At-Will

The relationship between an employee and Andre Chreky®, the salon spa is "at will" which means that it is entered into voluntarily and is not for any fixed period of time. Additionally, either the employee or the company may discontinue the employment relationship at any time, with or without cause.

## Equal Employment Opportunity

Andre Chreky®, the salon spa is committed to providing equal opportunity in all phases of employment. The employment and personnel policies ensure that all employees are treated equally. Equal opportunity benefits will be provided to individuals without discrimination due to age, sex, race, color, religion, national original, political affiliation, disability, veteran status, marital status, or any other prohibited factors. ACS adheres to local, state and federal laws. Any employees that are affected by this policy should address questions or concerns to management.

Recruiting, hiring and advancement will be done solely on the merits of job-related requirements. Decisions made regarding employment are made to further the principles to which the company adheres and will be administered without regard to age, sex, race,

Chreky 000100

color, religion, national original, political affiliation, disability, veteran status, marital status, or any other prohibited factors.

Equal employment opportunity can only be achieved through the support of every staff member. Your support is invaluable in advancing equal employment opportunities at Andre Chreky®, the salon spa.

## Sexual Harassment

Andre Chreky®, the salon spa is firmly committed to providing a workplace free from sexual harassment or harassment based on age, sex, race, color, religion, national original, political affiliation, disability, veteran status, marital status, or any other prohibited factors.

Any type of harassment involving staff members and/or clients will not be tolerated by the company. This policy applies to every staff member and includes harassment in the salon or in salon-related settings. Violators will be subject to disciplinary action possibly including the termination of employment.

Sexual harassment includes, without limitation, unwanted physical sexual advances, sexual innuendo, requests for sexual favors and any other verbal comments that are of a sexual nature. Sexual harassment can occur in many different circumstances including unwelcome flirtations, unwelcome physical contact, offensive jokes or remarks and the use of sexually explicit language.

Other forms of harassment include verbal and physical abuse that are hostile in nature. This includes foul language, threats and fighting between staff members and between staff members and clients.

Claims of harassment should be reported to management as soon as the incident occurs. Every claim will be investigated thoroughly and attempts to resolve the matter will be made.

Individuals who are victims of harassment will not suffer retaliation. Retaliation by another staff member is a serious offense to this policy and that person will be subject to disciplinary action which may include termination of employment.

## Referral Premium

Andre Chreky®, the salon spa believes in hiring staff of the highest caliber. Any staff member who refers a candidate to the company who is hired and subsequently stays with the company for at least one year in a full-time capacity will receive a $250 cash premium.

Chreky 000101

# Employee Statement

I acknowledge that I received a copy of the Andre Chreky Staff Manual. I hereby certify that I have read and understand the following policies. I understand that this is a basic guide for all employees and is not intended to create an express or implied employment contract or agreement. I understand that any conduct on my part that constitutes a violation of these policies may result in disciplinary action including termination of employment.

## POLICIES

1. Employment Policy

2. Salary Administration

3. Employee Benefits

4. General Policies

5. Termination of Employment

Print Name: RONNIE REITENBACH LAU

Signature: _Ronnie Reitenbach_    Date: 5/5/98

---

Chreky 000031

# Employee Acknowledgment

Employee, by signing below acknowledges that he/she has received a copy of the April 1, 2001 Andre Chreky®, *the salon spa* Staff Manual and has had a sufficient opportunity to review the provisions, terms, conditions and covenants contained therein. Employee agrees to abide by and comply with the provisions, terms, conditions and covenants contained in the Staff Manual both during the term of his/her employment and, as may be provided in the Staff Manual provisions, after employment has terminated. Employee specifically acknowledges the employment relationship to be "at will," as set forth in the Staff Manual, and thus terminable by the Employee or ACS at any time, for any reason and without prior notice.

Employee Name

Signature: _Ronnie Lau_          Date: _9/06/03_

Chreky 000030

EXHIBIT

3

April 15 1999

To: Andre Chreky and management

Please accept this as my formal letter of resignation effective as of today. I am giving you (2) two weeks of notice as required. My main reason for making this decision is that I want to be able to both cut and color hair, as well as be paid by commission. As of the middle of last year (1998), I was making around $2,000 oo (two thousand dollars) more than I am making today because I was switched from commission to salary. I understand that the company's new policies and procedures were better for the business, and a way to be able to gather revenues for improvements, such as; advertisements, receptionists etc... Unfortunately, after (5) months on salary I am not making more money. You do have a family and responsabilities and I need to see that I have room to grow professionally, and I do not find it in here any more. I have tried to communicate my worries, and I was told that soon there would be a chance for me to make on commission and a room to grow professionally. Unfortunately, you are too busy with the business constant growth to pay attention on any issues. Andre

Chreky 000037

Chreky salon has been a great success
for the past two years, thanks for a well
elaborated idea of a salon, and to a
very well qualified personell which
are very talented, willing to help, to
learn and please everyone.
I am leaving with great regret
and I want you to know that
I am greatfull to been given the
opportunity to work side by side with
Andre and been able to learn so
much from him. I will miss all
of the staff as well as our clients.

In conclusion, I present this
as my official resignation and
give my (2) two weeks notice
effective immediately

Sincerely yours
Jennie Fau

# KATZ, MARSHALL & BANKS, LLP

<u>By Hand Delivery</u>
November 8, 2006

Intake Officer
D.C. Office of Human Rights
441 4th Street, NW
Suite 570N
Washington, D.C. 20001

    Re:   <u>Ronnie Barrett v Andre Chreky Salon</u>

Dear Intake Officer:

    Please accept for filing today the attached complaint form to be filed with the D.C. Office of Human Rights.  As our investigation proceeds, we will supplement the facts alleged in the complaint, as necessary.

    If you have any questions regarding this complaint, or if there is any problem, please contact me immediately at the number listed below.  Thank you for your assistance in this matter.

               Sincerely,

               Ari M. Wilkenfeld
               Attorney for Ronnie Barrett

Enclosures
cc:   Ronnie Barrett


EXHIBIT
4

RB - 00082

# COMPLAINT FORM

Information required herein will assist OHR staff to determine the nature and extent of discrimination as defined by the Federal/Local Discrimination Laws. Please complete the following form in its entirety and to the best of your knowledge. This form is subject to review and acceptance by the Office of Human Rights.

### *Notice of Non-Discrimination*

*In accordance with the D.C. Human Rights Act of 1977, as amended, D.C. Official Code Section 2-1401.01 et seq., (Act) the District of Columbia does not discriminate on the bases of actual or perceived: race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, familiar status, family responsibilities, matriculation, political affiliation, disability, source of income, or place of residence or business. Sexual harassment is a form of sex discrimination, which is also prohibited by the Act. In addition, harassment based on any of the above-protected categories is also prohibited by the Act. Discrimination in violation of the Act will not be tolerated. Violators will be subject to disciplinary action.*

## I. COMPLAINANT

| | | |
|---|---|---|
| Date: 11/8/06 | OHR Docket No.: | EEOC No.: |

Name: Ronnie Barrett

Address: 1015 Baltimore Ave. Apt 3402

City/State/Zip: College Park, MD 20740

Tel # (H): 240-271-0971

Tel # (W):

Race: Caucasian    Sex: Female

Social Security No.: 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

The Primary Language Spoken in your household:
__Spanish __Amharic __Chinese __Vietnamese __Korean __Other

Date of Birth: 2/25/1969

### CONTACT PERSON IF YOU CANNOT BE REACHED:

Name: William Barrett (husband)

Address: Same as above

City/State/Zip:

DC Office of Human Rights
441 4th Street, NW, Suite 570N
Washington, DC 20001
202-727-4559 *Fax 202-727-9589
Complaint Form

1

rev 02/06

RB - 00083

| Tel # (H): 240-210-0981 | Tel # (W): |
|---|---|

**IF REPRESENTED BY COUNSEL, PLEASE PROVIDE THE FOLLOWING:**

Name: Ari Wilkenfeld    Telephone/Fax: 202-299-1140

Address: 1718 Connecticut Ave. NW, Suite 600  Washington, DC 20009

*Please note: If you are represented by counsel or retain counsel prior to your scheduled Intake interview, the counsel must either (1) be present with you for the duration of your Intake interview, or (2) withdraw his/her appearance from the interview by submitting a letter to the Office indicating that the interview may take place without his/her representation.

## 2. RESPONDENT

Name of company or organization:
Andre Chreky Salon & Spa and Andre Chreky

Name and Title of principal officer (i.e. President, Owner, Human Resources Manager):
Andre Chreky, Owner

Nature of Business: Hair Salon & Spa

Address: 1604 K St. NW

City/State/Zip: Washington, DC 20006

| Tel #: 202-293-9393 | Fax #: 202-293-2634 |
|---|---|

## 3. BASIS OF COMPLAINT
The basis is the reason you were treated differently than others outside of your protected class.

Do you feel you were discriminated against because of your: (Please check appropriate box and provide detail, if necessary.)

- ☐ Race ___
- ☐ National Origin ___
- ☐ Color ___
- Source of Income*
- Personal Appearance
- ☐ Gender Identity or expression
- Family Responsibilities

- ☒ Sex  Sexual Harrasment
- Religion ___
- ☐ Disability ___
- ☐ Matriculation
- ☐ Genetic Information
- ☐ Place of Residence or Business*

- Age ___
- ☐ Familial Status*
- Marital Status
- ☐ Sexual Orientation
- Political Affiliation

* Please note: Pursuant to the D.C Human Rights Act of 1977, as amended, the "familial status" and "source of income" bases are applicable only when alleging discrimination in housing, public accommodations and educational institutions. The basis of "place of residence or business" is applicable only if alleging discrimination in housing and public accommodations.

DC Office of Human Rights
441 4th Street, NW, Suite 570N
Washington, DC 20001
202-727-4559 *Fax 202-727-9589
Complaint Form

2

rev 02/06

RB - 00084

## 4. JURISDICTION

[X] Alleged violation occurred in the District of Columbia.

[X] Alleged violation occurred 365 days or less (6 months or less for D.C. Government Employees).

[X] At least 1 employee (More than 15 employees to cross file with EEOC).

[X] You have not commenced any other action, civil, criminal, or administrative in any other forum based on the same unlawful discriminatory practice described herein.

## 5. AREA OF COMPLAINT

[X] Employment          Public Accommodation          Educational Institution

☐ Language Access          DC Family and Medical Leave Act

## 6. ISSUES

### What action was taken that made you feel you were treated differently?

☐  Family Medical Leave     Promotion     Transfer     Demotion     Discharge
[X] Retaliation   x Sexual Harassment   x Hostile Work Environment     Failure to Hire
☐  Equal Pay     Terms and Conditions     Failure to Accommodate     Discipline
☐  Denial of Service   x Constructive Discharge     Admission or Admission Fees     Discounts
☐  Crowd Capacity     Personal Identification     Time of day/event     Restrictions/Rules
☐  Credit/Insurance     Complimentary Admission/Guest     Curriculum
☐  Membership Fee/Dues     Program Participation

Other: _____

## 7. DISTRICT OF COLUMBIA GOVERNMENT EMPLOYEES OR APPLICANTS

Please note: Pursuant to §115 of DCMR Title IV, all District Government employees must first consult an agency EEO counselor within 180 days of the alleged discriminatory act prior to filing with the Office of Human Rights, unless the District Government employee is alleging unlawful discrimination based on sexual harassment. The Office of Human Rights cannot process a complaint from a current or former District Government employee unless (1) the employee has received an exit letter from his/her agency EEO Counselor; (2) twenty-one days have passed since the matter was called to the attention of the agency's

DC Office of Human Rights
441 4th Street, NW, Suite 570N          3
Washington, DC 20001
202-727-4559 *Fax 202-727-9589
Complaint Form

rev 02/06

RB - 00085

EEO counselor and no exit letter has been written; or (c) the employee is alleging unlawful discrimination based on sexual harassment.

☐   You have filed an informal complaint with an agency assigned EEO Officer/ Counselor.

Counselor's Name: _____

Counselor's Agency: _____

Counselor's Telephone Number: _____

Date Filed: _____ Date of Exit Letter: _____

## 8. EMPLOYMENT
### Time of Hire, Evaluations, Discipline, Termination

Date of Hire: September 2003 _____ Title: Colorist _____

Salary at time of hire: 1,900 Bi- weekly (See Attached Affidavit) _____

Date of Last Performance Evaluation: none given _____

Supervisor/Manager who performed the Evaluation: N/A _____

Last Performance Evaluation Rating: . Excellent    Good    Fair    Poor

Alleged adverse actions taken against you (i.e., written reprimand, suspension, denial of promotion) and the date the action was taken:

Action: See Affidavit of Ronnie Barrett _____ Date: _____

Action: _____ Date: _____

☐   **Current** or  X **Final** position held with Respondent: Colorist _____

Salary: $ 21.00 per hr _____

What reason did Respondent give for your . **termination** or . **denial of promotion**:

Work Performance    Attendance    Insubordination    Gross Misconduct

Date of Termination/Denial of Promotion: _____

## 9. PUBLIC ACCOMMODATION/EDUCATIONAL INSTITUTIONS
### (Only complete section if your complaint deals with discrimination against a public accommodation or educational institution)

Date of alleged incident: _____

Service you requested: _____

DC Office of Human Rights
441 4th Street, NW, Suite 570N
Washington, DC 20001
202-727-4559 *Fax 202-727-9589
Complaint Form

4

rev 02/06

RB - 00086

Person who denied your service request:

Name: _____    Title: _____

How is this person different from you (i.e. what is this person's protected basis?):

_____

Have you tried to resolve this matter with the Respondent? If so, please describe with whom you spoke and their response:

_____
_____
_____
_____

## 10. D.C. FAMILY AND MEDICAL LEAVE ACT
### (Only complete section if your complaint deals with FMLA.)

Have you been employed with this company for at least one (1) year and have worked at least one thousand (1,000) hours?
YES    NO

Date(s) you requested: _____
Reason you requested: _____
Person who denied your request: _____
Title: _____

Others who have requested leave: _____
_____

How are these persons different from you: _____
_____

Have you tried to resolve this matter with Respondent? If so, please describe with whom you spoke and their response:
Name/Title: _____
_____
_____
_____
_____
_____
_____

DC Office of Human Rights
441 4th Street, NW, Suite 570N
Washington, DC 20001
202-727-4559 *Fax 202-727-9589
Complaint Form

5

rev 02/06

RB - 00087

## 11. WITNESSES

List whom you feel can corroborate your experience and provide evidence in your support.

Name: Jennifer Thong
Title: Hairstylist
Telephone: 202-415-2861
What s/he can attest to: witnessed sexually inappropriate comments and touching, sexually hostile work environment, retaliation

Name: Xiomara Fontanez
Title: Hair Colorist
Telephone: 571-721-9931
What s/he can attest to: Witnessed sexually inappropriate comments and touching; retaliation by moving clients

Name: Nora Critzos
Title: Hair Stylist
Telephone: 202-210-0973
What s/he can attest to: witnessed sexually inappropriate comments and retaliation

Name: Damon Taylor
Title: Receptionist
Telephone: 202-352-8357
What s/he can attest to: sexual comments; retaliation by moving clients

There are other witnesses that we feel may be useful and would be happy to provide those additional names

## 12. YOUR COMPLAINT

Describe in detail the incident(s) that led you to file a complaint of discrimination. Please list dates as well as the name(s) of the person(s) who discriminated against you including employment, promotion, training, goods, services, educational services, etc. If this is a disability-based complaint, please specify whether an accommodation was requested, the person the request was submitted to, and the date Respondent was notified of your disability.

(Please see attached affidavit of Ronnie Barrett)

DC Office of Human Rights
441 4th Street, NW, Suite 570N
Washington, DC 20001
202-727-4559 *Fax 202-727-9589
Complaint Form

6

rev 02/06

RB - 00088

DC Office of Human Rights
441 4th Street, NW, Suite 570N
Washington, DC 20001
202-727-4559 *Fax 202-727-9589
Complaint Form

7

rev 02/06

RB - 00089

The D.C. Office of Human Rights provides mediation. Mediation is a process in which an acceptable, impartial, third party attempts to assist disputing parties toward a mutual settlement. Two (2) mediators (co-mediators) are assigned to each case as a neutral third party to assist disputants in reaching a mutually acceptable resolution to their problem(s). The mediation process is mandatory and disputing parties design solutions to their own problems.

**Please Note:** In the event the Investigation reveals that your complaint should be dismissed you will receive a letter explaining the reasons for dismissal. Applicable regulations also require the OHR to send a copy of the dismissal notice to the Respondent.

_____          11/8/06
Complainant's Signature                           Date

---

## NOTARY SECTION

I, RONNIE R. LEE BARRETT , having read the above, state that the responses contained herein are true and correct to the best of my knowledge and belief.

_____
Signature

SUBSCRIBED AND SWORN to before me this 8th day of November , of 2006

_____
Notary Signature

IVY OORO
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires October 14, 2010

My Commission Expires: _____

DC Office of Human Rights
441 4th Street, NW, Suite 570N
Washington, DC 20001
202-727-4559 *Fax 202-727-9589
Complaint Form

8

rev 02/06

RB - 00090

FOR OFFICE USE ONLY: JURISDICTION

☐  Alleged violation occurred in the District of Columbia.

☐  Alleged violation occurred 365 days or less (6 months or less for D.C. Government Employees).

☐  At least 1 employee (More than 15 employees to cross file with EEOC).

☐  Complainant has not commenced any other action, civil, criminal, or administrative in any other forum based on the same unlawful discriminatory practice described herein.

DC Office of Human Rights
441 4th Street, NW, Suite 570N
Washington, DC 20001
202-727-4559 *Fax 202-727-9589
Complaint Form

9

rev 02/06

RB - 00091

## AFFIDADIVT OF RONNIE BARRETT

I, Ronnie Barrett, am submitting this declaration in support of my claims against Andre Chreky Hair Salon & Spa ("the Salon" or "the Company") and Andre Chreky, in his individual capacity, for sexual harassment and retaliation, in violation of the District of Columbia Human Rights Act, D.C. Code § 2-1401.01 et seq. ("DCHRA").

1.     I am a Brazilian immigrant who came to the United States in 1985. I earned my cosmetology license from Aspen Beauty Academe in Maryland in 1992 and worked at Bubbles Hair Salon on Capitol Hill for a year. In 1994, at the age of 24, I began working for Mr. Chreky at Piaf Salon, a salon owned by his brother.

2.     For the first two years that I worked with him, Mr. Chreky made intrusive inquiries about my personal life and attempted to gain my trust and loyalty. Commencing in 1996, Mr. Chreky began to make unwelcome sexual demands of my and subjected me to unwelcome touching and sexually explicit comments. Mr. Chreky tried to catch me alone at the Salon, and when he managed to do so, he grabbed me, tried to kiss me, and pressed his erect penis against me. I was disgusted by his behavior and made clear to him that his sexual advances were unwelcome.

3.     By the Summer of 1997, Mr. Chreky's propositions and touching had become so constant that I raised the issue directly with him even though I was extremely fearful that he would

1

RB - 00092

retaliate against me for doing so. I told him that I appreciated his help with my career but that I was not interested in him sexually and wanted him to cease his sexual overtures. Mr. Chreky responded that all I had to do was to be "friendly" to him and that he would then take care of me "professionally and financially." I replied that I felt I should be respected for the good job that I was doing and that I was unwilling to engage in a sexual relationship with him in order to keep my job. Mr. Chreky was visibly angered by my remarks, but remained undeterred.

4.      In 1997, Mr. Chreky opened his own salon, the Andre Chreky Salon & Spa, and I decided to transition from my office manager role to a stylist position where I felt I would be more independent from Mr. Chreky and would be able to earn more money. Once I became a stylist and began to earn more money, however, Mr. Chreky became increasingly hostile and focused even more unwanted sexual attention on me. By the Fall of 1997, Mr. Chreky became fixated on the fact that I had a boyfriend, and repeatedly questioned me about my sex life, often suggesting that what I really needed was a "lover" like him or a "sugar daddy." In May 1998, I reached my limit with Mr. Chreky's harassment and quit my job.

5.      I worked for the next three years at the Roche Salon in Georgetown and then for a year at the Toka Salon in Georgetown. By the Summer of 2003, I was engaged to be married and realized that the Toka Salon was not busy enough to support me financially. I was in the Salon visiting a colleague in 2003, when Mr. Chreky offered me a position to return to the Salon. Convinced that enough time had passed and I could safely return to the Salon, I agreed to meet

2

RB - 00093

with him to explore the possibility of returning. I brought my fiancé along with me when I met

with Mr. Chreky. Mr. Chreky offered me a salaried position of $1,900 every two weeks, and told

me that I would receive a raise after three months. When Mr. Chreky and I discussed the terms

of my employment, I specifically raised the issue of how he had treated me in the past, and stated

that I wanted to be treated as a professional. He assured me that "that was all in the past," and

that I "had nothing to worry about." With this assurance, I returned to the Salon in September

2003.


6.      Upon my return, Mr. Chreky began harassing me almost immediately. He stalked me at

work and often grabbed my arm and attempted to drag me into the lunchroom or the bathroom.

On those occasions, he tried to kiss and grope me. Each time, I told him he was hurting me and

demanded that he stop touching me. Mr. Chreky acted with anger and disgust, but remained

undeterred. I tried to steer clear of Mr. Chreky and enlisted the assistance of other stylists to

avoid being alone with him. This strategy worked to some degree, but after I returned from my

honeymoon in February 2004, Mr. Chreky's obsession with me escalated as did his unwelcome

sexual attention. He inundated me with inappropriate comments about my husband and

denigrated his sexual prowess. He also propositioned me repeatedly and suggested that I should

have sex with him because I undoubtedly "needed some extra" sex. Mr. Chreky made such

comments in front of other stylists, causing me extreme embarrassment. I told Mr. Chreky that

his remarks were making me uncomfortable, that I was a married woman, and that I wanted him

to stop. Mr. Chreky laughed in response to my remarks.

3

RB - 00094

7.    When I rejected his advances, Mr. Chreky retaliated against me by removing clients from

my schedule. Mr. Chreky commonly punished me and other sexual harassment victims by

directing the receptionists to make changes to the schedule, moving clients from one stylist to

another in a manner that disfavored his victims. Witnesses have confirmed that Salon

receptionists were prohibited from speaking about this practice, and were threatened with

termination if they revealed to the stylists that clients were being removed from their schedules.

By secretly reassigning new clients and my established clients to other stylists, Mr. Chreky

deliberately depressed my earnings, depriving me of the $15-20 in tips each client represented.

He also deliberately damaged my future earnings by interfering with my ability to develop a loyal

client base.


8.    In February 2004, after I had worked for the Salon for five months, I asked Mr. Chreky

for the raise he had promised I would be given after working at the Salon for three months. He

directed me to meet him at the end of the day in his office on the fifth floor to discuss this

request. When I arrived, Mr. Chreky was sitting at his desk. I sat down in the visitor's chair,

making sure the door behind me remained open as I was aware that Mr. Chreky had previously

isolated other female employees in his office and tried to force himself on them sexually. Mr.

Chreky began the meeting by stating that Sammy, his assistant, just went to buy lemonade, "so

we have a little time." As soon as I heard this, I got up and began to try to leave the office. Mr.

Chreky jumped up and grabbed me below my neck and shoulder blades and forcefully shoved me

4

RB - 00095

back into my chair. He put one hand on his belt as if to open his pants and said, "Come on, just give me a blow job." I pushed him away and ran out of the office. I was terrified and humiliated by his conduct.

9.    Mr. Chreky called me that evening to apologize and to assure me that he would not repeat this conduct. I told him that I would not tolerate his behavior and was contemplating leaving the Salon. He assured me that he would leave me alone and that I did not need to resign. Since I had entered into a non-compete agreement with the Chreky Salon as a condition of my employment, I feared that if I quit my job and went elsewhere, Mr. Chreky would retaliate against me by filing a lawsuit to prevent me from working. Indeed, Mr. Chreky made repeated threats in staff meetings to Salon stylists that if they left to work elsewhere, he would go after them in court and "take them to the cleaners."

10.    In the weeks following the assault and battery in his office, Mr. Chreky stayed clear of me. However, as time went on, Mr. Chreky made demeaning and taunting remarks to me, alluding to the incident in his office and asking me if I wanted to "go to the fifth floor with him." Mr. Chreky made these comments in the presence of other stylists, who became aware that he was targeting me for especially hostile and demeaning treatment. I was terrified that he would try to force himself on me again and experienced severe anxiety as a result. I began having difficulty sleeping and suffered mood swings when away from work. This in turn negatively affected my relationship with my husband and child. I looked for a new job, but was not able to

5

RB - 00096

find a comparable position.

11.     In April 2004, after Mr. Chreky learned that I was pregnant, he escalated his harassment of me. He made constant comments about my breasts, often in front of other employees, telling me "Ronnie, your boobs are really swelling. Come on, let me see them, Umm they look good. Your husband must be really happy." These comments, which continued throughout my pregnancy, caused me great anxiety and embarrassment. As my pregnancy progressed, Mr. Chreky became increasingly obsessed with my body and breast size, and tried, on repeated occasions, to touch my breasts while working close to me on the styling floor. He required me to assist him with clients, and deliberately bumped up against me trying to press against my body and breasts. On one occasion in September 2004, while in the kitchen of the Salon, Mr. Chreky ran his hand down the collar of my shirt and tried to reach in and touch my breast. I pulled his hand away and told him to stop.

12.     In response to this physical confrontation and my rejection of his physical advances, Mr. Chreky became irate with me and retaliated against me again by taking away additional clients and altering my work schedule. I became aware of this pattern when a number of my loyal and longstanding clients contacted me and told me that when they arrived at the Salon, the receptionist told them that "Ronnie was not available because of a mistake in the book," or that "Ronnie is booked." I noticed that my client load dropped off significantly, and heard from at least two or three loyal clients each week that they were prevented from making an appointment

6

RB - 00097

with me. In addition to depriving me of loyal clients, Mr. Chreky prevented me from building

my new client base by instructing the receptionists not to assign any new clients to me. The

overall impact of this interference with my client schedule was significant.

13.    Mr. Chreky also subjected me to punishing working conditions. He refused to let me sit

on a stool while cutting or styling a client's hair – a perfectly acceptable way to service a client.

He regularly came into the kitchen when I was on my lunch break resting my legs, and insisted

that I immediately return to the floor to assist him with clients even though there were other

stylists who were available to do so. In May 2004, I began experiencing potentially serious

unexplained vaginal bleeding. I became concerned about my pregnancy and asked Mr. Chreky if

I could leave work early to see my obstetrician. Mr. Chreky refused to let me leave and told me

that I had to stay through the rest of the morning to finish my clients. I spoke to another

employee who recently had a baby and became very alarmed when I learned that unexplained

bleeding pregnancy could lead to a miscarriage. Accordingly, I left the Salon without permission

and went directly to the doctor.

14.    In September 2004, I developed hypertension as a result of the anxiety I was experiencing

at work. My physician instructed me to cut back on my work hours. Instead of my typical 50

plus hours per week, I cut back to 40 to 50 hours per week. As a result of the stress and long

hours on my feet with no relief or rest, and the emotional stress I suffered because of Mr.

Chreky's abusive conduct, I developed preeclampsia, a life threatening condition for both me and

7

RB - 00098

my then unborn child. My baby was born almost a month prematurely and required a lengthy period of hospitalization. As a result of the complications of my delivery, and in order to care for my premature baby, I was forced to remain away from work for five and a half months. When I returned to the Salon in May of 2005, I was deeply in debt from medical bills and lost income during my absence, and was especially vulnerable to Mr. Chreky's harassment and abuse.

15.    Upon my return to the Salon, Mr. Chreky repeatedly pleaded with me to let him see my breasts and to let him taste my breast milk. He made frequent comments about my body, often in front of other stylists, and tried repeatedly to touch me. I tried to ignore his offensive remarks and behavior because I needed my job and the income it provided to my family.

16.    In November 2005, Mr. Chreky told me to leave my husband and insisted that I start a relationship with him. He said that I "needed a lover," "American men are not good in bed," and that "you can count on me, you have counted on me before," "I will be your sugar daddy." Other stylists were present and overheard his comments, adding to my humiliation. I tried to ignore his remarks and focus on my work, but Mr. Chreky became more physically aggressive when I did so. On or about November 15 2005, he ran his hand down the front of my shirt over my breast as other stylists looked on. I was offended and humiliated by his conduct. Mr. Chreky continued to try to convince me to show him my breasts and to allow him to touch them. I worked in constant fear that he would once again try to grab my breasts, or otherwise assault me.

8

17.    At this point, the workplace had become completely intolerable and I was forced into an

involuntary resignation. In order to escape the abuse and harassment, I quit my job at the Salon

on December 6, 2005 and accepted a much lower paying position with Urban Style Lab. The day

I informed Mr. Chreky that I was leaving the Salon, I attempted to handle my departure in a

professional and non-confrontational way. Mr. Chreky, however, flew into an uncontrollable

rage and demanded that I leave the building immediately. He screamed wildly at me in front of

the entire Salon staff, using a string of profanity and invectives. I was shaken, as were other

Salon employees, and feared that Mr. Chreky might strike me. I backed away from Mr. Chreky

to protect myself, well aware of his boasts that he had physically assaulted others. Mr. Chreky

had a reputation for engaging in physically violent behavior. On numerous occasions he bragged

to his employees that he beat up a homeless person outside of the Salon. His conduct terrified

me and caused me even greater anxiety.


18.    Mr. Chreky's harassment of me over the course of my employment caused me significant

psychological injury. I have been diagnosed with anxiety and depression and am taking

medication to treat anxiety-related migraine headaches. I have experienced difficulty sleeping

and have constant migraine headaches. I am under the care of a psychiatrist for treatment related

to the sexual harassment and trauma to which Mr. Chreky subjected me. My psychiatrist is

prepared to testify as an expert witness regarding the emotional trauma I suffered and continue to

suffer as a result of Mr. Chreky's sexual harassment and abuse of me.


9

19.    In addition, I have suffered significant economic harm as a result of Mr. Chreky's sexual

harassment of me and my involuntary resignation.  It will take me several years, if ever, to reach

a level at my new job where I can earn a salary comparable to what I earned at the Chreky Salon.


I declare, this $\underline{8}$ day of November 2006, subject to the pain and penalty of perjury, that the

foregoing is true and correct to the best of my knowledge.

Ronnie Barrett

SUBSCRIBED AND SWORN to before me this $\underline{8th}$ day of $\underline{November}$ of 2006.

Notary Signature

IVY OORO
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires October 14, 2010

My Commission Expires: _____

10

RB - 00101

# KATZ, MARSHALL & BANKS, LLP

Ari M. Wilkenfeld, Partner
Direct Dial: 202-299-1147
wilkenfeld@kmblegal.com

By Hand Delivery
January 19, 2007

Ms. Mullane C. Ahern
Investigator
District of Columbia Office of Human Rights
4441 4th Street, N.W.
Suite 570N
Washington, DC 20001

Re:    **Ronnie Barrett v. Andre Chreky Salon & Spa**
       **Docket No.: 07-081-P(N)**

Dear Ms. Ahern:

Enclosed please find the Declaration of Ronnie Barrett dated January 19, 2007. This Declaration is provided as a supplemental charge. The Declaration clarifies critical facts contained in Ms. Barrett's Declaration of November 8, 2007, which was attached to the original Charge filed with your office on November 11, 2006. Please contact me if you have any questions regarding this supplemental filing. Thank you for your attention to this matter.

Sincerely,

Ari M. Wilkenfeld

cc: Ms. Ronnie Barrett

**EXHIBIT**

5

## DECLARATION OF RONNIE BARRETT

I, Ronnie Barrett, am submitting this declaration in support of my claims against Andre Chreky Hair Salon & Spa ("the Salon" or "the Company") and Andre Chreky, in his individual capacity, for sexual harassment and retaliation, in violation of the District of Columbia Human Rights Act, D.C. Code § 2-1401.01 et seq. ("DCHRA").

1. On November 8, 2006, I submitted a charge with the District of Columbia Office of Human Rights. I appended a declaration in support of that charge which contains a statement that needs clarification. I am submitting this declaration to provide the necessary clarification and to put into proper context the statement I previously made.

2. At paragraph 17 of my declaration I referenced that by December 6, 2005, my workplace had become completely intolerable and I was forced into an involuntary resignation. I also referred to quitting my job at the Salon. These statements are misleading because they omitted crucial details of what occurred on December 6, 2005, which led to my involuntary separation from the Salon.

3. After I rejected Mr. Chreky's sexual propositions on November 15, 2005, and objected to his running his hand down the front of my shirt, he became extremely angry with me. In the days that followed, he directed receptionists to reassign my clients to other stylists and not to assign any new clients to me. Instead of assigning me clients, he directed me to stock supplies in the supply room on the fifth floor. This work required carrying supplies from the ground floor up to the fourth floor, and was hard physical labor. My Chreky was aware that I had a shoulder injury that and that such work was particularly physically taxing for me. In addition, assigning me this type of work and in taking away my clients, Mr. Chreky diminished my income. It was clear to me that he did all of this to retaliate against me for rejecting his sexual advances.

4. In late November 2005, one of my best clients told me that Mr. Chreky had tried to convince her to work with another hair stylist/colorist instead of me, and had made negative comments to her about my work. Other Salon employees also commented to me that Mr. Chreky was treating me worse than ever.

5. On December 6, 2005, which was a Saturday, I clocked out at 6:00 p.m. after my work shift had ended. I remained at the Salon to attend a baby shower for a Salon employee that was to take place at the Salon at 7:00 p.m., after the Salon was closed for the day. Shortly after I clocked out, Amal Darri, who served as Mr. Chreky's General Manager, directed me to stock products (e.g., shampoos and other hair care products that were sold at the Salon). She stated "Andre said to tell you that if you are going to be downstairs, you have to do the retail." I informed her that I had already clocked out and had already stocked the color room. Ms. Darri then went upstairs to report this conversation to Mr. Chreky.

6. A short time later Ms. Darri came back and informed me that Mr. Chreky was very upset that I would not stock the supply room. She told me, in the presence of several other employees, that Mr. Chreky was extremely upset with me, did not want to see my face in the Salon and that he wanted me out of the building immediately. She said that he would call me when he wanted me to come back. I responded that I would clock back in and stock the supplies as Mr. Chreky had requested. Ms. Darri responded, "he wants you out of here and wants you to leave the building immediately." I then told my co-workers that I would clock in and help them. Ms. Darri responded that "Andre is really mad at you and is going to fire you." At that point, I got very scared and went and gathered all of my belongings. Mr. Chreky has a terrible and violent temper and I was concerned about my physical well-being. I had no intention of resigning that day, but had begun to explore other employment options because the workplace

had become so intolerable.

7. I had collected my belongings to go home before the baby shower. After the baby shower, Mr. Chreky approached me in a threatening manner and began screaming at me. He said "didn't I fucking tell you to leave the building? When I tell you to do something, I expect you to do it." When I tried to explain that I had not refused to stock the supplies and that I had simply told Ms. Darri that I had already clocked out, he became even more irrate and began cursing at me and demanding that I leave at once. I asked Mr. Chreky if he was firing me. Mr. Chreky wanted me to quit so that I would not be able to collect unemployment. When I refused to quit and asked him again if he was firing me he responded, "you can take it as you want, fine, if you want to collect unemployment then you are fired." I attempted to handle my departure in a professional and non-confrontational manner, and was willing, even though he had been so abusive to me, to give two weeks notice. When I tried to explain that to him, he flew into an uncontrollable rage and screamed and cursed at me in front of the Salon staff. I was crying hard at the time, and was very scared of Mr. Chreky. He continued to act physically threatening to me, and I felt that I had no choice but to leave for my own safety. I did not return to the Salon.

8. I had no intention of resigning that day and did not resign. I had begun to explore other employment options because the workplace had become so intolerable. However, after hearing from Ms. Darri that Mr. Chreky wanted me out of there and after being physically accosted by Mr. Chreky, I had no choice to leave. Even though my initial declaration referred to this as my resigning, I never resigned from the Salon. Mr. Chreky kicked me out.

I declare, this ___ day of January 2007, subject to the pain and penalty of perjury, that the

foregoing is true and correct to the best of my knowledge.

Ronnie Barrett

SUBSCRIBED AND SWORN to before me this ___ day of ___ of 2007.

Notary Signature

My Commission Expires: ___

◤ **KATZ, MARSHALL & BANKS, LLP**

Ari M. Wilkenfeld, Partner
Direct Dial: 202-299-1147
wilkenfeld@kmblegal.com

By Telecopier and First Class Mail
January 30, 2007

Ms. Mullane C. Ahern
Investigator
D.C. Office of Human Rights
441 4th Street, NW
Suite 570N
Washington, D.C. 20001

Re:   Ronnie Barrett v Andre Chreky Salon and Spa
Docket No.: 07-081-P(N)

Dear Ms. Mullane:

Ms. Barrett had directed me to withdraw the above-captioned Charge of Discrimination against Andre Chreky Salon & Spa so that she may bring a private cause of action in court as is her right under D.C. Code § 1-2556(a). This letter serves as Ms. Barrett's official request to the DCOHR to withdraw Charge Docket No. 07-081-P(N).

Thank you for your assistance. Please contact me if you have any questions.

Sincerely,

Ari M. Wilkenfeld
Attorney for Ronnie Barrett

cc: Ms. Ronnie Barrett



EXHIBIT

6

Chreky 000747

GOVERNMENT OF THE DISTRICT OF COLUMBIA
**Office of Human Rights**



Judiciary Square Office
441 4th Street, NW, Suite 570N
Washington, DC 20001
Phone: (202) 727-4559  Fax: (202) 727-9589

Penn Branch Office
3220 Pennsylvania Avenue, SE, 1st Fl.
Washington, DC 20020
Phone: (202) 727-4559  Fax: (202) 645-6390

February 12, 2007

Kaufman & Canoles
David J. Sullivan
Attorney for Andre Chreky Salon & Spa
One Commercial Place
PO Box 3037
Norfolk, VA 23514

**Reference:**  *Ronnie Barrett v. Andre Chreky Salon & Spa*
**Docket No.: 07-081-P(N)**

Dear Mr. Sullivan:

The Complainant in the above-referenced matter has withdrawn the Charge of Discrimination that was docketed on December 11, 2006 with the Office of Human Rights. Therefore, in accordance with the District of Columbia Human Rights Act of 1977, amended December 2000 (D.C. Code, Title 2, Chapter 14), this matter has been closed administratively with no finding made on the merits of the allegations.

If you have any questions, please contact Alease Parson, Supervisory Equal Opportunity Specialist, at (202) 727-4559.

Very truly yours,

Gustavo Velasquez
Director



EXHIBIT
7

Chreky 000745

**U.S. Postal Service™**
**CERTIFIED MAIL₁₀ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here  2/13/07

Sent To  Kaufman + Canoles Atty for Andre Chreky
Street, Apt. No.; or PO Box No.  David J. Sullivan One Commercial Place PO Box 303
City, State, ZIP+4  Norfolk, VA 23514

7006 2760 0005 6365 9020

GOVERNMENT OF THE DISTRICT OF COLUMBIA

**Office of Human Rights**



Judiciary Square Office
441 4th Street, NW, Suite 570N
Washington, DC 20001
Phone: (202) 727-4559  Fax: (202) 727-9589

Penn Branch Office
3220 Pennsylvania Avenue, SE, 1st Fl.
Washington, DC 20020
Phone: (202) 727-4559  Fax: (202) 645-6390

February 12, 2007

Katz, Marshall & Banks, LLP
Ari M. Wilkenfield
Attorney for Ronnie Barrett
1718 Connecticut Avenue, NW
Sixth Floor
Washington, DC 20009

Reference:   *Ronnie Barrett v. Andre Chreky Salon & Spa*
             **Docket No.: 07-081-P(N)**

Dear Mr. Wilkenfield,

On February 12, 2007 your client voluntarily withdrew her Charge of Discrimination in the above-referenced matter. Therefore, in accordance with the District of Columbia Human Rights Act of 1977, as amended December 2000 (D.C. Code, Title 2, Chapter 14), your client's complaint has been closed administratively with no finding being made on the merits of the allegations.

If you have any questions, please contact Alease Parson, Supervisory Equal Opportunity Specialist, at (202) 727-4559.

Very truly yours,

Gustavo Velasquez
Director

**EXHIBIT**

8

U.S. Postal Service™
CERTIFIED MAIL™ RECEIPT
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

Postage    $

Certified Fee                    2/13/07
                                 Postmark
                                 Here
Return Receipt Fee
(Endorsement Required)

Restricted Delivery Fee
(Endorsement Required)

Total Postage & Fees   $

*Sent To* Katz, Marshall + Banks, LLP
Mr. M Wilkenfield Atty. for Ronnie
*Street, Apt. No.;*
*or PO Box No.* 1718 Connecticut Ave, NW

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
                              :
RONNIE BARRETT,               :
                              :
        Plaintiff,            :
                              :
    vs.                       :      C.A. No.
                              :   07-CV-0250(RCL)
ANDRE CHREKY,                 :
ANDRE CHREKY SALON/ANDRE      :
CHREKY INC., SPAC, LLC,       :
                              :
        Defendants.           :
- - - - - - - - - - - - - - - x
                              :
JENNIFER THONG,               :
                              :
        Plaintiff,            :
                              :      Civil No.
    vs.                       :   1:06-1807(RCL)
                              :
ANDRE CHREKY SALON, et al.,   :
                              :
        Defendants.           :
                              :
- - - - - - - - - - - - - - - x

                Washington, D.C.
                Tuesday, October 16, 2007

        The deposition of MAURICE CLARKE, called for

examination by counsel for Defendants in the

above-entitled matter, pursuant to Notice, in the

offices of Sheppard, Mullin, Richter & Hampton, LLP,

1300 I Street, N.W., 11th Floor East, Washington,

JARDIM REPORTING ASSOCIATES
(703) 867-0396

EXHIBIT

tabbies®

9

2

D.C., convened at 9:03 a.m., before PAULA J. EASTES,

a notary public in and for the District of Columbia,

when were present on behalf of the parties:


APPEARANCES:


    On behalf of the Plaintiff Ronnie Barrett:

        ARI M. WILKENFELD, ESQUIRE
        Katz, Marshall & Banks, LLP
        1718 Connecticut Avenue, N.W.
        Sixth Floor
        Washington, D.C. 20009
        (202) 299-1140


    On behalf of the Plaintiff Jennifer Thong:

        JONATHAN G. ROSE, ESQUIRE
        EMILY SEYMOUR, ESQUIRE
        Sheppard, Mullin, Richter & Hampton
        1300 I Street, N.W.
        11th Floor East
        Washington, D.C. 20005
        (202) 772-5390

3

APPEARANCES (Continued):


    On behalf of the Defendants:

        JOHN M. BREDEHOFT, ESQUIRE
        DAVID SULLIVAN, ESQUIRE
        Kaufman & Canoles
        150 West Main Street
        Suite 2100
        Norfolk, Virginia 23510
        (757) 624-3225


    Videographer:  RON MEEK


    Also Present:  ANDRE CHREKY

52

1    pretty much the gist of it.

2        Q.    Okay.

3            Let me ask you the same sort of questions

4    about Ronnie.

5            Did Ronnie Barrett come to you with

6    complaints about Andre?

7        A.    Complaints about her salary, her position.

8        Q.    Any other complaints?

9        A.    No.

10       Q.    Did Ronnie Barrett ever come to you and

11   complain that Andre was making her feel

12   uncomfortable?

13       A.    No.

14       Q.    Did Ronnie come to you with these complaints

15   about her salary and position before she left the

16   first time?

17       A.    Yes.

18       Q.    Did she also come to you with these

19   complaints about her salary and position after she

20   came back?

21       A.    Yes.

22       Q.    And did that pretty much go on towards the

JARDIM REPORTING ASSOCIATES
(703) 867-0396

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act
Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| [X] FEPA | 07-081-P(N) |
| [ ] EEOC | |

| D.C. Office Of Human Rights | and EEOC |
|---|---|

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Ms. Ronnie Barrett | (240) 271-0971 | 02-25-1969 |

| Street Address | City, State and ZIP Code |
|---|---|
| 1015 Baltimore Avenue, Apt. 3402, College Park, Maryland 20740 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| Andre Chreky Salon & Spa | Unknown | (202) 293-9393 |

| Street Address | City, State and ZIP Code |
|---|---|
| 1604 K Street, N.W., Washington, DC 20006 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

[ ] RACE  [ ] COLOR  [X] SEX  [ ] RELIGION  [ ] NATIONAL ORIGIN
[X] RETALIATION  [ ] AGE  [ ] DISABILITY  [ ] OTHER (Specify below.)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **09-2003**   Latest **11-15-2005**

[ ] CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I believe that I have been discriminated against on the basis of my gender (female, sexual harassment) and retaliation of my employment for the following reasons:

In September 2003, I began working as a Colorist with Respondent and I performed my duties satisfactorily.

**Sexual Harassment**

From the beginning of my employment up until November 2005, Respondent's Owner (male) has subjected me to unwelcoming sexual demands, explicit comments and inappropriate touching.

In November 2005, Respondent's Owner told me to leave my husband and insisted that I start a relationship with him. He said that "I needed a lover," "American men are not good in bed," and that "you can count on me, you have counted on me before," "I will be your sugar daddy." Other stylists were present and overheard his comments, adding to my humiliation.

On or about November 15, 2005, Respondent's Owner ran his hand down the front of my shirt over my breast as other stylists looked on. I was offended and humiliated by his conduct. Respondent's Owner continued to try to convince me to show him my breast and to allow him to touch them.

etaliation

**EXHIBIT**

tabbies® 10

On several occasions I made Respondent's Owner aware that his sexual advances were unwelcoming and offensive. As a result, the Owner would retaliate against me by taking away additional clients and altering my work schedule. I noticed that my client load dropped off significantly and that my loyal clients were being prevented from making an appointment with me.

In addition, Respondent's Owner pre___ted me from building my new client ____ by instructing other employees to not assign any new clients to me. The overall impact of this interference with my client schedule was significant.

## Constructive Discharge

For the aforementioned reasons and among others, the workplace had become completely intolerable and I was forced into an involuntary resignation. On December 6, 2005, I resigned my employment with Respondent and accepted a much lower paying position with another company.

Therefore, I charge Respondent with unlawful discriminatory practice on the bases of my sex, in violation of the D.C. Human Rights Act of 1977, as amended. I have not commenced any action, civil, criminal or administrative, based on the above allegations.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| | **Melissa Sharpe Jones** |
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 12/11/06 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| Date        Charging Party Signature | |

Melissa C. Sharpe
Notary Public, District of Columbia
My Commission Expires 12-14-2006

## EEOC AFFIDAVIT

*(This form is affected by the Privacy Act of 1974. See Privacy Act Statement on reverse before completing this form.)*

.nie Barrett

TELEPHONE NUMBER (Give area code)

HOME: (240) 271-0971    WORK:

ADDRESS (Number, street, city, state, zip)

**1015 Baltimore Avenue, Apartment # 3402, College Park, MD 20740**

### THE FOLLOWING PERSON CAN ALWAYS CONTACT ME

NAME AND TELEPHONE NUMBER

ADDRESS (Number, street, city, state, zip)

### STATUS OF EMPLOYMENT

| CHECK ONE: | | NAME OF EMPLOYER |
|---|---|---|
| ☐ WORKING | ☐ NOT WORKING / SOUGHT EMPLOYMENT AT | |

| TYPE OF BUSINESS | DATES OF EMPLOYMENT | FROM: | TO: |
|---|---|---|---|
| | WHEN EMPLOYMENT WAS SOUGHT | FROM | TO: |

| POSITION TITLE | DEPARTMENT |
|---|---|

ADDRESS (Number, street, city, state, zip)

EEOC Form 133 (10/94)

*I declare under the penalty of perjury that the foregoing is true and correct.*

| DATE | SIGNATURE OF WITNESS | SIGNATURE OF EEOC REPRESENTATIVE | | |
|---|---|---|---|---|
| ec 15, 2006 | | | PAGE | OF |

PRIVACY ACT STATEMENT:    (This form is covered by the Privacy Act of 1974, Public Law 93-579. Authority for requesting and uses of the personal data are given below.)

1. FORM NUMBER/TITLE/DATE:   EEOC FORM 133, EEOC AFFIDAVIT, December 1993.

2. AUTHORITY:  42 USC 2000e(9), 29 USC 201, 29 USC 621, 42 U.S.C. 12117.

3. PRINCIPAL PURPOSES:  Provides a standardized format for obtaining sworn statements of information relevant to a charge of discrimination.

4. ROUTINE USES:  The affidavits are used to:  (1) make an official determination regarding the validity of the charge of discrimination; (2) guide the Commission's investigatory activity; and (3) in Commission litigation, to impeach or substantiate a witness's testimony.

5. WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR PROVIDING INFORMATION: Voluntary: Failure to provide an affidavit has no effect upon jurisdiction of the Commission to process a charge. However, sworn statements submitted by the parties are, of course, relied upon more heavily than unsworn statements in making a determination as to the existence of unlawful discrimination.

REVERSE OF EEOC FORM 133 (10/94)

I believe that I have been discriminated against on the basis of my gender (female, sexual harassment) and retaliation of my employment for the following reasons:

... September 2003, I began working as a Colorist with Respondent and I performed my duties satisfactorily.

## Sexual Harassment

From the beginning of my employment up until November 2005, Respondent's Owner (male) has subjected me to unwelcoming sexual demands, explicit comments and inappropriate touching.

In November 2005, Respondent's Owner told me to leave my husband and insisted that I start a relationship with him. He said that "I needed a lover," "American men are not good in bed," and that "you can count on me, you have counted on me before," "I will be your sugar daddy." Other stylists were present and overheard his comments, adding to my humiliation.

On or about November 15, 2005, Respondent's Owner ran his hand down the front of my shirt over my breast as other stylists looked on. I was offended and humiliated by his conduct. Respondent's Owner continued to try to convince me to show him my breast and to allow him to touch them.

## Retaliation

On several occasions I made Respondent's Owner aware that his sexual advances were unwelcoming and offensive. As a result, the Owner would retaliate against me by taking away additional clients and altering my work schedule. I noticed that my client load dropped off significantly and that my loyal clients were being vented from making an appointment with me.

In addition, Respondent's Owner prevented me from building my new client base by instructing other employees to not assign any new clients to me. The overall impact of this interference with my client schedule was significant.

## Constructive Discharge

For the aforementioned reasons and among others, the workplace had become completely intolerable and I was forced into an involuntary resignation. On December 6, 2005, I resigned my employment with Respondent and accepted a much lower paying position with another company.

Therefore, I charge Respondent with unlawful discriminatory practice on the bases of my sex, in violation of the D.C. Human Rights Act of 1977, as amended. I have not commenced any action, civil, criminal or administrative, based on the above allegations.

## COMPLAINANT'S AFFIDAVIT

I, (name): Ronnie Barrett
am an_____ employee of _____ applicant to _x_ former employee of  Andre Chreky
Salon and Spa

Company: Andre Chreky Salon and Spa
(Branch): _____

(Located in): 1604 K Street, N.W, Washington, DC  20006

In the capacity of (show both your organization title and the classification of your job, if
different): Stylist / colorist f(___)

Grade _____  Step _____

Between (dates): Sep 2003 to Dec. 6, 2005

My contact telephone numbers during the day and evening are the following:

Day 202-299-1140 – Attorney: Ari Wilkenfeld        Evening

I HAVE BEEN ADVISED OF THE FOLLOWING:

I have an obligation to cooperate fully with the investigator, who has been assigned to
conduct a thorough and impartial investigation of my complaint of discrimination.
Therefore, I must provide a statement for the investigative record which is true and
complete to the best of my knowledge and belief and which fully addresses the issues
accepted for investigation.  My statement must be specific with regard to names, dates,
places, circumstances and related events, and disclose my firsthand knowledge of any
directly related information, which is relevant to the issue(s).  My statement, along with
my Complaint Form and the Charge of Discrimination shall serve as the basis for the
investigation.  While I may voluntarily submit any additional documents or information
to the investigator for consideration, it will be the investigator's responsibility to
determine what evidence shall actually become part of the letter of determination.  If
there are any documents or facts, which substantiate my allegations, I must provide them
to the investigator, or make them known to the investigator.  I may suggest witnesses to
be interviewed by the investigator and disclose why they would be relevant witnesses.
However, the investigator will decide which witnesses to interview based on the relevant
information he or she feels will be furnished by the witness.

*and my attached declaration affidavit*

I have the right to review my statement prior to signing it, and may make initialed corrections if it is incomplete or inaccurate. I have a right to receive a copy of the signed statement.

Having reviewed the preceding information, I solemnly __xx____swear_____ affirm that the statement that follows is true and complete to the best of my knowledge and belief, and fully addresses the issues and allegations raised me in my EEO complaint.

I have reviewed this statement, which consists of __2_ pages, and hereby solemnly ___xx_ swear _____ affirm that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as a permanent part of the record of investigation.

_____
(Signature of Affiant)

_____
(Signature of Investigator/Witness)

_____
(Date)

_____
12/11/06
(Date)

_____
Notary Signature

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____DAY OF _____.
(Day, month and year)

My Commission Expires:_____

EXHIBIT

tabbies

11

**Intake Questions**
# Constructive Discharge

1. What working conditions were you subjected to?

   *sexual harassment*

2. When were you subjected to these conditions?

   *Nov 15, 2005*

3. Who subjected you?

   *Andie*

4. Why do you feel that you were singled out for this treatment? *(National origin)*

   *@ Not singled out (YoubG, immigrants)*

5. Who else was subjected to these same conditions?

   *See declarations*

6. Why do you feel that you were forced to resign?

   *Under the circumstances (sexual harassment) argoing + see Intake Questionair*

7. Who witnessed the treatment you received?

8. Did you complain about these working conditions?

9. When and to whom did you complain?

10. What proof do you have that you complained?

11. What happened as a result of your complaint?

Intake Questions
# Sexual Harassment

_____ Quid Pro Quo
___✓___ Hostile Work Environment

1. Describe the incident.

   _____
   _____
   _____

2. What is the relationship of the accused person to you?
   _Supervisor/owner — Andie Cleary_

3. When did the incident occur?
   _Nov 15, 2005_

4. What was the exact conduct/words/pictures, etc. relating to the incident?

   _____
   _____
   _____

5. Who witnessed the incident?
   _Fabiola - Colorist (Female) possibly Manager_
   _____

6. What was your response/reaction to each cited incident?
   _Told him, not interested, that's enough, (touch breast)_
   _look at me as a good ee - he should inspect me during hair cut._

7. What was the harasser's response when you advised that their conduct was
   offensive?
   _He never took serious look afret, laugh or say_
   _come on you need a sugar daddy!!_

8. When and to whom did you report the incident to a supervisor or management?
   _There was not anybody for me to report to._

9. What was the response that you received from those you reported the incident to?
   _N/A_
   _____

10. What, if any, effect was the offensive conduct?
    a. Economic _____   b. Performance Related _____   c. Psychological _____

**Intake Questions**
# Retaliation

1. Did you participate in the investigation and Title VII based discrimination
   complaint?    Yes ___✓___    No _____

2. Did you file a Title VII based discrimination complaint(s) or participate in an
   EEO investigation?   _NO_

3. What was the nature of your complaint?
   _Sexual harassment_

4. Who did you make the complaint to?
   _Andre Cleaky, owner_

5. When was the complaint made?
   _yes  Nov 15, 2005_

6. What proof do you have to substantiate that you made a Title VII based
   complaint?  _complaints of other ees; on that day Fabiola_

7. What did your employer do in retaliation for your filing a discrimination
   complaint or your complaint to them about employment discrimination? (i.e.
   explain the adverse action that was taken against you.  Did you receive an unfair
   job performance evaluation, unfair disciplinary action(s), terminate you, fail to
   promote you, refuse to give you leave, overtime, or refer you work, etc.)

   _Taking clients away from; telling clients
   that was books; clients come to salon and was
   told that I was; books; reduction in work regarding
   clients; ex: transfer clients to schedule; make me
   do more than others, tips taken (stolen) mgmt would
   know._

8. What date was the action taken?
   _After a before Nov 15, 05_

9. What reason was given for the action taken?
   _did give reason  said that it did happen; would get
   upset if you approched him_

10. What proof do you have that the adverse action taken against you was the result of the complaint that you filed?

*Several clients that took the scheduling — Xonaza Zunica — Taylor*

11. What employees have committed similar infractions and no disciplinary action was taken?

*None*



DISTRICT OF COLUMBIA
OFFICE OF ADMINISTRATIVE HEARINGS

**DISTRICT OF COLUMBIA**
**OFFICE OF ADMINISTRATIVE HEARINGS**
941 North Capitol Street, NE, Suite 9100
Washington, DC 20002

2008 MAY 13  P 2: 38

2005 DEC 19  P 3: 48

DISTRICT OF COLUMBIA
DEPARTMENT OF CONSUMER AND
REGULATORY AFFAIRS
    Petitioner,

v.

RONNIE R. LAU
    Respondent

Case No.: CR-I-05-S100593

## FINAL ORDER

### I.   Introduction

This case arises under the Civil Infractions Act of 1985, D.C. Official Code §§ 2-1801.01 – 1802.05 and D. C. Official Code § 47-2853.02.[1] By Notice of Infraction served September 23, 2005, and again on October 26, 2005,[2] the Government charged Ronnie R. Lau (hereinafter "Respondent") with a violation of D. C. Official Code § 47-2853.02 for practicing cosmetology without a license. The Notice of Infraction alleged that the violation occurred on September 20, 2005, at 1604 K Street, N.W. (the "Property"), and sought a fine of $2,000.

---

[1] D. C. Official Code § 47-2853.02 provides:

    (a) No person shall practice, attempt to practice, or offer to practice an occupation or profession for which a license, certification, or registration is required under this subchapter without a current valid license, certificate, or registration in accordance with the requirements of this subchapter.

[2] The original Notice of Infraction changed the date of service on Respondent to October 26, 2005. The copy of the Notice of Infraction filed by Respondent as her answer, reflects the date of service on this same Notice of Infraction as September 23, 2005.

**EXHIBIT**

tabbies

12

RB 03167

COPY

Case No.: CR-I-05-S100593

On October 13, 2005, Respondent filed a timely answer, with a plea of Admit with Explanation. Respondent included a letter explaining she had a D. C. license, which expired, and that she had already sent her District of Columbia renewal license application to the board of cosmetology for approval.

The Government was provided an opportunity to respond to Respondent's answer. The Government responded, agreeing to a reduction in the fines.

Based on the entire record in this matter, I now make the following findings of fact and conclusions of law.

II.   **Findings of Fact**

The Notice of Infraction was served on September 23, 2005. There is no evidence the Notice was returned. However, the Respondent informed the court of her new address, which is 10105 Baltimore Avenue, #3402; College Park, MD 20740.

By Respondent's plea of Admit with Explanation, Respondent has admitted violating the law on September 20, 2005 by practicing cosmetology at a salon spa without first obtaining a renewal of her District of Columbia cosmetology license. Respondent had requested reinstatement or renewal of her license. The renewal had not been granted at the time the Notice of Infraction was issued. Respondent has since taken corrective measures to renew her D.C. cosmetology license.

The Government provided a recommendation for reduction of the fine.

-2-

RB 03168



Case No.: CR-1-05-S100593

## III.    Conclusions of Law

By Respondent's plea of Admit with Explanation, Respondent has admitted violating the law, D.C. Official Code § 47-2853.02 by practicing cosmetology without a license on September 20, 2005. This is a Class 1 infraction. 16 DCMR 3301.1(x). A violation of this provision authorizes a fine of $2,000, for a first offense. 16 DCMR 3201.1(a)(1). Respondent has accepted responsibility for the violation, and has taken corrective measures by obtaining her renewal license to avoid this problem in the future, which are mitigating factors. In addition, she is a first time offender; therefore, I find this case involving a cosmetologist whose licensed expired, but was previously licensed and had applied for reinstatement, eligible for a downward departure from the guidelines. *See Koon v. United States* 518 U.S. 81 (1996). Accordingly, I will reduce the fine to $500. *See* D.C. Official Code §§ 2-1802.02(a)(2) and 2-1801.03(b)(6); U.S.S.G. § 3E1.1; 18 U.S.C. § 3553.

## IV.    Order

Based upon the above findings of fact and conclusions of law, and the entire record of this case, it is this 19th day of December 2005:

ORDERED, that Respondent is **LIABLE** for violating D. C. Official Code § 47-2853.02, as charged in the Notice of Infraction (No. S100593); and it is further

ORDERED, that Respondent shall pay a fine in the total amount of **FIVE HUNDRED DOLLARS ($500)** in accordance with the attached instructions within 20 calendar days of the mailing date of this Order (15 days plus 5 days for service by mail pursuant to D.C. Official Code §§ 2-1802.04 and 2-1802.05); and it is further

-3-

RB 03169



Case No.: CR-I-05-SI00593

ORDERED, that if Respondent fails to pay the above amount in full within 20 calendar days of the date of mailing of this Order, shall accrue on the unpaid amount at the rate of 1½ % per month or portion thereof, starting 20 calendar days after the mailing date of this Order, pursuant to D.C. Official Code § 2-1802.03(i)(1); and it is further

ORDERED, that failure to comply with the attached payment instructions and to remit a payment within the time specified will authorize the imposition of additional sanctions, including the suspension of Respondent's licenses or permits pursuant to D.C. Official Code § 2-1802.03(f), the placement of a lien on real and personal property owned by Respondent pursuant to D.C. Official Code § 2-1802.03(i), and the sealing of Respondent's business premises or work sites, pursuant to D.C. Official Code § 2-1801.03(b)(7); and it is further

ORDERED, that the appeal rights of any person aggrieved by this Order are stated below.

Claudia Barber
Administrative Law Judge

-4-

RB 03170



**RECEIPT**

DATE 06-25-08

RECEIVED FROM Ronnie R Lau-Barrett

ADDRESS

FOR Cosmetology Reinstatement Application

CHECK ☐ MONEY ORDER ☐

# 1250

$ 225.00

RECEIVED BY: Alice D. Felder

**PEARSON VUE**

8201 Corporate Dr #400
Landover, MD 20785
888.204.6290

**EXHIBIT**
13

tabbies

RB 03166

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
                              :
RONNIE BARRETT,               :
                              :
          Plaintiff,          :
                              :
     vs.                      :    C.A. No.
                              :    07-CV-0250(RCL)
ANDRE CHREKY,                 :
ANDRE CHREKY SALON/ANDRE      :
CHREKY INC., SPAC, LLC,       :
                              :
          Defendants.         :
                              :
- - - - - - - - - - - - - - - x    MORNING SESSION


                    Washington, D.C.
                    Wednesday, May 28, 2008


        The deposition of ANDRE CHREKY, called for

examination by counsel for Plaintiff Ronnie Barrett

in the above-entitled matter, pursuant to Notice, in

the offices of Katz, Marshall & Banks, 1718

Connecticut Avenue, N.W., Sixth Floor, Washington,

D.C., convened at 9:17 a.m., before CATHY JARDIM, a

notary public in and for the District of Columbia,

when were present on behalf of the parties:


                JARDIM REPORTING ASSOCIATES
                    (703) 867-0396

EXHIBIT
14

APPEARANCES:


   On Behalf of the Plaintiff Ronnie Barrett:

        DEBRA KATZ, ESQUIRE
        ARI M. WILKENFELD, ESQUIRE
        HANAN IDILBI, ESQUIRE
        Katz, Marshall & Banks, LLP
        1718 Connecticut Avenue, N.W.
        Sixth Floor
        Washington, D.C. 20009
        (202) 299-1140


   On behalf of the Defendants:

        JOHN M. BREDEHOFT, ESQUIRE
        DAVID SULLIVAN, ESQUIRE
        Kaufman & Canoles
        150 West Main Street
        Suite 2100
        Norfolk, Virginia 23510
        (757) 624-3225


   Also Present:  RONNIE BARRETT


   Videographer:  RON MEEK


JARDIM REPORTING ASSOCIATES
(703) 867-0396

```
1   meetings.

2        Q.    And does that office have a lock?

3        A.    No.  A lock that doesn't lock.

4        Q.    Do you have a desk in that office?

5        A.    There are two desks in that office.

6        Q.    Who uses those desks?

7        A.    The managers use those desks.

8        Q.    Is there a desk that you primarily use?

9        A.    Yes, the one against the wall.

10       Q.    Do other people use the desk against the

11  wall?

12       A.    Yes, they do.

13       Q.    Who else uses that desk?

14       A.    I believe Paula uses it when she does the

15  bridal case, for the brides.  They use that desk for

16  all the meetings that they have.

17       Q.    Are there drawers in the desk?

18       A.    The desk I have, no.

19       Q.    Where do you keep any personal papers?

20       A.    I don't have much personal papers.

21       Q.    Okay.  To the extent that you have personal

22  papers, do you keep them at your office?
```

1   money in the bank to get everybody paid and the bills

2   to be paid, to follow-up, make sure all of the

3   managers do the job.

4       Q.   Do you supervise the managers or is that

5   your wife's job?

6       A.   My wife does most of these things.

7       Q.   Are you in charge of personnel issues?

8       A.   What you mean personnel issues, like if

9   something breaks or --

10      Q.   No, personnel is people?

11      A.   The managers take care of that.

12      Q.   Are you responsible for supervising the

13  managers or is that your wife's job?

14      A.   My wife's job.

15      Q.   What are the hours you keep at the saloon?

16      A.   I get in around 6:15, 6:30, six on a rare

17  occasion and I am there until about eight, 8:30.

18      Q.   What are you doing from 6:15 to 8:30?

19      A.   What do I do?  Okay.  What do I do when I

20  come in?

21      Q.   Do you open the salon?

22      A.   I open the salon.  Yes, when I am there.  I

63

1      Q.    Absolutely what?

2      A.    Yes, it is illegal.

3      Q.    Have you ever made a sexual advance to any

4   of your employees?

5      A.    No.

6      Q.    Never?

7      A.    Never.

8      Q.    Have you ever -- do you know whether it is

9   illegal to touch employees in a sexual manner if that

10  touch is unwelcome?

11     A.    That is correct.

12     Q.    What is correct, is that illegal?

13     A.    To touch a co-worker --

14     Q.    I am talking about a subordinate employee?

15     A.    What does subordinate mean?

16     Q.    Someone that works underneath you, one of

17  your employees.

18     A.    It is illegal to touch them?  I guess it is.

19     Q.    Do you kiss your employees hello in the

20  morning?

21     A.    Do I kiss my employees hello in the morning?

22     Q.    Yes, do you kiss your employees hello in the

```
 1        Q.    Yes.

 2        A.    Not that I know of.

 3        Q.    And what is David's role at the salon?

 4        A.    Receptionist.

 5        Q.    Receptionist.

 6              Have you ever suggested that a female

 7   employee have sex with you?

 8        A.    No.

 9        Q.    And you are quite sure of that?

10        A.    I am positive of that.

11        Q.    What year were you married?

12        A.    23 years ago, 22 years ago.

13        Q.    Do you and your wife have an open marriage,

14   where you have sexual relations with other people?

15        A.    No.

16        Q.    Have you ever cheated on your wife?

17        A.    No.

18        Q.    Have you ever had sexual relations with

19   someone other than your wife?

20        A.    No.

21        Q.    Never?

22        A.    No.
```

1    Q.    And why sexual relations, I am using that

2    term broadly, not just intercourse, have you had any

3    type of sexual contact with someone other than your

4    wife?

5    A.    Since I have been married with my wife?

6    Q.    Yes.

7    A.    No.

8    Q.    Have you ever kissed an employee at the

9    Andre Chreky Salon in a sexual manner?

10    A.    No, I have not.

11    Q.    You ever touched an employee at the Andre

12    Chreky Salon, an employee of the salon, whether it is

13    at the salon or anywhere else, have you ever kissed

14    an employee in a sexual manner?

15    A.    No, I did not

16    Q.    How about touched an employee?

17    A.    No.

18    Q.    Never?

19    A.    Touched what?

20    Q.    Touched an employee in a sexual manner?

21    A.    No.

22    Q.    Have you ever touched the breasts of an

68

```
 1   employee at the salon?

 2       A.    Never.

 3       Q.    Have you ever asked an employee to show you

 4   their breasts?

 5       A.    No.

 6       Q.    Never?

 7       A.    Never.

 8       Q.    And you are quite sure of that?

 9       A.    I am positive of that.

10       Q.    Have you ever been caught in a sexual

11   embrace with an employee at the salon -- has anybody

12   ever walked in on you when you were in a sexual

13   embrace with an employee at the salon?

14       A.    No.

15       Q.    You are aware that there have been many

16   rumors of you having sexual relations with employees,

17   right, you know that from attending these

18   depositions?

19       A.    Attending these depositions, I heard rumors,

20   yes.

21       Q.    Why do you think there are so many rumors

22   about you having sex with so many different
```

1          MR. BREDEHOFT: Objection. Form. Legal

2    conclusion.

3          BY MS. KATZ:

4    Q.    Are you aware of that?

5    A.    If that was going on.

6    Q.    That would be improper, wouldn't it be?

7    A.    Of course, it would be improper.

8    Q.    Have you ever invited a female employee to

9    join you in your hotel room?

10   A.    No.

11   Q.    Have you ever invited a customer to join you

12   in a hotel room?

13   A.    No.

14   Q.    Have you ever invited a female employee to

15   your office for purposes of kissing you?

16   A.    Never.

17   Q.    Or engaging in any other kind of sexual

18   contact?

19   A.    Never.

20   Q.    And it is your testimony you have never

21   asked an employee to perform oral sex on you, is that

22   correct?

 1      A.    Never.

 2      Q.    You are quite sure of that?

 3      A.    I am positive of that.

 4      Q.    Have you ever suggested to a female employee

 5  that you wanted her to engage in physical contact

 6  with you?

 7      A.    No.

 8      Q.    Do you know whether it is illegal for an

 9  employer to ask an employee to provide him with

10  sexual favors?

11      A.    Of course.

12      Q.    Of course what?

13      A.    I am sure it is illegal.

14      Q.    You are sure that is illegal?

15      A.    Well, it just doesn't get done.  It is not

16  right.

17      Q.    And if -- to you knowledge, if an employer

18  requested that of an employee, that would be illegal,

19  right?

20      A.    If an employee asked that to a co-worker, if

21  it came to my attention, that wouldn't happen.

22      Q.    I am asking you something very different.

1    they come and give me a kiss, is that sexual, I would

2    say no.

3        Q.    So it is your testimony that no employees

4    have ever come on to you sexually?

5        A.    No.

6        Q.    Have any employees ever suggested having a

7    sexual relationship with you?

8        A.    No.

9        Q.    Do you know if an employee were pressured to

10   have sexual relations with their boss to keep their

11   jobs, would that constitute sexual harassment?

12       A.    Of course.

13       Q.    And it is your testimony you have never

14   pressured an employee to have sex with you?

15       A.    Never.

16       Q.    To kiss you?

17       A.    Never.

18       Q.    Is it your testimony that you have never had

19   a romantic relationship with an employee?

20       A.    Correct.

21       Q.    Is it sexual harassment for an employer to

22   ask an employee to perform a specific sex act?

1            MR. BREDEHOFT:  Form.

2            THE WITNESS:  Ask the question again.

3            BY MS. KATZ:

4       Q.    Yes.  Do you believe that it would be

5   illegal for an employer to pressure an employee to

6   perform a specific sex act with them?

7       A.    Absolutely.

8       Q.    That would include kissing?

9       A.    Of course.

10      Q.    Touching their best --

11      A.    Anything inappropriate.

12      Q.    Do you massage your employees at work?

13      A.    No.

14      Q.    Have you ever massaged your employees at

15  work?

16      A.    Never.

17      Q.    That would include massaging necks and

18  shoulders?

19      A.    Never.

20      Q.    You have never touched your employees --

21      A.    Never.

22      Q.    And it is your testimony that you have never

1    asked an employee to perform a sex act on you?

2         A.    Never.

3         Q.    Now, you have been sued in the context of a

4    paternity suit; is that correct?  You have been sued

5    in a paternity case, correct?

6         A.    I am trying to recall how it was.  We

7    fought -- I voluntarily took my test and it came out

8    positive so we knew what we knew and we fought it --

9         Q.    Was it your testimony that you never had

10   sexual relations with Adele?

11        A.    No, I did.

12        Q.    You had sexual relations with her?

13        A.    I did.

14        Q.    How old is her child?

15        A.    Must be 19 or 20.

16        Q.    And she was an employee of yours, correct?

17        A.    She was an employee of Piaf.

18        Q.    And you were one of the employers -- you

19   were one of the managers?

20        A.    That is correct.

21        Q.    So it is your testimony -- do you need to

22   modify your testimony whether you had sexual

1    You testified earlier you work four days a week.  Was

2    that accurate testimony?

3        A.    That is correct.

4        Q.    Are you there to close the salon at night?

5        A.    No.

6        Q.    Who generally closes the salon at night?

7        A.    Whoever the manager is on staff.

8        Q.    When you open the salon in the morning, what

9    does that entail other than doing the laundry, are

10   there codes to enter, is there something you do to

11   open the salon in the morning?

12       A.    I don't put the computer on because I don't

13   know how.

14       Q.    I see.

15            Is it sexual harassment to pull an employee

16   close to you and hold that employee?

17            MR. BREDEHOFT:  Form.

18            THE WITNESS:  For me to pull an employee

19   close to me?

20            BY MS. KATZ:

21       Q.    Yes, would that be sexual harassment?

22       A.    I don't do that.

94

1     Q.    Have you ever done that?

2     A.    Never.

3     Q.    Have you ever groped an employee?

4     A.    What does groped mean?

5     Q.    Touched, groped.

6     A.    Groped?

7     Q.    Touched an employee's breast or other

8  private parts?

9     A.    Never.

10     Q.    Never.  What about touching an employee's

11  buttocks, have you ever done that?

12     A.    No.

13     Q.    In your view would that constitute sexual

14  harassment for you to touch an employee's buttocks?

15     A.    Absolutely.

16     Q.    Why -- why would that be sexual harassment?

17     A.    To touch someone?

18     Q.    Someone's buttocks.

19     A.    Because that is private parts.  You don't

20  touch that, period.

21     Q.    Have you ever slapped an employee on the

22  butt to say, good job, you have done a good job?

95

```
 1        A.    On the butt?

 2        Q.    Yes, on the buttocks.

 3        A.    Is that the best you can do?

 4              MR. BREDEHOFT:  Answer the question.  Is the

 5   answer no?

 6              THE WITNESS:  No.

 7              BY MS. KATZ:

 8        Q.    You have never done that?

 9        A.    No.

10        Q.    Have you ever spanked an employee, even

11   jokingly, have you ever spanked an employee on their

12   buttocks?

13        A.    Never.

14        Q.    And you are sure of that?

15        A.    I am positive of that.

16        Q.    Have you ever smacked an employee's buttocks

17   with a towel, even jokingly?

18        A.    No.

19        Q.    Would you agree that would be inappropriate

20   if you did such a thing?

21        A.    Absolutely.

22        Q.    And it is your testimony you never asked an
```

101

1    Q.    Is it your testimony that you have never

2    commented that Jennifer Thong has quite a great ass?

3    A.    No.

4    Q.    Is it your testimony that you have never

5    commented on Ronnie Barrett's breasts?

6    A.    Never.

7    Q.    Including when she was pregnant?

8    A.    Never.

9    Q.    You never commented to Ronnie Barrett that

10    her breasts were getting large because she was

11    pregnant?

12    A.    Never.

13    Q.    You would agree that would be highly

14    inappropriate if you did such a thing?

15    A.    That is not respectful for a mother.  We

16    don't do that, period.

17    Q.    Would you agree that would be highly

18    inappropriate if you commented about Ronnie Barrett's

19    breasts when she was pregnant?

20    A.    Yes.

21    Q.    Have you ever told an employee that she

22    doesn't look sexy enough?

1    Q.    Have you ever looked at the buttocks of any

2    employee, or the body?

3    A.    Do I look at their back?  Do I look at them

4    when they walk in?

5    Q.    Yes, do you look at their buttocks when they

6    walk in?

7    A.    Do I stare or look?

8    Q.    Either one, sir.

9    A.    Do I stare?  Never.  Do I look?  Maybe,

10   maybe not.

11   Q.    Have you ever asked any of your employees if

12   they feel comfortable being called honey by you?

13   A.    I never ask.

14   Q.    Have you ever asked your employees if they

15   fell comfortable being called sweetie by you?

16   A.    I never call them sweetie.

17   Q.    And it is your testimony you have never

18   called your employees baby; is that right?

19   A.    Correct.

20   Q.    Have you ever talked about the sex life of

21   employees at the workplace?

22   A.    No.

  
```
 1        Q.    Have you ever asked an employee whether they
 2   are getting any sex or what they are doing in their
 3   sex lives?
 4        A.    No.
 5        Q.    Do you talk about whether employees are
 6   dating?
 7        A.    No.
 8        Q.    Do you talk about the private sex lives of
 9   either you or your employees at work?
10        A.    No.
11        Q.    Never done that?
12        A.    Never done that.
13        Q.    Would you agree that that constitute a
14   sexually hostile work environment?
15        A.    Sure.
16        Q.    That would be highly inappropriate, right?
17        A.    We don't do that.
18        Q.    I am not asking you about we.  I am asking
19   you, sir.
20        A.    No.
21        Q.    Have you read your wife's deposition in this
22   case?
```

```
 1        A.    Never.

 2        Q.    You also play an active role in deciding

 3    what stylists should be assigned to new customers; is

 4    that right?

 5        A.    No, wrong.

 6        Q.    Do you ever play that role?

 7        A.    No.  I give them guidance to the manager.

 8        Q.    Is it your testimony you have never told a

 9    manager, Block this person's book, don't give this

10    person any more customers -- have you ever done that?

11        A.    No.

12        Q.    Have you ever gotten mad to an employee and

13    said to a manager as a punishment, Do not give them

14    any more clients?

15        A.    No.

16        Q.    Have you ever said, Remove clients from this

17    person's book?

18        A.    No.

19        Q.    And you are quite sure you never did that

20    with any employee?

21        A.    I have never removed a customer from a

22    customer --
```

1    Q.    That is the question.  Have you ever told

2    your managers not to assign certain stylists new

3    customers?

4    A.    No.

5    Q.    Is it your testimony that you have never

6    done that as a way to reward employees who you think

7    are doing a good job or to punish employees that you

8    are angry with?

9    A.    Angry with?  No.

10    Q.    Have you ever done this as a way to punish

11    employees?

12    A.    Never.

13    Q.    And to the extent that a number of people

14    have testified that you, as a way to punish or exert

15    control over stylists, would direct managers to block

16    certain employees from having new clients or to

17    remove clients -- you heard that testimony, right?

18    A.    That is something I heard, not exactly word

19    by word, but that is no.

20    Q.    They would be lying if they said that about

21    you?

22    A.    They would be big liars, yes.

1   employees, correct?

2       A.    That is what I have heard.

3       Q.    Have you ever taken a tip of an employee?

4       A.    No.

5       Q.    And you are quite sure of that?

6       A.    I am positive of that.

7       Q.    Have you ever taken a tip envelope that has

8   an employee's name and taken that for yourself or

9   given it to someone else?

10      A.    Never.

11      Q.    And you are sure of that?

12      A.    Positive.

13      Q.    You have never taken the tip envelopes of an

14  employee to punish the employee?

15      A.    No.

16      Q.    You are sure of that?

17      A.    Positive.

18      Q.    Have you ever directed that managers or the

19  people distributing the tips not give an employee a

20  particular tip?

21      A.    No.

22      Q.    And you are sure of that?

127

1    Q.    Who is wee?  You said we.

2    A.    Me, the management and my wife.

3    Q.    Did you have that discussion with her?

4    A.    I don't know if I did, but I think my wife

5    did or the management did.  I don't recall.

6    Q.    Did you have a favorites list or a list that

7    designated how clients should be allocated?

8    A.    We don't have that kind of list.

9    Q.    Did you have any kind of list of that kind?

10    A.    Yes, we have a list of -- we have a guide,

11    who does what, who does highlighting, who does spiral

12    perms, highlighting the perms, who does regular cuts,

13    who does --

14    Q.    Who makes this list?

15    A.    The receptionist.

16    Q.    And what is the purpose of this list?

17    A.    For the receptionist to have a guide who

18    does what.

19    Q.    Would you tell the receptionist you want

20    this person higher on the favorites list?

21    A.    No, of course not.

22    Q.    Did you ever go to the receptionist area to

1    ask that the receptionist make any changes to a

2    stylist's schedule, never did that?

3        A.    No.

4        Q.    Didn't involve yourself with that at all?

5        A.    No.

6        Q.    What policies do you have with respect to

7    pregnant women at work?

8        A.    We allow them to take as much time as they

9    want.

10       Q.    Time for what, sir?

11       A.    Time off, breaks, they can snack, because

12   being pregnant, you need to snack, you cannot eat too

13   heavily, you need to snack during the day.

14       Q.    What policy do you have if pregnant women

15   want to sit while cutting hair?

16       A.    There is no problem.

17       Q.    Have you ever told pregnant employees that

18   they needed to stand while providing a service?

19       A.    Never.

20       Q.    You were aware that when Ronnie Barrett was

21   working with you, she had an incident where she was

22   bleeding at work and needed to leave the salon?

```
1        A.    What was the voice?

2        Q.    Yes, what was your voice?

3        A.    To leave the salon.

4        Q.    Were you talking in just this tone of voice?

5        A.    I don't remember that.

6        Q.    Were you yelling?

7        A.    I don't know -- I do not yell.

8        Q.    Were you talking louder than you are talking

9   now?

10       A.    Maybe a little bit louder, but not much

11  louder.

12       Q.    Why did you tell her to leave the salon?

13       A.    Because she punched out, and I want the

14  employees to finish the work.  She keeps talking to

15  them and they don't do their work.  When have you a

16  few people getting together telling jokes, they are

17  on the clock and there is so much to be done for

18  people that come in on Sunday, so they don't have to

19  do the work for them.  The retail have to be stocked.

20  The towels have to be done.  The stations have to be

21  cleaned.  If you punched out, please leave the

22  premises and come back and get your tips at the end
```

1   of the day.

2       Q.    What was happening on that day, December 6,

3   2005, what kind of celebration was happening at the

4   Salon on that day?

5       A.    I wasn't aware.  It was somebody's -- what

6   do you call it -- baby shower.

7       Q.    And there was a baby shower that was

8   scheduled to take place at the salon at 7 p.m. that

9   evening; is that correct?

10      A.    It was scheduled to be taking place at the

11  end of the day after we finish everything, and I

12  wasn't aware of it.  I saw Ronnie coming down and I

13  told her, I told you to leave the salon.  What are

14  you still doing here?  And then I saw all those

15  people over there.  I had no idea.  Managers put it

16  together, which was fine with me.

17      Q.    Isn't it true that when you saw Ms. Barrett,

18  you were upstairs on the second floor cutting hair,

19  and you sent Amal down to tell her that she needed to

20  go stock the shelves if she was still there, right?

21      A.    No, that is not true, because as a manager,

22  that is not correct.

1    Q.    Did you give any kind of direction to Amal

2  Zaari about Ronnie Barrett on December 6, 2005, yes

3  or no?

4    A.    No, I did not.

5    Q.    Do you know whether Amal had any

6  interactions with Ronnie Barrett?

7    A.    Yes, she did.

8    Q.    Tell me exactly what you understood she

9  said?

10    A.    What I understood she said was that she

11  wanted to tell Ronnie, When you finish, can you

12  please help do the retail?  There are a lot of things

13  to be done, and Ronnie responded, I am not doing

14  anything.

15    Q.    Was she insubordinate, in your opinion?

16    A.    What does insubordinate mean?

17    Q.    Was she not taking direction of a manager?

18    A.    She was not taking direction from a manager.

19    Q.    And what did she say to Amal when she

20  reported that to you?

21    A.    The second that it was happening, I said,

22  Amal, just make sure, you know, to leave the premises

1    saw was Ronnie downstairs chit-chatting with the

2    employees downstairs.  There was nobody -- everybody

3    was working.  She had a few group right there just

4    talking.  Nobody said anything about the baby shower

5    or nothing.

6        Q.    Who was she chit-chatting with?

7        A.    I don't remember.

8        Q.    Please identify those people.

9        A.    I don't remember.

10       Q.    You are testifying she was chit-chatting.

11   Who was she talking to?

12       A.    I don't remember.

13       Q.    Was she being disruptive?

14       A.    They were not doing their work.

15       Q.    Was Ronnie Barrett being disruptive?

16       A.    Yes.

17       Q.    What was she doing that was disruptive?

18       A.    From not doing -- those people can't do

19   their work.

20       Q.    What were the people at the front desk

21   supposed to be doing that they were not doing because

22   Ronnie Barrett was chit-chatting with them?

240

1    A.    They have to clean up the desk, they have to

2    put all the new customers in the computer, they have

3    to make sure the envelopes are done, make sure

4    everything is done, they have to make sure the desk

5    is clean, they have to make sure to check the voice

6    mail, empty the trash, make sure there are no

7    messages on the voice mail, they have to make sure

8    the schedule has been confirmed for the following

9    day.

10    Q.    And Ronnie Barrett was disrupting that?

11    A.    She was disrupting the group.

12    Q.    By chit-chatting with people who you cannot

13    identify.  Who were those people, sir?

14          MR. BREDEHOFT:  Asked and answered four

15    times.

16          THE WITNESS:  I don't remember.

17          BY MS. KATZ:

18    Q.    You told Ms. Zaari to go tell Ms. Barrett

19    that you did not want to see her in the salon and

20    that she needed to leave, correct?

21    A.    I said if she is finished, I would

22    appreciate if she leaves and would come back and get

1    with color I would tell her what to use.

2        Q.    Did you allow customers to come and get

3    haircuts from Ronnie, get styled by Ronnie?

4        A.    She was a colorist.  She was not a stylist.

5    There is a difference.

6        Q.    I understand that.  Now, Ronnie Barrett left

7    the salon and went to work at the Roche Salon; is

8    that right?

9        A.    I don't know where she went.

10       Q.    Why did you understand she left the salon in

11   1998?

12       A.    Because she wanted to cut hair, she said.

13       Q.    When she left the salon, did you try to

14   persuade her to stay?

15       A.    No.

16       Q.    Did you stay in touch with her?

17       A.    No.

18       Q.    Prior to the time Ronnie Barrett left the

19   salon, had you had any kind of physical or sexual

20   contact with her?

21       A.    No.

22       Q.    Had you ever tried to touch her or kiss her?

255

1    A.    You heard my answer.   No.

2    Q.    Then when Ronnie Barrett came back in the

3  summer of 2003, you offered her a position with the

4  salon, did you not?

5    A.    No.   She asked me for a job.   She said she

6  would promise to be very focused, she promised she

7  would be better than ever, and she is willing to work

8  very hard.   I did not propose her.   I said fine.

9    Q.    Anybody walks over to you, I want a job with

10  you, oh, fine?

11    A.    I give them a chance, absolutely.

12    Q.    You give everybody a chance.

13    A.    Absolutely.

14    Q.    Sure.   When you offered her the position,

15  what was the position you offered her?

16    A.    Colorist.

17    Q.    Did you ever offer her a stylist position?

18    A.    No.

19    Q.    Did you talk to her about what her salary

20  requirements were for the position?

21    A.    No.

22    Q.    What did you offer her?

1    on her honeymoon.  Do you remember that?

2        A.    No.

3        Q.    Did you know she got married?

4        A.    Yes.  She brought in her husband to

5    introduce him to me.

6        Q.    Do you remember talking to her about her sex

7    life with her husband?

8        A.    No.

9        Q.    Do you remember making comments about her

10   husband's lack of sexual prowess?

11       A.    No.

12       Q.    Do you remember telling her she needed to

13   have a lover?

14       A.    No.

15       Q.    Do you remember offering to be her lover?

16       A.    No.

17       Q.    Do you remember making comments to Ronnie

18   Barrett in front of co-workers about her sex life?

19       A.    No.

20       Q.    And you deny you ever did that?

21       A.    I never, never done that.

22       Q.    In your whole life, never made any

1    comments to Ronnie Barrett that sexual in nature?

2        A.    In my whole life, I have never did anything

3    to Ronnie, behavior, touching or harassing or calling

4    her or bothering her, no.

5        Q.    Ever call her at home?

6        A.    Maybe if I did, I don't remember.

7        Q.    Did you ever call her on your cell phone?

8        A.    May be I did.  I don't remember.

9        Q.    Did you ever direct your receptionist to

10    make changes to Ronnie Barrett's schedule to remove

11    clients?

12        A.    If she calls me sometimes telling me she has

13    a migraine headache, she calls me and says, I cannot

14    make it, I have a migraine headache, I tell them at

15    the front desk, please call her appointments and

16    requests and just disburse them evenly.

17        Q.    Aside from an occasion where Ronnie Barrett

18    was medically unable to work, did you ever direct the

19    receptionist to make changes to Ronnie Barrett's

20    schedule to move clients from her and give them to

21    other people?

22        A.    No.

1    Q.    Never did that?

2    A.    No, never did that.

3    Q.    Did you every reassign new clients that were

4    listed on Ms. Barrett's schedule and give them to

5    other stylists?

6    A.    If she calls in sick or she is coming late

7    and somebody is waiting, I would say to the manager

8    at the time, make sure they are taken care of, give

9    them the option if they want to wait or they want to

10    give them somebody else.

11    Q.    Leaving aside any instance when there was a

12    medical need to change, did you ever direct your

13    receptionist, ever a single time direct your

14    receptionist to remove new clients from Ronnie

15    Barrett's schedule and give them to another stylist?

16    A.    No.

17    Q.    You would agree that if you remove people

18    from the schedule for one stylist and put them on the

19    schedule of another, you are going to be depressing

20    the earnings of the person whose schedule you removed

21    the --

22    A.    No, because if you remove customers, first

1        A.    That I ever asked her?

2        Q.    Yes, come up with me to the salon, the fifth

3    floor?

4        A.    I deny that.

5        Q.    And the same answer with respect to Jennifer

6    Thong, you deny that you ever asked them to come up?

7        A.    I answered that question earlier, yes.

8        Q.    What is a blow job?  Is that a term you use?

9        A.    No.

10       Q.    Never used that term?

11       A.    No.

12       Q.    Do you know what it means?

13       A.    Yes.

14       Q.    Did you ask Ronnie Barrett to give you a

15   blow job?

16       A.    No.

17       Q.    Is it your testimony that you never asked an

18   employee to give you a blow job?

19       A.    I never asked anybody in the world to give

20   me a blow job.

21       Q.    Never anyone in the whole world?

22       A.    That is correct.

1    Q.    Do you deny putting your hand on your belt

2    and opening your pants or simulating opening your

3    pants in front of Ronnie Barrett?

4    A.    Never.

5    Q.    Do you remember asking Ronnie Barrett in

6    front of other employees, Do you want to go to the

7    fifth floor with me?

8    A.    Never.

9    Q.    And if other employees are prepared to come

10   into court and testify that you used to taunt Ronnie

11   Barrett and ask her if she wanted to go to the fifth

12   floor with you, they are liars also?

13   A.    Big liars.

14   Q.    Drunks, liars, criminals --

15   A.    Big liars.

16   Q.    Just big liars.  You said that you have

17   never used that phrase, blow job.  Have you ever used

18   other words to ask employees to perform oral sex?

19   A.    No.

20   Q.    Do you use the word boobs to describe

21   breasts?

22   A.    No.

269

```
1       Q.    Why not?

2       A.    That is not how I talk.

3       Q.    What words would you use?

4       A.    Chest.

5       Q.    Chest?

6       A.    Yes.

7       Q.    Do you remember making comments about Ronnie

8   Barrett's breasts when she was pregnant?

9       A.    No.

10      Q.    And you deny that you did that?

11      A.    Of course.

12      Q.    Do you deny making attempts to touch Ronnie

13  Barrett's breasts during the time she was pregnant?

14      A.    Never, never, never touched her breasts.

15      Q.    Do you deny slapping Ronnie Barrett on the

16  buttocks?

17            MR. BREDEHOFT:  Most of these are asked and

18  answered.

19            MS. KATZ:  I asked him generally whether he

20  did this, and now I am asking specifics if he did

21  this to Ronnie Barrett.

22            THE WITNESS:  You asked me already and I
```

270

1  said no already, and I tell you again.

2          BY MS. KATZ:

3      Q.    It is your testimony that you never engaged

4  in any kind of behavior with Ronnie Barrett that

5  caused her to say stop, you never did anything with

6  Ronnie Barrett or to Ronnie Barrett that caused her

7  to say, Stop this behavior?

8      A.    How can she say stop if I never did

9  anything?

10     Q.    So your testimony is no, that never

11  happened?

12     A.    No.

13     Q.    Do you remember telling Ronnie Barrett that

14  if she did not like the way that things were done at

15  the salon, the front door was open, or words to that

16  effect?

17     A.    No.

18     Q.    Do you remember saying that to other

19  employees, if they didn't like how you ran the place,

20  they should just leave?

21     A.    I don't remember saying that.

22     Q.    Is that the kind of thing you would say?

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
                              :
RONNIE BARRETT,               :
                              :
          Plaintiff,          :
                              :
     vs.                      :        C.A. No.
                              :    07-CV-0250(RCL)
ANDRE CHREKY,                 :
ANDRE CHREKY SALON/ANDRE      :
CHREKY INC., SPAC, LLC,       :
                              :
          Defendants.         :
                              :
- - - - - - - - - - - - - - - x
                              :
JENNIFER THONG,               :
                              :
          Plaintiff,          :
                              :        Civil No.
     vs.                      :    1:06-1807(RCL)
                              :
ANDRE CHREKY SALON, et al.,   :
                              :
          Defendants.         :
                              :
- - - - - - - - - - - - - - - x

              Washington, D.C.
              Thursday, October 4, 2007

          The deposition of AMAL ZAARI, called for

examination by counsel for Plaintiffs in the

above-entitled matter, pursuant to Notice, in the

offices of Katz, Marshall & Banks, 1718 Connecticut

Avenue, N.W., Sixth Floor, Washington, D.C., convened

JARDIM REPORTING ASSOCIATES
(703) 867-0396

EXHIBIT

15

at 1:40 p.m., before PAULA J. EASTES, a notary public in and for the District of Columbia, when were present on behalf of the parties:


APPEARANCES:


   On behalf of the Plaintiff Ronnie Barrett:

       DEBRA S. KATZ, ESQUIRE
       ARI M. WILKENFELD, ESQUIRE
       HANAN IDILBI, ESQUIRE
       Katz, Marshall & Banks, LLP
       1718 Connecticut Avenue, N.W.
       Sixth Floor
       Washington, D.C. 20009
       (202) 299-1140


   On behalf of the Plaintiff Jennifer Thong:

       JONATHAN G. ROSE, ESQUIRE
       Sheppard, Mullin, Richter & Hampton LLP
       1300 I Street, N.W.
       11th Floor East
       Washington, D.C. 20005
       (202) 772-5390

3

```
APPEARANCES:


    On behalf of the Defendants:

        DAVID SULLIVAN, ESQUIRE
        Kaufman & Canoles
        150 West Main Street
        Suite 2100
        Norfolk, Virginia 23510
        (757) 624-3225


    Also Present:  ANDRE CHREKY
```

1       Q.    Do you have any recollection of going to

2    Mr. Chreky and telling him that -- well, strike that.

3             Directing your attention to this was mid or

4    early December 2005.

5             Do you remember Mr. Chreky telling you to

6    direct Ronnie Barrett to go to the room and do

7    stocking?

8       A.    I don't remember.

9       Q.    You have no recollection about these

10   circumstances?

11      A.    No recollection.  I'm sorry.  I don't.

12      Q.    Do you recall telling Ronnie Barrett that

13   Mr. Chreky wanted her to go stock?

14      A.    I don't.

15             I do that all the time.  So, I don't

16   remember saying it specifically to Ronnie.  I ask

17   employees to stock all the time.  I ask employees to

18   clean up their stations before they leave all the

19   time.

20             These are all things that we all have to

21   help each other to do so we can close on time.

22   Otherwise, one person would clean up after the other.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RONNIE BARRETT,                          )
                                         )
                    Plaintiff,           )
                                         )
            v.                           )   C.A. No. 07-CV-0250 (RCL)
                                         )
ANDRE CHREKY,                            )
ANDRE CHREKY SALON/ANDRE CHREKY INC.,    )
SPAC, LLC                                )
                                         )
                    Defendants.          )
                                         )
                                         )

## PLAINTIFF RONNIE BARRETT'S RESPONSES TO
## DEFENDANT'S FIRST SET OF INTERROGATORIES

Plaintiff Ronnie Barrett, through undersigned counsel, hereby responds to Defendant's

First Set of Interrogatories. Plaintiff reserves the right to supplement her interrogatory responses

as necessary.

### GENERAL OBJECTIONS

Plaintiff objects to defendant's "Definitions" and "Instructions" insofar as they:

(a) request information or identification of documents concerning confidential

communications between plaintiff and her attorneys, on the ground that the information sought is

protected under the attorney-client privilege;

(b) request information or identification of documents prepared by plaintiff's counsel

for their own use, or prepared by plaintiff or plaintiff's witnesses for use by plaintiff's counsel,

on the grounds that the information sought protected from disclosure by the attorney work-

product doctrine;

EXHIBIT

16

INTERROGATORY NO. 9:

Please identify each occasion on which you complained about gender-based discriminatory treatment (including harassment) while working at Andre Chreky Salon. This response should include, at least, the date of the complaint, a characterization of the nature of the complained-of activity, the person or persons to whom you directed the complaint, and the identification of any documents evidencing the complaint.

RESPONSE TO INTERROGATORY NO. 9:

Plaintiff objects to Interrogatory No. 9 on the grounds that it is duplicative. See Plaintiff's response to interrogatory number 5.

Plaintiff further avers that by resisting his advances, and indicating by both her words and conduct that his behavior was unwelcome, Ms. Barrett complained about Mr. Chreky's behavior to Mr. Chreky on each and every occasion in which he harassed or assaulted her. Furthermore, Ms. Barrett complained on numerous occasions throughout her period of employment to Salon Manager, Maurice Clarke about Mr. Chreky's harassment and abuse of her, including his inappropriate sexual comments and advances. She complained with increasing frequency toward the end of his employment. Mr. Clark confirmed to Ms. Barrett that many other female employees had complained to him about Mr. Chreky's misconduct, but that his behavior only got worse over time.

INTERROGATORY NO. 10:

Please identify all mental health care providers (including psychologists, psychiatrists, social workers, licenced clinical social workers, counselors, "life coaches," or similar providers) from whom you have sought diagnosis and/or treatment based on the injuries you allege to have been caused by any defendant, as you state I n your Complaint. This response should include, at least, the date(s) on which you met with such health care providers, a description of their diagnoses and/or treatments, the identification of any medications and/or prescriptions issued, and the identification of any documents evidencing the provision of these mental health services.

19

RESPONSE TO INTERROGATORY NO. 10:

Plaintiff objects to Interrogatory No. 10 on the grounds that it is overly broad, unduly burdensome, irrelevant and not calculated to lead to the discovery of admissible evidence.

INTERROGATORY NO. 11:

If you have filed for bankruptcy or filed any administrative claim, please provide the date of such filings, the style of the matter, the identification of the court or agency in which such filing or claim occurred, and any documents evidencing the proceedings. In the event of a bankruptcy, provide the date of entry and any final order entered by the court.

RESPONSE TO INTERROGATORY NO. 11:

Plaintiff objects to this interrogatory on the grounds that it is overly broad, unduly burdensome, irrelevant and not calculated to lead to the discovery of admissible evidence. Subject to and without waiving these objections, Plaintiff answers as follows:

Plaintiff filed for bankruptcy in June of 1999 in Maryland.

INTERROGATORY NO. 12:

Please describe any lawsuit, including any divorce proceeding, to which you have been a party or in which you have been a witness. Provide the style of the matter, the court in which the suit was filed, and any documents evidencing the proceedings.

RESPONSE TO INTERROGATORY NO. 12:

Plaintiff objects to interrogatory number 12 on the grounds and to the extent that it seeks information concerning any divorce proceeding to which she has been a party, and is, as such overly broad, irrelevant and not likely to lead to the discovery of admissible evidence. Subject to and without waiving these objections, Plaintiff answers as follows:

Lisette Chreky v. Andre Chreky: In this case Lisette Chreky sued Defendant Andre

20



Ronnie Barrett

Subscribed and sworn to before me,
this 16ᵗʰ day of May, 2007.

Notary Public

KELLY M. DOLPHIN
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires April 14, 2012

My commission expires _april 14_ , _2012_

Debra S. Katz (Bar No. 411861)
Ari M. Wilkenfeld (Bar. No. 461063)
Justine F. Andronici
Katz, Marshall & Banks, LLP
1718 Connecticut Avenue, N.W.
Sixth Floor
Washington, D.C. 20009
(202) 299-1140
(202) 299-1148 (fax)

Attorneys for Plaintiff Ronnie Barrett

Dated: May 17, 2007

## CERTIFICATE OF SERVICE

I hereby certify that a copy of Plaintiff's Responses to Defendant's First Set of

Interrogatories has been served overnight delivery and electronic mail on this 17th day of May

2007, to:

John M. Bredehoft
Kaufman & Canoles
150 W. Maine Street
P.O. Box 3037
Norfolk, VA 23514-3037

Ari M. Wilkenfeld

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RONNIE BARRETT,<br><br>               Plaintiff,<br><br>          v.<br><br>ANDRE CHREKY,<br>ANDRE CHREKY SALON/ANDRE CHREKY INC.,<br>SPAC, LLC<br><br>               Defendants. | )<br>)<br>)<br>)<br>)<br>)  C.A. No. 07-CV-0250 (RCL)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFF RONNIE BARRETT'S OBJECTIONS AND RESPONSES TO DEFENDANT'S FIRST SET OF DOCUMENT REQUESTS

NOW COMES Plaintiff Ronnie Barrett, by counsel, and responds to Defendant's First Set of Requests for the Production of Documents as follows:

DOCUMENT REQUEST NO. 1

Please produce any documents you were requested to identify by Defendants' first set of interrogatories in this action.

RESPONSE TO DOCUMENT REQUEST NO. 1:

Other than documents numbers,000116 to 000120 attached hereto, which supplement the

documents provided with Plaintiffs Rule 26a disclosures and Defendants First Set of

Interrogatories, no further documents responsive to Defendant's First set of Interrogatories exist.

DOCUMENT REQUEST NO. 2:

Please produce any documents you plan to use for any purpose at any hearing other proceeding, or trial in this matter.

DOCUMENT REQUEST NO. 17:

Please produce any documents evidencing your allegations that any defendant discriminated against you by removing clients from your work schedule and/or unfavorably altering your work schedule. If you do not have such documents, please respond, "None."

RESPONSE TO DOCUMENT REQUEST NO. 17:

See RB Nos. 00055, 00058 - 00059; 00063 - 00065, 00068 - 00069, 00074 - 00080, 00082 - 000101, 00104 - 00106, 00112 - 00118, 00120.

DOCUMENT REQUEST NO. 18:

Please produce any documents supporting your claim that any defendant failed to compensate you properly for hours worked over forty hours per workweek, at any time during your employment at the Andre Chreky Salon. If you do not have such documents, please respond "None."

RESPONSE TO DOCUMENT REQUEST NO. 18:

See Plaintiff's earning statements RB Nos. 00027 - 00054.

DOCUMENT REQUEST NO. 19:

Please produce any documents evidencing, supporting, reflecting, or negating any claim for damages or injuries of any kind you claim to have suffered because of any conduct by any defendant.

RESPONSE TO DOCUMENT REQUEST NO. 19:

See Plaintiff's earning statements RB Nos. 00027-00054.

DOCUMENT REQUEST NO. 20:

If you seek damages for emotional distress, emotional pain, or emotional suffering, please provide the following documents:

(a)     A complete set of your medical records from each and every health care provider you have consulted for any reason from January 1, 1998 to present.

(b)     A complete set of your records from each and every mental health care provider (including any psychologist, psychiatrist, social worker, licenced clinical social worker, counselor, "life coach" or similar provider) you have consulted for any reason from January 1, 1998 to the present.

(c)     A complete set of any test, assessment, evaluation, or inventory respecting your psychological, medical or medical health from January 1, 1998 to the present.

RESPONSE TO DOCUMENT REQUEST NO. 20:

Plaintiff objects to Document request No. 20 and parts a, b and c on the grounds that they are overly broad, unduly burdensome, not relevant and not calculated to lead to the discovery of admissible evidence inasmuch as plaintiff is not seeking emotional distress damages.

DOCUMENT REQUEST NO. 21:

Please produce your personal federal and state income tax returns from 1998 to the present. If you filed, or participated in filing, income tax returns on behalf of a partnership, corporation, or limited liability entity of any kind, include those returns as well.

RESPONSE TO DOCUMENT REQUEST NO. 21:

Plaintiff will produce responsive documents upon entry of an appropriate protective order, however plaintiff objects to the time period for which records are requested. Plaintiff will produce responsive documents for the years 2003 through the present upon entry of an appropriate protective order.

June 8, 2007

Respectfully submitted,

_Debra Katz_ / ᴴᶠᴬ

Debra S. Katz (Bar No. 411861)
Ari M. Wilkenfeld (Bar No. 461063)
Katz, Marshall & Banks, LLP
1718 Connecticut Avenue, N.W.
Sixth Floor
Washington, D.C. 20009
(202) 299-1140
(202) 299-1148 (fax)

Attorneys for Plaintiff Ronnie Barrett

## CERTIFICATE OF SERVICE

I hereby certify that a copy of Plaintiff's Responses To Defendant's First Set of Requests

for the Production of Documents was sent to Defendant via electronic mail (e-mail), and first

class mail on this 8th day of June 2007, to:

John Bredehoft, Esquire
David Sullivan, Esquire
Kaufman & Canoles
Suite 2100
150 West Main Street
Norfolk, VA 23510

Debra S. Katz

11

# KAUFMAN & CANOLES

——— | A Professional Corporation | ———
**Attorneys and Counselors at Law**

David J. Sullivan
757 / 624-3249
djsullivan@kaufcan.com

757 / 624-3000
*fax:* 757 / 624-3169

P.O. Box 3037
Norfolk, VA 23514

150 West Main Street
Suite 2100
Norfolk, VA 23510

March 18, 2008

**VIA FACSIMILE AND U. S. MAIL**

MAP 2 1 2008

BY: ----------------

Ari M. Wilkenfeld, Esquire
KATZ, MARSHALL & BANKS, LLP
1718 Connecticut Avenue, N.W.
Sixth Floor
Washington, DC 20009

Re:     **Ronnie Barrett v. Andre Chreky Salon & Spa**
        **Case No.: 1:07 CV 00250 (RCL)**

Dear Mr. Wilkenfeld:

We have reviewed the cases you cited in your recent letter dated March 14, 2008. We believe that in the absence of evidence regarding the full impact upon your client – including any mental, medical, and psychological – your client would not be entitled to recover general compensatory or punitive damages. Your client's remedy, if any, would be limited to lost income. If you will agree to such a limitation on damages, we would agree to such a limitation on discovery.

If you wish to discuss this further, please contact me.

Regards,

David J. Sullivan

DJS/jwb

1202131\1

Attachment 2

**EXHIBIT**

tabbies®

17

# KATZ, MARSHALL & BANKS, LLP

Ari M. Wilkenfeld, Partner
Direct Dial: 202-299-1147
wilkenfeld@kmblegal.com

By Electronic and First Class Mail
March 26, 2008

John M. Bredehoft, Esquire
David J. Sullivan, Esquire
Kaufman & Canoles, P.C.
150 West Main Street, Suite 2100
Norfolk, VA 23510

RE:    Ronnie Barrett v. Andre Chreky et al.
Case No.: 1:07 CV 00250 (RCL)

Dear Counsel:

I am writing in response to your letter dated March 26, 2008 in which you assert that defendants are entitled to additional discovery regarding plaintiff's sex life unless she agrees that her recovery in this case is limited to lost wages.

It is important to note that your letter has not been written in a vacuum. As you know, we first discussed this issue on March 11, 2008 at which time defendants proposed to refrain from asking Ms. Barrett about her sexual history if, in return, plaintiff agreed to withdraw her claim for punitive damages. This proposal represented a lack of understanding on your part as to the function of punitive damages in our legal system and with regard to the DCHRA in particular. As I explained, consideration of an award of punitive damages only occurs if the defendant's wrongdoing is established. Punitive damages presuppose wrongdoing, and the only relevant inquiry is into the nature of the defendant's wrongdoing and the defendant's state of mind when committing the wrongful acts. Plaintiff's state of mind, much less her sexual history, is irrelevant to the calculus.

By letter dated March 14, 2008 (attached hereto as Attachment 1), plaintiff sought defendants' consent for a Motion for a Protective Order to bar discovery of information related to Ronnie Barrett's sexual history. As we explained, the case law in the District of Columbia prohibits such discovery expeditions, especially in a case, such as this, where the discovery is unlikely to result in the discovery of admissible evidence and is sought for the sole purpose of harassing and intimidating Ms. Barrett. Specifically, evidence of a plaintiff's prior sexual conduct has been found to be inadmissible and irrelevant to the inquiry of whether the harasser's conduct was unwelcome. Courts have held that such information is not even discoverable because such information is not relevant, and compelling a victim to delve into her sexual history creates a substantial likelihood of harm which would far outweigh any probative value.

◢◣ KATZ, MARSHALL & BANKS, LLP

John M. Bredehoft, Esq.
David J. Sullivan, Esq.
March 26, 2008
Page 2

In our letter of March 14, 2008, we explained, citing substantial authority, that evidence of a plaintiff's sexual history is outside the scope of discovery and inadmissible evidence with regard to the ultimate issue of liability. Your responsive communications to date reflect that you agree with this position.

Our letter also explained that evidence of a plaintiff's sexual history is outside the scope of discovery and inadmissible evidence with respect to the issue of whether punitive damages should be assessed against defendants. We explained that under the D.C. Human Rights Act, D.C. Code § 2-1402.61 et seq. ("DCHRA"), a plaintiff may be awarded punitive damages when the defendant acts with a state of mind evincing "evil motive or actual malice." Daka, Inc. v. Breiner, 711 A.2d 86, 98 (D.C. 1998), and that a jury determination of punitive damages focuses the inquiry on the nature of the *defendant's* conduct and the *defendant's* state of mind. See Pendarvis v. Xerox Corp., F. Supp. 2d 53, 57 (D.D.C. 1998) (denying summary judgment on the basis that defendant's termination of plaintiff's employment—and subsequent lies to justify her termination—were sufficient to establish evil motive); Daka, 711 A.2d 99 (finding plaintiff's evidence that defendant persisted in ridiculing, condoning, and encouraging other employees to make ageist remarks despite plaintiff's protests to be sufficient evidence of malice or evil motive to support jury's award of punitive damages). There is no authority for the proposition that *plaintiff's* conduct or state of mind factors into an evaluation of whether the defendant's wrongdoing evinces evil motive or actual malice.

You responded by letter dated March 18, 2008 (attached hereto as attachment 2) in which you stated:

We believe that in the absence of evidence regarding the full impact upon your client - including any mental, medical and psychological - your client would not be entitled to recover general compensatory or punitive damages. Your client's remedy, if any, would be limited to lost income. If you will agree to such a limitation on damages, we would agree to such a limitation on discovery.

You have now followed up on your March 18, 2008 letter, with your letter of March 26, 2008, demanding "unlimited discovery on all issues related to the alleged impact on your client." We find it extremely telling that both of your letters fail to cite a single case supporting your proposition that the evidence you seek is discoverable or admissible as to the issue of punitive damages or anything else at issue in this case.

As I have previously stated and reaffirm here, plaintiff has consistently maintained that she is not seeking damages for pain, suffering or emotional distress arising from defendants' unlawful conduct. She is seeking damages to compensate her for the full measure of economic harm caused to her as a result of defendants' unlawful

# ◢◢KATZ, MARSHALL & BANKS, LLP

John M. Bredehoft, Esq.
David J. Sullivan, Esq.
March 26, 2008
Page 3

conduct. And, as the facts of this case clearly warrant it, plaintiff is seeking punitive damages.

Your position that you require discovery regarding plaintiff's sexual history for the purposes of defending against plaintiff's claims for economic damages and punitive damages defies common sense and the clearly established legal precedents cited in our letter of March 14, 2008.

Please be advised that will not be supplementing our responses to the discovery requests cited in your letter of March 26, 2008. Further, we will instruct Ms. Barrett not to answer any questions relating to her sexual history when defendants depose her on April 17, 2008.

If it is truly defendants' position that they cannot defend this case without delving into the personal details of Ms. Barrett's sex life, we would encourage you to file a motion to compel so that the Court may resolve this issue without causing an unnecessary delay to the closing of discovery.

Please feel free to contact me if you have any questions.

Sincerely,

Ari M. Wilkenfeld
Attorney for Ronnie Barrett

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RONNIE BARRETT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 07-CV-0250 (RCL) |
| | ) |
| ANDRE CHREKY, | ) |
| ANDRE CHREKY SALON/ANDRE CHREKY INC., | ) |
| SPAC, LLC | ) |
| | ) |
| Defendants. | ) |
| | ) |

**PLAINTIFF RONNIE BARRETT'S RESPONSES TO DEFENDANTS'
FIRST SET OF REQUESTS FOR ADMISSIONS**

NOW COMES Plaintiff Ronnie Barrett, by counsel, and responds to Defendants' First

Set of Requests for Admissions as follows:

Plaintiff hereby designates the following responses as "Confidential" and fully covered

by the Protective Order entered into by this Court on November 29, 2007.

**REQUEST FOR ADMISSION NO. 1:**

Please admit or deny the following: you under-reported your tip income on at least one

occasion during the course of your employment at the Andre Chreky Salon.

**RESPONSE TO REQUEST FOR ADMISSION NO. 1:**

Admitted.  However, Plaintiff avers that Mr. Chreky instructed her to under-report her

tips.

EXHIBIT

tabbies®

18

CONFIDENTIAL

Notwithstanding and without waiving this objection, Plaintiff is unable to admit or deny. The salons where Ms. Barrett has worked since the Andre Chreky Salon have included a standard amount of tips on each paycheck, and it was the employee's responsibility to report the rest of his or her tips at the end of the year. Ms. Barrett added tip income to her taxes each year, but the figures were her best approximations. Ms. Barrett did not keep records of her tips and cannot say whether she underreported or over- reported her tip income for the year.

**REQUEST FOR ADMISSION NO. 13:**

Please admit or deny the following: you do not currently possess a valid, unexpired cosmetology license, authorizing you to perform cosmetology services in the District of Columbia.

**RESPONSE TO REQUEST FOR ADMISSION NO. 13:**

Admitted. Plaintiff avers that she has been attempting to renew her D.C. license since its expiration.

**REQUEST FOR ADMISSION NO. 14:**

Please admit or deny the following: you have not possessed a valid, unexpired cosmetology license, authorizing you to perform cosmetology services in the District of Columbia, at any time in the previous ten years.

**RESPONSE TO REQUEST FOR ADMISSION NO. 14:**

Denied. Ms. Barrett had a valid DC license from 1994 until late 2006 when it expired. She has been attempting to get her license renewed since that time. She does not currently posses a valid D.C. cosmetology license.

**REQUEST FOR ADMISSION NO. 15:**

CONFIDENTIAL

Respectfully Submitted,

Debra S. Katz (Bar No. 411861)
Ari M. Wilkenfeld (Bar. No. 461063)
Justine F. Andronici
Katz, Marshall & Banks, LLP
1718 Connecticut Avenue, N.W.
Sixth Floor
Washington, D.C. 20009
(202) 299-1140
(202) 299-1148 (fax)

Attorneys for Plaintiff Ronnie Barrett

Dated: February 19, 2008

CONFIDENTIAL

## CERTIFICATE OF SERVICE

I hereby certify that a copy of Plaintiff's Responses to Defendant's First Set of Requests for Admissions has been served overnight delivery and electronic mail on this 1st day of February 2008, to:

John M. Bredehoft
David J. Sullivan
Kaufman & Canoles
150 W. Main Street
P.O. Box 3037
Norfolk, VA 23514-3037

_____
Ari M. Wilkenfeld

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RONNIE BARRETT,                              )
                                             )
            Plaintiff,                       )
                                             )
v.                                           )        C.A. No. 07-CV-0250
                                             )
ANDRE CHREKY SALON, ET AL.                   )
                                             )
            Defendants.                      )
                                             )

## PLAINTIFF RONNIE BARRETT'S RESPONSE TO DEFENDANT ANDRE CHREKY SALON'S SECOND SET OF INTERROGATORIES

NOW COMES Plaintiff Ronnie Barrett, by counsel, and responds to Defendant's Second Set of Interrogatories as follows:

Plaintiff hereby designates the following responses as "Confidential" and fully covered by the Protective Order entered by this Court on November 29, 2007.

INTERROGATORY NO. 1:

Please identify all activities you have undertaken for remuneration since your last day of employment with the Andre Chreky Salon in December 2005. For each such activity, please identify your rate of pay and whether you were being paid as an employee, independent contractor or otherwise, including whether you were or will be issued an IRS Form W-2 or an IRS Form 1099 for such income.

RESPONSE TO INTERROGATORY NO. 1:

Plaintiff objects to this interrogatory because it is neither relevant to the subject matter of this action nor is it reasonably calculated to lead to the discovery of admissible evidence.

CONFIDENTIAL

At the Andre Chreky Salon, Ms. Barrett estimated her tips for IRS purposes based on the number of envelopes she received.

At the Urban Style Lab, Ms. Barrett estimated the amount of tips she received beyond the amount the Urban Style Lab automatically reported to the IRS based on the number of tip envelopes she had received.

At the Ava Salon, Ms. Barrett estimated the amount of tips she received based on her tip envelopes.

At the 18th Amendment Bar, Plaintiff estimated her tips for IRS purposes based on a running tally that she committed to memory during the short period of time during her employment.

At Daniel's Salon, Ms. Barrett will estimate her 2007 tips to report to the IRS based on memory of the tips she earned in November and December of 2007.

INTERROGATORY NO. 7:

Please describe any and all valid, unexpired cosmetology licenses or other licenses related to the provision of cosmetology or hair styling services that you currently hold, and state whether such license(s) authorize you to provide such services in the District of Columbia.

RESPONSE TO INTERROGATORY NO. 7:

Plaintiff objects to this interrogatory because it is neither relevant to the subject matter of this action nor is it reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving this objection, Plaintiff responds as follows:

Plaintiff held a valid unexpired cosmetology license in the District of Columbia from 1994 until the end of 2006. This cosmetology license is a general license that allows Plaintiff to perform hair styling, cutting, and coloring services. Plaintiff applied for renewal of her D.C.

6                                                    CONFIDENTIAL

cosmetology license in April of 2006, as was her custom, because the license must be renewed every year.  Plaintiff submitted payment, paperwork, and her change of address to the D.C. Board of Barber and Cosmetology.  She received confirmation that her renewal application had been completed successfully.  In May 2006, Plaintiff received a request for two photos in order to complete her application, which she sent to the Board.  Plaintiff heard nothing further regarding her application for renewal and believed that her license had been renewed.  On April 9, 2007, Plaintiff again submitted her application for renewal.  She received no information from the Board.  When she inquired at the end of 2007 about the status of her license, she received a letter from the Board stating that her application had been closed and that she should contact the Board.  Plaintiff has called repeatedly and has gone to the Board in person, but has still been unable to resolve the matter.

INTERROGATORY NO. 8:

Please describe any and all valid, unexpired cosmetology licenses or other licenses related to the provision of cosmetology or hair styling services that you have held in the past ten years, and state whether such license(s) authorize(d) you to provide such services in the District of Columbia.

RESPONSE TO INTERROGATORY NO. 8:

Plaintiff obtained a cosmetology license in Maryland in the mid-1990s.  She performed hair cutting and coloring services in Maryland, and she applied for reciprocity to receive her D.C. cosmetology license when she began working in the District of Columbia.  For the past 10 years, Plaintiff has possessed a valid, unexpired D.C. license until its expiration in 2006.  See Plaintiff's Response to Interrogatory No. 7.

CONFIDENTIAL



## CERTIFICATE OF SERVICE

This will certify that a true copy of the foregoing Defendant Andre Chreky Salon's Second Set of Interrogatories to Plaintiff Ronnie Barrett was sent via first class mail and e-mail, this 21st day of February, 2008, to:

John M. Bredehoft
David J. Sullivan
Kaufman & Canoles
150 W. Main Street
P.O. Box 3037
Norfolk, VA 23514-3037

Ari M. Wilkenfeld